Steven Miskinis
JoAnn Kintz
Christine Ennis
Ragu-Jara Gregg
U.S. Department of Justice
Environment & Natural Resources Div.
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044-7611
Telephone: (202) 305-0262
Email: steven.miskinis@usdoj.gov
*Attorneys for Federal Defendants*

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| A.D. and C. by CAROL COGHLAN CARTER, their next friend; S.H. and J.H., a married couple; M.C. and K.C., a married couple; for themselves and on behalf of a class of similarly-situated individuals, | No. 2:15-CV-01259- PHX-NVW |
| | **FEDERAL DEFENDANTS' MOTION TO DISMISS AND MEMORANDUM OF POINTS AND AUTHORITIES** |
| Plaintiffs, | |
| v. | (Assigned to The Honorable Neil V. Wake) |
| KEVIN WASHBURN, in his official capacity as Assistant Secretary of BUREAU OF INDIAN AFFAIRS; SALLY JEWELL, in her official capacity as Secretary of Interior, U.S. DEPARTMENT OF THE INTERIOR; GREGORY A. McKAY, in his official capacity as Director of the ARIZONA DEPARTMART OF CHILD SAFETY, | |
| Defendants. | |

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ............................................... 1

INTRODUCTION .............................................................................................. 1

STATUTORY AND REGULATORY BACKGROUND ......................................... 2

STANDARD OF REVIEW .................................................................................. 5

ARGUMENT .................................................................................................... 6

I.    Plaintiffs Fail to Establish Standing ..................................................... 6

     A.    Plaintiffs Have Not Alleged That They Have Been Injured By the Named Provisions of ICWA and the Guidelines, Nor That They Have Been Injured by Any Forced Association With a Tribe ...................................... 7

     B.    Plaintiffs' Allegations of Harm Fail to Satisfy Constitutional Requirements for Injury-In-Fact or Are Not Traceable to ICWA ..................... 9

          1.    *C.'s Alleged Injury From the Adoptive-Placement Preferences Does Not Support Standing* ....................................................... 9

          2.    *Carter Failed to Allege that A.D. is Injured by ICWA or the Guideline's Transfer Provision* ............................................. 11

          3.    *Foster Parents Have Not Alleged Injury In Fact or That Any Injury Is Caused By ICWA or the Guidelines* ......................... 12

     C.    Carter Does Not Have Next-Friend Standing ...................................... 14

     D.    No Plaintiff Has Standing to Challenge the Guidelines ....................... 16

II.    Plaintiffs' Claims Are Not Ripe Because Their Adjudication Will Require Factual Assumptions About Whether and How State Courts Will Apply ICWA and the Guidelines and Because Plaintiffs Will Suffer No Hardship from Delay ..................... 16

III.    This Court Should Abstain From Review of Plaintiffs' Claims ................................... 18

IV.    The Complaint Should Be Dismissed For Failure to State Any Claim for Relief .......... 20

     A.    Plaintiffs' Equal Protection Claims Fail Because ICWA and the Guidelines Apply According to the Parent or the Child's Political Affiliation, Not Their Race ..................................................... 20

     B.    Plaintiffs Have Failed to Identify a Cognizable Constitutional Liberty Interest In Support of Their Due Process Claims ................................. 26

     C.    Plaintiffs' Claim that ICWA Exceeds Congress' Authority Must Be Dismissed Because It Understates the Breadth of the Indian Commerce Clause and Because ICWA Does Not Violate the Tenth Amendment ............... 28

     D.    Plaintiffs Have Failed to State a First Amendment Claim ................................. 32

ii

V.      Plaintiffs' Administrative Procedure Act Claim Fails Because the Guidelines Are Not
        Final Agency Action……………………………………………………..…………. 33

CONCLUSION.......................................................................................................................35

Pursuant to Rule 12(b)(1) and (6) of the Federal Rules of Civil Procedure, Federal Defendants Kevin Washburn, Assistant Secretary of Indian Affairs, and Sally Jewell, Secretary of the Department of the Interior ("Department") submit this Motion to Dismiss Plaintiffs' Complaint in its entirety.  The grounds for this motion are set forth in the incorporated memorandum of law.  The attached Declaration of Steven Miskinis indicates consultation with Plaintiff in compliance with this Court's Order of July 9, 2015 (ECF No. 7).

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Plaintiffs – Carol Coghlan Carter, a "next friend" on behalf of two Indian children in the custody of the State of Arizona, and two sets of foster parents – bring a broad challenge to the constitutionality of the Indian Child Welfare Act of 1978 ("ICWA").  They claim that particular provisions of this 37-year-old statute are racially discriminatory, exceed Congress' authority under the Constitution, and violate associational freedoms under the First Amendment.  They also challenge aspects of updated Guidelines recently issued by the Bureau of Indian Affairs ("BIA") that provide guidance to State courts and agencies implementing ICWA.

Plaintiffs' suit should be dismissed for two reasons.  First, this Court does not have subject-matter jurisdiction, or should decline to exercise its jurisdiction.  Plaintiffs have failed to demonstrate that they have standing to challenge ICWA or the Guidelines, much less that their claims are ripe.  They ask this Court to take the remarkable step of invalidating numerous provisions of a long-standing congressional enactment, even though Plaintiffs do not claim that most of these provisions are negatively affecting them.  For example, Plaintiffs challenge ICWA's heightened standard of proof for the termination of the parental rights of an Indian child, but they fail to even allege injury due to the application of this standard.  To the extent Plaintiffs claim injuries, their injuries are hypothetical or are not caused by ICWA or the Guidelines:  Plaintiffs challenge transfer provisions that have not been applied, adoptive

1

preferences for a child not cleared for adoption, and non-binding Guidelines that one federal court has already determined are not subject to review under the Administrative Procedure Act.  Even if subject-matter jurisdiction did exist, however, Plaintiffs cannot maintain their case for failure to supply the Indian children for whom they purport to speak with an adequate next friend, and because, as Plaintiffs appear to concede, their claims are most appropriately heard in state court.  *See* Compl. ¶ 112 ("Child custody proceedings and domestic relations matters are a virtually exclusive province of the States . . . upon which the federal government cannot intrude.") (internal citation omitted).

Second, even if Plaintiffs establish standing, the suit should be dismissed because it fails to state a valid claim for relief.  The claim that provisions of ICWA are racially discriminatory is foreclosed by governing Supreme Court precedent, which firmly establishes that classifications based on tribal membership like those in ICWA are political, not racial classifications.  Nor does federal law recognize the liberty interests that Plaintiffs propose in support of their due process claims.  The Court should also reject, as a matter of law, Plaintiffs' remarkable assertion that ICWA exceeds Congress' Indian affairs power under the Constitution – authority that derives both implicitly and explicitly from the Constitution and the inherent powers of federal government, and has been repeatedly described by the Supreme Court as "plenary."  Finally, ICWA does not violate Indian children's First Amendment associational rights, as their citizenship in a tribe (or affiliation through a parent's citizenship) is not forced upon them by ICWA.

## STATUTORY AND REGULATORY BACKGROUND

*The Indian Child Welfare Act.*  Congress enacted ICWA, pursuant to its broad constitutional authority over Indian affairs, to address "'the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes.'" *Adoptive Couple v. Baby Girl*, 133 S. Ct. 2552, 2557 (2013) (quoting *Miss. Band of*

2

*Choctaw Indians v. Holyfield*, 490 U.S. 30, 32 (1989)).  In particular, Congress found "that an alarmingly high percentage of Indian families [were] broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies" and that the States had "often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families."  25 U.S.C. § 1901(4)-(5); *see also Holyfield*, 490 U.S. at 32 (noting "that 25 to 35% of all Indian children had been separated from their families and placed in adoptive families, foster care, or institutions").

With ICWA, Congress declared "that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families."  25 U.S.C. § 1902.  Congress found that "there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children," *id.* § 1901(3), and thus ICWA both "'seeks to protect the rights of the Indian child as an Indian and the rights of the Indian community and tribe in retaining its children in its society.'"  *Holyfield*, 490 U.S. at 37 (quoting H.R. REP. NO. 95-1386, at 23 (1978)).  To accomplish this goal, ICWA "establish[es] . . . minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes."  *Id.*

ICWA applies to "child custody proceedings" (defined as foster-care placements, terminations of parental rights, and preadoptive and adoptive placements) involving an "Indian child," a term which is defined as "an unmarried person who is under age 18 and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."  25 U.S.C. § 1903(1), (4).  In such proceedings, Congress accorded tribes "numerous prerogatives . . . through the ICWA's substantive provisions . . . as a means of protecting not only the interests of individual Indian children and their families, but also of the tribes themselves."  *Holyfield*, 490 U.S. at 49.  ICWA also provides important procedural and substantive standards to be followed in state-administered proceedings concerning

1   possible removal of an Indian child from her family.  *See*, *e.g.*, 25 U.S.C. § 1912(d)

2   (requiring party seeking foster-care placement to prove that "active efforts" designed to

3   prevent the breakup of the Indian family were provided); *id.* § 1912(e) (requiring expert

4   testimony as to the potential for damage should child remain in parent's custody).

5       The "most important substantive requirement imposed on state courts" by ICWA

6   is the placement preference for any adoption, pre-adoptive placement, or foster-care

7   placement.  *Holyfield*, 490 U.S. at 36; *see* 25 U.S.C. § 1915(a)-(b).  "In any adoptive

8   placement of an Indian child under State law," ICWA requires that "a preference shall

9   be given, in the absence of good cause to the contrary, to a placement with (1) a

10   member of the child's extended family; (2) other members of the Indian child's tribe; or

11   (3) other Indian families." 25 U.S.C. § 1915(a); *see also id.* § 1915(b) (preferences for

12   foster-care or preadoptive placements).  These preferences reflect "Federal policy that,

13   where possible, an Indian child should remain in the Indian community." H.R. REP. NO.

14   95-1386, at 23; *see also Pima Cnty. Juv. Action No. S-903*, 635 P.2d 187, 189 (Ariz.

15   App. 1981) ("The Act is based on the fundamental assumption that it is in the Indian

16   child's best interest that its relationship to the tribe be protected."); *Michael J., Jr. v.*

17   *Michael J., Sr.*, 7 P.3d 960, 963 (Ariz. Ct. App. 2000) (same).

18       *The Department's Guidelines.*  On February 25, 2015, the Department updated

19   guidelines first published in 1979 to "help assure that rights guaranteed by the Act are

20   protected when state courts decide Indian child custody matters," 44 Fed. Reg. 67,584,

21   67,584 (1979), noting that "[m]uch has changed in the 35 years since the original

22   guidelines were published, but many of the problems that led to the enactment of ICWA

23   persist." 80 Fed. Reg. 10146, 10,147 (2015) ("Guidelines").  The Department invited

24   comments from federally recognized Indian tribes, state-court representatives, and

25   organizations concerned with tribal children, child welfare, and adoption.  *Id.*

26       As the Department explained, "[t]hese updated guidelines provide guidance to

27   State courts and child welfare agencies implementing [ICWA]."  *Id.* at 10,146.  The

28   Guidelines "promote compliance with ICWA's stated goals and provisions by providing

4

a framework for State courts and child welfare agencies to follow." *Id.* at 10,146-47. By offering the Department's interpretation of ICWA along with "best practices for ICWA compliance," the Guidelines address issues and problems that have arisen since the guidelines' original publication, and that have prevented the proper and nationally consistent implementation of this federal statute in keeping with Congress's purposes in enacting ICWA. *Id.* at 10,147-50.

The 2015 Formal Rulemaking. Recognizing that the non-binding nature of the Guidelines makes them less effective than regulations in addressing problems with the interpretation and implementation of ICWA, on March 20, 2015, the Department began a notice-and-comment process to promulgate regulations to implement ICWA. Regulations for State Courts and Agencies in Indian Child Custody Proceedings, 80 Fed. Reg. 14,880 (Mar. 20, 2015). Accordingly, the Department's proposed rule "would incorporate many of the changes made to the recently revised guidelines into regulations" in order to establish "the Department's interpretation of ICWA as a binding interpretation to ensure consistency in implementation of ICWA across all States." *Id.*; *see also id.* at 14,882 ("The proposed rule makes several of the provisions issued in the recently published [2015 Guidelines] binding as regulation."). The Department's rulemaking process is ongoing and no final regulation has been published.

## STANDARD OF REVIEW

Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction "may be either on the face of the pleadings or by presenting extrinsic evidence." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003). Where a 12(b)(1) motion is facial in nature, relying on the allegations of a complaint solely, the Court treats "the factual allegations in the complaint as true." *Courthouse News Serv. v. Planet*, 750 F.3d 776, 780 (9th Cir. 2014). "[T]he party asserting subject matter jurisdiction has the burden of proving its existence." *Pistor v. Garcia*, 791 F.3d 1104, 1111 (9th Cir. 2015) (internal quotations and brackets omitted). For a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a court "must accept all factual allegations of the

complaint as true and draw all reasonable inferences in favor of the nonmoving party."
*TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999).  Rule 12(b)(6) dismissal "can be
based on the lack of a cognizable legal theory or the absence of sufficient facts alleged."
*UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1014 (9th Cir.
2013) (*citing Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)).

## ARGUMENT

### I.    Plaintiffs Fail to Establish Standing

Plaintiffs must demonstrate that they have standing to appear before this Court
before it may exercise jurisdiction over their claims.  *Lujan v. Defenders of Wildlife*,
504 U.S. 555, 560 (1992).  To carry this burden, Plaintiffs must show (1) they have
suffered an "injury in fact" to a legally protected interest and that injury is (a) concrete
and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the
injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as
opposed to merely speculative, that the injury will be redressed by a favorable decision.
*Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000);
*Defenders*, 504 U.S. at 560.  Review of standing must be "especially rigorous when
reaching the merits of a dispute would force [a court] to decide whether an action taken
by one or the other two branches of Federal Government was unconstitutional." *Raines
v. Byrd*, 521 U.S. 811, 819-20 (1997).

Plaintiffs bring five counts against Federal Defendants.[1]  Count One alleges that
Plaintiffs' equal protection rights are violated by six particular provisions of ICWA and
the Guidelines: (1) the active-efforts requirement; (2) the burden of proof required to
remove a child from her parents and place her in foster care; (3) the burden of proof to
terminate a parent's rights; (4) the foster-care placement preferences; (5) the adoptive-
placement preferences; and (6) the transfer provision.  Compl. at ¶ 94.  Count Two
alleges that these same provisions (less the active-efforts requirement) violate Plaintiffs'
due process rights.  *Id.* ¶¶ 98, 100.  As discussed in Section I.A. below, Plaintiffs have

---

[1] The Complaint includes six counts, but Count Three names only the State Defendant.

not alleged, however, that they have been injured by each of these particular provisions. *See Laidlaw*, 528 U.S. at 185 ("[A] plaintiff must demonstrate standing separately for each form of relief sought."); *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) (citizen aggrieved in one respect does not have standing to bring broader challenge, as "standing is not dispensed in gross"); *see also Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988) ("the usual rule is that a party may assert only a violation of its own rights").

The only specific provisions that are even arguably alleged to have caused Plaintiffs injury are the adoptive-placement preferences (alleged to have injured C., M.C., and K.C.) and the transfer provision (alleged to have injured A.D., S.H., and J.H.), but these allegations, and those alleging injury from the statute more broadly, fail to satisfy the constitutional minimum for Article III standing.  *See infra* Section I.B. Because they have identified no cognizable injury caused by the statute, Plaintiffs also do not have standing to bring the claims in Count Four, which asserts that ICWA exceeds Congress' authority and violates the Tenth Amendment.  Nor have Plaintiffs identified any forced association with tribes to support their standing to bring Count Five, which alleges that ICWA and the Guidelines violate the rights of Indian children to freedom of association.  *See infra* Section I.A.  Moreover, Carol Coghlan Carter has failed to demonstrate that she has capacity to act as next friend to C. and A.D., much less a class of Indian children.  *See infra* Section I.C.  Finally, even if A.D., S.H., and J.H. met their burden of establishing standing based on the Guidelines' transfer provision, the Administrative Procedure Act ("APA") claim in Count Six must be dismissed because the Guidelines are not binding and any injury they allege is neither traceable to the Guidelines nor redressable by their removal.  *See infra* Section I.D.

    A.    <u>Plaintiffs Have Not Alleged That They Have Been Injured By the Named Provisions of ICWA and the Guidelines, Nor That They Have Been Injured by Any Forced Association With a Tribe</u>

*Counts One and Two*.  In Counts One and Two, Plaintiffs ask that this Court declare that provisions of ICWA and the Guidelines relating to active efforts, the

burdens of proof required to remove Indian children and terminate their parents' rights, and the foster-care placement preferences, *inter alia*, are unconstitutional.  Plaintiffs have the burden to demonstrate that they are directly affected by each provision of ICWA and the Guidelines that they challenge.  *See Laidlaw*, 528 U.S. at 185; *Ryan v. Mesa Unified Sch. Dist.*, 64 F.Supp.3d 1356, 1360 (D. Ariz. 2014) (dismissing First Amendment challenge to program because plaintiffs failed to allege personal exposure to it, adverse repercussions, or altered conduct as a result).  Here, neither C. nor A.D. (together "Indian Child Plaintiffs"), nor S.H., J.H., M.C., or K.C. (together, "Foster Parent Plaintiffs") have alleged that they are injured by the active-efforts provision, the burdens of proof, or the foster-care placement preferences established by ICWA and echoed in the Guidelines.[2]   *See* Compl. ¶¶ 57-81, 90-93 (describing these provisions in general terms without alleging that any named Plaintiff suffers injury from them).  Accordingly, this Court should dismiss Counts One and Two as they pertain to active efforts, the burdens of proof, and the foster-care placement preferences in ICWA and the Guidelines.

*Count Five*.  Although Carter asserts in Count Five that ICWA violates Indian Child Plaintiffs' First Amendment right to freedom of association, she does not allege injury sufficient to confer standing.  The Complaint does not allege that either C. or A.D. has been forced to associate with their Tribes, the Navajo Nation and the Gila River Indian Community ("Gila River"), respectively, or that the participation of the Tribes in their child-custody proceedings has in any way harmed them.  *See* Compl. ¶¶ 19, 117 (alleging only that A.D. could be subject to tribal jurisdiction, and that such association is often against the will or contrary to the best interests of Indian children like A.D. and C.); *see also Van Fossen v. United States*, No. CV-F-93-137-DLB, 1993

---

[2] Such allegations would not support Plaintiffs' standing anyway because any injury from active-efforts, the burdens of proof, or the foster-care placement preferences occurred in the past and is not likely to recur.  *See Hodgers-Durgin v. De La Vina*, 199 F.3d 1037, 1044 (9th Cir. 1999) (en banc) (finding that motorists lacked standing to challenge traffic stops when they had been stopped only once in ten years).

WL 655008, *1 (E.D. Cal. Dec. 27, 1993) (no standing to challenge membership disclosure because, as a known member of the organization, plaintiff will suffer no associational injury).  Without First Amendment injury, Count Five must be dismissed.

B.   Plaintiffs' Allegations of Harm Fail to Satisfy Constitutional Requirements for Injury-In-Fact or Are Not Traceable to ICWA

1.   *C.'s Alleged Injury From the Adoptive-Placement Preferences Does Not Support Standing*

In Counts One, Two, Four, Five, and Six, Carter purports to challenge various provisions of the Guidelines and ICWA on behalf of C., but she has failed to establish that C. has standing to support these challenges.  According to the Complaint, C. has remained in foster care while "alternative ICWA-compliant placements" are evaluated, and he has been harmed by allegedly being told that his foster parents are not his "mommy" and "daddy" and by being required to visit with potential adoptive placements.  Compl. ¶¶ 22-24.  Carter's challenge on behalf of C. in Counts One and Two thus must be limited to allegations that ICWA's adoptive-placement preferences violate equal protection and due process.  *See supra* Section I.A.  And Count Six must be dismissed as to C. because Carter does not allege that C. has been injured by the Guidelines' transfer provisions.  *See* Compl. ¶¶ 21-29.

Even as to the adoptive-placement preferences, however, Carter has not alleged sufficient facts to demonstrate that C. has been injured by this provision.  Nor has she alleged any injury caused by ICWA.  At most, Carter states that (1) ICWA has caused C. to spend four years in foster care, Compl. ¶ 24, and (2) C. suffered emotional and psychological harm from being reminded by third parties that M.C. and K.C. are not his biological or adoptive parents.  *Id*. ¶ 24.  Carter does not allege that the length of time in foster care has caused injury to C., nor could she, as Plaintiffs' complaint presumes that placement with M.C. and K.C. is in his best interests and asserts he has been with them *for the entire duration*.  *See id*. ¶ 22 ("C. has continuously remained in foster care with M.C. and K.C.").  The Ninth Circuit has previously declined to hear claims brought by children who remained in their preferred foster-care placements because they were

evidently not injured by policies alleged to threaten such placements.  *See Lipscomb By and Through DeFehr v. Simmons*, 962 F.2d 1374, 1376-77 (9th Cir. 1992) (considering only challenges brought by children who had been *denied* placement with relatives as a result of the policy).[3]

Nor is any emotional or psychological injury that C. may have suffered by virtue of being told that M.C. and K.C. are not his "mommy" and "daddy" caused by the adoptive-placement preferences.  As an initial matter, this claimed injury occurred in the past and is not alleged to be ongoing or likely to recur.  *See Hodgers-Durgin*, 199 F.3d at 1044; *Caldwell v. LeFaver*, 928 F.2d 331, 335 (9th Cir. 1991) (no standing for equitable relief when children's removal occurred in the past and father demonstrated no likelihood that it would be repeated).  Although Carter posits that this injury arose from a visit with an ICWA-compliant placement, *see* Compl. ¶ 23, there is no connection between the statute and C.'s injury, and Carter does not pretend otherwise.  The adoptive-placement preferences require no more than that extended family and tribal placements be considered; they do not direct any particular behavior by such persons or even require visitation prior to placement.  *See* 25 U.S.C. § 1915(a).  Therefore, even if the allegations in the Complaint are true, C. has not been injured by ICWA, but by a third party not before the Court.  *See San Diego Cnty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1130 (9th Cir. 1996) (concluding that plaintiff lacked standing to challenge legislation because increased cost of weapons was attributable to the independent decision of dealers, not to legislation restricting supply).  Finally, the relief Plaintiffs seek would not end C.'s ongoing injury (if any) or prevent it from recurring (if such were likely to happen): C. is in foster care as a result of decisions made by his biological parents, Compl. ¶ 21, and will remain in foster care until the state court decides on a permanency plan and, if the plan is for adoption, a suitable

---

[3] Carter does not allege that Foster Parent Plaintiffs will be prevented from adopting Indian Child Plaintiffs, nor could she because ICWA does not dictate an outcome, only a process.

adoptive home.  *See*, *e.g.*, Ariz. Dep't of Child Safety: Policy & Procedure Manual at

Ch. 6, § 6 *available at* https://extranet.azdes.gov/dcyfpolicy/.  Because Carter has not

alleged injury from or traceable to ICWA or the adoptive-placement preferences, C.

does not have standing to challenge the statute or the transfer provision, and Counts

One, Two, Four, Five, and Six must be dismissed.

### 2.   *Carter Failed to Allege that A.D. is Injured by ICWA or the Guideline's Transfer Provision*

In Counts One, Two, Four, Five, and Six, Carter purports to challenge various

provisions of the Guidelines and ICWA on behalf of A.D., but she has failed to establish

that A.D. has standing to support these challenges.  Carter does not even claim that A.D.

has been injured by any of the provisions other than those involving transfer, *see*

Compl. ¶¶ 17-20, so her challenge on behalf of A.D in Counts One and Two is limited

to allegations that the transfer provisions violate equal protection and due process.

These claims must also be dismissed, along with the rest of the constitutional and

APA claims that Carter brings on behalf of A.D., because Carter has failed to allege

injury to A.D. by ICWA or the transfer provisions sufficient to satisfy Article III

standing.  At most, Carter alleges that (1) but for ICWA, A.D. would already be cleared

for adoption, Compl. ¶ 20, and (2) were A.D.'s case to be transferred to tribal court, it

would force her to submit to tribal jurisdiction despite not having "any contact" with the

Tribe.  *Id*. ¶ 19.  As described above with respect to C., Carter does not and could not

claim that A.D. has been injured by remaining in foster care with S.H. and J.H., who are

"the only family that [she] has ever known."  *Id*. ¶ 19; *see Lipscomb*, 962 F.2d at 1376-

77; *see supra* note 3.

Nor is A.D. injured by the hypothetical possibility that her case could be

transferred to another jurisdiction. *See Mont. Envtl. Info. Ctr. v. Stone-Manning*, 766

F.3d 1184, 1189 (9th Cir. 2014) (anticipated injury from government's failure to survey

hydrological conditions in reviewing a mining-permit application was not imminent

where review was still pending); *Lipscomb*, 962 F.2d at 1376-77 (declining to consider

possibility that relative placements would abandon foster children in the absence of foster-care payments).  In order for A.D.'s case to be transferred, Gila River must do more than merely consider that alternative: it must formally petition the state court with a request to transfer.  *See* 25 U.S.C. § 1911(b).  The state court must then find that good cause does not exist to maintain the present forum.  *Id.*  Finally, the tribal court must agree to accept jurisdiction.  *Id.*  None of these steps can be assumed and Carter does not allege that they have come to pass.  *See Clapper v. Amnesty Int'l U.S.A.*, 133 S. Ct. 1138, 1150 (2013) ("It is just not possible for a litigant to prove in advance that the judicial system will lead to any particular result in his case.").  Even if the case were transferred, however, it would not require that A.D. submit to a forum with which she has no contact.  If A.D. is an Indian child, then by definition she is either a member of Gila River or the daughter of a member and eligible for membership.[4]  *See* 25 U.S.C. § 1903(4).  Thus, her contacts with Gila River are comparable to those she enjoys with the State of Arizona: citizenship by operation of choices made by her biological parents. Because A.D. is not injured by ICWA or the transfer provisions, she does not have standing to challenge them in Counts One, Two, Four, Five, and Six.

   3.   *Foster Parents Have Not Alleged Injury In Fact or That Any Injury Is Caused By ICWA or the Guidelines*

   Foster Parents have failed to allege cognizable injury or causation sufficient to maintain standing to challenge ICWA or the Guidelines.  As an initial matter, Foster Parents can only maintain claims that are supported by direct injury to their legally protected interests.  They do not have third-party standing to raise claims on behalf of Indian Child Plaintiffs, who are separately represented in this case by Carter.  *See Singleton v. Wulff*, 428 U.S. 106, 113-14 (1976) (requiring as a prerequisite for third-party standing a genuine obstacle to assertion of the right by the third party).

---

[4] Plaintiffs fail to establish in their Complaint that C. and A.D. are "Indian children" as defined by ICWA, which raises serious questions about whether these Plaintiffs can claim any injury from the statute.  Federal Defendants intend to address this and other fact issues relating to subject-matter jurisdiction and capacity in post-discovery motions.

At most, Foster Parents assert that (1) but for ICWA, Indian Child Plaintiffs would have been cleared for adoption by Foster Parent Plaintiffs, Compl. ¶¶ 20, 24; (2) were A.D.'s case to be transferred to tribal court, S.H. and J.H. would be "force[d]" to submit to tribal jurisdiction despite not having "any contact" with the Tribe, *id.* ¶ 19; and (3) that M.C. and K.C. allegedly drive C. each week, sometimes long distances, to visit with proposed placements, *id.* ¶ 23.  But Foster Parents do not allege that they are *harmed* by their unrealized desire to adopt Indian Child Plaintiffs, nor would such an allegation support injury in fact.  Foster Parent Plaintiffs do not have a legally protected interest in the adoption of their foster children.  *See Gibson v. Merced Cnty. Dep't of Human Res.*, 799 F.2d 582 (9th Cir. 1986) (noting, without deciding, that where foster care is intended to be temporary and the goals are expressly other than to permit the foster parents' adoption, it weighs against identifying a protected liberty interest).  Even if they did, Foster Parent Plaintiffs have not alleged that ICWA or the Guidelines prevent them from fulfilling their desire to adopt Indian Child Plaintiffs, and it would be entirely speculative to do so.  *See supra* note 3.

The injuries that S.H. and J.H. do allege from the transfer provisions are speculative and likewise do not describe injury in fact.  For the same reasons described above with respect to A.D., the hypothetical possibility that A.D.'s case could be transferred to another jurisdiction does not rise to the level of injury in fact.  Even if the case were transferred, however, it would not require that S.H. and J.H. submit to a forum with which they have no contact.  First, S.H. and J.H. have not alleged that they are parties to the child-welfare proceeding involving A.D, and that they are thus required to "submit" to the jurisdiction of a tribal forum.  *See Roberto F. v. Ariz. Dep't of Econ. Sec.*, 301 P.3d 211, 216 (Ariz. Ct. App. 2013) (absent intervention, foster parents are "participants," not "parties," in the dependency proceeding).  Further, S.H. and J.H. know that A.D. is subject to ICWA and, if they are licensed foster-care providers, have previously been trained in ICWA's application.  *See* Ariz. Admin. Code, R6-5-5825(A)(15) (requiring ICWA training as a licensing condition).  They

have since decided of their own accord to pursue adoption, thereby voluntarily affiliating themselves with not just A.D. but with her Tribe, Gila River.  Because their engagement with the tribal forum is voluntary and because they fail to identify any specific harm that would arise from participation therein, they cannot be said to be injured by a transfer to tribal court, if one were to occur.

Finally, the injuries M.C. and K.C. allege are not traceable to ICWA and the Guidelines.  Neither ICWA nor the Guidelines require that foster parents expend resources to have Indian children visit with prospective placements; rather, these are requirements of Arizona state law that M.C. and K.C. have voluntarily agreed to.  As M.C. and K.C. acknowledge, visits with proposed placements are "pursuant to a court-supervised and DCS-supported case plan," Compl. ¶ 23, and are therefore a condition of their continued custody of C.  By agreeing to provide C. with foster care, M.C. and K.C. have agreed to assist him by performing tasks, helping him attain goals, and helping him obtain services specified in the case plan.  *See* Ariz. Admin. Code, R6-5-5828(C).  They have also agreed to provide or arrange transportation to meet his needs as provided in the case plan.  *Id*. R6-5-5832(A).[5]  Because their engagement with C. is voluntary and their efforts to help him find a placement are a requirement of their agreement with the State, not of ICWA or the Guidelines, M.C. and K.C. have not identified a redressable injury linked to ICWA or the Federal Defendants.

C.     Carter Does Not Have Next-Friend Standing

Carter has failed to meet her burden to establish herself as a proper next friend to Indian Child Plaintiffs, or to the putative class of children with Indian ancestry, and without appropriate representation, A.D. and C. lack standing to pursue this action.  *See Safouane v. Fleck*, 226 F. App'x 753, 758 (9th Cir. 2007); Compl. ¶ 11.  Next-friend standing is not automatically conferred, and the burden is on the putative next friend to

---

[5] Moreover, M.C. and K.C., like all Arizona foster parents, are presumably compensated for their assistance to C.  *See, e.g.*, Arizona Admin. For Children, Youth and Families, Family Foster Home Care Rates and Fees Schedule (eff. Mar. 1, 2009) *available at* https://www.azdes.gov/InternetFiles/InternetProgrammaticForms/pdf/foster_rates.pdf.

clearly establish the propriety of her status.  *Whitmore v. Arkansas*, 495 U.S. 149, 163 (1990).

Federal Rule of Civil Procedure 17(c) allows a next friend to bring suit on behalf of a minor "who does not have a duly appointed representative."  Fed. R. Civ. P. 17(c); *see T.W. by Enk v. Brophy,* 124 F.3d 893, 895 (7th Cir. 1997).  Such capacity is not lightly granted.  *Whitmore,* 495 U.S. at 163 (1990); *Sam M. ex rel Elliot v. Carcieri*, 608 F.3d 77, 90 (1st Cir. 2010).  The Ninth Circuit requires an alleged "next friend" to demonstrate "(1) that the petitioner is unable to litigate his own cause due to mental incapacity, lack of access to the court, or other similar disability; and (2) the next friend has some significant relationship with, and is truly dedicated to the best interests of the [real party in interest]."  *Massie ex rel. Kroll v. Woodford,* 244. F.3d 1192, 1194 (9th Cir. 2001); *Coalition of Clergy, Lawyers, and Professors v. Bush*, 310 F.3d 1153, 1162 (9th Cir. 2002) (stating a significant relationship is a strong objective measure of dedication to a ward's best interests).  Here, Carter has made no showing that Indian Child Plaintiffs lacked general representation or other court-appointed representation, such as the guardian ad litems they were presumably appointed in their child-custody proceedings.  She also fails to allege *any* relationship, let alone a significant relationship, with Indian Child Plaintiffs.  Rather than showing any interest in or knowledge of A.D. and C. or their child-custody cases, Carter asserts instead her credentials as a licensed attorney who has represented "children with Indian ancestry" and other various parties in Arizona state child-custody proceedings.  Compl. ¶ 11.  However, courts will not allow persons having only an ideological stake in a child's case to serve as next friend.  *Sam M.*, 608 F.3d at 92; *see also Ad Hoc Comm. of Concerned Teachers v. Greenburgh No. 11 Union Free Sch. Dist.,* 873 F.2d 25, 31 (2nd Cir. 1989) ("We would not sanction any attempt to assert the legitimate rights of children as a mere pretext for advancing ulterior political or economic aims."); *T.W. by Enk*, 124 F.3d at 897.  Carter has asserted no interest in or involvement with Indian Child Plaintiffs or their ongoing child-custody proceedings, and as such, lacks standing

1    as next friend to the children.

2           D.      No Plaintiff Has Standing to Challenge the Guidelines

3           Even if the Court otherwise finds that at least one Plaintiff has standing to

4    maintain one of the counts in the Complaint, it must nonetheless dismiss that challenge

5    to the extent that it purports to apply to the Guidelines.  As non-binding

6    recommendations that state courts have full discretion to reject, consider, or apply if

7    they find them persuasive, the Guidelines cannot as a matter of law cause Plaintiffs

8    injury, nor would setting them aside provide Plaintiffs with relief.  As is discussed *infra*

9    Section V, the Guidelines are a guidance document that causes no injury because it does

10   not impose legal obligations or consequences on Plaintiffs or any other party except at

11   the discretion of state courts.  *See Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42-

12   43 (1976) (encouraging a third party to act in a particular way is not causation if not

13   actually directing the party or mandating a specific result).  Lastly, setting the

14   Guidelines aside would not relieve Plaintiffs from the operation of the placement

15   preferences, the transfer provisions, and the other provisions of ICWA they complain

16   of, nor would it prevent state courts from applying the interpretations advanced by the

17   Guidelines if they find them persuasive.

18   **II.    Plaintiffs' Claims Are Not Ripe Because Their Adjudication Will Require
          Factual Assumptions About Whether and How State Courts Will Apply
19        ICWA and the Guidelines and Because Plaintiffs Will Suffer No Hardship
          from Delay**

20          Just as Plaintiffs' failure to establish a likelihood of future injury undermines

21   their standing, it also renders their claim for declaratory relief unripe.  Ripeness doctrine

22   protects courts from premature adjudication likely to "entangl[e] them[] in abstract

23   disagreements."  *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967).  Because Plaintiffs

24   have not been injured by ICWA or the Guidelines, they also fail the Article III test for

25   ripeness, which coincides squarely with standing's injury-in-fact analysis.  *See Thomas*

26   *v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000).  That

27

28

16

analysis is included in Section I and is incorporated here by reference.[6]  But Plaintiffs also do not satisfy the prudential ripeness inquiry, whereby a Court must assess both the claim's fitness for adjudication and any hardship to its proponent that may be caused by withholding review.  *Abbott Labs.*, 387 U.S. at 149.  Where, as here, an injury "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all," it is not ripe as the subject of decision in a federal court.  *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation omitted).  It is Plaintiffs' burden to prove otherwise.  *See Renne v. Geary*, 501 U.S. 312, 316 (1991); *Colwell v. Dep't of Health and Human Servs.*, 558 F.3d 1112, 1121 (9th Cir. 2009).

Plaintiffs here rely on potential future harms that are not certainly impending.  Where state-court proceedings are ongoing, the Ninth Circuit has previously held that federal injunctive and declaratory relief regarding the same cause of action was premature.  In *Fern v. Turman*, 736 F.2d 1367, 1369 (9th Cir. 1984), the Ninth Circuit deemed "unfit for judicial resolution" claims challenging the constitutionality of a federal statute that authorized state courts hearing divorce cases to divide the retirement pay of military officers with their former spouses.  The complaint also sought injunctive relief from federal enforcement.  Because claims were "contingent both upon a decision of the state court not yet final and an administrative action not yet taken," the court

---

[6] The alignment of constitutional injury-in-fact and ripeness occurs when the injury alleged is grounded in potential future harms.  Thus, the fact that injury to C. is not certainly impending not only means that he lacks standing, but also that his case is not ripe:  In order for Carter to argue otherwise, a prospective placement for C. would need to once again convey to him that M.C. and K.C. are not his biological parents.  There is no indication that C. will have further visits with prospective placements, much less that they would behave in this way.  Similarly, for Carter's claims on behalf of A.D. and S.H.'s and J.H.'s claims regarding transfer to be ripe at the time the Complaint was filed, the state court would have had to have received a petition to transfer from Gila River, and have determined that good cause did not exist to deny transfer.  In addition, the tribal court would have had to have accepted jurisdiction.  Finally, ICWA and the Guidelines have neither altered Plaintiffs' existing foster-care placements nor had any effect on their prospects for adoption.

found that any decision on the matter would address a "purely hypothetical situation." Plaintiffs in the present suit likewise seek to challenge the constitutionality of multiple provisions of a federal statute that may or may not be applied to ongoing state proceedings and to enjoin Federal Defendants who have not expressed any intent to enforce the statute, and their claims should be dismissed as unripe.

## III.   This Court Should Abstain From Review of Plaintiffs' Claims

Consideration of Plaintiffs' Complaint is precluded by the *Pullman* and *Younger* abstention doctrines. These doctrines reflect the judgment of the courts and Congress as to the appropriate balance between principles of federalism and judicial economy when overlapping questions of federal and state law are adjudicated simultaneously in both courts. In particular, *Pullman* requires abstention from hearing Counts One, Two, Four and Five, and, in the alternative, *Younger* requires dismissing any claim for declaratory relief that ICWA or the Guidelines violate the Constitution both facially and as applied to Plaintiffs and others similarly situated.[7]  *See* Compl. at 28.

In the Ninth Circuit, the prerequisites for abstention under the *Pullman* doctrine require that (1) the complaint touches upon a sensitive area of social policy, (2) constitutional adjudication can be avoided if there were a definite ruling on the state issue, and (3) the determinative issue of state law is unclear. *See L.H. v. Jamieson*, 643 F.2d 1351, 1354-56 (9th Cir. 1981) (finding that class action regarding care of juveniles in state custody satisfied prerequisites for abstention under *R. R. Comm'n v. Pullman Co.*, 312 U.S. 496 (1941) ). Here, it is unclear that, *inter alia*, state-court precedent would require transfer of A.D.'s proceedings to tribal court, grant C. a new adoptive placement, or treat the Guidelines as anything other than guidance. *See In re Maricopa Cnty. Juvenile Action No. Js-8287*, 828 P.2d 1245 (Ariz. Ct. App. 1991) (affirming denial of transfer in part because child had bonded with foster parents); *Navajo Nation*

---

[7] A declaration is intended to have the same practical effect as an injunction prohibiting state courts from applying the statute and the Guidelines in child-custody hearings. *See Samuels v. Mackell*, 401 U.S. 66, 72 (1971).

*v. Ariz. Dep't of Econ. Sec.*, 284 P.3d 29, 36-38 (Ariz. Ct. App. Aug. 30, 2011) (upholding deviation from placement preferences in part because child had bonded with foster parents).  Because the resolution of these issues would moot or provide concrete factual context for Plaintiffs' constitutional claims, the correct approach is for this Court to abstain to allow Arizona courts to answer these questions.

Plaintiffs' request for declaratory judgment should also be dismissed under the *Younger* doctrine.  In *Younger v. Harris*, 401 U.S. 37, 46 (1971), the Supreme Court counseled against federal-court interference with a pending state-court proceeding in the absence of great and immediate irreparable injury to the federal plaintiff.  *Id*. at 54.  The Ninth Circuit has since determined that *Younger* abstention requires (1) the existence of a pending state proceeding, (2) that is a quasi-criminal enforcement action or involves a state's interest in enforcing orders and judgments of its courts, (3) that implicates an important state interest, (4) that plaintiff has adequate opportunity to raise federal constitutional claims in the state forum, and (5) that the federal action would have the practical effect of enjoining the state proceedings.  *See ReadyLink Healthcare, Inc. v. State Compensation Ins. Fund*, 754 F.3d 754, 758 (9th Cir. 2014).

All of these requirements are met here.  The Complaint assumes the existence of ongoing state-court, child-welfare proceedings, which implicate an important state interest and have long been treated as appropriate for *Younger* abstention.  *See, e.g.*, *Morrow v. Winslow*, 94 F.3d 1386 (10th Cir. 1996) (dismissing, pursuant to *Younger*, a federal due process challenge to ICWA in favor of ongoing, state-court adoption proceedings).[8]  Plaintiffs have failed to identify any procedural barrier that would prevent Arizona courts from evaluating claims that ICWA and the Guidelines violate

---

[8] Plaintiffs do not seek the type of relief – increased funding or systemic changes in the quality of child-welfare services provided by state agencies – that the Ninth Circuit found unworthy of *Younger* abstention in *Jamieson*, 643 F.2d at 1354; instead, they demand that this Court enjoin state courts and agencies from applying long-standing state and federal laws to their ongoing child-custody proceedings, which clearly warrants equitable restraint under *Younger*.

their constitutional rights (indeed, state courts routinely consider such claims). *See Moore v. Sims*, 442 U.S. 415, 432 (1979) (abstaining because, *inter alia*, appellees did not show that state procedural law would bar their claims). Yet Plaintiffs have elected to seek a declaratory judgment in federal court that, if granted, would necessarily change the outcome of the state-court proceedings. As a result, Plaintiffs' claim for declaratory relief should be dismissed in favor of pending state-court proceedings.

**IV.    The Complaint Should Be Dismissed For Failure to State Any Claim for Relief**

> A.    Plaintiffs' Equal Protection Claims Fail Because ICWA and the Guidelines Apply Based on the Parent or the Child's Affiliation with a Political Entity, Not on Their Race

Count One alleges that particular provisions of ICWA and the Guidelines violate the Equal Protection Guarantee of the Fifth Amendment because they provide procedures and standards that apply based on a child's race or ancestry. This is incorrect as a matter of law. ICWA's application does not turn on a child's race or ancestry. ICWA applies only to child-custody proceedings involving an "Indian child," defined as a child who is a member of an Indian tribe, or who is eligible for membership and has a biological parent who is a member of an Indian tribe. 25 U.S.C. § 1903(4). Thus, the law expressly limits its application based on political affiliation with a tribe; it makes no mention of race or ancestry.

The Supreme Court has flatly rejected the argument that federal laws providing for "special treatment" of Indians, and enacted in furtherance of "Congress' unique obligation toward the Indians," are based on a racial classification. In *Morton v. Mancari*, 417 U.S. 535 (1974), a unanimous Supreme Court held that a government-employment preference for qualified Indians did not run afoul of the Fifth Amendment because it was "granted to Indians not as a discrete racial group, but, rather, as members of quasi-sovereign tribal entities . . . ." *Id*. at 554, 554 n.24 ("The preference is political rather than racial in nature."). This distinction is based on tribes' unique legal status under federal law as domestic, dependent nations, and upon Congress' plenary power to

"single[] Indians out as a proper subject for separate legislation" under, *inter alia*, the Indian Commerce Clause of the U.S. Constitution.  *Id.* at 551-52; U.S. CONST. Art. II, s.2, cl.2; *Worcester v. Georgia*, 31 U.S. 515, 519 (1832) (Indian nations are "distinct, independent communities, retaining their original natural rights," and the United States may regulate relations with the tribes).

The Supreme Court elaborated on these principles in *United States v. Antelope*, 430 U.S. 641, 646 (1977).  In *Antelope*, the Court rejected an equal protection challenge by two tribal members to the application of federal criminal law, rather than state law, to crimes committed by Indians in Indian country.  The Court explained:

> The decisions of this Court leave no doubt that federal legislation with respect to Indian tribes, although relating to Indians as such, is not based on impermissible racial classifications.  Quite the contrary, classifications expressly singling out Indian tribes as the subjects of legislation are expressly provided for in the Constitution and supported by the ensuing history of the Federal government's relations with Indians.

*Id.* at 645.  Moreover, *Antelope* establishes that *Mancari* is not a narrow holding; rather, it stands more broadly for "the conclusion that federal regulation of Indian affairs is not based on impermissible racial classifications" but rather "is rooted in the unique status of Indians as 'a separate people' with their own political institutions."  *Id.* at 646.  Indeed, the principle that Congress may "single[] out Indians for particular and special treatment" in order to fulfill the United States' unique obligation toward the Indians underlies much of federal Indian law and policy.  *See Mancari*, 417 U.S. at 552 (noting that, if laws targeting tribal Indians "were deemed invidious racial discrimination, an entire Title of the United States Code (25 U.S.C.) would be effectively erased and the solemn commitment of the Government toward the Indians would be jeopardized").[9]

---

[9] Since *Mancari*, both the Supreme Court and the Ninth Circuit have consistently rejected challenges to statutes that provide different treatment of Indians as a political class.  *See Fisher v. Dist. Ct. of Sixteenth Jud. Dist. of Mont.*, 424 U.S. 382, 390-91 (1976) (exclusive tribal court jurisdiction over adoption proceedings involving Indians

ICWA's provisions fall squarely within *Mancari* and its progeny.  The application of ICWA depends on political affiliation with a federally recognized Indian tribe, not race.[10]  25 U.S.C. § 1903(4).  ICWA thus does *not* apply to proceedings involving children who may have Indian ancestry but are neither members of a tribe, nor eligible for membership and the child of a tribal member.[11]  A.D. and C. are alleged to be members of, or eligible for membership in, federally recognized Indian tribes, and if either of them qualifies as an "Indian child" under ICWA, the application of ICWA to their child-welfare proceedings has nothing to do with their race.  As numerous state courts have concluded, ICWA does not violate the equal protection guarantee of the U.S. Constitution.  *See, e.g.*, *In re K.M.O.*, 280 P.3d 1203, 1215 (Wyo. 2012) (ICWA's

---

is not racial discrimination); *Moe v. Confederated Salish and Kootenai Tribes of Flathead Reservation*, 425 U.S. 463, 479-80 (1976) (tax immunity for reservation Indians is not racial discrimination); *E.E.O.C. v. Peabody Western Coal Co.*, 773 F.3d 977, 988 (9th Cir. 2014) (upholding hiring preference based on tribal affiliation as a political classification designed to further the federal government's trust obligations to the tribe); *Means v. Navajo Nation*, 432 F.3d 924, 931 (9th Cir. 2005) (rejecting equal protection challenge to statute providing tribal criminal jurisdiction over nonmember Indians); *United States v. Zepeda*, 792 F.3d 1103, 1113 (9th Cir. 2015) (*Mancari* applies even if statute might impose "disproportionate burdens imposed on Indians").

[10] Although the definition of "Indian child" encompasses some children who are not themselves yet enrolled in a tribe, Congress reasonably determined that the political affiliation of the child could be measured through a parent's membership combined with the child's eligibility.  Congress considered its authority to legislate with regard to Indians who are not enrolled members of a tribe and concluded that "[t]he constitutional and plenary power of Congress over Indians and Indian tribes and affairs cannot be made to hinge upon the cranking into operation of a mechanical process established under tribal law, particularly with respect to Indian children who, because of their minority, cannot make a reasoned decision about their tribal and Indian identity."  H.R. REP. NO. 95-1386, at 16-17.

[11] *See, e.g., In re L.S.*, 812 N.W. 2d 505, 508-09 (S.D. 2012) (ICWA is not based on a racial classification, and does not apply to a child who is not a member and whose parent has not enrolled in tribe); *In re Arianna R.G.*, 657 N.W.2d 363, 368 (Wis. 2003) (ICWA requires more than merely having Native American ancestors).

standard of proof in case involving off-reservation Indian children did not violate equal protection); *In re Beach*, 246 P.3d 845, 849 (Wash. Ct. App. 2011) (ICWA does not deny off-reservation Indian child equal protection or substantive due process); *In re N.B.*, 199 P.3d 16, 23 (Colo. Ct. App. 2007) (ICWA is constitutional); *In re A.B.*, 663 N.W.2d 625, 636 (N.D. 2003) (transfer provision did not violate equal protection).

Plaintiffs suggest that the political classification of membership is, in fact, impermissible racial classification by alleging that "[m]ost Indian tribes have only blood quantum or lineage requirements as prerequisites for membership." Compl. ¶ 40. As the *Mancari* Court recognized, the political relationship of the United States with Indian tribes is inextricably bound up in the status of those tribes as sovereigns predating the formation of the United States, and tribal members are therefore typically descendants of the indigenous peoples of this country. 417 U.S. at 552-53; *see also* 25 C.F.R. § 83.11 (federal acknowledgment as an Indian tribe requires "membership consist[ing] of individuals who descend from a historical Indian tribe"). Accordingly, blood descent is typically shorthand for the social, cultural, and communal ties a person has with a sovereign tribal entity. Per *Mancari*, this fact does not transform statutes that single out Indians for special treatment into racial discrimination.[12]

---

[12] Plaintiffs' view is also a gross oversimplification, as a blood quantum or lineage requirement does not equate in all cases to a "racial" requirement. Compl. ¶ 40. Membership in some tribes, for example, requires proving descendancy, not as an inquiry into an individual's genetics or race, but rather as a requirement that members are related to the political entity. *See, e.g.* SEMINOLE NATION OF OKLAHOMA CONST., Art. II (requiring that members be descended from 1906 membership, as described on rolls from that era), *available at* http://www.sno-nsn.gov/government/constitution. Other tribes do not necessarily share a common tribal or ethnic ancestry, but were consolidated into a single political entity by the federal government. *See* Sarah Krakoff, *Inextricably Political: Race, Membership, and Tribal Sovereignty*, 87 WASH. L. REV. 1041, 1090-1104 (2012) (describing consolidation of Mohave, Chemehuevi, Navajo, and Hopi individuals into the Colorado River Indian Tribes). And in some cases, Congress has imposed membership restrictions on tribes in conjunction with the restoration of tribal status. *See, e.g.,* 25 U.S.C. § 941e (providing for compilation of base roll for Catawba Indian Tribe of South Carolina and limiting future membership in

ICWA's provisions are also tied closely to the United States' "unique obligation" to federally-recognized Indian tribes. *Mancari*, 417 U.S. at 555. Congress held extensive hearings, comprising hundreds of pages of testimony, that revealed that large numbers of Indian children were being removed from their families and tribes and placed in non-Indian homes and that this practice seriously harmed those children, families, and tribes. *See Holyfield*, 490 U.S. at 32-35; S. REP. NO. 95-597, at 11-13 (1977). Congress observed that most of these removals were not based on physical abuse, but rather on "ignoran[ce] of Indian cultural values and cultural norms" and the discovery of "neglect or abandonment where none exists." H.R. REP. NO. 95-1386, at 9-10. Congress also concluded that Federal policies towards Indian tribes – in particular, the "Federal boarding school and dormitory programs" – "also contribute[d] to the destruction of Indian family and community life." *Id.* at 9; *see also id.* at 12 (acknowledging that the breakdown of Indian families was caused by factors "aris[ing], in large measure, from our national attitudes as reflected in long-established Federal policy and from arbitrary acts of Government.")

Congress relied explicitly on "the special relationship between the United States and the Indian tribes and their members and the Federal responsibility to Indian people" in enacting ICWA. 25 U.S.C. § 1901. In particular, Congress found that "there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children and that the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe." *Id.* at § 1901(3); *see also* H.R. REP. NO. 95-1386, at 13-15 (discussing Congress' plenary power over Indian affairs, finding that "a tribe's children are vital to its integrity and future").

---

Tribe to "lineal descendant[s] of a person on the base membership roll [who] has continued to maintain political relations with the Tribe.") Given credence, Plaintiffs' arguments might also require courts to strike down other legal principles based on descendancy, such as inheritance presumptions and child welfare's preference for placement with extended family.

ICWA's provisions are narrowly tailored to this interest.  For example, ICWA's requirement that "active efforts" were made to provide remedial services and rehabilitation programs to prevent the breakup of the Indian family is designed to ensure that Indian children are not unnecessarily removed from their parents, and responds to the extensive evidence presented to Congress that Indian children were routinely removed from their parents for vague reasons and in circumstances that did not threaten their well-being.  25 U.S.C. 1912(d).  Plaintiffs presume this heightened standard harms all Indian children.  But typically, efforts to keep a family together are not detrimental on their face.  *See Santosky v. Kramer*, 455 U.S. 745, 765 (1982) ("[T]he parents and the child share in interest in avoiding erroneous termination.").

Plaintiffs also challenge the "beyond a reasonable doubt" standard of proof in termination of parental rights proceedings under ICWA because this differs from the standard in Arizona for non-ICWA cases.  But a uniform federal standard of proof cannot be objectionable, since the Supreme Court established "clear and convincing evidence" as a minimum standard in all child-welfare proceedings, rejecting a lower state standard.  *Id*. at 769.  Nor is a higher standard of proof, as used in ICWA, impermissible.  Prior to enacting ICWA, Congress heard volumes of testimony that led it to adopt the "beyond a reasonable doubt" standard for state proceedings.  *See* H.R. REP. NO. 95-1386, at 22 (noting that removal of a child from a parent is a penalty as great, if not greater, than a criminal penalty).  While the *Santosky* Court did not adopt this standard as the constitutional minimum for all termination proceedings, its opinion endorses both the ICWA standard as well as higher standards set by state legislatures and courts.  *Santosky*, 455 U.S. at 769-70.

Additionally, Plaintiffs challenge the adoptive-placement preference, which requires, absent "good cause to the contrary," a preference for placement with a member of the child's extended family, other members of the child's tribe, or other Indian families.  25 U.S.C. § 1915(a).  This preference helps ensure that Indian children are not unnecessarily removed from their families and tribes, and "seeks to protect the rights of

the Indian child as an Indian and the rights of the Indian community and the tribe in retaining its children in its society."  H.R. REP. NO. 95-1386, at 23.  However, the determination of "good cause" to deviate from these preferences is in the discretion of the state court, and the Guidelines have consistently stated that both "the request of the parents" and "the extraordinary physical and emotional needs of the child" constitute "good cause."  *See* 80 Fed. Reg. at 10158 (§ F.4(c)).  Thus, ICWA imposes modest requirements on child-welfare proceedings to facilitate Congress's purpose of preventing the unwarranted removal of Indian children from their families and tribes and their placement in non-Indian homes.  As a matter of law, Congress' special treatment of Indian children in ICWA "can be tied rationally to the fulfillment of Congress' unique obligations toward the Indians," and its "legislative judgment[] will not be disturbed."  *See Mancari*, 417 U.S. at 555.

> **B.**   Plaintiffs Have Failed to Identify a Cognizable Constitutional Liberty Interest In Support of Their Due Process Claims

Count Two, alleging due process violations, fails because no recognized liberty interest has been violated.  Plaintiffs make three due process allegations.  First, Plaintiffs allege that the "jurisdiction-transfer provision forces Plaintiffs to submit to the personal jurisdiction of a forum with which they have no contacts or ties."  Compl. ¶¶ 97-98.  The Court should not address this argument, as Plaintiffs do not have standing to challenge the transfer provisions, and have not alleged that they have been "forced to submit" to a tribal forum.  *See id.* ¶ 19.  Without a specific case or controversy, this Court cannot evaluate whether the transfer provision infringes on Plaintiffs' due process rights.  *See supra* at I.B.2.; *McCullen v. Coakley*, 134 S. Ct. 2518, 2534 n.4 (2014) (holding that, to prevail in an as-applied challenge, a plaintiff must show that the law has been, or is sufficiently likely to be, unconstitutionally applied to him).

Second, Plaintiffs repackage their equal protection argument as a due process claim, alleging that certain provisions of ICWA "violate the substantive due process rights of children with Indian ancestry, and those adults involved in their care and

upbringing who have an existing family-like relationship with the child."  Compl. ¶ 99.
But, as discussed *supra* Section IV.A, ICWA is based on an Indian child's political
affiliation, not her ancestry, and does not violate the guarantee of equal protection.

Moreover, in claiming that ICWA violates the rights of foster parents, Plaintiffs
seek application of a right not previously recognized.  Extensions of due process
protections are quite rare, as "'[t]he doctrine of judicial self-restraint requires [courts] to
exercise the utmost care whenever [courts] are asked to break new ground in this
field.'"  *Reno v. Flores*, 507 U.S. 292, 302 (1993) (internal citations omitted).  The
Supreme Court has, in any event, made clear that foster parents do not have an
established constitutionally protected liberty interest in the continuation of their
relationship with foster children.  *See, e.g., Smith v. Org. of Foster Families for Equality
and Reform*, 431 U.S. 816 (1977) (declining to recognize foster parents' constitutionally
protected liberty interest).[13]  Foster Parent Plaintiffs have no protected liberty interest at
issue here.

Third, Plaintiffs allege that "the failure of ICWA as applied by the BIA
Guidelines to adequately consider the child's best interests deprives the class of plaintiff
children of liberty without due process of law in violation of the Fifth Amendment."
Compl. ¶ 100.  Again, Plaintiffs are asking this Court to fashion a new fundamental
right that neither the Supreme Court nor the Ninth Circuit has recognized.  The Supreme
Court has, instead, stressed that "best interests of the child," while:

> a proper and feasible criterion for making the decision as to
> which of two parents will be accorded custody. . . . is not
> traditionally the sole criterion – much less the sole
> *constitutional* criterion – for other, less narrowly channeled
> judgments involving children, where their interests conflict in
> varying degrees with the interests of others. . . . [I]t is

---

[13] *See also Backlund v. Barnhart*, 778 F.2d 1386, 1390 (9th Cir. 1985) (foster parents
failed to establish any constitutionally protected right); *Egan v. Fridlund-Horne*, 211
P.3d 1213, 1221 (Ariz. Ct. App. 2009) ("[W]e sharply disagree with the bold
pronouncement [that a defacto parent] has a fundamental liberty interest in the care,
custody, and control of the child, to the same extent as a legal parent.")

likewise not an absolute and exclusive constitutional criterion
for the government's exercise of the custodial responsibilities
that it undertakes, which must be reconciled with many other
responsibilities.

*Reno v. Flores*, 507 U.S. at 304.

Furthermore, Plaintiffs are incorrect as a matter of law in alleging that decisions
made pursuant to ICWA regarding removal of a child from her home, termination of
parental rights, or foster or adoptive placements do not take into account the child's best
interests.  To the contrary, children and parents share a "vital" interest in preventing the
erroneous termination of their natural relationship, *Santosky*, 455 U.S. at 760, and
ICWA provides federal standards to protect this right.    And, ICWA itself is "based on
the fundamental assumption that it is in the Indian child's best interest that its
relationship to the tribe be protected."  *Holyfield*, 490 U.S. at 50 n.24 (citing *Pima
Cnty.*, 635 P.2d at 89).  Moreover, ICWA's foster- and adoptive-placement preferences
all specify that the state court may deviate from the preference where there is "good
cause to the contrary," 25 U.S.C. § 1915(a), (b).  This permits a court to consider a
child's particular circumstances, although it does not provide unfettered discretion to
ignore the statutory preferences.  Thus, to the extent that Plaintiffs have a liberty interest
in the consideration of their "best interests," ICWA protects this interest.

C.   Plaintiffs' Claim that ICWA Exceeds Congress' Authority Must Be
Dismissed Because It Understates the Breadth of the Indian Commerce
Clause and Because ICWA Does Not Violate the Tenth Amendment

Count Four alleges that ICWA exceeds Congress's power under the Indian
Commerce Clause ("ICC")[14] and asserts that ICWA commandeers state resources and
"displaces inherent state jurisdiction" over state child-welfare proceedings in violation
of the Tenth Amendment.  Compl. ¶¶ 111, 113.  This claim relies on a cramped
interpretation of the ICC and an overbroad interpretation of the Tenth Amendment that
finds no basis in law.  It is well settled that Congress has "plenary and exclusive"

---

[14] Outside its header, Count Four makes no explicit allegation that ICWA exceeds
Congress' power under the ICC.

28

authority to legislate in the field of Indian affairs.  *United States v. Lara*, 541 U.S. 193, 200 (2004).  The Supreme Court has recognized this broad authority of Congress since the early 19th century, emphasizing that:

> [the Constitution] confers on congress the powers of war and peace; of making treaties, and of regulating commerce with foreign nations, and among the several states, and *with the Indian tribes*. These powers comprehend all that is required for the regulation of our intercourse with the Indians. They are not limited by any restrictions on their free actions.

*Worcester*, 31 U.S. at 559 (emphasis in original).  Just a few years prior to the passage of ICWA, the Supreme Court recognized again the "plenary power of Congress to deal with the special problems of Indians . . . drawn both explicitly and implicitly from the Constitution itself."  *Mancari*, 417 U.S. at 551-52.  Thus, the central function of the ICC, U.S. CONST. Art. I, § 8, cl. 3, "is to provide Congress with plenary power to legislate in the field of Indian affairs."  *Lara*, 541 U.S. at 200 (citing cases).

Congress' authority in this area, however, is not drawn solely from the ICC.  The plenary authority also derives from the President's treaty power, U.S. CONST. Art. II, § 2, cl. 2, which "has often been the source of the Government's power to deal with the Indian tribes."  *Mancari*, 417 U.S. at 551.  The Supreme Court has also recognized that Congress' power in this area stems from "the Constitution's adoption of preconstitutional powers necessarily inherent in any Federal Government . . . ," *Lara*, 541 U.S. at 201, as well as the federal government's assumption of a trust obligation toward Indian tribes.  *Mancari*, 417 U.S. at 552; Cohen's Handbook of Federal Indian Law § 5.01, at 383-91 (Nell Jessup Newton ed., 2012).

Plaintiffs assert that "a child with Indian ancestry is not an item of commerce."  Compl. ¶ 110.  However, Plaintiffs confuse the ICC and the Interstate Commerce Clause, which have "very different applications."  *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 192 (1989).  "The extensive case law that has developed under the Interstate Commerce Clause . . . is premised on a structural understanding of the unique role of the States in our constitutional system that is not readily imported to

1   cases involving the Indian Commerce Clause."  *Id*; *see also United States v.*

2   *Lomayaoma*, 86 F.3d 142, 145 (9th Cir. 1996) (noting the distinction between principles

3   of federal Indian law and "those governing federal regulation of interstate commerce.").

4   As a result, limitations on Congress' authority to legislate through powers derived from

5   the Interstate Commerce Clause do not transfer to the ICC.  Nor is Congress' Indian

6   affairs power limited to the geographical confines of Indian lands or reservations or

7   Indian people on these lands.  *United States v. Holliday*, 70 U.S. 407, 417-19 (1865).

8         Accordingly, the standard of review of congressional enactments pursuant to the

9   ICC is "that the legislative judgment should not be disturbed "'[a]s long as the special

10   treatment can be tied rationally to the fulfillment of Congress' unique obligation toward

11   the Indians . . . .'"  *Delaware Tribal Bus. Comm. v. Weeks*, 430 U.S. 73, 85 (1977)

12   (citing *Mancari*, 417 U.S. at 455); *Perrin v. United States*, 232 U.S. 478, 486 (1914)

13   ("[I]n determining what is reasonably essential to the protection of the Indians,

14   Congress is invested with a wide discretion, and its action, unless purely arbitrary, must

15   be accepted and given full effect by the courts.").  As discussed in Section IV.A *supra*,

16   in enacting ICWA, Congress relied on its plenary authority over Indian affairs under the

17   Constitution and the United States' trust relationship with Indian tribes.  *See* 25 U.S.C. §

18   1901.  Pursuant to these authorities, the United States sought to protect the integrity and

19   resources of Indian tribes, none of which is "more vital" than their children.  25 U.S.C.

20   § 1901(3).[15]  Both the text of ICWA and its legislative history reflect reasoned and

21   justified federal substantive and procedural requirements aimed at protecting Indian

22   children and tribes.  *Id.* § 1901(3); H.R. REP. NO. 95-1386, at 12-19 (discussing

23   Congress' authority to enact ICWA).  Plaintiffs have failed to state a claim that ICWA

24   _____

25   [15] Such a finding only highlights the difference between enactments pursuant to the ICC
and enactments pursuant to the Interstate Commerce Clause.  With the latter, the Court
26   is careful to ensure Congress does not overstep its bounds by legislating matters
properly left to the States.  But the sovereign rights and interests of Indians do not
27   typically align with those of the States; instead, they rely upon federal legislation to
protect and advance their interests.  *See Cotton Petroleum*, 490 U.S. at 192-93.

28

1   exceeds the bounds of Congress' plenary authority under the ICC.

2       In Count Four, Plaintiffs also allege that ICWA violates the Tenth Amendment,

3   but ICWA neither "impermissibly commandeers state courts and state agencies" nor

4   displaces "inherent state jurisdiction" over state child-custody proceedings.  Compl. ¶¶

5   110, 112.  "If a power is delegated to Congress in the Constitution, the Tenth

6   Amendment expressly disclaims any reservation of that power to the States; if a power

7   is an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a

8   power the Constitution has not conferred on Congress." *New York v. United States*, 505

9   U.S. 144, 156 (1992).  Here, the Constitution expressly grants Congress authority over

10  Indian affairs, and given that Congress passed ICWA pursuant to this enumerated

11  power, the Tenth Amendment is necessarily not implicated.  *New York*, 505 U.S. at 156;

12  *Gila River Indian Cmty. v. United States*, 729 F.3d 1139, 1153-54 (9th Cir. 2013); *Raich

13  v. Gonzales*, 500 F.3d 850, 867 (9th Cir. 2007); *United States v. Jones,* 231 F.3d 508,

14  515 (9th Cir. 2000) ("We have held that if Congress acts under one of its enumerated

15  powers, there can be no violation of the Tenth Amendment.").  Thus, while it is true that

16  the Supreme Court has recognized that domestic relations are the province of the States,

17  *Sosna v. Iowa*, 419 U.S. 393, 404 (1975), the Supreme Court has also long recognized

18  that States "have been divested of virtually all authority over Indian commerce and

19  Indian tribes."  *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 62 (1996);

20  *Worcester*, 31 U.S. at 560-61.  ICWA is fully within Congress' Indian affairs authority,

21  and does not violate the Tenth Amendment.

22       Moreover, ICWA does not violate the anti-commandeering principle of *Printz v.

23  United States*, 521 U.S. 898 (1997), and *New York*.  The principle is not implicated

24  when federal directives apply to state courts, as Congress possesses the power to "pass

25  laws enforceable in state courts." *New York*, 505 U.S. at 178; *Testa v. Katt,* 330 U.S.

26  386, 390-91 (1947).  The Supremacy Clause establishes that "judges in every State shall

27  be bound" by federal law.  U.S. CONST., Art. VI.  Therefore, state courts must hear

28  ICWA cases as they would hear any other dispute arising under a federal statute.

31

*Maricopa Cnty.*, 828 P.2d at 1245 ("The Act does not deprive a state of its traditional jurisdiction over an Indian child within its venue; it establishes 'minimum federal standards and procedural safeguards designed to protect the rights of the child as an Indian and the integrity of the Indian family.'")  Count Four should be dismissed.

> D.      Plaintiffs Have Failed to State a First Amendment Claim

Federal Defendants' conduct does not impose an undue burden on Indian Child Plaintiffs' associational rights.  Plaintiffs erroneously contend in Count Five that Indian Child Plaintiffs are suffering from "forced association," "have virtually no connection to the tribes" and "are forced to associate with tribes and tribal communities . . . contrary to their best interests."  Compl. ¶¶ 116-18.  There is no basis to assert that an Indian child's enrollment in or relation to an Indian tribe under ICWA violates her associational rights.

Membership in a federally recognized Indian tribe, or being born the child of a member of such a sovereign entity, is not a forced association.  ICWA does not require association, but rather protects associations that already exist.[16]  Plaintiffs' comparison to *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 653 (2000), where the Supreme Court recognized an organization's right to exclude individuals is, therefore, inapposite.  As discussed in Section IV.A *supra*, ICWA was "adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms."  *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984).  Accordingly, Count Five should be dismissed.

---

[16] ICWA's enactment reverses the "wholesale separation of Indian children from their families," H.R. REP. NO. 1386, at 9, and protects intimate association as well as the existing communal and political association between the children and the tribe.  A sovereign tribe is capable of protecting a child's interests because the tribe, like the states, has a compelling interest in intervening in child-custody proceedings when a child's life or health is endangered by her parents' decisions.  *See Jensen v. Wagner*, 603 F.3d 1183 (10th Cir. 2014).  The tribe also has closer ties to the children than the proposed "next friend" because the children are members of or the offspring of members politically affiliated with the sovereign tribe.

**V.     Plaintiffs' Administrative Procedure Act Claim Fails Because the Guidelines Are Not Final Agency Action**

Plaintiffs' Count Six should be dismissed for lack of subject matter jurisdiction. That count, brought pursuant to the APA, asks the Court to hold unlawful and set aside Sections C.1 through C.3 of the Guidelines.  Compl. ¶¶ 121-23.  The APA authorizes judicial review of "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  Plaintiffs shoulder the burden of demonstrating final agency action, *Grand Canyon Trust v. Williams*, No. CV13-8045, 2013 WL 4804484 at *5 (D. Ariz. Sept. 9, 2013), and cannot do so.

In order for agency action to be final, it must (1) mark "the consummation of the agency's decision making process," and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 178 (1997); *see also Or. Natural Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006).  With regard to the second prong, the Ninth Circuit looks to "whether the [agency action] has the status of law or comparable legal force, and whether immediate compliance with its terms is expected."  *Ukiah Valley Medical Ctr. v. F.T.C.*, 911 F.2d 261, 264 (9th Cir. 1990); *see also Fairbanks N. Star Borough v. U.S. Army Corps of Engineers*, 543 F.3d 586, 591 (9th Cir. 2008) (no final agency action where agency action "did not impose an obligation, deny a right, or fix some legal relationship") (internal quotations omitted).

The Guidelines are advisory in nature, providing state courts and child-welfare agencies best practices for interpreting and implementing ICWA.  *See* 80 Fed. Reg. 10,146 ("These updated guidelines provide *guidance* to State courts and child welfare agencies implementing [ICWA].") (emphasis added).  As a "statement of the agency's opinion" on what ICWA requires and how it may best be interpreted and implemented by state courts and agencies, the Guidelines, "can be neither the subject of immediate compliance nor of defiance."  *Fairbanks*, 543 F.3d at 593-94 (internal quotations omitted).  That is because they only "express [the Department's] view of what the law

33

requires . . . without altering or otherwise fixing its legal relationship" with Plaintiffs or any other party.  *Id.* at 594.

Nothing compels state courts, state agencies, or any other party to adhere to the Guidelines.  Indeed, in the thirty-five years that the 1979 Guidelines were in place, state courts accorded them varying degrees of deference but did not find them binding.[17]  The 2015 Guidelines have thus far been treated no differently.  *See Oglala Sioux Tribe v. Van Hunnik,* No. CIV. 13-5020-JLV, 2015 WL 1466067, at *14 (D.S.D. Mar. 30, 2015) ("The DOI Guidelines are not binding on the court but are an administrative interpretation of ICWA entitled to great weight."); *In the Matter of M.K.T.*, Case No. 113, 110, 6-9 (Okla. Civ. App. May 1, 2015) (rejecting the 2015 Guidelines' suggestions regarding good cause to deviate from ICWA's placement preferences because "[t]he BIA Guidelines are not binding and are instructive only"), https://turtletalk.files.wordpress.com/2015/05/okctappicwa.pdf; *Payton S. v. State*, 349 P.3d 162, 173 (Alaska 2015).[18]

Unsurprisingly, a similar challenge to the Guidelines brought in the Eastern District of Virginia was dismissed because, *inter alia*, the court concluded that the Guidelines do not constitute final agency action.  Order at 2, *Nat'l Council for Adoption v. Jewell*, 1:15cv675 (E.D. Va. Sept. 29, 2015) (memorandum opinion to follow).

---

[17] *See, e.g., People ex rel. M.H.*, 691 N.W.2d 622, 625 (S.D. 2005) ("[G]uidelines do not have binding legislative effect."); *Adoption of N.P.S.*, 868 P.2d 934, 936 (Alaska 1994) ("The guidelines assist but do not bind this court."); *In re J.J.C.*, 302 S.W.3d 896, 900 (Tex. Ct. App. 2009) ("[G]uidelines do not have binding legislative effect" but are used in interpreting ICWA); *People ex rel. S.R.M.*, 153 P.3d 438, 441 (Colo. Ct. App. 2006) (Guidelines are not binding but are persuasive).

[18] In fact, some courts have, subsequent to the 2015 Guidelines, continued to look to the 1979 Guidelines in interpreting ICWA's requirements.  *See In re Interest of Nery V.*, 864 N.W.2d 728, 736 (Neb. Ct. App. 2015).  And yet another state court used suggestions from *both* the 1979 Guidelines and the 2015 Guidelines.  *State ex rel. Children, Youth & Families Dep't v. Casey J.*, No. 33,409, 2015 WL 3879548, at *4 (N.M. Ct. App. June 22, 2015).

That result is not surprising.  Other courts, considering comparable documents which, like the 2015 Guidelines, lack any express agency-enforcement mechanism, have found no final agency action.[19]  Moreover, the fact that a state court might – indeed, should – adopt the Guidelines and apply them in state-court proceedings cannot transform the Guidelines into final agency action.  In such case, it is the state court, not the Guidelines, that fixes a legal relationship and establishes obligations as among the parties before it.  *See La Jolla Friends of the Seals v. Nat. Marine Fisheries Serv.*, 630 F. Supp. 2d 1222, 1232 (S.D. Cal. 2009), *aff'd* 403 F. App'x 159 (9th Cir. 2010) ("Even assuming the state court relied upon [the agency] comments as if they represented a final agency decision, this reliance would not convert [the agency] comments into final agency actions reviewable under the APA or convert any adverse affect [*sic*] caused by the state court order into federal agency action.").  Accordingly, Count Six should be dismissed.

## **CONCLUSION**

Plaintiffs lack standing to bring these claims, nor are they ripe, and the Court thus lacks jurisdiction over this case.  The Court also should abstain from hearing these claims, given pending state-court proceedings.  Finally, Plaintiffs' claims fail as a matter of law.

---

[19] *See BBK Tobacco & Foods, LLP v. U.S. Food & Drug Admin.*, 672 F. Supp.2d 969, 975 (D. Ariz. 2009) (no final agency action where "the FDA's guidance documents do not provide any legal basis from which the FDA can institute civil or criminal legal proceedings"); *Defenders of Wildlife v. Tuggle*, 607 F. Supp. 2d 1095, 1111 (D. Ariz. 2009) (no final agency action where "agency simply expressed its opinion as to what the law requires, without altering or otherwise fixing any legal obligations or relationships."); *Friends of Potter Marsh v. Peters*, 371 F. Supp.2d 1115, 1120-21 (D. Alaska 2005) ("This guidance document has no legal effect, it merely summarizes what the agency believes the law to be.  The guidance does not enforce an interpretation of the law.").

RESPECTFULLY SUBMITTED this 16th day of October, 2015.

JOHN C. CRUDEN
Assistant Attorney General

s/_____
Steve Miskinis
JoAnn Kintz
Indian Resources Section
Christine Ennis
Ragu-Jara Gregg
Law and Policy Section
U.S. Department of Justice
Environment & Natural Resources Div.
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044-7611
Telephone: (202) 305-0262
Email: steven.miskinis@usdoj.gov
*Attorneys for Federal Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 16, 2015, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

MARK BRNOVICH
ATTORNEY GENERAL
Firm Bar No. 14000
John S. Johnson (016575)
Division Chief Counsel
1275 West Washington Street
Phoenix, Arizona 85007
Telephone: (602) 542-9948
e-mail:  John.Johnson@azag.gov
*Attorney for Defendant Gregory A. McKay*

Clint Bolick (021684)
Aditya Dynar (031583)
Courtney Van Cott (031507)
Scharf-Norton Center for Constitutional Litigation at the
Goldwater Institute
500 East Coronado Road
Phoenix, Arizona 85004
(602) 462-5000
e-mail:  litigation@goldwaterinstitute.org

Michael W. Kirk *(admitted pro hac vice)*
Brian W. Barnes *(admitted pro hac vice)*
Harold S. Reeves *(admitted pro hac vice)*
Cooper & Kirk, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D. C. 20036
(202) 220-9600
(202) 220-9601 (fax)
*Attorneys for Plaintiffs*

s/_____
Steven Miskinis

37

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

U.S. Department of Justice
ENRD/Indian Resources Section/
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044-7611
Telephone: (202) 305-0262
Email: steven.miskinis@usdoj.gov
*Attorneys for Federal Defendants*

1
2

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

3
4
5
6
7

A.D. and C. by CAROL COGHLAN
CARTER, their next friend;
S.H. and J.H., a married couple;
M.C. and K.C., a married couple;
for themselves and on behalf of a class of
similarly-situated individuals,

No.  2:15-CV-01259- PHX-NVW

**ORDER**

8
9

Plaintiffs,

10

v.

11
12
13
14
15
16
17

KEVIN WASHBURN, in his official
capacity as Assistant Secretary of BUREAU
OF INDIAN AFFAIRS; SALLY JEWELL,
in her official capacity as Secretary of
Interior, U.S. DEPARTMENT OF THE
INTERIOR;
GREGORY A. McKAY, in his official
capacity as Director of the ARIZONA
DEPARTMENT OF CHILD SAFETY,

Defendants.

18
19
20
21

The Court having considered Federal Defendants' motion to dismiss,

**IT IS ORDERED** that Plaintiffs' complaint is **DISMISSED WITH PREJUDICE.**

22
23
24
25
26
27
28

39