Mark Brnovich
Attorney General
Firm State Bar No. 14000

John S. Johnson (016575)
Division Chief Counsel
Dawn R. Williams (020730)
Appeals Unit Chief Counsel
1275 West Washington
Phoenix, Arizona 85007-2997
Telephone: (602) 542-9948
Fax: (602) 364-0055
e-mail: John.johnson@azag.gov
*Attorney for Defendant Gregory A. McKay*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| A.D. and C. by CAROL COUGHLIN CARTER, their next friend; S.H. and J.H., a married couple; M.C. and K.C., a married couple; for themselves and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>KEVIN WASHBURN, in his official capacity as Assistant Secretary of BUREAU OF INDIAN AFFAIRS; SALLY JEWELL, in her official capacity as Secretary of Interior, U.S. DEPARTMENT OF THE INTERIOR; AND GREGORY A. MCKAY, in his official capacity as Director of the ARIZONA DEPARTMENT OF CHILD SAFETY,<br><br>Defendants. | No. 2:15-cv-01259-PHX-NVW<br><br>**STATE DEFENDANT'S MOTION TO ABSTAIN AND DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1), (6)**<br><br><br>(Assigned to The Honorable Neil V. Wake) |

**PRELIMINARY STATEMENT**

The Arizona Department of Child Safety (DCS or the Department) exists to ensure the well-being of Arizona's children.  That purpose is shared by Arizona's juvenile courts, which are duty-bound to protect the interests of Arizona children in dependency matters.  By incorporating the provisions of the federal Indian Child Welfare Act (ICWA or the Act), 25 U.S.C. §§ 1901-1963, into Arizona law and judicial procedure, Arizona and the federal government alike "protect the best interests of Indian children and . . . promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture. . . ."  25 U.S.C. § 1902; *see also* A.R.S. § 8-815(B) ("If the child is subject to the Indian [C]hild [W]elfare [A]ct, the court and parties shall meet all requirements of the act that are not prescribed by this chapter."); Ariz. R.P. Juv. Ct. 8(B) ("All provisions of the Indian Child Welfare Act shall be incorporated by reference, including any amendments to the Act.").

This proposed class action would have the Court assert its authority over issues not yet decided by the juvenile court to prevent theoretical or speculative harm to the children or their caregivers.  The Court should decline the invitation based on concerns of equity, comity, and federalism.  This class action demands injunctive and declaratory relief that, if granted, would prevent Arizona courts from deciding issues regarding the applicability of ICWA's various policies and requirements in each case based on the facts of that case and from making an initial determination regarding the applicability and scope of the BIA Guidelines in Arizona dependency matters.

The Complaint demonstrates the rationale for abstention here.  It asks this Court to enter injunctions and declarations in order to prevent compliance with a federal law that has been in effect, serving Indian children and families, for almost forty years.  That federal law was enacted to remediate generations of forced assimilation that weakened or severed Indian

children's ties to their tribes—yet Plaintiffs cite to those very weakened ties to support their claim that ICWA disserves Indian children.  Moreover, the Complaint refers to nebulous, speculative harm in ongoing dependency matters that are properly before the juvenile court, a court particularly suited to address these claims.  If the alleged harms do indeed come to pass for the named plaintiffs, the remedy lies in the Arizona juvenile and appellate courts, not a federal class action for nationwide and statewide reform.  The Complaint's own allegations thus confirm and amplify the dispositive role of juvenile courts, demonstrating that any relief sought from this Court can and should come from Arizona's juvenile courts.

Before what promises to erupt into resource-intensive federal litigation, Director McKay (the State Defendant or State)  moves the Court to abstain and dismiss the Complaint pursuant to Fed. R. Civ. P.12(b)(1) and (6) as warranted under the *Younger* abstention doctrine.  The Complaint seeks to embroil this Court in juvenile court proceedings that remain active and ongoing for all putative class members, including the named plaintiffs.

In the alternative, the State moves the Court to dismiss the Complaint under Fed. R. Civ. P 12(b)(6).  Plaintiffs have failed to plead that ICWA's application to Indian children and tribes—terms defined by the Act to include only those with political affiliations to federally recognized tribes—is not rationally related to the federal government's legitimate interest in protecting and preserving Indian tribes.  Nor have they alleged that the State Defendant has applied or adopted ICWA beyond what is required by federal law, thus failing to state a claim that Arizona's statutory scheme—which simply adopts or mirrors the federal statutes—is subject to strict scrutiny.  The Complaint also fails to state a claim that the State Defendant has failed to adequately protect Indian children's best interests or that the foster and adoptive parents have asserted a liberty interest protected by the Fourteenth Amendment's due process clause.  And because not all of the counts address the actions of the State Defendant, if this

1    Court dismisses the counts that apply to the State, Director McKay requests that he be

2    dismissed from the action.[1]

3           Finally, this Court should dismiss the Complaint for lack of standing on the part of the

4    named foster/adoptive parents, insofar as they have not alleged any injury in fact and any

5    injuries alleged remain conjectural and hypothetical unless and until the Indian children in

6    their care are removed from their custody or their cases are transferred to tribal court.

7    Similarly, this Court should dismiss Counts 1, 2, and 4 as they pertain to A.D. and C., because,

8    again, the Complaint has failed to allege any injury in fact suffered by those children as a

9    result of compliance with the Act.  For the same reasons, this Court should dismiss those

10

---

11   [1] The State Defendant first alerted Plaintiffs' counsel by telephone on or about August 25, 2015,

12   that the Complaint did not provide notice as to which counts were alleged against which
     Defendants.  In a subsequent telephone conference on September 2, Plaintiffs' counsel stated

13   that Count 3 was the only cause of action alleged against the State Defendant and that Plaintiffs
     would be "agreeable to a stipulation."  On October 14, 2015, the State Defendant conferred with

14   Plaintiffs, as required by this Court's July 9, 2015, Order, to determine whether Plaintiffs would

15   amend the Complaint to cure deficiencies in the Complaint that the State would otherwise argue
     amount to a failure to state a claim against the State Defendant under Fed. R. Civ. P. 12(b)(6),

16   including amending the Complaint consistent with Plaintiffs' representation that only Count 3 is
     alleged against the State Defendant.  Plaintiffs did not agree to amend the Complaint, but

17   suggested that the State Defendant prepare a stipulation for Plaintiffs' review.  The parties also
     conferred on deficiencies specific to Count 3.  It was at that point—two days before the deadline

18   for filing this Motion to Dismiss—that Plaintiffs stated that Count 5 and possibly other counts

19   may also be directed at the State Defendant based solely on the nature of Director McKay's Rule
     12(b)(6) claim with respect to Count 3.  (*See* e-mail dated October 14, 2015, attached as

20   Attachment 1.)  The parties were therefore unable to agree to any proposed amendments to
     avoid this Motion to Dismiss.

21

22   In addition to the absence of any indication in the Complaint that Counts 1, 2, 4, and 6 are

23   alleged against the State Defendant, these counts do not apply to the State by their very terms:
     Counts 1 and 2 because the Fifth Amendment as challenged does not apply to state action (*see*

24   *Lee v. City of Los Angeles*, 250 F.3d 668, 687 (9th Cir. 2001) ("The Due Process clause of the

25   Fifth Amendment and the equal protection component thereof apply only to actions of the
     federal government—not to those of state or local governments."), Count 4 because it challenges

26   the use of federal powers relating to Indian tribes, and Count 6 because it challenges federal
     agency action.

portions of the Complaint seeking injunctive and declaratory relief on the as-applied

challenges to ICWA and the BIA Guidelines.  Because there has been no demonstrated harm

to the plaintiffs by the application of the Act or Guidelines, those claims are not yet ripe for

review.

## BACKGROUND

### The Indian Child Welfare Act

The Indian Child Welfare Act was the result of Congressional hearings into "[t]he

wholesale separation of Indian children from their families" by state agencies and courts.  H.R.

Rep. No. 1386, 95th Cong. 2d Sess. 9, reprinted in 1978 U.S.C.C.A.N. 7530, 7531.  Congress

found a shocking disparity in the rate of removal for Indian children versus other children in

the child welfare system, and attributed it to "the insensitivity of 'many social workers [to] . . .

Indian cultural values and social norms' which led to misevaluation of parenting skills and to

unequal application of considerations such as parental alcohol abuse." *American Indian Law*

*Deskbook*, Conference of Western Attorneys General, § 13:1 at 909 (2015) (quoting H.R. Rep.

No. 1386 at 9, 1978 U.S.C. C.A.N. at 7531); *See also*, 25 U.S.C. § 1901(4).  The U.S.

Supreme Court characterized the child welfare practices that necessitated ICWA as "abusive."

*Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32 (1989).

As a result of those hearings, Congress utilized its authority "[t]o regulate [c]ommerce

* * * with Indian tribes," its "plenary power over Indian affairs," and its assumption of "the

responsibility for the protection and preservation of Indian tribes and their resources" to find

"that there is no resource that is more vital to the continued existence and integrity of Indian

tribes than their children," but that the states had "often failed to recognize the essential tribal

relations of Indian people and the cultural and social standards prevailing in Indian

communities and families," leading to "an alarmingly high percentage of Indian families

[being] broken up by the removal, often unwarranted, of the children from them" and the

placement of those children "in non-Indian foster and adoptive homes and institutions."  25

U.S.C. § 1901.  Consequently, Congress declared "that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture. . . ."  25 U.S.C. § 1902.

Those "minimum Federal standards" generally relate to jurisdiction, intervention, notice, active efforts to provide rehabilitative and remedial services, elevated burdens of proof, qualified expert witness testimony, and placement preferences.  *See* 25 U.S.C. §§ 1911, 1912, 1915.  Congress also provided that "where State or Federal law applicable to a child custody proceeding under State or Federal law provides a higher standard of protection to the rights of the parent or Indian custodian of an Indian child than the rights provided under [ICWA], the State or Federal court shall apply the State or Federal standard."  25 U.S.C. § 1921.

*ICWA Applicability*

The Act applies only to a "child custody proceeding," i.e., one of four types of proceedings that occur in juvenile court: a "foster care placement," "termination of parental rights," "preadoptive placement," and "adoptive placement."  25 U.S.C. § 1903(1) (defining each type of child custody proceeding covered by the Act).  The Act applies only when the proceeding involves an "Indian child," defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."  25 U.S.C. § 1903(4).  Indian tribes are limited to those "recognized as eligible for the services provided to Indians by the Secretary [of the Interior] because of their status as Indians. . . ."  25 U.S.C. § 1903(8).[2]  Arizona has recognized that a claim of "Indian ancestry" is insufficient to trigger anything beyond ICWA's notice requirement, which allows the tribe to ascertain whether the child is, in

[2] The current list of federally recognized tribes can be found at 80 Fed. Reg. 1942 (Jan. 14, 2015).

1   fact, an Indian child as defined by Section 1903(4). *See Ariz. Dep't of Econ. Sec. v. Bernini*,

2   202 Ariz. 562, 564-65, ¶¶ 10-11, 48 P.3d 512, 514-15 (App. 2002).

*ICWA Jurisdiction, Transfer, and Intervention*

3        The ICWA's jurisdictional provisions are its "heart." *Holyfield*, 490 U.S. at 36, 109 S.

4   Ct. at 1601. Indian tribes hold exclusive jurisdiction over any child custody proceeding

5   involving an Indian child who resides or is domiciled within the tribe's reservation or over any

6   Indian child who has been made a ward of a tribal court (regardless of the child's residence or

7   domicile). 25 U.S.C. § 1911(a). State and tribal courts share concurrent, but presumptively

8   tribal, jurisdiction over all other child custody proceedings involving Indian children. *See* 25

9   U.S.C. § 1911(b); *Holyfield*, 490 U.S. at 36, 109 S. Ct. at 1601. Upon a parent or tribe's

10  request to transfer a child custody proceeding from state to tribal court, a state court must

11  transfer the case to tribal court unless the tribal court declines jurisdiction, either parent

12  objects, or the state court finds "good cause" to deny the transfer request. Moreover, the tribe

13  has a right to intervene "at any point" in a state court proceeding "for the foster care placement

14  of, or termination of parental rights to, an Indian child." 25 U.S.C. § 1911(c).

*ICWA Substantive Requirements*

15        The ICWA's significant substantive provisions include elevated burdens of proof for

16  certain necessary findings (and, for some, the supporting testimony of a qualified expert

17  witness); provision of active efforts at reunification; and placement preferences for foster care,

18  preadoptive, and adoptive placements. 25 U.S.C. §§ 1911(d), (e), (f); 1915. Arizona makes

19  state-law findings according to state-law burdens of proof, whereas findings explicitly required

20  by ICWA are subject to ICWA's elevated burdens of proof. *See Valerie M. v. Ariz. Dep't of*

21  *Econ. Sec.*, 219 Ariz. 331, 335, ¶ 16, 198 P.3d 1203, 1207 (2009). The ICWA requires, for

22  example, that the foster care placement of an Indian child rest on clear and convincing

23  evidence that "the continued custody of the child by the parent or Indian custodian is likely to

24  result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(e). Similarly,

the same finding must be made beyond a reasonable doubt before a state court can terminate a parent's rights to an Indian child.  25 U.S.C. § 1912(f).

The findings under both Subsection (e) and (f) must be supported by the testimony of a qualified expert witness.  25 U.S.C. § 1912(e), (f); *see also Steven H. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 566, 572, ¶ 22, 190 P.3d 180, 186 (2008).  These findings are in addition to, not in lieu of, state requirements for dependency or termination orders, *see Steven H.*, 218 Ariz. at 572, ¶ 22, 190 P.3d at 186, and apply to the Indian child's parent regardless of whether that parent shares the child's Indian ancestry, *see* 25 U.S.C. § 1903(9) (defining "parent" to include "any biological parent or parents of an Indian child" without reference to the parent's Indian status).

The Act also requires that a party seeking the foster care placement of or termination of parental rights to an Indian child demonstrate that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."  25 U.S.C. § 1911(d).  This is separate from, and in addition to, state law findings required under the Adoptions and Safe Families Act and Title IV-E of the Social Security Act, § 671(a)(15), and A.R.S. §§ 8-846 and 8-533(B)(8) for "reasonable" or "diligent" efforts to achieve a case plan goal of family reunification.

Finally, ICWA provides that any Indian child in foster care or preadoptive placement must be placed "in the least restrictive setting which most approximates a family and in which his special needs, if any, may be met;" and "within reasonable proximity to his or her home;" with preference given to a placement within a specified order of placement preferences.  25 U.S.C. § 1915(b).  Specifically, those foster-care or preadoptive placement preferences are: (1) a member of the child's extended family; (2) a foster home licensed, approved, or specified by the Indian child's tribe; (3) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or (4) an institution for children approved by an Indian tribe or

1   operated by an Indian organization that is suitable to meet the Indian child's needs.  *Id.*  For an

2   adoptive placement, preference must be given in the following order: (1) a member of the

3   child's extended family, (2) other members of the Indian child's tribe, or (3) other Indian

4   families.  25 U.S.C. § 1915(a).  In either case, the state court may deviate from the placement

5   preferences only upon a finding of good cause.  25 U.S.C. § 1915(a), (b).  A tribe may,

6   however, modify the order of placement preferences by tribal resolution, and the preference of

7   the parent or Indian child is one consideration when making a placement determination.  25

8   U.S.C. § 1915(c).

9                                   **The BIA Guidelines**

10          When it enacted ICWA, Congress mandated that the Secretary of the Interior

11   "promulgate such rules and regulations as may be necessary to carry out" the Act's provisions.

12   25 U.S.C. § 1952.  Pursuant to that requirement, the Bureau of Indian Affairs produced

13   *Guidelines for State Courts; Indian Child Custody Proceedings* in 1979.  44 Fed. Reg. 67,584

14   (Nov. 26, 1979).  Although the BIA followed the procedures necessary to make rules to bind

15   state courts, the Guidelines were intentionally not published as regulations "because they

16   [were] not intended to have binding legislative effect" and because "[p]rimary responsibility

17   for interpreting . . . language in the Act . . . rests with the courts that decide Indian child

18   custody cases."  1979 *Guidelines*, Introduction, 44 Fed. Reg. at 67,584.[3]

19          The Department of the Interior recently found, however, that although "[m]uch ha[d]

20   changed in the 35 years since the original guidelines were published, . . . many of the problems

21   that led to the enactment of ICWA persist."  *Guidelines for State Courts and Agencies in*

22   *Indian Child Custody Proceedings*, Background, 80 Fed. Reg. 10,146, 10,147 (Feb. 25, 2015).

23   So, after conducting listening sessions and receiving comments throughout 2014 from tribes,

24   agencies, the Attorney General's Advisory Committee on American Indian/Alaskan Native

25

26   _____
[3] To the extent that portions of the ICWA required interpretation by the Secretary of the Interior, some binding regulations were enacted.  *See* 25 C.F.R. part 23.

Children Exposed to Violence, and other stakeholders, the BIA published new Guidelines in February 2015. *Id.* The stated purpose of the new Guidelines is to "clarify the minimum Federal standards, and best practices, governing implementation of the [Act] to ensure that ICWA is applied in all States consistent with the Act's express language, Congress' intent in enacting the statute, and the canon of construction that statutes enacted for the benefit of Indians are to be liberally construed to their benefit." *Id.* at A.1, 80 Fed. Reg. at 10,150.

### This Lawsuit

This lawsuit was filed on July 6, 2015. The named plaintiffs are identified as two minors presently in Arizona state foster care custody, the would-be adoptive parents of one of those children, and the foster parents of the other child (the "Named Plaintiffs"), all of whom are subject to ongoing proceedings in, and the continued jurisdiction of, Arizona's juvenile courts; a "next friend" alleged to represent the named children and "all off-reservation children with Indian ancestry in the State of Arizona in child custody proceedings," (Complaint, ¶ 11), and a class of "all off-reservation non-Indian Arizona-resident foster, preadoptive, and prospective adoptive parents in child custody proceedings involving a child with Indian ancestry and who are not members of the child's extended family, (Complaint, ¶ 30).

The lawsuit comes on the heels of two recent developments in ICWA jurisprudence. First, the United States Supreme Court resolved an ICWA custody matter in *Adoptive Couple v. Baby Girl*, 133 S. Ct. 2252 (2013). Second, as noted above, the BIA promulgated revised guidelines for interpreting ICWA in February 2015. *See* 2015 Guidelines, 80 Fed. Reg. 10,146 (Feb. 25, 2015). Shortly thereafter, the BIA solicited input on proposed regulations to enforce many of the provisions in the revised Guidelines. *See* Proposed Rule: Regulations for State Courts and Agencies in Indian Child Custody Proceedings, 80 Fed. Reg. 14,880 (Mar. 20, 2015).

The allegations in the Complaint relate to certain key provisions found in ICWA and the Guidelines. Specifically, the Complaint challenges the Act's jurisdictional provisions,

1  placement preferences, requirements for reunification efforts, and burdens of proof.  The Act's
2  jurisdiction and placement provisions in particular are the very heart of and reason for the
3  Act's existence.

4  The Complaint seeks broad injunctive and declaratory relief that supplants and
5  interferes with ongoing state dependency proceedings in Arizona juvenile state courts.  It seeks
6  a declaration that certain provisions of ICWA and the Guidelines are unconstitutional both
7  facially and as applied.   (Complaint at ¶ 5.)   It also requests an injunction against the
8  application of certain provisions of ICWA and the Guidelines.  *Id.*

9  **ARGUMENT**

10 **I.    This Court Should Abstain from Becoming Embroiled in Ongoing State-Level**
11 **Juvenile Dependency Matters.**

12 The claims and sweeping relief in this proposed class action would impermissibly
13 interfere with ongoing state-court proceedings and functions, contrary to basic concepts of
14 federalism and separation of powers.  *Moore v. Sims*, 442 U.S. 415, 427 (1979) ("The breadth
15 of a challenge to a complex state statutory scheme has traditionally militated in ***favor*** of
16 abstention, not ***against*** it.") (emphasis in original).  Consequently, this Court must abstain
17 from and dismiss the Complaint under the doctrine of abstention under *Younger v. Harris*, 401
18 U.S. 37 (1971), if properly raised, considered, and granted upon a Rule 12(b)(1) motion to
19 dismiss.  *World Famous Drinking Emporium, Inc. v. City of Tempe*, 820 F.2d 1079, 1081 (9th
20 Cir. 1987) (dismissal is required when court abstains). [4]

21

22 [4] In another recent lawsuit against DCS, this Court declined to dismiss the Complaint based on
23 the *Younger* abstention doctrine.  *Tinsley v. McKay*, No. 2:15-CV-00185- ROS (D. Ariz. Sept.
24 29, 2015) (Order denying Motion to Abstain and Dismiss).  But that ruling rested on the district
   judge's conclusion that the complaint sought federal judicial intervention in the Department's
   systemic treatment of children in Arizona's foster-care system, rather than in state juvenile court
25 proceedings attendant to the Department's challenged executive actions.  (*Id.* at 1.)  Here, in
   contrast, Plaintiffs do *not* challenge the Department's policy and procedure, but rather its
26 compliance with state and federal laws relating to ICWA.  These are challenges to the statutes
   and the juvenile court's application of those statutes (and related Guidelines) to individual cases.

1    This Court should abstain from and dismiss the Complaint to avoid interfering with

2    active and ongoing state court proceedings for each Named Plaintiff and putative class

3    member.  The U.S. Supreme Court has articulated "a strong policy against intervention in state

4    court processes in the absence of great and immediate irreparable injury to the federal

5    plaintiff."  *Moore*, 442 U.S. at 423.  This policy hinges on "the constraints of equity

6    jurisdiction and the concern for comity in our federal system," in addition to the fundamental

7    principle that federal courts "avoid unwarranted determination of federal constitutional

8    questions" if and when a state court can decide a matter on grounds short of constitutional

9    dimension.  *Gilbertson v. Albright*, 381 F.3d 965, 970, 973 (9th Cir. 2004) (en banc); *see also*

10   *Moore*, 442 U.S. at 423 (explaining the "basic concern" as a "threat to our federal system

11   posed by displacement of state courts by those of the National Government.").

12   Thus, "absent extraordinary circumstances," this Court must abstain and dismiss the

13   Complaint when state court proceedings (1) are ongoing, (2) implicate important state

14   interests, and (3) provide the plaintiff an adequate opportunity to litigate federal claims.  *Hirsh*

15   *v. Justices of the Sup. Ct.*, 67 F.3d 708, 712 (9th Cir. 1995) (citing *Middlesex County Ethics*

16   *Comm. v. Garden State Bar Ass'n*, 457 U.S. 423 (1982)).

17   Each criterion is satisfied here.  As this Court explained in dismissing a prior statewide

18   challenge to Arizona's foster care system: "The Supreme Court, the Ninth Circuit and other

19   circuits have specifically held that claims related to ongoing juvenile proceedings in state court

20   are properly dismissed in federal court pursuant to the *Younger* abstention doctrine."  *Dema v.*

21   *Arizona*, No. CV-08-0900-PHX-LOA, 2008 WL 2437939, at *3 (D. Ariz. June 13, 2008).

22

23

24

25

26   Contrary to *Tinsley*, the Complaint here *does* seek to change judicial rulings, and therefore does
     require abstention under *Younger* which would not (under the *Tinsley* ruling's analysis) be
     required in adjudicating challenges to DCS policies and procedures alone.

### 1.   The ongoing proceedings in state juvenile court

The state juvenile courts have ongoing, meaningful proceedings in place for each named Plaintiff and would-be class member, where the judges hear and decide issues of placement, services, and jurisdiction.  *See*, *e.g.*, *31 Foster Children v. Bush*, 329 F.3d 1255, 1278-79 (11th Cir. 2003) ("In this case, the plaintiffs are seeking relief that would interfere with the ongoing state dependency proceedings by placing decisions that are now in the hands of the state courts under the direction of the federal district court."); *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1291 (10th Cir. 1999) ("[The state dependency proceedings] exist as long as the child remains in custody, so they are ongoing.  We hold that the continuing jurisdiction of the Children's Court to modify a child's disposition, coupled with the mandatory six-month periodic review hearings, constitutes an ongoing state judicial proceeding.") (internal citation omitted).

Arizona law provides that state juvenile courts have critical, substantial, and continuous responsibilities in all phases of all child dependency cases.  *Juvenile Action No. JD-6236*, 178 Ariz. at 451, 874 P.2d at 1008 ("The juvenile court has jurisdiction over all matters affecting dependent children."); *see also Alexander M. v. Abrams*, 235 Ariz. 104, 107, ¶ 15, 328 P.3d 1045, 1048 (2014) ("Arizona's statutes, case law, and rules of procedure reflect that the juvenile court is obligated to oversee the dependency case, to consider the best interests of the child in every decision, and to independently review the decisions and recommendations of [the Department].");  *Laurie Q. v. Contra Costa Cnty.*, 304 F.Supp.2d 1185, 1206 (N.D. Cal. 2004) ("California law has conferred upon the Juvenile Court the sweeping power to address nearly any type of deficiency in the care of a minor and order nearly any type of relief.").

Juvenile court proceedings in dependency cases are plainly judicial in nature.  *Laurie Q.*, 304 F.Supp.2d at 1203 ("Close examination of Contra Costa County's foster care system places the existence of a pending judicial proceeding beyond doubt. The Juvenile Court—

which the parties agree is a classically judicial body—retains jurisdiction over foster children throughout the entire duration of their care and administration within the system.").  Juvenile courts hear facts and decide the law; counsel is present or available for parents and children; state court judges are present who are bound to pursue the child's best interest at each phase; and a complex body of state statutes, rules, and regulations that govern the outcome.  *Dema v. Arizona*, 2008 WL 2437939, at *3 (D. Ariz.) ("Here, clearly the State's juvenile dependency and parental severance proceedings are active and underway in Arizona's juvenile court system. This federal lawsuit is a classic example of the applicability of the *Younger* doctrine because Plaintiff seeks solely injunctive relief that, if granted, would substantially interfere in the State's proceedings. Thus, the first condition for *Younger* abstention is met in that the State proceedings are ongoing.").

The Complaint emphasizes the ongoing juvenile court proceedings of several Named Plaintiffs, expressly alleging that the juvenile court has not yet ordered changes in placement, services, or jurisdiction.  These allegations amplify a dispositive, fatal flaw that compels abstention and dismissal:  the proceedings are ongoing in the court specifically established and empowered to decide the very issues—such as placement, services, and jurisdiction— challenged by the Plaintiffs.

First consider A.D.  According to the Complaint, A.D. has been involved in dependency proceedings in "the state court properly having jurisdiction over the matter," and her proposed adoptive parents—S.H. and J.H.—have a petition to adopt her currently pending in state court.  (Complaint at 29, 30.)  The Complaint asks this Court to issue injunctive and declaratory relief on the basis of Plaintiffs' speculation that A.D.'s tribe *may* seek to have her case transferred to tribal court, on the unsupported assumption that the juvenile court would grant the transfer request.  (*Id.* at 29.)  Likewise, C.'s ongoing dependency matter is in "the state court properly having jurisdiction over the matter."  (*Id.*)  And the state court is holding ongoing proceedings to determine the most appropriate placement for C.  (*Id.*)  Although

1   Plaintiffs characterize him as "languishing" in foster care, he has resided with his foster

2   parents—M.C. and K.C.—for the duration of that period.  (*Id.* at 29-30.)  Although C. has

3   visited with proposed ICWA-preferred placements, Plaintiffs have not shown and cannot show

4   that the juvenile court has ordered him removed from his foster parents' care or that the court

5   will ultimately order such a removal.  (*Id.*)

6          Based on these allegations *alone*, the Court should abstain and dismiss the action.  In

7   sum, state court proceedings are on-going, with the juvenile court exercising jurisdiction and

8   control over child dependency matters from the start; and then maintaining regular contact

9   with each matter at required intervals—always assessing and reassessing such things as

10  placement, health, and well-being.  *Laurie Q.*, 304 F.Supp.2d at 1206 ("In the eyes of

11  *Younger*, plaintiffs are undone by the particularities of their allegation; the remedies they seek

12  cannot be accomplished without substantial interference in affairs otherwise left to the state

13  courts.").  Plaintiffs' proposed relief would directly impact the ongoing state court proceedings

14  of the Named Plaintiffs and all putative class members; it would interfere with day-to-day

15  practice of juvenile courts; and it would prevent or inhibit juvenile courts from meeting their

16  duties and obligations under Arizona law to independently decide such matters under existing

17  state and federal law.  *See, e.g.*, *31 Foster Children*, 329 F.3d at 1278 ("The federal and state

18  courts could well differ, issuing conflicting orders about what is best for a particular plaintiff,

19  such as whether a particular placement is safe or appropriate or whether sufficient efforts are

20  being made to find an adoptive family.").

21                      **2.      The important state interest**

22         The state has a critical interest in protecting the victims of child abuse and neglect from

23  start to finish—from removal to placement to permanency.  *Peterson v. Babbitt*, 708 F.2d 465,

24  466 (9th Cir. 1983) (noting that " issue[s] of the proper care, custody and control of juveniles

25  held in state custody . . . have traditionally been left to the states").  Federal courts have long

26  recognized that states have an important interest in child dependency matters.  *Babbitt*, 708

F.2d at 466 ("The strong state interest in domestic relations matters, the superior competence of state courts in settling family disputes because regulation and supervision of domestic relations within their borders is entrusted to the states, and the possibility of incompatible federal and state court decrees in cases of continuing judicial supervision by the state makes federal abstention in these cases appropriate."); *Dema*, 2008 WL 2437939, at *4 (D. Ariz.) ("The Supreme Court has made emphatically clear its recognition that '[f]amily relations are a traditional area of state concern.'").

The state likewise has a "vital" interest in protecting the authority of state courts and ensuring that juvenile court orders (such as those alleged in the Complaint) are enforced, especially here. *H.C. ex rel. Gordon v. Koppel*, 203 F.3d 610, 612 (9th Cir. 2000) ("[A] state has a vital interest in protecting 'the authority of the judicial system, so that its orders and judgments are not rendered nugatory.' This is a particularly appropriate admonition in the field of domestic relations, over which federal courts have no general jurisdiction, and in which the state courts have a special expertise and experience."); *see also Pennzoil*, 481 U.S. at 14 (recognizing important interest of the states in enforcing orders of their judicial system).

### 3.   An adequate opportunity to raise federal claims

Next, to avoid abstention, the Named Plaintiffs must prove that state juvenile courts do not afford an adequate opportunity to raise federal constitutional claims. *Pennzoil*, 481 U.S. at 14 (plaintiff has burden to show inadequate state forum). A state court forum is "inadequate only when state procedural law *bars* presentation of the federal claims." *Hirsch*, 67 F.3d at 713 (emphasis in original) (affirming lower court decision to abstain on *Younger* grounds).

The Named Plaintiffs cannot meet that burden. *Moore*, 442 U.S. at 430 ("[T]he only pertinent inquiry is whether the state proceedings afford an adequate opportunity to raise the constitutional claims, and Texas law appears to raise no procedural barriers."). Arizona juvenile courts and higher courts can and do hear federal constitutional claims and arguments; all parties have an adequate opportunity to raise such claims. *See, e.g.*, *Pima Cnty. Juv. Action*

*No. S-903*, 130 Ariz. 202, 208, 635 P.2d 187, 193 (App. 1981) (addressing parent's equal protection challenge to the application of ICWA); *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, 110 P.3d 1013, 1018 (2005) (analyzing burdens of proof in light of parent's fundamental liberty interest in childrearing and associated due process considerations); *Megan R. v. Arizona Dep't of Econ. Sec.*, No. 2 CA-JV 2009-0056, 2009 WL 4695344, at *1 (App. 2009) ("We see nothing in the actions of the court or ADES that 'shocks the conscience' and thereby constitutes a violation of Megan's right to substantive due process.").

It is neither reasonable nor rational to believe that Arizona juvenile court judges are unable or unwilling to protect the constitutional rights of juveniles or their caregivers (to the extent those caregivers have protected constitutional interests) and hear their due process claims. *Moore*, 442 U.S. at 435 ("We are unwilling to conclude that state processes are unequal to the task of accommodating the various interests and deciding the constitutional questions that may arise in child-welfare litigation."); *Dema v. Arizona*, 2008 WL 2437939, at *4 ("It is not reasonable or rational to believe that a presiding juvenile court judge in dependency proceedings is incapable or unwilling to protect the juvenile's U.S. constitutional rights.") (internal quotation marks omitted).

In sum, given the ongoing proceedings in juvenile court for each Named Plaintiff and all putative class members, the Court should abstain from and dismiss the First Amended Complaint under *Younger*.  "To rule on the constitutional issue in these circumstances would implicate the state's interest in administration of its judicial system, risk offense because it unfavorably reflects on the state courts' ability to enforce constitutional principles, and put the federal court in the position of making a premature ruling on a matter of constitutional law. Thus, the interests of comity counsel restraint."  *Albright*, 381 F.3d 984.

1
2

**II.     This Court Should Dismiss Count 3 Pertaining to Plaintiffs' Equal Protection and Due Process Claims Because They Have Failed to Properly State a Claim Under Rule 12(b)(6).**

3

4      In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6),

5  Federal Rules of Civil Procedure, this Court must dismiss the complaint  if "it appears beyond

6  a reasonable doubt that plaintiff can prove not set of facts in support of his claim which would

7  entitle him to relief."  *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295 (9th Cir. 1998).

8  Dismissal may also "be based on the lack of a cognizable legal theory or the absence of

9  sufficient facts alleged under a cognizable legal theory."  *Balisteri v. Pacifica Police Dept.*,

10  901 F.2d 696, 699 (9th Cir. 1990).  The "allegations of material fact in the complaint are taken

11  as true and construed in the light most favorable to the nonmoving party," but this Court "is

12  not required to accept legal conclusions cast in the form of factual allegations if those

13  conclusions cannot reasonably be drawn from the facts alleged."  *Clegg v. Cult Awareness*

14  *Network*, 18 F.3d 752, 754-55 (9th Cir. 1994).

15      **A.     Plaintiffs Have Failed to State an Equal Protection Claim Regarding ICWA.**

16      The "Equal Protection Clause of the Fourteenth Amendment commands that no State

17  shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is

18  essentially a direction that all persons similarly situated should be treated alike."  *City of*

19  *Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985).

20      Plaintiffs challenge the application of the federal ICWA based on a claim that it violates

21  the Equal Protection guarantee of the Due Process Clause of the Fourteenth Amendment.

22  Because they have incorrectly identified the standard of review, and because ICWA satisfies

23  the rational-basis test for the constitutionality of a federal statute, their claim fails.

24      In analyzing an equal protection claim, the first step is to identify the statutory

25  classification being challenged.  The next step is to determine the proper standard by which the

26  legislative classification is to be reviewed.  The final step is to determine whether the

17

appropriate standard has been satisfied.  *See U.S. v. Lopez-Flores*, 63 F.3d 1468, 1472 (9th Cir. 1995); *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1064-67 (9th Cir. 2014).

### 1.    The challenged statutory classification

Plaintiffs challenge ICWA's distinction between "Indian children" and non-Indian children.  (Complaint at 21–22, 24.)  However, Plaintiffs suggest that their purported class includes "all off-reservation Arizona-resident children with Indian ancestry."  (*Id.* at 8.)  Were ICWA to include all children with "Indian ancestry," Plaintiffs would likely have a legitimate equal protection claim.  As it stands, however, ICWA applies only to a specific subset of children with "Indian ancestry," that is, "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."  25 U.S.C. § 1903(4).  Thus ICWA excludes even children who are eligible for membership in an Indian tribe—that is, a tribe recognized by the Federal government as eligible for receipt of services because of their status as Indians, 25 U.S.C. § 1903(8)—if the child's parent is not also already a member of the tribe.  As discussed further in the following subsection, this serves to limit ICWA's applicability to only those children who can demonstrate the requisite political affiliation to a federally recognized Indian tribe.

### 2.    The proper standard of review

The Complaint erroneously assumes that ICWA's distinction between children is race based.  Consequently, Plaintiffs contend that the appropriate standard for reviewing ICWA's constitutionality is whether it "serve[s] a compelling governmental interest in a narrowly tailored fashion"—that is, that the applicable standard is strict scrutiny.  (Complaint at 21-22, 24.)  The Plaintiffs have pleaded the wrong standard based on their erroneous assumption.

The United States Supreme Court has held that federal legislation concerning Indian Tribes and tribal members is a matter of *political* association, not *race*.  *Morton v. Mancari*, 417 U.S. 535, 551–55 (1974).  In *Mancari*, the United States Supreme Court addressed

1   whether a federal law granting an employment preference for qualified Indians in the Bureau

2   of Indian Affairs violated the equal protection component of the Due Process Clause of the

3   Fifth Amendment.  417 U.S. at 537.  In rejecting the equal protection challenge, the Court

4   explained that the challenged preference did not constitute "racial discrimination" because it

5   did not employ a "racial preference." *Id*. at 553.  Instead, the preference was political in

6   nature. *Id*. at 553, n. 24.  As the court explained, "[t]he preference [was] not directed towards

7   a racial group consisting of 'Indians'; instead, it applie[d] only to members of 'federally

8   recognized' tribes." *Id*.  This distinction in turn operated to exclude individuals who were

9   racially classified as "Indians."  *Id*.  Because the provision did not use a racial preference, the

10  Court concluded that the question before it was merely whether the challenged provision was

11  reasonable and directly related to a legitimate, nonracially based goal—that is, whether it

12  passed the rational-basis level of scrutiny.[5] *Id*. at 554.

13         In like manner, the Act does not apply categorically to children who are racially

14  classified as "Indians."  Instead, it applies to a child "who is a member of an Indian tribe" or

15  "is eligible for membership in an Indian tribe and is the biological child of a member of an

16  Indian tribe." 25 U.S.C. § 1903(4).  The term "Indian tribe" as used in ICWA applies only to

17  federally recognized tribes. 23 U.S.C. § 1903(8).  As a result, like the provision in *Mancari*,

18  ICWA serves to include children with a political connection to the Tribe.  It also excludes

19  individuals who are racially "Indian" but who lack that political connection.

20                      **3.      Satisfying the rational basis standard**

21         Thus, this Court applies the rational basis test—not strict scrutiny—to Plaintiffs'

22  allegation that Defendant McKay and DCS violates their equal protection rights by following

23  ICWA.  The Complaint does not allege that ICWA is not rationally tied to Congress's unique

24

25         [5].  The United States Supreme Court has since reaffirmed *Mancari* multiple times. *See*
    *Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 673 n.
26  20 (1979); *United States v. Antelope*, 420 U.S. 641 (1977); *Duro v. Reina*, 495 U.S. 676 (1990),
    *superseded by statute as recognized in United States v. Lara*, 541 U.S. 193. 197–98 (2004).

obligation toward Indians.  (Complaint at 21–22, 24–25.)  This failure is dispositive of their claim.  On one hand, when the appropriate standard of review is strict scrutiny, *the government* is charged with showing that the classification is "[n]ecessary to promote a compelling governmental interest;" that is, the government must show that "less drastic means" are not available to achieve the legislation's goals.  *Dunn v. Blumstein*, 405 U.S. 330, 342–43 (1972).  On the other hand, when the appropriate standard is the rational-basis test, the legislation is presumed valid and is sustained if the classification drawn by it is merely rationally related to a legitimate governmental interest.  *Exxon Corp. v. Eagerton*, 462 U.S. 176, 195 (1983); *Kotch v. Bd. of River Pilot Comm'rs*, 330 U.S. 552, 564 (1947).  Additionally, *the plaintiff* bears the burden of proving unconstitutionality under the rational basis test.  *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973).

The Complaint incorrectly places the burden on the State Defendant and Federal government to establish ICWA's constitutionality.  But under controlling Supreme Court case law, Plaintiffs have the burden to "to negative every conceivable basis which might support" ICWA.  *Lehnhausen*, 410 U.S. at 364.  Their Complaint fails to do so.  Consequently, Plaintiffs have failed to adequately state their claim and the Complaint must be dismissed.

**B.    Plaintiffs Have Failed to State an Equal Protection Claim Based on Arizona's Implementing Statutes.**

To the extent that Plaintiffs challenge Arizona law that implements ICWA, the Arizona statutes are likewise subject to rational-basis review.  Courts have generally refused to extend *Mancari* to instances in which an entity other than Congress legislates toward Indian tribes because only Congress possesses the requisite unique and constitutional obligations to justify such legislation.  *See Tafoya v. City of Albuquerque*, 751 F. Supp. 1527, 1530 (D. N.M. 1990) ("The City of Albuquerque does not have comparable power to treat members of federally recognized Indian tribes . . . differently than other groups of Indians or non-Indians.").  But courts have also recognized that if a state merely follows a federal statute and adopts a state law regarding rights of Indian tribes or their members consistent with existing Congressional

1   action, the state law will also satisfy equal protection as long as it has a rational basis.  *See*

2   *Yakima Indian Nation*, 439 U.S. at 501–02; *New York Ass'n of Convenience Stores v. Urbach*,

3   92 N.E.2d 204, 213, 699 N.E.2d 904, 908 (N.Y. App. 1998) (citing *Yakima* to support that

4   states "may adopt laws and policies to reflect or effectuate Federal laws designed 'to readjust

5   the allocation of jurisdiction over Indians' without opening themselves to the charge that they

6   have engaged in race-based discrimination").

7       Here, the three challenged Arizona statutes do not expand ICWA and are merely

8   consistent with Congress's action.  *See* A.R.S. § 8-105.01(B) (anti-discrimination statute does

9   not impact the duties set forth in ICWA); A.R.S. § 8-453(A)(20) (the Director shall "[e]nsure

10  the department's compliance with the Indian child welfare act"); A.R.S. § 8-514(C) (setting an

11  order of placement preferences consistent with ICWA).  Plaintiffs have not pleaded any

12  manner in which those statutes expand on Congress's actions via ICWA.  (*See* Complaint.)

13  Because these statutes are consistent with Congress's actions via ICWA, they are subject to

14  rational basis review rather than strict scrutiny as the Complaint wrongly assumes.  To be

15  clear, Plaintiffs have *not* pleaded that the statutes fail to pass rational-basis review.  (*See*

16  Complaint).  Consequently, the Complaint does not state a cognizable equal protection claim

17  as to the Arizona statutes and the equal protection-based causes of action against Defendant

18  McKay and DCS, and must be dismissed.

19      **C.    Plaintiffs Have Failed to State a Substantive Due Process Claim.**

20      Plaintiffs also complain that the State Defendant "violate[s] the substantive due process

21  rights of children with Indian ancestry, and those of adults involved in their care and

22  upbringing who have an existing family-like relationship with the child" based on the state's

23  "failure to adequately consider the child's best interests."  (Complaint at 24-25.)

24      The Complaint addresses the State Defendant's compliance with ICWA and provides

25  the conclusory statement that doing so is tantamount to ignoring the best interests of Indian

26  children.  But ICWA is a federal law enacted with the explicit purpose of "protect[ing] the best

21

interests of Indian children."  25 U.S.C. § 1902.  To that end, by complying with ICWA's mandates with respect to Indian children in its care, the State is considering and acting upon those children's best interests.  That view is reflected in the Guidelines, *see* Guideline F.4(3), 80 Fed. Reg. at 10,158 ("the [ICWA placement] preferences reflect the best interests of an Indian child in light of the purposes of the Act"), and state and federal case law, *see Navajo Nation v. Ariz. Dep't of Econ. Sec.*, 230 Ariz. 339, 344, 284 P.3d 29, 34 (App. 2012) ("ICWA 'is based on the fundamental assumption that it is in the Indian child's best interest that its relationship to the tribe be protected.'") (quoting *Holyfield*, 490 U.S. at 50, n.24).

Moreover, the Complaint fails to state a claim that the foster and adoptive parents have a recognized liberty interest in maintaining their ties to the Indian children entrusted to their care by DCS and the juvenile court.  The protections of the Due Process Clause are not afforded to "any and all important, intimate, and personal decisions," *Washington v. Glucksberg*, 521 U.S. 702, 727 (1997), and courts should be "reluctant to expand the concept of substantive due process" when the asserted right is not one that is "objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed," *id.* at 720-21.  "To state a prima facie substantive . . . due process claim, one must, as a threshold matter, identify a liberty or property interest protected by the Constitution."  *U.S. v. Guillen-Cervantes*, 748 F.3d 870, 872 (9th Cir. 2014).  Plaintiffs have failed to do so here.  *See Glucksberg*, 521 U.S. at 721 (noting that the Supreme Court "require[s] in substantive-due-process cases a careful description of the asserted fundamental liberty interest") (internal quotes and citations omitted).

## III.   To the Extent that It Applies to the State, the Freedom of Association Claim in Count 5 Is Not Cognizable.

The Complaint's allegations do not implicate any state infringement of the constitutional freedom of association.  The First Amendment protect freedom of association as

well as "the freedom not to assemble with those whose goals we do not share." *IDK, Inc. v. Clark County*, 836 F.2d 1185, 1192 (9th Cir. 1988). Consequently, the state may not compel an association unless it serves a compelling state interest that cannot be otherwise achieved without restricting associative freedoms under the First Amendment. *Knox v. Service Employees Intern. Union, Local 1000*, 132 S. Ct. 2277, 2289 (2012).

Here, however, the Complaint has not alleged that it is the *State* compelling association with a tribe. (*See* Complaint at 26-27.) Instead, the Complaint refers to the fact that "the *tribes* make the primary determination whether children with a specified blood quantum[6] will be brought within their jurisdiction and control." (*Id.* at 26, emphasis added.) The State Defendant's action with respect to ICWA is premised entirely on a tribe's determination of the child's membership or eligibility for membership status. *See* 25 U.S.C. § 1903(1), (4) (defining the types of proceedings covered by ICWA and the requirements to be considered an "Indian child"). The State is expressly prohibited from "substitute[ing] its own determination regarding a child's membership or eligibility for membership in a tribe or tribes." Guideline B.3(d), 80 Fed. Reg. at 10,153. There is no information in the Complaint regarding whether the Named Plaintiff children's association with the tribes—via their enrollment or membership therein—predated the State's involvement through the dependency process. Consequently, they have failed to state a cognizable claim that the *State* is enforcing an unwanted association.

To the extent that Plaintiffs challenge the tribes' ability to determine whether the Named Plaintiff children or the class are "Indian children" as defined by ICWA, this Court is "restrained" in any attempt to "adjust[ ] relations between and among tribes and their

---

[6] Here, the Complaint is incorrect. The ICWA does not itself reference tribal membership requirements, but Guideline B.3(a) provides that "[o]nly the Indian tribe(s) of which it is believed a biological parent or the child is a member or eligible for membership may make the determination whether the child is a member of the tribe(s), is eligible for membership in the tribe(s), or whether a biological parent of the child is a member of the tribe(s)." 80 Fed. Reg. at 10,153. Guideline B.3(c)(1) explicitly indicates that "[t]here is no requirement . . . for a certain blood quantum or degree of Indian blood" before a tribe can determine a child's membership in the tribe. *Id.*

members" because to do so "may substantially interfere with a tribe's ability to maintain itself as a culturally and politically distinct entity." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 71-72 (1978). Moreover, Plaintiffs have not joined the tribes with whom A.D. and C. have political ties, who are the only entities who can assert those children's affiliation status.

## IV. Plaintiffs Lack Standing to Raise Their Claims.

The facts to show standing must be clearly apparent on the face of the complaint. *Baker v. United States*, 722 F.2d 517, 518 (9th Cir. 1983). To satisfy the pleading requirement of establishing standing, (1) a plaintiff must allege an "injury in fact" that is "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical'"; (2) "there must be a causal connection between the injury and the conduct complained of"; and (3) "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351 (1992). When "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation . . . of *someone else*," the plaintiff must show that the actions of the regulated third party will cause and permit redressability of injury. *Lujan*, 504 U.S. at 562, 112 S. Ct. at 2137.

### 1. A.D. and C.'s standing

With respect to Counts 1, 2, 4, and 6, Plaintiffs have not pled that the named children have standing to raise those claims. The children have not alleged a specific harm that they *have suffered*; instead, they speculate about potential harms that *may* occur *if* the juvenile court enters certain orders (changing placement or transferring jurisdiction, for example). Neither child has been removed from the home of the named foster/adoptive parent Plaintiffs, and there is currently no motion pending in either case to either move the child or transfer jurisdiction to tribal court.

Under Count 3, Named Plaintiff C. *may* have standing based on Plaintiffs' unsupported allegation that he has suffered emotional harm as a result of the State Defendant's enforcement

24

1    of the adoptive placement preferences provision.  Similarly, under Count 5, the children *may*

2    have standing if they are being "forced" to associate with their tribes.  Both children have

3    appointed representatives in the juvenile court proceedings who can and should raise any such

4    issues on their behalf in that forum.  Plaintiffs' "Next Friend," however, has failed to establish

5    that she has ever met with the Named Plaintiff children, knows anything about their particular

6    interests, or has contacted their court-appointed representatives to determine what course of

7    action is in these particular children's best interests.  (*See* Declaration of Carol Coghlan

8    Carter.)

9                    **2.     S.H., J.H., M.C., and K.C.'s standing**

10           None of the named caregivers have suffered an injury in fact on any of the counts

11   alleged in the Complaint.  To date, neither the Gila River Indian Community (regarding A.D.

12   and her prospective adoptive parents S.H. and J.H.) nor the Navajo Nation (regarding C. and

13   his foster parents, M.C. and K.C.) has moved to transfer jurisdiction to the tribal court.  Thus

14   any claims of harm to the foster/adoptive caregivers are speculative at best.  To the extent that

15   the caregivers claim that the ICWA's "active efforts" provisions have harmed them, those

16   efforts were made and, indeed, completed prior to this lawsuit.  Nor have they pled any facts to

17   support that they were, in fact, harmed by the State Defendant's efforts at family reunification,

18   or that those efforts differed from the "reasonable" or "diligent" efforts that would have been

19   required in any event under state law.  (*See* A.R.S. §§ 8-846(A), 8-533(B)(8).)  The same is

20   true with respect to the application of the ICWA's burdens of proof and specific required

21   findings: Plaintiffs have failed to plead that the application of those substantive provisions

22   caused the proceedings to materially differ from what would have happened under applicable

23   state law.  And, because the children remain in their respective homes, none of the caregiver

24   Plaintiffs has suffered any injury as a result of the application of ICWA's placement

25   preferences.  Even if the child is removed from the caregiver's home, they have not alleged

26

                                                25

1   that they have a recognized liberty interest in a dependent child sufficient to support actual

2   "harm" from the removal of the child from their custody.

3   **IV.    Plaintiffs Have Failed to Demonstrate That Their Challenge to ICWA and the BIA**
4   **Guidelines as Applied Is Ripe for Review.**

5         Plaintiffs ask this Court to declare the following statutes unconstitutional, but facially

6   and as applied to Plaintiffs: 25 U.S.C. §§ 1911(b)(transfer of proceedings to Indian child's

7   tribe); 1912(d) ("active efforts"), (e) (foster care placement orders), and (f) (termination of

8   parent's parental rights to Indian child); and 1915(a) (adoptive placement preferences) and (b)

9   (preadoptive placement preferences).  Plaintiffs also ask the Court to declare unconstitutional

10  the provisions of the BIA Guidelines related to these statutes.  (Complaint at 28.)  Further, they

11  ask the Court to enjoin Defendants from "enforcing" those statutes and Guideline provisions.

12  (*Id.*)   To the extent that Plaintiffs' claims are not ripe for review, this Court should dismiss

13  them.

14        "The ripeness doctrine is 'drawn both from Article III imitations on judicial power and

15  from prudential reasons for refusing to exercise jurisdiction.'"  *Nat'l Park Hospitality Ass'n v.*

16  *DOI*, 538 U.S. 803, 808 (2003) (quoting *Reno v. Catholic Social Servs., Inc.*, 509 U.S. 43, 57,

17  n.18 (1993)).  It is a "justiciability doctrine designed 'to prevent the courts, through avoidance

18  of premature adjudication, from entangling themselves in abstract disagreements over

19  administrative policies and also to protect the agencies from judicial interference until an

20  administrative decision has been formalized and its effects felt in a concrete way by the

21  challenging parties.'"  *Nat'l Park Hospitality Ass'n*, 538 U.S. at 807-08 (quoting *Abbott Labs.*

22  *v. Gardner*, 387 U.S. 136, 148–49 (1967)).  As a result, "[e]ven where jurisdiction is present in

23  the Article III sense, courts are obliged to dismiss a case when considerations of prudential

24  ripeness are not satisfied."  *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*,

25  433 F.3d 1199, 1211 (9th Cir. 2006) (citing *Socialist Labor Party v. Gilligan*, 406 U.S. 583,

26  588 (1972) ("Problems of prematurity and abstractness may well present 'insuperable

26

1  obstacles' to the exercise of the Court's jurisdiction, even though that jurisdiction is

2  technically present.")).

3      In deciding whether a case satisfies prudential requirements for ripeness, the Ninth

4  Circuit considers two factors: (1) "the fitness of the issues for judicial decision" and (2) "the

5  hardship to the parties of withholding court consideration." *Id*. at 1211–12 (citing *Abbott*

6  *Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated on other grounds by Califano v.*

7  *Sanders*, 430 U.S. 99 (1977)).

8      **1.      Fitness of the issues for judicial decision**

9      Fitness for judicial decision depends on the "state of the factual record" and the

10  "substantive legal question to be decided." *Id*. at 1212.  "If the legal question is

11  straightforward, relatively little factual development may be necessary." *Id*.  Indeed, "pure

12  legal questions that require little factual development are more likely to be ripe." *San Diego*

13  *Cnty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1132 (9th Cir. 1996).  Yet legal questions that

14  depend on "numerous factors for its resolution" may demand "extensive factual development."

15  *Yahoo! Inc.*, 433 F.3d at 1212.  Finally, "[a] question is fit for decision when it can be decided

16  without considering 'contingent future events that may or may not occur as anticipated, or

17  indeed may not occur at all.'" *Addington v. U.S. Airline Pilots Ass'n*, 606 F.3d 1174, 1179

18  (9th Cir. 2010) (citing *Cardenas v. Anzai*, 311 F.3d 929, 934 (9th Cir. 2002)).

19      Here, extensive factual development is likely to be necessary for a number of reasons.

20  First and foremost is the confusion regarding the extent and nature of the proposed class.  It is

21  unclear whether Plaintiffs intend to add *all* Indian children to the class, or only *off-reservation*

22  Indian children, and their caregivers.  (*See* 8/21/15 Motion for Class Certification at 7-9.)  In

23  addition, Plaintiffs' claims require certain actions in the juvenile court before they will be ripe.

24  For example, unless and until a motion to transfer is made—and granted—in A.D.'s case (*see*

25  Complaint at 5), any claims pertaining to the potential harm of such a transfer are unripe.

26

27

1    Similarly, Plaintiffs' claims regarding the application of the BIA Guidelines require

2    determining what, if any, deference the juvenile court intends to give the challenged

3    Guidelines.  Arizona's courts have historically relied on the BIA Guidelines in certain

4    contexts.  *See*, *e.g.*, *Ariz. Dep't of Econ. Sec. v. Bernini*, 202 Ariz. 562, 565, 48 P.3d 512, 515

5    (App. 2002); *Steven H. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 566, 572, 190 P.3d 180, 186

6    (2008).  But Arizona's courts have also recognized limits to the Guidelines' applicability.  *See*

7    *Navajo Nation*, 230 Ariz. at 345, 284 P.3d at 35 (holding that "the Guidelines are not exclusive

8    and are advisory in nature, so we need not limit our inquiry for good cause [to deviate from

9    ICWA's placement preferences] to the[] factors" identified in the Guidelines).  Now that the

10   BIA has promulgated new Guidelines—*see* 80 Fed. Reg. 10,146 (Feb. 25, 2015)—state courts

11   must again determine their applicability and weight in cases involving Indian children.  And,

12   to the extent that the Guidelines may be promulgated as binding regulations—*see* 80 Fed. Reg.

13   14,880 (Mar. 20, 2015)—those regulations have not been published and are not currently

14   applicable to Plaintiffs' cases.  Indeed, the content of the regulations could well change from

15   the proposal submitted by the Secretary of the Interior, given that the Secretary explicitly

16   solicited commentary on them.  80 Fed. Reg. at 14,880.

17        **2.      Hardship to the parties**

18        "Where . . . the threat of action is very real," challenges to legislative enactments that

19   lack procedural protections may be ripe even if no deprivation has occurred yet.  *Alaska*

20   *Airlines, Inc. v. City of Long Beach*, 951 F.2d 977, 987 (9th Cir. 1991) (citation omitted).  In

21   other words, "a litigant need not 'await the consummation of threatened injury to obtain

22   preventive relief.  If the injury is *certainly* impending, that is enough.'"  *Addington*, 606 F.3d

23   at 1179 (citations omitted).  But "where there is no direct threat that a law will be construed in

24   a given way" a challenge to a statute is premature.  *Alaska Airlines*, 951 F.2d at 986.

25        Plaintiffs have failed to plead the necessary hardship.  Although a potential hardship is

26   possible if the juvenile court rules against them, that is not enough to obviate the ripeness bar.

It is also possible that the juvenile court will find good cause to deviate from ICWA's placement preferences, or good cause to deny transfer to tribal court, negating Plaintiffs' claims that they will suffer hardship if the children are removed from their care or their cases are transferred to tribal court.  Moreover, Plaintiffs' claims cannot ripen (by demonstrating a hardship) without first seeking redress in the juvenile court.

## CONCLUSION

For all of the foregoing reasons the State—by and through Defendant McKay—moves this Court to abstain and dismiss the Complaint in its entirety pursuant to Fed. R. Civ. P.12(b)(1).  In the alternative, the State moves the Court to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6), and because Counts 3 and 5 fail to state a claim upon which relief can be granted and the remaining Counts do not—and cannot—allege action on the part of the State Defendant that would give rises to causes of action alleged in those Counts, dismiss the State from the action.

DATED October   16  , 2015.


MARK BRNOVICH
Attorney General


s/ Dawn R. Williams
John S. Johnson
Dawn R. Williams
Office of the Attorney General
State of Arizona
1275 West Washington Street
Phoenix, Arizona  85007-2926
*Attorney for Defendant Gregory A. McKay*

29

# CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2015, I electronically transmitted the attached

document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice

of Electronic Filing to the following CM/ECF registrants:

JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
Steve Miskinis
Indian Resources Section
Ragu-Jara Gregg
Law and Policy Section
Environment and Natural Resources Div.
United States Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044-7611
Telephone: (202) 305-0262
Email: steven.miskinis@usdoj.gov
*Attorneys for Federal Defendants*

Clint Bolick (021684)
Aditya Dynar (031583)
Scharf-Norton Center for Constitutional Litigation at the
Goldwater Institute
500 East Coronado Road
Phoenix, Arizona 85004
(602) 462-5000
e-mail:  litigation@goldwaterinstitute.org

1 Michael W. Kirk *(admitted pro hac vice)*
Brian W. Barnes *(admitted pro hac vice)*
2 Harold S. Reeves *(admitted pro hac vice)*
Cooper & Kirk, PLLC
3 1523 New Hampshire Avenue, N.W.
Washington, D. C. 20036
4 (202) 220-9600
(202) 220-9601 (fax)
5 *Attorneys for Plaintiffs*

6

7                                   MARK BRNOVICH
                                    Attorney General
8
                                     s/ Dawn R. Williams
9                                   Appeals Unit Chief Counsel
                                    Attorney for Defendant Gregory A. McKay
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26