Pratik A. Shah (*pro hac vice* pending)
(D.C. Bar No. 497108)
James E. Tysse (*pro hac vice* pending)
(D.C. Bar. No. 978722)
Hyland Hunt (*pro hac vice* pending)
(D.C. Bar No. 999276)
Z.W. Julius Chen (*pro hac vice* pending)
(D.C. Bar. No. 1002635)
AKIN GUMP STRAUSS HAUER &
    FELD LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036-1564
(202) 887-4000
pshah@akingump.com
jtysse@akingump.com
hhunt@akingump.com
chenj@akingump.com

*Attorneys for Casey Family Programs,
et al.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

Carol Coghlan Carter, *et al.*,

Plaintiffs,

v.

Kevin Washburn, *et al.*,

Defendants.

No. CV-15-01259-PHX-NVW

**BRIEF OF CASEY FAMILY PROGRAMS AND TWELVE OTHER NATIONAL CHILD WELFARE ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF MOTIONS TO DISMISS**

## INTERESTS OF AMICI CURIAE

*Amici curiae* are Casey Family Programs, the Annie E. Casey Foundation, the Center for the Study of Social Policy, the Child Welfare League of America, the Children's Defense Fund, the Donaldson Adoption Institute, the First Focus Campaign for Children, FosterClub, Generations United, the National Alliance of Children's Trust and Prevention Funds, the National Center on Adoption and Permanency, the North

American Council on Adoptable Children, and the W. Haywood Burns Institute. *Amici* are national child welfare organizations with decades of firsthand experience developing and implementing the best practices and policies for child welfare decisionmaking. *Amici* are united in their view that, in the Indian Child Welfare Act, Congress enacted the gold standard for child welfare policies and practices that should be afforded to all children, and that it would work serious harm to child welfare programs nationwide for this Court to curtail the Act's protections and standards. Statements of interest of each *amicus curiae* are provided in an appendix to this brief.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

Through decades of experience, *amici* have found that the cornerstone of an effective child welfare system is the presumption that children are best served by supporting and encouraging their relationship with birth parents who are interested in raising them and are able to do so safely, unless and until the parental relationship must be permanently severed. When children are unable to safely remain with their parents, *amici* have found that their interests are best served by creating policies and procedures maximizing the likelihood that they will be raised by relatives. These bedrock principles, which are applicable to all children and serve as the cornerstone of *amici*'s work in child welfare, are codified in the Indian Child Welfare Act ("ICWA").

Accordingly, in alleging (Compl. ¶ 3) that "[c]hildren with Indian ancestry" are "[a]lone among American children" in being uniquely disadvantaged by ICWA, plaintiffs get it exactly backwards. Congress provided a framework for custody decisions in ICWA that systematically serves the best interests of children and that incorporates the established model for child welfare and placement decisionmaking. ICWA's standards requiring child welfare agencies to engage in active efforts to

---

[1] A separate set of attorneys from the firm representing *amici* is representing intervenor Gila River Indian Community, but neither those attorneys nor counsel for any other party has authored this brief in whole or in part. No party (including intervenor) or party's counsel, nor any person other than *amici* or their members, has contributed money intended to fund preparation or submission of this brief.

preserve and reunify families, and limiting the circumstances in which parental rights can be terminated or children can be removed from their families, embody the first principle in child welfare:  children's best interests are served by maintaining their ties with their parents so long as it is safe to do so.  When children must be removed from their families due to abuse and/or neglect, ICWA's placement preferences codify the best practice in child welfare of favoring extended family placements, including placement within a child's broader kinship community.  Moreover, in the decades following ICWA's enactment, Congress has incentivized states to adopt child welfare principles for all children that are similar to ICWA's standards.  Congress's judgment that these standards serve the best interests of children is sound and should not be second-guessed; ICWA applies the gold standard for child welfare decisions for all children, and unraveling its protections could cause significant harm for Indian children.

## <u>ARGUMENT</u>

**I.    ICWA EMBODIES THE BEST PRACTICES IN CHILD WELFARE OF ALLOWING FAMILIES TO REMAIN TOGETHER AND ENCOURAGING REUNIFICATION**

### A.    The Primary Principle in Child Welfare is that Children are Best Served by Preserving and Strengthening Their Family Relationships

*Amici* work in child welfare across the spectrum of proceedings in which the relationships of children to their parents are affected:  from family support and advocacy services, to foster care and kinship placements, to the permanent termination of parental rights and the creation of new families through adoption.  Through decades of experience, *amici* have found that the cornerstone of an effective child welfare system is the presumption that children are best served by supporting and encouraging their relationship with parents who are interested in raising them and are able to do so safely.

This principle is reflected in a number of best practices in child welfare that seek to limit the separation of children from parents and to enable reunification, if possible, when a separation has occurred.  It is also applied by the majority of states as the guiding principle for determining the best interests of the child.  *See* Child Welfare

Information Gateway, *Determining the Best Interests of the Child:  Summary of State Laws* 2 (2012) (finding the most frequently stated guiding principle in state statutes for determining the best interests of the child is the "importance of family integrity and preference for avoiding removal of the child from his/her home").

*First*, a best practice in child welfare is to provide appropriate services to parents and families *before* there is any separation of a child from either parent.  Among the most important components of a sound child welfare system is the requirement that agencies and others responsible for children's well-being be vigilant in striving to keep children in their families.  Research and experience confirm that when it is possible for children to stay with their families, children's interests are best served.  *See, e.g.*, Kristine Nelson, *et al.*, *A Ten-Year Review of Family Preservation Research* 1 (2009); The Annie E. Casey Foundation*, Every Kid Needs A Family* 11 (2015) ("Whenever possible, children should remain at home with their parents or with a caring relative."). It is thus no surprise that practitioners and child advocates recognize the importance of "provid[ing] [parents] with services and support and … empower[ing] [them] to change their lives," so that "children c[an] be safely protected and treated within their own homes" and avoid the trauma and lasting negative effects of family separation.  CWLA, STANDARDS OF EXCELLENCE FOR SERVICES TO STRENGTHEN AND PRESERVE FAMILIES WITH CHILDREN 20 (2003) ("Services Standards").

*Second*, although the protection of children is paramount, children's well-being is best served if they are removed from their families only when necessary to protect them from serious harm.  *See* CWLA, STANDARDS OF EXCELLENCE FOR SERVICES TO ABUSED AND NEGLECTED CHILDREN AND THEIR FAMILIES § 1.24 (1998) ("The removal of a child from the home … is a drastic action that should be considered only when there is imminent danger to the child's life and safety, or when other measures to alleviate risk have failed or will not provide sufficient protection.").  This has been an animating principle of child welfare practice since the time of ICWA's enactment in the late 1970s.  At that time, prominent child welfare advocates were

pressing for child welfare interventions to be limited to cases of "[s]erious bodily injury inflicted by Parents upon their Child, or an attempt to inflict such injury, or the repeated failure of Parents to prevent their Child from suffering such injury," or when children were abandoned or victims of sexual abuse.  Joseph Goldstein, *et al.*, BEFORE THE BEST INTERESTS OF THE CHILD 193-195 (1979).[2]   Most prominently, the American Bar Association and the Institute for Judicial Administration proposed formal standards with the same limitations:  a child should be subject to court jurisdiction only when (i) a "child has suffered, or there is a substantial risk that a child will imminently suffer, a physical harm . . . which causes, or creates a substantial risk of causing, disfigurement, impairment of bodily functioning, or other serious physical injury"; (ii) "a child is suffering serious emotional damage, evidenced by severe anxiety, depression, or withdrawal, or untoward aggressive behavior toward self or others"; or (iii) "a child has been sexually abused."  Joint Comm'n on Juvenile Justice Standards, Inst. of Judicial Admin., *ABA Standards Relating to Abuse and Neglect* § 2.1 (1982).

*Third*, if temporary separation of a child from her family is unavoidable, the presumptive initial goal of the child welfare system is reunification.  *See* National Council of Juvenile and Family Court Judges, *Adoption and Permanency Guidelines: Improving Court Practice in Child Abuse and Neglect Cases* 5 (2000) ("Consistent with child safety, families should be preserved, reunified and strengthened so they can successfully rear their children."); *see also* Child Welfare Information Gateway, *Supporting Reunification and Preventing Reentry Into Out-of-Home Care* 1 (2012) ("Once a child or youth has been removed from the care of his or her parents, safe and timely family reunification is the preferred permanency option.").

*Fourth*, it is a best practice to encourage and preserve a child's ties with her parents even if those ties are initially undeveloped due to early separation of the child

---

[2] *See also* Robert Mnookin, *Foster Care: In Whose Best Interests?*, 43 HARV. EDUC. REV. 599 (1973); Michael Wald, *State Intervention on Behalf of 'Neglected' Children: A Search for Realistic Standards*, 27 STAN. L. REV. 985 (1975).

from the parents.  "The first permanency plan" for any child "is to provide services to the birth parents to determine whether they are willing and able to assume parenting responsibilities for their child," and the "first goal" of child welfare services "is reunification of the child with the birth parents."  CWLA, STANDARDS OF EXCELLENCE FOR ADOPTION SERVICES § 4.14 (2000) ("Adoption Standards").

*Finally*, it is a key best practice to require courts to follow pre-established, objective rules that operate above the charged emotions of individual cases and that presume that preservation of a child's ties to her parents is in her best interests.  *See* National Council of Juvenile and Family Court Judges, *supra*, at 14.  Application of the best-interests-of-the-child standard should be guided by substantive rules and presumptions because "judges too may find it difficult, in utilizing vague standards like 'the best interests of the child,' to avoid decisions resting on subjective values."  *Smith v. Organization of Foster Families for Equal. & Reform*, 431 U.S. 816, 835 n.36 (1977).  Courts should not terminate a child's relationship to a parent based on "imprecise substantive standards that leave determinations unusually open to the subjective values of the judge."  *Santosky v. Kramer*, 455 U.S. 745, 762-763 (1982).

## B.  ICWA Adopts and Implements the First Principle of Family Preservation and Reunification

In considering ICWA, Congress was faced with the need to develop a body of family law in one area where Congress, rather than the States, can directly legislate regarding such matters—Indian affairs.  *See* 25 U.S.C. § 1901(1) (invoking "Congress['s] … plenary power over Indian affairs").  In developing federal standards to apply across the full range of child custody proceedings "to protect the best interests of Indian children," *id*. § 1902, Congress properly embraced, for Indian children, the key best practices that in *amici*'s experience serve the best interests of all children.

Congress sought in ICWA to increase the likelihood that parent-child and familial relationships would be preserved by requiring that "active efforts" to support and develop a child's relationship with her parents and extended family be made before

1    that relationship is permanently ended.   Specifically, ICWA requires that any party

2    seeking to "effect a foster care placement of, or termination of parental rights to, an

3    Indian child under State law" must establish "that active efforts have been made to

4    provide remedial services and rehabilitative programs designed to prevent the breakup

5    of the Indian family."  25 U.S.C. § 1912(d).

6        ICWA also implements the best practice of presuming that it is in a child's best

7    interests to preserve ties with her parents by appropriately limiting the circumstances in

8    which a child can be removed from her family.  A child may be placed in foster care

9    only if clear and convincing evidence establishes that the "continued custody of the

10   child by the parent or Indian custodian is likely to result in serious emotional or physical

11   damage to the child."   25 U.S.C. § 1912(e).   Moreover, to ensure that no child is

12   wrongfully separated permanently from her family, Congress requires that grounds for

13   terminating the parent-child relationship of Indian children be proven beyond a

14   reasonable doubt.  *Id*. § 1912(f).  This reasonable-doubt standard is consistent with the

15   Supreme Court's post-ICWA recognition that "[b]efore a State may sever completely

16   and irrevocably the rights of parents in their natural child," the Constitution "requires

17   that the State support its allegations by *at least* clear and convincing evidence."

18   *Santosky*, 455 U.S. at 747-748 (emphasis added).

19       Plaintiffs contend that Indian children are denied their rights to equal protection

20   of the law because Congress required more than the constitutional minimum to

21   terminate their parents' rights, whereas Arizona hews to the constitutional floor.  *See*

22   Compl. ¶ 77.   But other states share Congress's judgment in ICWA—and *amici*'s

23   judgment from decades of experience—that the best interests of children are served by a

24   termination standard exceeding the constitutional minimum.  *See, e.g.*, *In re Adam R.*,

25   992 A.2d 697, 700 (N.H. 2010) (reasonable doubt standard to terminate parental rights

26   in New Hampshire).

27       Finally, ICWA ensures that children's best interests are served even-handedly by

28   enforcing a uniformly applicable presumption in favor of maintaining parent-child ties,

rather than allowing unguided judicial decisionmaking that risks infusing the best-interests-of-the-child standard with case-specific biases.  *See generally* 25 U.S.C. § 1912(f); *see also* H.R. Rep. No. 95-1386, 95th Cong., 2d Sess. 19 (1978) (the purpose of ICWA is to serve the best interests of children, but without structure the best interest standard "is vague, at best").  In mandating a strong showing of parental unfitness in any involuntary termination proceeding and requiring active efforts to support existing child-parent relationships before they are severed, 25 U.S.C. § 1912(d)-(f), ICWA's substantive standards are consistent with *amici*'s field-tested experience regarding how best to achieve the most favorable outcomes for vulnerable children and families.[3]

## II.   ICWA EMBODIES THE BEST PRACTICES IN CHILD WELFARE OF ENCOURAGING KINSHIP AND COMMUNITY PLACEMENTS

Beyond its strong protections for preserving and supporting a child's relationships with her parents, ICWA implements the best practices in child welfare with respect to alternative placements for children:  extended family first and foremost, and placements within a child's broader community as a secondary option.

If removal from her parents is unavoidable, the first choice in child welfare practice for an alternative placement is the child's extended family, for both temporary and adoptive placements.  *See* National Council of Juvenile and Family Court Judges, *supra*, at 10–11 (2000) ("An appropriate relative who is willing to provide care is almost always a preferable caretaker to a non-relative."); Adoption Standards § 1.10 ("The first option considered for children whose parents cannot care for them should be placement with extended family members when a careful assessment clearly indicates

---

[3] Similarly, in the case of voluntary relinquishments, ICWA ensures that consents are fully voluntary, prohibits relinquishment for 10 days after birth, and provides for a period during which revocation of consent can occur.  25 U.S.C. § 1913.  Organizations that promote best practices for adoption similarly recommend "waiting periods of at least several days after childbirth before signing relinquishments and adequate revocation periods during which birthparents can change their minds."  Evan B. Donaldson Adoption Institute, *Safeguarding the Rights and Well-Being of the Birthparents in the Adoption Process*, at 5 (2007).

the ability, willingness, and capacity of those individuals to care for the children."); CWLA, STANDARDS OF EXCELLENCE FOR KINSHIP CARE SERVICES § 1.4 ("Kinship Care Standards") ("Kinship care … should be the first option considered and assessed when a child is placed in the custody of a child welfare agency….").

Placement within the extended family is advised because kinship care "maximizes a child's connection to his or her family."  Adoption Standards § 8.24; *see* Tiffany Conway & Rutledge Hutson, *Is Kinship Care Good for Kids?* 2 (2007) ("[T]he research tells us that many children who cannot live with their parents benefit from living with grandparents and other family members.") (emphasis omitted).  Children in temporary kinship care are less likely to experience multiple placements and more likely to be successfully reunified with their parents, among other beneficial outcomes.  *See* Kinship Care Services, at 5.  In addition, "[a]doption by kinship caregivers can have many advantages for children who cannot be reunited with their parents."  Adoption Standards § 4.23.[4]  Recognizing the benefits of extended family placements, many states have employed the "Family Finding model," which calls for searching intensively to identify family members and other adults close to a child in foster care, and involving those adults in developing and carrying out a permanency plan for the child. *See* Sharon Vandivere & Karin Malm, *Family Finding Evaluations: A Summary of Recent Findings* (Child Trends Publication # 2015-01), Jan. 2015.

The benefits of extended family placements are not limited to biological relatives, but extend to placements within a child's larger community.  Child welfare agencies consider "members of [a child's] tribes or clans, godparents, stepparents, or other adults who have a kinship bond with the child" as potential resources for kinship care.  Kinship Care Standards § 1.1.  For all children, best practices dictate that child

---

[4] *See also* Marc A. Winokur, *et al.*, *Matched Comparison of Children in Kinship Care and Foster Care on Child Welfare Outcomes*, 89 FAMILIES IN SOC'Y: J. CONTEMP. SOC. SCIENCES 338, 344-345 (2008) (reporting better outcomes for children in kinship care on several metrics).

welfare agencies should assess a child's "family friends … and neighbors," along with members of a child's tribe or clan where applicable, "to determine their willingness and ability to provide care and protection before seeking a nonrelative placement." *Id.* § 2.8.

Preserving a child's ties with this extended network of adults who can provide family-like relationships is important for all children, but may be of special importance to children from Native American communities. In those communities, the concept of family often includes other important relationships with adults who may be considered "aunts," "uncles," or "grandparents," regardless of bloodlines. *See* Allison Barlow & John T. Walkup, *The First Americans Have Much to Teach Us*, 47 J. AM. ACAD. CHILD ADOLESCENT PSYCHIATRY 843, 844 (2008). In fact, one of Congress's "particular points of concern" in enacting ICWA "was the failure of non-Indian child welfare workers to understand the role of the extended family in Indian society." *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 35 n.4 (1989).

Furthermore, as with all decision-making regarding whether to remove children from their families (*see* p. 6, *supra*), the best practice is to structure choices about temporary or adoptive placements around a set of objective criteria, rather than leaving decisionmaking to an unbridled best-interests-of-the-child standard. That standard is vague; decisions based only on that standard are supported not by evidence-based practices but instead by "limited science." Robert E. Emery *et al.*, *A Critical Assessment of Child Custody Evaluations: Limited Science and a Flawed System*, 6 PSYCHOLOGICAL SCI. IN THE PUB. INTEREST 1 (2005). The interests of children are better served when laws governing their placement in foster care and adoptive homes are grounded in objective principles designed to guide and constrain judicial decision-making—including preferences for a child's extended family and placement within family-like, community-based relationships.

ICWA fully implements these best practices by making "a member of the child's extended family" the first-priority placement when it is necessary either to place the

child in foster care temporarily or to terminate parental relationships.   25 U.S.C. § 1915(a), (b).  Consistent with the critical importance of supporting or maintaining a child's ties with an extended family beyond blood relatives and a child's larger social network, ICWA provides for temporary or adoptive placement within a child's tribe as a secondary alternative.  *Id.*  In all cases, a court can make a different placement if "good cause" so requires.  *Id.*

Plaintiffs allege that these placement preferences discriminate against Indian children because they do not "look to the interests-of-the-child factors that state courts have traditionally applied."  Compl. ¶ 86.  But ICWA does not elevate an invalid racial preference above the best interests of the child, as plaintiffs allege.   Congress's determination to guide placement decisions by substantive (but rebuttable) presumptions of the proper placement, consistent with child-welfare best practices, is precisely what best serves the interests of all children in *amici*'s judgment.

Plaintiffs further decry engagement of a child's tribal community through the "active efforts" provision, which in their view "single[s] out and afford[s] separate, unequal treatment" that harms Indian children.   Compl. ¶¶ 68-69; *see* 80 Fed. Reg. 10146, 10150 (Feb. 25, 2015) (active efforts "are intended primarily to maintain and reunite an Indian child with his or her family *or tribal community*") (emphasis added). To the contrary, this provision embodies the child welfare best practice of engaging a child's community in support of family preservation efforts.   *See* CWLA, Services Standards 136 ("Although parents have the primary responsibility for ensuring their child's safety and well-being, they need ongoing support from the community to succeed.").   And it makes sense to engage a child's tribal community in seeking to preserve the child's family and broader familial network.   Engaging a child's tribe is more likely to lead to the identification of additional resources that can help support the family, or a family member who can care for the child, if necessary—all of which

furthers, not hinders, the child's well-being.[5]

It is also consistent with the highest standards of child welfare for the Bureau's implementing guidelines to provide that a child's ordinary bonding with a temporary non-family custodian does not constitute good cause for deviating from ICWA's placement preferences when that bonding stems from a placement that does not comply with ICWA.  *See* 80 Fed. Reg. at 10,158.  Contrary to plaintiffs' contention, this does not impermissibly "force a child … to sever existing relationships in order to create new racially-conforming ones."  Compl. ¶ 87.  *Amici* recognize that it can be difficult for children to shift from one custody arrangement to another.  But the concepts of bonding and attachment have serious limitations as applied in an unguided best-interests-of-the-child analysis.  *See* David E. Arrendondo & Lenord P. Edwards, *Attachment, Bonding, and Reciprocal Connectedness*, 2 J. CTR. FOR FAM. CHILD. & CTS. 109, 110-111 (2000) (discussing the ways that bonding and attachment theory "may mislead courts").  The way to limit any disruption, moreover, is to mandate careful adherence to procedures that minimize errors in temporary or initial custodial placements.  It is not a best practice to "'reward those who obtain custody, whether lawfully or otherwise, and maintain it during any ensuing (and protracted) litigation,'" *Mississippi Band of Choctaw Indians*, 490 U.S. at 54 (citation omitted), by treating relationships established

---

[5] In enacting ICWA's placement preferences, Congress was responding to evidence that very few adoptive placements were being made within the tribal community. *See, e.g.*, *Problems that American Indian Families Face in Raising Their Children and How These Problems are Affected by Federal Action or Inaction: Hearings Before the Subcomm. on Indian Affairs, S. Comm. on Interior and Insular Affairs*, 93rd Cong. 61 (1974) (statement of Dr. Carl Mindell) ("Once you're at the point of thinking about adoption … welfare agencies are not making adequate use of the Indian communities themselves.  They tend to look elsewhere for adoption type of homes."); *Indian Child Welfare Act of 1977: Hearing on S. 1214 Before the S. Select Committee on Indian Affairs*, 95th Cong. 271 (testimony of Virgil Gunn) (of 136 adoptions of Colville children in last 10 years, only 20 were with Indian families).

by temporary, non-ICWA-compliant placements as good cause to depart from ICWA's mandates.[6]

## III.   CONGRESS HAS ENCOURAGED STATES TO ADOPT CHILD WELFARE PRACTICES CONSISTENT WITH ICWA FOR ALL CHILDREN

As described above, ICWA embodies and gives effect to the best practices, long endorsed by *amici*, governing the most effective and protective child welfare procedures and decisionmaking for all children and families.  Congress confined and tailored its judgment in ICWA to Indian children because Indian affairs is one of the rare areas in which Congress exercises direct legislative authority over family law, which is otherwise broadly governed by the States.  Nonetheless, since ICWA's enactment, Congress has used federal spending to encourage states to adopt child welfare practices similar to the standards embodied in ICWA.

For example, the Adoption Assistance and Child Welfare Act of 1980 hinges federal matching funds for foster care expenditures on state law's provision that, in each case, "reasonable efforts will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home."  Pub. L. No. 96-272 § 101, 94 Stat. 501, 503 (1980); *compare* ICWA, 25 U.S.C. § 1912(d) (requiring "active efforts").  The Adoption and Safe Families Act of 1997 amended the "reasonable efforts" standard by providing some aggravated circumstances in which it would not apply, but otherwise

---

[6] State courts have also long recognized that the bonding that may occur in temporary placements should not disrupt the overall goals of the child welfare system of reunification or extended family placement.  *See In re Michael B.*, 604 N.E.2d 122, 130 (N.Y. 1992) ("To use the period during which a child lives with a foster family, and emotional ties that naturally eventuate, as a ground for comparing the biological parent with the foster parent undermines the very objective of voluntary foster care[.]"); *In re Halloway*, 732 P.2d 962, 971-972 (Utah 1986) ("The adoptive parents argue that we should consider the bonding that has taken place between themselves and Jeremiah in reaching a decision in this matter.  … Such a standard would reward those who obtain custody … and maintain it during any ensuing (and protracted) litigation.").

reaffirmed Congress's commitment that "reasonable efforts shall be made to preserve and reunify families" before children are permanently placed elsewhere.  42 U.S.C. § 671(a)(15).  Although the "reasonable efforts" and "active efforts" standards are different, *see* 80 Fed. Reg. at 10151, that difference merely reflects longstanding principles of federalism.  Given the primary role of states in governing family relationships, it makes sense for Congress to leave them discretion whether to hew to the minimum "reasonable efforts" standard or adopt the higher "active efforts" standard.  Moreover, Congress has provided grants to states to fund the kinds of services that make up "active efforts" and are critical for supporting vulnerable families, such as community-based family support and preservation services, including "preplacement preventive services."  42 U.S.C. § 629a(a)(1)(B).

In addition, for many years, Congress has recognized the importance of relying on relatives and extended kin as preferred caregivers when children are unable to be raised by their parents.  In order to obtain federal matching funds, a state must "consider giving preference to an adult relative over a non-related caregiver when determining a placement for a child, provided that the relative caregiver meets all relevant State child protection standards," and must exercise "due diligence" to identify, locate, and notify relatives when children enter the foster care system.  42 U.S.C. § 671(a)(19), (29); *see also Miller v. Youakim*, 440 U.S. 125, 142 n.21 (1979) (noting "Congress' determination that homes of parents and relatives provide the most suitable environment for children").  Congress has further recognized that placement within the community is best, requiring states to prioritize placement "in close proximity to the parents' home," among other requirements.  42 U.S.C. § 675(5)(A).

* * * * *

ICWA does not represent a departure from Congress's judgment about the best interests of all children.  Rather, ICWA is the full expression of that judgment in a comprehensive system for child welfare that embodies the best practices in the field.  Congress chose the pathway and practices that are best for all children; ICWA's

1   legislative reach was more limited because the scope of Congress's direct legislative

2   authority over child welfare matters is limited.   For that reason, Plaintiffs' effort

3   (Compl. ¶¶ 3, 91-95, 107) to portray ICWA as imposing some special disadvantage on

4   Indian children—predicated on their fundamentally flawed conception of child-welfare

5   best practices and ICWA's sound application of those practices—is flatly wrong.

6                                    **<u>CONCLUSION</u>**

7        This Court should grant the motions to dismiss.

8                                          Respectfully submitted,
                                          By:  <u>/s/ *James E. Tysse*          </u>
9                                          Pratik A. Shah
                                          James E. Tysse
10                                         Hyland Hunt
                                          Z.W. Julius Chen
11                                         AKIN GUMP STRAUSS HAUER &
12                                             FELD LLP
                                          1333 New Hampshire Avenue, N.W.
13                                         Washington, D.C. 20036-1564
                                          (202) 887-4000
14
15                                         *Attorneys for Casey Family Programs, et*
16                                         *al.*

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2
3
4

       I hereby certify that on October 23, 2015, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and service to counsel of record in this proceeding.

5

6
7
8
9
10
11

Clint Bolick
Aditya Dynar
Scharf-Norton Center for
Constitutional Litigation at the
Goldwater Institute
500 E. Coronado Rd.
Phoenix, Arizona 85004
(602) 462-5000
litigation@goldwaterinstitute.org

12
13
14
15
16
17

Michael W. Kirk
Brian W. Barnes
Harold S. Reeves
Cooper & Kirk, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
*Attorneys for Plaintiffs*

18
19
20
21
22
23
24

Steven Edward Miskinis
US Dept of Justice
Land & Natural Resources Division
PO Box 44378
Indian Resources Section
Washington, DC 20026
202-305-0262
202-305-0271 (fax)
steven.miskinis@usdoj.gov
*Attorneys for Defendants Washburn and Jewell*

25

26

27

28

John Stephen Johnson
Office of the Attorney General - Phoenix
1275 W Washington St.
Phoenix, AZ 85007-2997
602-542-9948
john.johnson@azag.gov
*Attorneys for Defendant McKay*


Linus Everling
Thomas L. Murphy
Gila River Indian Community
525 W. Gu u Ki
P.O. Box 97
Sacaton, Arizona 85147
(520) 562-9760
linus.everling@gric.nsn.us
thomas.murphy@gric.nsn.us

Donald R. Pongrace (pro hac vice application pending)
Merrill C. Godfrey (pro hac vice application pending)
Akin Gump Strauss Hauer &
Feld, LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036-1564
(202) 887-4000
dpongrace@akingump.com
mgodfrey@akingump.com
*Attorneys for Proposed Intervenor Gila River Indian Community*


       I hereby certify that on October 23, 2015, I arranged for a copy of the foregoing to be hand-delivered on the following day to:


Honorable Neil V. Wake
United States District Court
Sandra Day O'Connor U.S. Courthouse, Suite 524
401 West Washington Street, SPC 52
Phoenix, AZ 85003-2154

Dated this 23rd day of October, 2015

/s/James E. Tysse

## APPENDIX

Casey Family Programs is the nation's largest operating foundation focused entirely on foster care and improving the child welfare system. Casey Family Programs has provided direct family services to children and families involved in public and tribal foster care systems for more than 40 years. It also works to improve the child welfare system by consulting with child welfare agencies and providing research and education to policymakers about best practices in the child welfare area. The Indian Child Welfare Act both embodies and has served as a model for the child welfare principles and policies that are critical to Casey Family Programs' work, and Casey Family Programs has filed other amicus briefs related to the interpretation and application of the Act. *See, e.g.*, *Adoptive Couple v. Baby Girl*, 133 S. Ct. 2552 (2013).

The Annie E. Casey Foundation is a private charitable organization dedicated to improving the well-being of our nation's most vulnerable children. The Foundation collaborates with public agencies, nonprofit organizations, policymakers and community leaders to develop innovative, cost-effective solutions for challenging social problems. For more than 60 years, the Foundation has supported programs and initiatives to secure and sustain lifelong family connections for children and youth in foster care, and for 36 years, the Foundation provided direct foster care and related child welfare services in New England and Maryland. This work, along with the Foundation's system improvement initiatives, direct consulting work with numerous public child welfare agencies, and grantmaking, has contributed to significant and measurable transformations in these systems and helped to improve outcomes for children and their families. Federal policies such as the Indian Child Welfare Act set substantive and procedural standards that are central to the Foundation's goal of ensuring that child welfare systems operate effectively and efficiently to strengthen families.

The Center for the Study of Social Policy (CSSP) is a national, nonprofit organization, headquartered in Washington, D.C., with offices in New York and Los Angeles, which advances innovative ideas and public policies to secure equal

opportunities and better futures for all children and families, especially those most often left behind. For more than 30 years, CSSP has supported elected officials, public administrators, families, and neighborhood residents to take the actions they need to ensure that children can thrive.  CSSP's current work focuses on improving child welfare systems, with a particular focus on racial equity; improving the healthy sexual and gender identity development for all children and youth in the child welfare system; accelerating the development of effective, integrated, local early childhood systems; ensuring the optimal development for children and youth through strategies to develop protective factors for young children and older youth; and providing local leaders with the tools needed to transform neighborhoods into healthy communities.

Established in 1920, the Child Welfare League of America ("CWLA") is the nation's oldest and largest membership-based child welfare organization. CWLA is a coalition of public and private agencies serving vulnerable children and families, including those in tribal communities, by advancing standards of excellence, accreditation, and the best research-based practices with respect to child welfare work. In particular, CWLA is recognized nationally as the standard-setter for child welfare services and publishes thirteen "Standards of Excellence" as a means to achieve professionalism and uniformity in the administration of child welfare services, including in particular Standards of Excellence for Adoption Services. CWLA adheres to and supports ICWA in its Standards of Excellence. CWLA's Standards also influence and improve child welfare practices throughout North America, as well as inform the Standards of Accreditation for agency administration, management, and service delivery for accredited child welfare agencies.

The Children's Defense Fund ("CDF") Leave No Child Behind® mission is to ensure every child a Healthy Start, a Head Start, a Fair Start, a Safe Start and a Moral Start in life and successful passage to adulthood with the help of caring families and communities.  CDF has worked relentlessly for more than four decades to ensure a level playing field for all children and to keep them out of the Cradle to Prison Pipeline®.

CDF champions policies, programs and practices that lift children out of poverty, ensure their access to health care, offer them quality early childhood experiences and a quality education, protect children from abuse and neglect and delinquency, and keep children safely out of foster care and the juvenile justice system.   CDF provides a strong, effective and independent voice for all children of America and pays particular attention to the needs of poor children, children of color and those with disabilities.   One of CDF's earliest reports, *Children Without Homes: An Examination of Public Responsibility to Children in Out of Home Care*, identified, among other findings, a pervasive, implicit anti-family bias that often shapes decisions about children at risk of removal from their families or in out-of home care.   CDF works collaboratively at the federal, state and local levels to achieve policy and practice reforms to keep children safely with their families, and only when that is not possible, to place children in the most family-like setting appropriate and within reasonable proximity to their families and community, to seek safe reunification with the support of needed services for the child and the parents in a timely fashion, and only when reunification is not appropriate, to move children promptly to new permanent families through adoption or kinship guardianship.

The Donaldson Adoption Institute is a national not-for-profit organization whose mission is to provide leadership that improves adoption laws, policies, and practices in order to better the lives of everyone touched by adoption. To achieve those goals, the Institute conducts and synthesizes research, offers education to inform public opinion, promotes ethical practices and legal reforms, and works to translate policy into action.

The First Focus Campaign for Children is a bipartisan organization advocating for legislative change in Congress to ensure children and families are a priority in federal policy and budget decisions. The organization is dedicated to the long-term goal of substantially reducing the number of children entering foster care, and working to ensure that the existing system of care protects children and adequately meets the needs of families in the child welfare system. First Focus is especially concerned with

1   increasing federal investment in prevention efforts and providing support and services

2   for at-risk families to ensure that they avoid entering the child welfare system in the first

3   place. First Focus fully supports the Indian Child Welfare Act, and views it as a model

4   for child welfare principles and policies in the field.

5           FosterClub is the national network of young people in foster care. FosterClub's

6   mission is to lead the efforts of young people in and from foster care to become

7   connected, educated, inspired, and represented so that they can realize their personal

8   potential and contribute to a better life for their peers. For over a decade, FosterClub has

9   provided foster youth a place to turn for advice, information, and hope. With over

10  32,000 members, FosterClub elevates the collective voice of young people who have

11  experienced foster care, including Native American youth involved with the child

12  welfare system. FosterClub's young leaders engage and inform policymakers,

13  practitioners, and the public about the critical needs of children and youth through first-

14  hand stories about what life is like in the foster care system.

15          Generations United's mission is to improve the lives of children, youth, and older

16  adults through intergenerational collaboration, public policies, and programs for the

17  enduring benefit of all.  For nearly three decades, Generations United has been the

18  catalyst for policies and practices stimulating cooperation and collaboration among

19  generations, evoking the vibrancy, energy, and sheer productivity that result when

20  people of all ages come together.  Generations United believes that we can only be

21  successful in the face of our complex future if generational diversity is regarded as a

22  national asset and fully leveraged.   Generations United's National Center on

23  Grandfamilies is a leading voice for issues affecting families headed by grandparents

24  and other relatives.  Through the center, Generations United leads an advisory group of

25  organizations, caregivers and youth that sets the national agenda to advance public will

26  in support of these families.  Center staff conduct federal advocacy, provide technical

27  assistance to state level practitioners and advocates, and train grandfamilies to advocates

28  for themselves.  The Center raises awareness about the strengths and needs of the

1  families through media outreach, weekly communications, and awareness raising
2  events. It offers a broad range of guides, fact sheets, and tools for grandfamilies which
3  cover issues from educational and heath care access to financial and legal supports.

4     The National Alliance of Children's Trust and Prevention Funds is a national
5  leader in preventing child abuse and neglect and strengthening families. Its mission
6  includes efforts to promote and support a system of services, laws, practices and
7  attitudes that supports families by enabling them to provide their children with safe,
8  healthy, and nurturing childhoods. It is the only national organization that supports all
9  aspects of the work of state children's trust and prevention funds, which are special
10  funds established in state law, funded by a variety of state revenue sources or donations,
11  and dedicated to child welfare programs. The Alliance provides training, technical
12  assistance, and publications that support effective child welfare practices throughout the
13  Country, including a 14-hour online training in how to help families build protective
14  factors that have been shown to increase the health and well-being of children and
15  families.

16     The National Center on Adoption and Permanency ("NCAP") is a unique
17  nonprofit organization that provides a full range of multidisciplinary services, resources
18  and information relating to adoption, foster care and child welfare.  NCAP's mission is
19  to reshape permanency-related policy and practice in the U.S. so that they progress
20  beyond their primary, traditional goal of ensuring that all children live in safe,
21  permanent, loving homes—with their families of origin when possible, and in new
22  families when necessary—to a new paradigm with a more-vital objective: enabling
23  those children and their families to succeed.

24     The North American Council on Adoptable Children ("NACAC") was founded
25  in 1974 by adoptive parents to meet the needs of children waiting for permanent
26  families and the families who adopt them.  NACAC promotes and supports permanent
27  families for children and youth in the United States and Canada, especially those in
28  foster care and those who have special needs.  Dedicated to the belief that every child

deserves a permanent, loving family, NACAC's activities include advocacy, parent and youth leadership development, adoption support, and education and information sharing.  NACAC produces conferences, position statements, articles, and publications highlighting best practices in child welfare and adoption.  NACAC fully supports ICWA and several of NACAC's position statements highlight the practices codified in ICWA as best practices for all children and youth.

The W. Haywood Burns Institute works to improve the life outcomes of youth of color and poor youth in public child serving systems.  The Burns Institute facilitates a collaborative environment where community and system stakeholders strategically use data to reduce racial and ethnic disparities and supports capacity building of families and organizations to redirect resources to community-based interventions, thus reducing system involvement.