SAMUEL F. DAUGHETY (SBN 023170)
SAMUEL KOHN *
DENTONS US LLP
1301 K Street, NW,
Suite 600, East Tower
Washington, DC  20005-3364
(202) 408-6400
samuel.daughety@dentons.com
samuel.kohn@dentons.com

ERIN C. DOUGHERTY *
MATTHEW N. NEWMAN *
NATIVE AMERICAN RIGHTS FUND
745 W. 4th Avenue, Suite 502
Anchorage, AK 99501-1736
(907) 276-0680
dougherty@narf.org
mnewman@narf.org

PAULA M. YOST *
DENTONS US LLP
525 Market Street, 26th Floor
San Francisco, CA 94105-2708
(415) 882-5000
paula.yost@dentons.com

KATHRYN E. FORT *
INDIGENOUS LAW AND POLICY
  CENTER
MICHIGAN STATE UNIVERSITY
  COLLEGE OF LAW
648 N. Shaw Lane
East Lansing, MI 48824-1300
(517) 432-6992
fort@law.msu.edu

* Application for admission pro hac vice pending

Attorneys for Amici Curiae

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| A.D. and C. by CAROL COGHLAN CARTER, their next friend; S.H. and J.H., a married couple; M.C. and K.C., a married couple; for themselves and on behalf of a class of similarly-situated individuals,<br><br>                    Plaintiffs,<br><br>          v.<br><br>KEVIN WASHBURN, in his official capacity as Assistant Secretary of BUREAU OF INDIAN AFFAIRS; SALLY JEWELL, in her official capacity as Secretary of Interior, U.S. DEPARTMENT OF THE INTERIOR; GREGORY A. McKAY, in his official capacity as Director of the ARIZONA DEPARTMENT OF CHILD SAFETY,<br><br>                    Defendants. | Case No. 2:15-CV-01259-PHX-NVW<br><br>**[LODGED] BRIEF OF AMICI CURIAE NATIONAL CONGRESS OF AMERICAN INDIANS, ASSOCIATION ON AMERICAN INDIAN AFFAIRS, AND NATIONAL INDIAN CHILD WELFARE ASSOCIATION IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................... 1

INTEREST OF THE AMICI CURIAE ..................................................................... 1

ARGUMENT ......................................................................................................... 2

I.  Congressional Hearings In the 1970's Revealed a Crisis in Child Welfare and Adoption Systems That Disproportionately Displaced Indian Children From Their Parents and Communities................................................................................ 2

    A.  The Disparities in Removals of Indian Children Were the Direct Result of 19th and Early 20th Century Federal Policies Designed to Displace Indian Children and Eradicate Indian Life................................................................................. 4

    B.  The Federal Indian Adoption Project Supported Adopting Indian Children to Non-Indian Households, Thereby Contributing to Widespread Displacement of These Children........................................................................................................... 5

    C.  Congress Determined That This Displacement Inflicted Significant Damage Upon Indian Children, Families, and Tribes....................................................... 6

II.  Congress Responded To These Abuses By Enacting ICWA Pursuant To Its Constitutional Authority Over Indian Affairs. ............................................. 10

III.  ICWA Has Improved Indian Child Welfare Systems, But The Full Benefits Of Its Protections Remain Elusive. ...................................................................... 12

CONCLUSION ..................................................................................................... 13

## <u>TABLE OF AUTHORITIES</u>

**<u>Page(s)</u>**

### <u>Federal Cases</u>

*Miss. Band of Choctaw Indians v. Holyfield*,
    490 U.S. 30 (1989) .................................................................................... *passim*

*Morton v. Mancari*,
    417 U.S. 353 (1974) ............................................................................... 11, 12

*Oglala Sioux Tribe v. Van Hunnik*,
    No. CIV. 13-5020-JLV, 2015 WL 1466067 (D.S.D March 30, 2015) ........................ 13

*Rice v. Cayetano*,
    528 U.S. 495 (2000) ....................................................................................... 10

*Seminole Nation v. United States*,
    316 U.S. 286 (1942) ....................................................................................... 11

*Seminole Tribe v. Florida*,
    517 U.S. 44 (1996) ......................................................................................... 10

*United States v. Antelope*,
    430 U.S. 641 (1977) ....................................................................................... 12

### <u>Constitutional Provisions</u>

U.S. CONST. art. I, § 8, cl. 3 ................................................................................ 12

### <u>Federal Statutes</u>

25 U.S.C.
    § 1901 .............................................................................................. 1, 10, 11
    § 1903 ............................................................................................................ 12

### <u>Administrative Materials</u>

*Guidelines for State Courts in Indian Child Custody Proceedings*, 80 Fed.
    Reg. 10,146 (Feb. 25, 2015) ....................................................................... 3, 13

## **Legislative Materials**

*Hearing on S. 1214 Before the Select Comm. on Indian Affairs*, 95th Cong.
(1977) .......................................................................................... 3, 4, 6, 7, 8

*Hearings on S. 1214 Before the Subcomm. on Indian Affairs and Pub. Lands
of the Comm. on Interior and Insular Affairs*, 95th Cong. (1978) ................................ 7

H.R. REP. No. 95-1386 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7530 ..................... *passim*

*Indian Child Welfare Program: Hearings before the Subcommittee on
Indian Affairs of the Senate Committee on Interior and Insular Affairs,*
93rd Cong, 2d Sess. (1974) .......................................................................... 3, 7, 8

S. REP. No. 95-597 (1977) .................................................................................. 3, 9

124 Cong. Rec. 37,379 (1978)..................................................................... 8, 9, 10


## **Other Authorities**

ALASKA DEPT. OF HEALTH & SOC. SERV'S, OFFICE OF CHILDREN'S
SERVICES, DATA OVER-VIEW OF DISPROPORTIONALITY IN ALASKA'S
CHILD WELFARE SYSTEM (2012), *available at*
http://dhss.alaska.gov/ocs/Documents/icwa/pdf/Disproportionality-
data.pdf.............................................................................................................. 12

CENTER FOR ADVANCED STUDIES IN CHILD WELFARE, POLICY BRIEF, CHILD
WELL-BEING IN MINNESOTA (2013), *available at*
http://cascw.umn.edu/wp-content/uploads/2013/11/policyreport3_web-
versionFINAL.pdf................................................................................................ 12

COHEN'S HANDBOOK OF FEDERAL INDIAN LAW (Nell Jessup Newton ed.
2012) ................................................................................................................... 4

CONDITION OF THE INDIAN TRIBES: REP. OF THE J. SPECIAL COMM.,
APPOINTED UNDER THE J. RES. OF MARCH 3, 1865 (1867) ........................................... 4

DAVID WALLACE ADAMS, EDUCATION FOR EXTINCTION: AMERICAN
INDIANS AND THE BOARDING SCHOOL EXPERIENCE, 1875-1928 (Univ.
Press of Kan. 1995) .............................................................................................. 5

DOCUMENTS OF UNITED STATES INDIAN POLICY (Francis Paul Prucha ed.,
Univ. Neb. Press 3d ed. 2000) ............................................................................. 5

ELLEN SLAUGHTER, INDIAN CHILD WELFARE: A REVIEW OF THE
    LITERATURE  (1976), *available at*
    http://files.eric.ed.gov/fulltext/ED138422.pdf ................................................... 6

INDIAN LAW & ORDER COMMISSION, A ROADMAP FOR MAKING NATIVE
    AMERICAN SAFER (Nov. 2013) .................................................................. 12

INSTITUTE FOR GOVERNMENT RESEARCH, THE PROBLEM OF INDIAN
    ADMINISTRATION (1928) ............................................................................ 5

MARGARET D. JACOBS, A GENERATION REMOVED: THE FOSTERING AND
    ADOPTION OF INDIGENOUS CHILDREN IN THE POSTWAR WORLD (Univ.
    Neb. Press 2014) ........................................................................................... 6

Claire Palmiste, *From the Indian Adoption Project to the Indian Child
    Welfare Act: the Resistance of Native American Communities*,
    INDIGENOUS POL'Y J., vol. XXII, No. 1, at 1 (Summer 2011) ...................... 6

Press Release, National Council of Juvenile and Family Court Judges,
    *NCJFCJ Encourages Judges to Apply Revised BIA ICWA Guidelines*
    (May 9, 2015), *available at* http://www.ncjfcj.org/ICWA-Revised ............................. 13

R.H. Milroy, *Our Indian Policy Further Considered*, 5 PRESBYTERIAN Q.
    AND PRINCETON REV. 624 (1876) ............................................................... 4, 5

TASK FORCE FOUR: FEDERAL, STATE, AND TRIBAL JURISDICTION, REPORT
    ON FEDERAL, STATE, AND TRIBAL JURISDICTION, FINAL REPORT TO THE
    AMERICAN INDIAN POLICY REVIEW COMMISSION ............................... 5, 6, 10

**INTRODUCTION**

Congress enacted the Indian Child Welfare Act of 1978 (ICWA or "the Act"), 25 U.S.C. § 1901 *et seq.*, in response to a nationwide crisis—namely, the widespread and wholesale displacement of Indian children from their families by federal, state, and private child welfare agencies at rates far disproportionate to those of non-Indian families. Studies and Congressional testimony revealed the devastating impact of this displacement on Indian tribes and families and pointed to significant and pervasive abuses in child welfare and private adoption practices as contributing to these harms.[1] As a result, Congress carefully crafted ICWA to protect the rights of Indian children, families, and tribes by establishing uniform federal standards governing state child welfare proceedings involving Indian children. In passing ICWA, Congress intended to combat the collective and often deliberate abuses by child welfare systems and to restore the integrity of Indian families and tribes.

Plaintiffs seek to have this Court undo decades of progress in child welfare made possible by ICWA. Amici agree with federal, state, and tribal-intervenor Defendants (collectively "the Defendants") that the Court should decline Plaintiffs' invitation and dismiss this matter for the reasons well stated in Defendants' respective motions to dismiss. (Docs. 41, 44, and 47.) Amici write separately to address the factual and legal history leading to ICWA's enactment and the settled authority under which it was passed.

**INTEREST OF THE AMICI CURIAE**

Amici are three national organizations dedicated to the interests of American Indians and tribes. Collectively, amici share a commitment to the well-being of Indian children and an understanding that ICWA is essential to the continued resilience of Indian children, their families, and their tribes. Amici and their members share a substantial interest in promoting and securing national conformity with ICWA's procedural and

---

[1] For this Court's convenience, the legislative history underlying the enactment of the Indian Child Welfare Act may be found on the public website of the National Indian Law Library, LEGISLATIVE HISTORY, INDIAN CHILD WELFARE ACT OF 1978, http://www.narf.org/nill/documents/icwa/federal/lh.html.

1   substantive mandates in state child welfare and adoption proceedings involving Indian
2   children.

3       Amicus National Congress of American Indians (NCAI) is the largest national
4   organization addressing American Indian interests, and represents more than 250
5   American Indian and Alaska Native tribes.  As part of its efforts, NCAI works closely
6   with state governments and private organizations to develop productive models of state-
7   tribal cooperation, including cooperation relating to Indian child welfare.

8       Amicus Association on American Indian Affairs (AAIA) is a 93-year-old Indian
9   advocacy organization that began its active involvement in Indian child welfare issues in
10   1967.  AAIA's studies were a central focus of the Congressional hearings and committee
11   reports underlying ICWA's passage.  At Congress's invitation, AAIA was closely
12   involved in the drafting of the Act.  Since 1978, AAIA has continued to work with tribes
13   to implement ICWA.

14       Amicus National Indian Child Welfare Association (NICWA) is a non-profit
15   membership organization founded in 1987 and dedicated to the well-being of American
16   Indian and Alaska Native children and families.  NICWA is committed to protecting and
17   preserving ICWA while promoting ICWA compliance through trainings, technical
18   assistance, research, advocacy, and information sharing.

19                                   **ARGUMENT**

20   **I.    CONGRESSIONAL HEARINGS IN THE 1970's REVEALED A CRISIS IN
        CHILD WELFARE AND ADOPTION SYSTEMS THAT
21      DISPROPORTIONATELY DISPLACED INDIAN CHILDREN FROM
22      THEIR PARENTS AND COMMUNITIES.**

23       The Indian Child Welfare Act must be viewed in light of the historical abuses that
24   it was intended to stop.  For most of American history prior to ICWA's enactment, federal
25   Indian policy favored the removal of Indian children from their homes as a means of
26   eroding Indian culture and tribes.  State and private child welfare agencies later took on
27   the implementation of these policies, carrying them out with little concern for the families
28   or communities they affected.  By the 1970's, the widespread and wholesale removal of

Indian children from their parents and communities resulted in a crisis recognized as "the most tragic and destructive aspect of American Indian life today."  H.R. REP. No. 95-1386, at 9 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7530, 7532.

By 1973, Congress had received reports that "an alarmingly high percentage of Indian children were being separated from their natural parents" as a result of abusive child welfare practices.  S. REP. No. 95-597, at 11 (1977); *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 35 (1989).  Over the course of the next five years and three congressional sessions, both the Senate and the House held hearings on this crisis with testimony from a broad spectrum of concerned parties, including "the administration, Indian people, State representatives, tribal leaders, medical and psychiatric professionals and child welfare groups."  S. REP. No. 95-597 at 12; H.R. REP. No. 95-1386 at 27-28.  These hearings, in conjunction with the findings of various commissions and task forces, confirmed that Indian children were removed from their families and placed in foster care at rates far higher than non-Indian children:  between 25 and 35 percent of *all* Indian children nationwide had been removed from their families with about 90 percent of those children placed in non-Indian homes.[2]  *Holyfield*, 490 U.S. at 32-33 (*citing Indian Child Welfare Program: Hearings before the Subcommittee on Indian Affairs of the Senate Committee on Interior and Insular Affairs*, 93rd Cong, 2d Sess., 15, 75-83 (1974) (statement of William Byler) (1974 Hearings)).  Nationwide, the adoption rate of Indian children "was eight times that of non-Indian children," *Holyfield*, 490 U.S. at 33, while in the most extreme case, it was 18.8 times the non-Indian rate.  *Hearing on S. 1214 Before the Select Comm. on Indian Affairs*, 95th Cong. 539, 598 (1977) (Indian Child Welfare Statistical Survey, July 1976) (1977 Senate Hearing on S.1214).

---

[2]      The state of affairs in Arizona prior to the passage of ICWA typified the disturbing trends seen nationally.  When adoption, foster care, and federal boarding schools were accounted for, Indian children in Arizona were separated from their families 27.3 times more often than non-Indian children.  1977 Senate Hearing on S.1214 at 544.  Elsewhere the separation from American Indian children ranged from 69% in Washington State to 98% in Minnesota.  *Id.* at 537-603.

### A. The Disparities in Removals of Indian Children Were the Direct Result of 19th and Early 20th Century Federal Policies Designed to Displace Indian Children and Eradicate Indian Life.

These mass removals had their genesis in early federal Indian policy.  Throughout the late 19th and early 20th centuries, the established practice of the federal government was to remove Indian children from their homes, first through the government's education policy of forcibly removing Indian children to boarding schools far from their families, and later through state and private agencies acting on behalf of the federal government to adopt Indian children to non-Native families.  *See* COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 1.04, at 76 (Nell Jessup Newton ed. 2012) (COHEN'S HANDBOOK).  As the House Insular and Indian Affairs Committee later recognized, boarding school programs "contribute[d] to the destruction of Indian family and community life."  H.R. REP. No. 95-1368 at 9.

These policies resulted from the conventional view that Indians would be better off assimilating into mainstream American life, and that the means to accomplish this goal was to separate Indian children from their parents and tribal communities in order to raise them in a non-Indian environment.  COHEN'S HANDBOOK at § 22.03(1)(a), at 1397.  As one early report to Congress noted, "[a]ll experience has demonstrated the impossibility of educating Indian children while they are permitted to consort and associate with their ignorant, barbarous, and superstitious parents." CONDITION OF THE INDIAN TRIBES: REP. OF THE J. SPECIAL COMM., APPOINTED UNDER THE J. RES. OF MARCH 3, 1865, at A3 (1867).  This policy was later bluntly summarized by General Robert H. Milroy, the Superintendent of Indian Affairs in the Washington Territory in the 1870s:  "[a]ll Indian children over five years old should be taken away from under the authority and influence of their savage parents (from whom they absorb only poisonous barbarism) and placed wholly under the control of white male and female teachers."  R.H. Milroy, *Our Indian Policy Further Considered*, 5 PRESBYTERIAN Q. AND PRINCETON REV. 624, 625-26 (1876).

By 1905, more than 20,000 Indian pupils were enrolled in government-run boarding schools. DAVID WALLACE ADAMS, EDUCATION FOR EXTINCTION: AMERICAN INDIANS AND THE BOARDING SCHOOL EXPERIENCE, 1875-1928 320 (Univ. Press of Kan. 1995).  Some of the boarding schools adopted the "outing system," a form of temporary adoption under which Indian pupils were sent to live with non-Indian families for the summer or for the entire year.  *Id.* at 156-63.  The Bureau of Indian Affairs ("the BIA") encouraged other schools to follow the outing system's example.  DOCUMENTS OF UNITED STATES INDIAN POLICY 178 (Francis Paul Prucha ed., Univ. Neb. Press 3d ed. 2000).

### B.    The Federal Indian Adoption Project Supported Adopting Indian Children to Non-Indian Households, Thereby Contributing to Widespread Displacement of These Children.

During the mid-20th century, policymakers gradually lost faith in the efficacy of boarding schools, *see, e.g.*, INSTITUTE FOR GOVERNMENT RESEARCH, THE PROBLEM OF INDIAN ADMINISTRATION 573-75 (1928), and turned instead to adoption through state, private, and religiously-affiliated social service and adoption agencies as a less expensive means of achieving Indian assimilation.  One such program was the Indian Adoption Project (IAP), formed by the BIA and Child Welfare League of America in 1959.  TASK FORCE FOUR: FEDERAL, STATE, AND TRIBAL JURISDICTION, REPORT ON FEDERAL, STATE, AND TRIBAL JURISDICTION, FINAL REPORT TO THE AMERICAN INDIAN POLICY REVIEW COMMISSION 218 (Comm. Print July 1976) (TASK FORCE REPORT); Claire Palmiste, *From the Indian Adoption Project to the Indian Child Welfare Act: the Resistance of Native American Communities*, INDIGENOUS POL'Y J., Vol XXII, No. 1, at 1 (Summer 2011).  IAP-approved state agencies took on the responsibility of enacting a federal policy of "Indian extraction," which  mandated that Indian children be adopted out to primarily non-Indian families in order to reduce the populations of Indian reservations, lower the federal government's cost obligations at boarding schools, and satisfy a growing demand for adoptive children.  ELLEN SLAUGHTER, INDIAN CHILD WELFARE: A REVIEW OF THE

LITERATURE 61 (1976), *available at* http://files.eric.ed.gov/fulltext/ED138422.pdf.  With the IAP, the federal government looked to the "private sector to take over the expense of raising Indian children and assimilating them once and for all."  MARGARET D. JACOBS, A GENERATION REMOVED: THE FOSTERING AND ADOPTION OF INDIGENOUS CHILDREN IN THE POSTWAR WORLD 6 (Univ. Neb. Press 2014) (GENERATION REMOVED).

By its end, the IAP placed hundreds of American Indian children for adoption across the country, and "virtually always with non-Indian families.[3]  TASK FORCE REPORT at 218, n.1.  Children subject to the IAP were rarely removed from their families due to actual physical abuse or neglect; instead, social workers and other child advocates often equated single parents, poverty, and traditional community parenting with abandonment and unfitness to parent.  GENERATION REMOVED at 52.  The IAP at one point "listed unmarried motherhood as the top social problem—above alcoholism, gross neglect of family, criminal record, and mental illness—that social workers should be concerned with in possibly placing an Indian child for adoption."  *Id.* (internal quotation and citation omitted).  Disproportionately High Adoption Rates For Indian Children Were Exacerbated by State Child Welfare Systems.

By the time Congress began investigating Indian child welfare in the 1970's, state child welfare systems were already complicit in the wholesale removal of Indian children from their families.  Many removals were the result of vague claims of "neglect" or "social deprivation," and the emotional damage the children might be subject to by continuing to live with their Indian families.  H.R. REP. NO. 95-1386. at 10.  Social workers made decisions "that [were] wholly inappropriate in the context of Indian family life and so they frequently discover[ed] neglect or abandonment where none exist[ed]."  *Id.*  State agencies deemed some children "abandoned" where they resided with non-parent relatives, while others living in homes lacking amenities found in non-Indian

---

[3]    Historically, nearly all Arizona Indian children placed for adoption were sent out of state.  1977 Senate Hearing on S.1214 at 414.  For example, when the IAP was in effect, "74 Indian children, mostly from Arizona and South Dakota were placed for adoption in New York."  TASK FORCE REPORT at 218.

society were considered "neglected."  *See*, *e.g.*, 1977 Senate Hearing on S.1214  at 77-78, 166, 316; *Hearings on S. 1214 before the Subcomm. on Indian Affairs and Pub. Lands of the Comm. on Interior and Insular Affairs*, 95th Cong. 115 (1978) (statement of Nat'l Urban Indian Council) (1978 House Hearing on S.1214); *Holyfield*, 490 U.S. at 35, n.4. Child welfare agencies conducted these removals with "no basis for intelligently evaluating the cultural and social premises underlying Indian home life and childrearing," and excluded Indian family members as the most appropriate — or even viable — placements.  *Holyfield*, 490 U.S. at 34-35 (*citing* 1978 House Hearing on S.1214 at 191-92).[4]

Many state child welfare systems operated virtually unfettered by notions of due process.  1977 Senate Hearing on S.1214 at 21.  A House Report summarized this systemic failure:

> The decision to take Indian children from their natural homes is, in most cases, carried out without due process of law . . . Many cases do not go through an adjudicatory process at all, since the voluntary waiver of parental rights is a device widely employed by social workers to gain custody of children. Because of the availability of waivers and because a great number of Indian parents depend on welfare payments for survival, they are exposed to the sometimes coercive arguments of welfare departments.

H.R. REP. No. 95-1386 at 10-12.  Earlier testimony revealed that when cases were adjudicated, it was "rare for either Indian children or their parents to be represented by

---

[4]      Congress heard testimony on this point from child welfare experts and tribal representatives alike. *See*, *e.g.*, 1974 Hearings at 61 (testimony of Dr. Carl Mindell, Department of Psychiatry and Child Psychiatry, Albany Medical College) ("[W]elfare agencies tend to think of adoption too quickly without having other options available . . . Once you're at the point of thinking about adoption . . . welfare agencies are not making adequate use of the Indian communities themselves. They tend to look elsewhere for adoption type of homes."); *Id*. at 117 (statement of Mel Sampson, Northwest Affiliated Tribes) ("The standards that have been established by adoption agencies have created an additional burden . . . as they are white status quo oriented . . . As you well know, this automatically leaves the Indian out.").

counsel, or to have the supporting testimony of expert witnesses."  1974 Hearings at 15,

21 (statement of William Byler, AAIA).  For many cases, "[t]he only guarantee that a

child has of Federal representation is if a private lawyer and private legal agency is

brought in to defend that child."  *Id*. at 168 (statement of Michael Chosa, Administrative

Assistant, American Indian Child Placement and Development Program).  In addition,

there were generally "no requirements for responsible tribal authorities to be consulted

about or even informed of child removal actions" by state or private adoption

organizations. 124 Cong. Rec. 37,379, 38,102 (1978) (statement of Rep. Robert

Lagomarsino).

### C.  Congress Determined That This Displacement Inflicted Significant Damage Upon Indian Children, Families, and Tribes.

The harmful effect of these abuses on Indian children, families, and tribes is

difficult to overstate.  Congress expressed significant concern "over the placement of

Indian children in non-Indian homes . . . based in part on evidence of the detrimental

impact on the children themselves of such placement outside their culture."  *Holyfield*,

490 U.S. at 49-50.  Congress heard multiple examples that Indian children placed in non-

Indian homes later suffered identity crises when they reached adolescence and adulthood.

*See*, *e.g*., 1977 Senate Hearing on S.1214at 114 (statement of James Shore, former Chief,

Mental Health Office, Portland Area Indian Health Service, and William Nicholls,

Director, Health, Welfare and Social Services, Confederated Tribes of The Warm Springs

Reservation).  Such testimony led Congress to conclude that "[r]emoval of Indians from

Indian society has serious long- and short-term effects" for the "child removed from

his/her home environment who may suffer untold social and psychological

consequences."  S. REP. No. 95-597 at 43.

In addition, Congress heard considerable testimony on the importance of the

extended family in Indian cultures as well as the harms to those families when children

are removed.  As the House Committee on Interior and Insular Affairs explained:

> [T]he dynamics of Indian extended families are largely
> misunderstood. An Indian child may have scores of, perhaps
> more than a hundred, relatives who are counted as close,
> responsible members of the family . . . The concept of the
> extended family maintains its vitality and strength in the
> Indian community. By custom and tradition, if not necessity,
> members of the extended family have definite responsibilities
> and duties in assisting in childrearing.

H.R. REP. No. 95-1386 at 10, 20 (1978).  In some Indian cultures, all relatives have the label of parent and the same responsibility for the child. *See Holyfield*, 490 U.S. at 35, n. 4.  As Senator Abourezk summarized at the end of the 1974 Senate Hearing:

> [w]e've had testimony here that in Indian communities
> throughout the Nation there is no such thing as an abandoned
> child because when a child does have a need for parents for
> one reason or another, a relative or friend will take that child
> in. It's the extended family concept.

1974 S. Hearings at 473.  Congressional testimony acknowledged both the importance of this unique family structure and that child welfare agencies' systematic placement of children outside the tribe "threaten[ed] 'the future and integrity of…Indian families.'" *See Holyfield*, 490 U.S. at 45 n. 18 (quoting 124 Cong. Rec. 38103 (1978) (letter from Rep. Morris K. Udall to Assistant Attorney General Patricia M. Wald).

Finally, the legislative record reflects "considerable emphasis on the impact on the tribes themselves of the massive removal of their children."  *Holyfield*, 490 U.S. at 34.  "Child rearing and the maintenance of tribal identity" were recognized to be "essential tribal relations."  TASK FORCE REPORT at 86 (citation and quotation omitted); *see also,* 25 U.S.C. § 1901(5).  The large number of Indian children placed with families outside their tribes "paralyz[ed] the ability of the tribe to perpetuate itself."  TASK FORCE REPORT at 86.  The House Committee described "'the failure of State officials, agencies, and procedures to take into account the special problems and circumstances of the Indian families and the *legitimate interest of the Indian tribe in preserving and protecting the*

*Indian family as the wellspring of its own future.*'"  H.R. REP. No. 95-1386 at 19 (emphasis added); *see also*, 124 Cong. Rec. at 38,103 (1978) (statement of Rep. Lagomarsino) ("[f]or Indians generally and tribes in particular, the continued wholesale removal of their children by nontribal government and private agencies constitutes a serious threat to their existence as ongoing, self-governing communities"); *id*. at 38,102 (statement of sponsor Rep. Morris Udall) ("Indian tribes and Indian people are being drained of their children and, as a result, their future as a tribe and a people is being placed in jeopardy.").

## II.   CONGRESS RESPONDED TO THESE ABUSES BY ENACTING ICWA PURSUANT TO ITS CONSTITUTIONAL AUTHORITY OVER INDIAN AFFAIRS.

Following years of hearings and deliberation, Congress enacted ICWA to remedy the widespread harms that non-Indian governments and agencies had perpetrated upon Indian people.  Congress did so through well-established constitutional authority to legislate concerning Indian affairs.  *See* 25 U.S.C. § 1901(1) (*citing* U.S. CONST. art. I, § 8, cl. 3 (charging Congress with the exclusive authority to "regulate commerce . . . with the Indian Tribes")); *see also*, *Seminole Tribe v. Florida*, 517 U.S. 44, 62-63 (1996) (summarizing the Indian Commerce Clause's broad grant of authority over Indian affairs to Congress); *Rice v. Cayetano*, 528 U.S. 495, 519 (2000) ("Congress may fulfill its treaty obligations and its responsibilities to the Indian tribes by enacting legislation dedicated to their circumstances and needs.").[5]  ICWA's findings further acknowledge both Congress's

---

[5]     Plaintiffs' assert that "a child with Indian ancestry is not an item of commerce." Compl., Doc. 1, at ¶ 110.  But this truism elides the fact that ICWA was enacted *in response* to unscrupulous market-based practices in the adoption Indian children.  *See* 1974 S. Hearings at 70 (testimony of Bertram Hirsch, AAIA) (describing the "tremendous pressure" felt by child welfare workers to adopt Indian children as a "grey market"); 1977 S. Hearing at 359 (statement of Don Milligan, State of Washington, Department of Social and Health Services) ("[s]ome people will pay thousands of dollars for a child. It is also well-known that Indian children have always been a prize catch in the field of adoption.").

responsibility to "protect and preserve Indian tribes," and its "direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe." 25 U.S.C. § 1901(2); (3); *see also*, *Seminole Nation v. United States*, 316 U.S. 286, 296-97 (1942) (recognizing the United States' "distinctive obligation of trust" to federally recognized tribes).  Where Congress enacts "legislation that singles out Indians for particular and special treatment" pursuant to its unique relationship with Indian tribes, "such legislative judgments will not be disturbed" by the courts.  *Morton v. Mancari*, 417 U.S. 353, 554-55 (1974).  The Congressional findings make "clear that the underlying principle of the bill is in the best interest of the Indian child."  H.R. Rep. No. 95-1386 at 19.

ICWA, like other statutes singling "out Indians for particular and special treatment," *Mancari*, 417 U.S. at 555-56, easily survives Plaintiffs' due process and equal protection challenges.  For example, in *Mancari* the Supreme Court rejected the claim that a BIA hiring preference for tribal members constituted racial discrimination in violation of the Fifth Amendment.  *Id.* at 553-54.  In upholding the hiring preferences, the Court explained:

> The preference is not directed towards a "racial" group consisting of "Indians;" instead, it applies only to members of "federally recognized" tribes.  This operates to exclude many individuals who are racially to be classified as "Indians." In this sense, the preference is political rather than racial in nature.

*Id.* at 554 n.24; *see also*, *United States v. Antelope*, 430 U.S. 641, 646 (1977) (rejecting equal protection challenge to federal criminal statute applying only to "Indians").  And indeed, ICWA's membership-based definition of "Indian child" is such that it is similarly likely to exclude many children who may otherwise be racially to be classified as "Indians" but that do not otherwise qualify for membership. 25 U.S.C. § 1903(4).  Fundamentally, if ICWA, "derived from historical relationships and explicitly designed to help only Indians," constituted impermissible racial discrimination, "an entire Title of the

United States Code (25 U.S.C.) would be effectively erased and the solemn commitment of the Government toward the Indians would be jeopardized." *Mancari*, 417 U.S. at 552.

### III.   ICWA HAS IMPROVED INDIAN CHILD WELFARE SYSTEMS, BUT THE FULL BENEFITS OF ITS PROTECTIONS REMAIN ELUSIVE.

ICWA's substantive and procedural mandates were carefully tailored to address the harms identified during Congressional hearings, thereby reflecting  "a Federal policy that, where possible, an Indian child should remain in the Indian community." *Holyfield*, 490 U.S. at 37 (*quoting* H.R. REP. No. 95-1386, at 23). Although ICWA's procedural mandates have significantly improved Indian child welfare systems, this progress is not universal.  For example, states such as Minnesota and Alaska still have vastly disproportionate rates of Native children in out-of-home placements compared to the general child population.[6]  In addition, serious due process violations persist in states such as South Dakota, where a federal court recently enjoined a state judge from conducting cursory removal hearings sometimes lasting no more than a few minutes and at which parents were not allowed even to view case documents outlining the case against them. *See Oglala Sioux Tribe v. Van Hunnik*, No. CIV. 13-5020-JLV, 2015 WL 1466067 *1, *6 (D.S.D March 30, 2015).

Certain state welfare programs and courts such as those in South Dakota have continued to resist ICWA's provisions and goal.  That resistance led the BIA to recently

---

[6]     In Minnesota, Indian children have been placed in out-of-home care at a rate more than twice that of any other group and were 12 times more likely than a Caucasian child to spend time in placement. CENTER FOR ADVANCED STUDIES IN CHILD WELFARE, POLICY BRIEF, CHILD WELL-BEING IN MINNESOTA 2 (2013), (citing Minnesota Department of Human Services statistics), *available at* http://cascw.umn.edu/wp-content/uploads/2013/11/policyreport3_web-versionFINAL.pdf.  In Alaska, Alaska Native children comprise roughly 20% of the statewide child population, but represent over 60% of children removed by the state and placed in out-of-home care. INDIAN LAW & ORDER COMMISSION, A ROADMAP FOR MAKING NATIVE AMERICAN SAFER 43 (Nov. 2013) (*citing* ALASKA DEPT. OF HEALTH & SOC. SERV'S, OFFICE OF CHILDREN'S SERVICES, DATA OVER-VIEW OF DISPROPORTIONALITY IN ALASKA'S CHILD WELFARE SYSTEM (2012), *available at* http://dhss.alaska.gov/ocs/Documents/icwa/pdf/Disproportionality-data.pdf).

1    reissue its ICWA Guidelines to guide ICWA's implementation. *Guidelines for State*

2    *Courts in Indian Child Custody Proceedings*, 80 Fed. Reg. 10,146 (Feb. 25, 2015).  While

3    Plaintiffs and some other organizations criticize the Guidelines, they have been embraced

4    by many of the same state court judges that Plaintiffs claim suffer under their  yoke:

5
              Since the release of the original guidelines it has become
6             increasingly clear that additional clarification has been
              needed to assist with the interpretation of key provisions and
7             to ensure consistent compliance. . . . [The new Guidelines]
              clear up much of the ambiguity in the previous guidelines and
8             should provide additional certainty for judges while still
              allowing for sufficient discretion when making tough
9             decisions in these cases.
10

11       Press Release, National Council of Juvenile and Family Court Judges, *NCJFCJ*

12   *Encourages Judges to Apply Revised BIA ICWA Guidelines* (May 9, 2015), *available at*

13   http://www.ncjfcj.org/ICWA-Revised.  ICWA and the Guidelines thus remain vital in

14   protecting Indian children, families and tribes.

15

16                                  **CONCLUSION**

17       For the foregoing reasons, and those well stated by Defendants,  Amici Curiae

18   respectfully request the Court grant the respective Motions to Dismiss.

19       Respectfully submitted this 23rd day of October, 2015.

20

21

22

23

24

25

26

27

28

1    Dated: October 23, 2015

2

3                                                     By: _____/s/_____
                                                         Samuel F. Daughety  (SBN 023170)
                                                         Samuel Kohn *
4                                                        DENTONS US LLP
                                                         1301 K Street, N.W.
5                                                        Suite 600, East Tower
                                                         Washington, DC 20005
6                                                        Telephone:      (202) 408-6400
                                                         Facsimile:      (202) 408-6399
7                                                        E-mail: samuel.daughety@dentons.com

8                                                        PAULA M. YOST *
                                                         DENTONS US LLP
9                                                        525 Market Street, 26th Floor
                                                         San Francisco, CA 94105-2708
10                                                       (415) 882-5000
                                                         paula.yost@dentons.com
11
                                                         ERIN C. DOUGHERTY *
12                                                       MATTHEW N. NEWMAN *
                                                         NATIVE AMERICAN RIGHTS
13                                                       FUND
                                                         745 W. 4th Avenue, Suite 502
14                                                       Anchorage, AK 99501-1736
                                                         (907) 276-0680
15                                                       dougherty@narf.org
                                                         mnewman@narf.org
16
                                                         KATHRYN E. FORT *
17                                                       INDIGENOUS LAW AND POLICY
                                                         CENTER
18                                                       MICHIGAN STATE UNIVERSITY
                                                         COLLEGE OF LAW
19                                                       648 N. Shaw Lane
                                                         East Lansing, MI 48824-1300
20                                                       (517) 432-6992
                                                         fort@law.msu.edu
21
                                                         * Application for admission pro hac
22                                                       vice pending

23                                                       Attorneys for Amici Curiae

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of October, 2015, that I electronically filed with the Clerk the foregoing using the Court's Electronic CM/ECF System and that service was thereby accomplished upon:

Clint Bolick (ASB # 021684)
Email: cbolick@goldwaterinstitute.org
Aditya Dynar (ASB # 031583)
Email: adynar@goldwaterinstitute.org
Courtney Christine Van Cott
Email: cvancott@goldwaterinstitute.org
Scharf-Norton Center for Constitutional Litigation at the Goldwater Institute
500 E. Coronado Rd.
Phoenix, Arizona 85004
(602) 462-5000
litigation@goldwaterinstitute.org

*Attorneys for Plaintiffs*

Michael W. Kirk
Email: mkirk@cooperkirk.com
Brian W. Barnes
Email: bbarnes@cooperkirk.com
Harold S. Reeves
Email: hreeves@cooperkirk.com
Cooper & Kirk PLLC
1523 New Hampshire Ave. NW
Washington, DC 20036
202-220-9600
202-220-9601 (fax)

*Attorneys for Plaintiffs*

Steven Edward Miskinis
Email: steven.miskinis@usdoj.gov
US Dept of Justice
Land & Natural Resources Division
PO Box 44378
Indian Resources Section
Washington, DC 20026
202-305-0262
202-305-0271 (fax)

*Attorneys for Federal Defendants*

John Stephen Johnson
Email: john.johnson@azag.gov
Dawn Rachelle Williams
Email: dawn.williams@azag.gov
Office of the Attorney General - Phoenix
1275 W Washington St.
Phoenix, AZ 85007-2997
602-542-9948

*Attorneys for State Defendant*

Linus Everling
Email: linus.everling@gric.nsn.us
Thomas L Murphy
Email: thomas.murphy@gric.nsn.us
Gila River Indian Community
Pima-Maricopa Tribe Law Office
PO Box 97
Sacaton, AZ 85247
520-562-9763
520-562-9769 (fax)

*Attorneys for Proposed Intervenor Defendant*

Merrill C Godfrey
Email: mgodfrey@akingump.com
Donald R Pongrace
Email: dpongrace@akingump.com
Akin Gump Strauss Hauer & Feld LLP - Washington, DC
1333 New Hampshire Ave. NW, Ste. 400
Washington, DC 20036
202-887-4195
202-887-4288 (fax)

*Attorneys for Proposed Intervenor Defendant*

By:  _____/s/_____
        Samuel F. Daughety  (ASB # 023170)