**Scharf-Norton Center for Constitutional Litigation at the GOLDWATER INSTITUTE**
Clint Bolick (021684)
Aditya Dynar (031583)
500 E. Coronado Rd.
Phoenix, Arizona 85004
(602) 462-5000
litigation@goldwaterinstitute.org

**COOPER & KIRK, PLLC**
Michael W. Kirk (admitted *pro hac vice*)
Brian W. Barnes (admitted *pro hac vice*)
Harold S. Reeves (admitted *pro hac vice*)
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| A.D. and C. by CAROL COGHLAN CARTER, their next friend; S.H. and J.H., a married couple; M.C. and K.C., a married couple; for themselves and on behalf of a class of similarly-situated individuals, Plaintiffs, vs. KEVIN WASHBURN, in his official capacity as Assistant Secretary of BUREAU OF INDIAN AFFAIRS; SALLY JEWELL, in her official capacity as Secretary of Interior, U.S. DEPARTMENT OF THE INTERIOR; GREGORY A. McKAY, in his official capacity as Director of ARIZONA DEPARTMENT OF CHILD SAFETY, Defendants. | No.  CV-15-1259-PHX-NVW  **PLAINTIFFS' CONSOLIDATED RESPONSE TO FEDERAL DEFENDANTS' MOTION TO DISMISS AND STATE DEFENDANT'S MOTION TO ABSTAIN AND DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1), (6)**  **(Oral Argument Scheduled Dec. 18, 2015 at 1:30 p.m. in Phoenix, AZ)** |

1

**Table of Contents**

2  INTRODUCTION…………….. ............................................................................1

3  RESPONSE TO FEDERAL DEFENDANTS' MOTION.............................2

4      I.  Rule 12(B)(1)………………………….........................................2

5          A.  Standing…………………….........................................................4

6          B.  Ripeness…………………....................................................15

7          C.  Abstention…………….......................................................17

8      II.  Rule 12(B)(6)………………………….......................................20

9          A.  Equal Protection…………………......................................20

10         B.  Due Process…………………….......................................25

11             1.  Jurisdiction transfer provision..................................25

12             2.  Individualized determination....................................26

13             3.  Children's best interests.........................................27

14         C.  Federalism.........................................................29

15         D.  Freedom of Association......................................31

16         E.  BIA Guidelines...............................................33

17  RESPONSE TO STATE DEFENDANT'S MOTION.............................35

18      I.  Rule 12(B)(1).....................................................35

19         A.  Abstention.......................................................35

20         B.  Standing.........................................................38

21         C.  Ripeness.........................................................39

22      II.  Rule 12(B)(6) ..................................................40

23         A.  Equal Protection...............................................40

24         B.  Due Process....................................................42

25         C.  Freedom of Association.......................................43

26  CONCLUSION.........................................................44

27

28

i

# INTRODUCTION

This case is a successor to *Adoptive Couple v. Baby Girl*, 133 S.Ct. 2552 (2013). It is a proposed class action lawsuit that challenges the constitutionality of provisions of the Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. § 1901, *et seq*., which systematically subject certain children of Indian heritage and their non-Indian foster and prospective adoptive parents to separate and unequal treatment in child custody proceedings involving termination of parental rights, foster care placements, and adoptions. In *Baby Girl*, the United States and others pressed an interpretation of ICWA that the Court concluded "would put certain vulnerable children at a great disadvantage solely because an ancestor—even a remote one—was an Indian," an interpretation that "would raise equal protection concerns." *Id.*, 133 S.Ct. at 2565. Here, plaintiffs challenge ICWA provisions on their face and as applied by defendants that do exactly that.

Throughout their motions to dismiss,[1] both in their procedural and substantive arguments, defendants fail or refuse to recognize the nature of the harm to the named plaintiffs and the proposed class members in this legal challenge. To be sure, the named plaintiffs suffer harms inflicted by specific applications of the law, but the principal harm is more fundamental than that: all of the plaintiffs are harmed by being subjected to a separate and unequal legal regime that deprives them of rights and opportunities enjoyed by all other Americans; what we refer to as the ICWA "penalty box." For those reasons, this case is not a "pattern or practice" or *de facto* discrimination case. It alleges *de jure*

---

[1] Because many of the arguments made in the Federal Defendants' Motion to Dismiss and Memorandum of Points and Authorities are duplicative of those made in the State Defendant's Motion to Abstain and Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1), (6), Plaintiffs provide a single consolidated reply for the convenience of the Court. Where the arguments are essentially the same, we address them in the reply to the Federal Defendants' Motion, and limit our reply to the State Defendant's Motion to its additional or unique arguments made by the State. To be clear, arguments made in response to the Federal Defendants' motion are incorporated in their entirety as arguments against the State Defendant's motion, and *vice versa*.

1

segregation by ICWA on its face and as applied by defendants through the BIA Guidelines.

The paradigm example of such a case is *Brown v. Bd. of Educ.*, 347 U.S. 483 (1954). There the Court explicitly did not examine "tangible" injuries such as school buildings, curricula, or qualifications and salaries of schoolteachers, but rather "the effect of segregation itself" on educational opportunities   *Id.* at 690-91. Here, too, plaintiffs "seek the aid of the courts" in securing important rights and opportunities "on a nonsegregated basis." *Id.* at 487.

In their determination to prevent these important questions from being considered, defendants have put forward a multitude of procedural and substantive objections. Viewed in the context of challenging the separate and unequal legal regime to which they are consigned, there is no doubt that plaintiffs are entitled to proceed with the lawsuit and that they have stated a cause of action under the Constitution.

## RESPONSE TO FEDERAL DEFENDANTS' MOTION

Federal defendants raise jurisdictional issues of standing, ripeness, and abstention under Fed. R. Civ. P. 12(b)(1) (Federal Defendants' Motion ("Mot.") Parts I, II, and III) and allege that the Complaint fails to state a claim under Rule 12(b)(6) (Mot. Part IV). Throughout, despite acknowledging that facts in the Complaint must be taken as true (Mot. at 5-6), defendants fail to do so. We address defendants' arguments in turn.

## I.  RULE 12(B)(1)

As it permeates our response to defendants' jurisdictional contentions, it is important to explain how ICWA works. ICWA applies by its own terms to all child custody proceedings (foster care placements, terminations of parental rights, and preadoptive and adoptive placements) involving an "Indian child," defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4). Once ICWA is implicated in a child custody proceeding, state rules and procedures no longer apply in ordinary fashion. Rather, as

2

defendants explain (Mot. at 3-4), two things happen: Indian tribes are given "numerous prerogatives" that they may exercise in the child custody proceedings, and ICWA imposes "procedural and substantive standards to be followed in state-administered proceedings." (Mot. at 3).  Hence, from literally the moment that ICWA is implicated, it places Indian children and families who wish to foster or adopt them on a different legal track than all other American children and families.[2] All of the rules and procedures complained of become operative the moment a child is classified as "Indian":  the requirement of continuous "active efforts" to place the child with an Indian family; the detrimental differences in burdens of proof; the jurisdiction-transfer provision; the foster and adoption placement preferences; the subordination of the child's best interests to the interests of a tribe.  That does not mean every person subject to ICWA will encounter all of those injuries, but rather that every person subject to ICWA by definition is subject to this separate and unequal system of laws and procedures, which engenders segregation and disparate treatment from beginning to end.

As in *Brown v. Bd. of Educ.*, to the extent that the legal regime to which they are subjected is adverse to those children and families, the harm is inflicted immediately and is ongoing throughout the child custody proceedings.  Just as any black children in the Jim Crow South would have had standing to challenge segregated schools, and just as their case would have been ripe for adjudication even if they had adequate schools or teachers within the segregated system, so too do plaintiffs here have standing to challenge the federally mandated legal regime to which they are consigned, the case is ripe for resolution, and this Court should not abstain from deciding it.  The Article III injury is not

---

[2] Indeed, the Supreme Court recognized in *Baby Girl*, 133 S.Ct. at 2565, that the harm could accrue even earlier, observing that "many prospective adoptive parents would surely pause before adopting any child who might possibly qualify as an Indian under the ICWA."  As is clear from the Complaint, children in the ICWA penalty box are rendered far more difficult to foster or adopt by loving, capable families because of the multiple obstacles placed in the path of non-Indian families who might wish or offer to do so.

limited to the myriad potential harms flowing from the disparate treatment mandated by ICWA, the disparate treatment *itself* is a concrete injury in fact.

**A. <u>Standing</u>.** As a threshold matter, nowhere do defendants acknowledge that this is a proposed class action lawsuit. "Ordinarily, of course, this or any other Article III court must be sure of its own jurisdiction before getting to the merits." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999). "But the class certification issues are . . . 'logically antecedent' to Article III concerns . . . . Thus the issue about Rule 23 certification should be treated first, 'mindful that [the Rule's] requirements must be interpreted in keeping with Article III constraints'." *Id.* (citations omitted). See also *Payton v. County of Kane*, 308 F.3d 673, 680 (7th Cir. 2002) ("We have begun our analysis with the question of class certification, mindful of the Supreme Court's directive to consider issues of class certification prior to issues of standing").

Here, of course, defendants resisted having class certification decided first. That does not mean, however, that the Court should ignore factual allegations made pertaining to members of the class. In *Gratz v. Bollinger*, 539 U.S. 244 (2003), the government argued that an individual plaintiff lacked standing to challenge racial classifications in university freshman admissions on behalf of absent class members because his own alleged injury emanated from racial classifications in transfer admissions. Because, as here, the named plaintiff was challenging a broad racial classification policy, he had standing to assert the interests of class members whose injuries emanated from different applications of the policy. "In the present case, the University's use of race in undergraduate transfer admissions does not implicate a significantly different set of concerns than does its use of race in undergraduate freshman admissions." *Id.* at 265. Thus, against a challenge to his standing, "we think it clear that [plaintiff's] personal stake, in view of both his past injury *and the potential injury he faced at the time of certification*, demonstrates that he may maintain this class-action challenge to the University's use of race in undergraduate admissions." *Id.* at 268 (emphasis added).

4

1   Here, the lawsuit conjoins individual named plaintiffs who have sustained injuries

2   with proposed class members who have alleged similar or related injuries arising from the

3   same set of policies.  See, e.g., Complaint ("Comp.") ¶¶ 25-29).  Rather than viewing the

4   named plaintiffs' injuries in isolation, the Court should consider the injuries of the entire

5   class, taking as true the Complaint's complete array of factual allegations.

6   Defendants argue that the individual plaintiffs do not have standing because they

7   have not been directly harmed by each of the specific ICWA provisions that are targeted

8   in the action; that some of the injuries inflicted upon them are in the past and are unlikely

9   to recur; and that ultimately they may have happy outcomes, or those outcomes may be

10   affected by factors other than ICWA, and therefore their claims are conjectural and might

11   not be redressed by invalidating the challenged provisions.  The arguments miss the point

12   of the action: every day that the plaintiffs are subjected to ICWA, they are harmed because

13   they are deprived of the otherwise applicable state legal procedures and protections to

14   which they would be entitled absent ICWA.

15   The plaintiffs here readily meet the standards for standing under *Lujan v. Defenders*

16   *of Wildlife*, 504 U.S. 555, 560-61 (1992).  The injury common to every plaintiff is being

17   relegated to a different and disadvantageous set of laws and procedures solely because of

18   their status under ICWA.[3]  Within that framework, the individual and proposed class

19   plaintiffs are subjected to tangible injuries and hardships as set forth in the Complaint.

20   Those injuries are directly traceable to the defendants' actions in enforcing ICWA.  Were

21   ICWA's challenged provisions struck down, plaintiffs would be entitled to the same legal

22   protections and procedures as other similarly situated American children and families.  As

23   a result, plaintiffs plainly have standing to challenge the discriminatory system.  See, e.g.,

24

25

26   [3] Defendants argue (Mot. at 20-26) that the classifications created by ICWA are not
based on race; but that goes to the merits, not standing.  Indeed, even non-suspect

27   classifications that create legal disabilities can be challenged by those disadvantaged by
them.  See, e.g., *Romer v. Evans*, 517 U.S. 620 (1996); *City of Cleburne v. Cleburne*

28   *Living Ctr., Inc.*, 473 U.S. 432 (1985).

1  *Regents of Univ. of Calif. v. Bakke*, 438 U.S. 265 (1978) (standing to challenge the "special

2  admissions program" to which only some students were eligible to apply).

3        Indeed, a case cited by defendants (Mot. at 8) helps explain this point.  In *Ryan v.*

4  *Mesa Unif. Sch. Dist.*, 64 F. Supp.3d 1356, 1360 (D. Ariz. 2014), the court held that

5  plaintiffs lacked standing to challenge the constitutionality of certain religious policies

6  because they failed to allege that the "policy affected them directly in some way," that

7  they had "personal exposure" to the challenged program, or that it "caused them to alter

8  their conduct."  Plainly, plaintiffs here all have alleged all three elements: they are directly

9  affected by ICWA, they have personal exposure to it, and their conduct has been altered

10  by it.

11        For Baby Girl A.D. and her foster parents, adoption and formation of a permanent

12  family likely would have happened if they were subject to normal state laws and not

13  ICWA (Comp. ¶ 20).  Baby Boy C. has not been made eligible for adoption because of

14  the constant efforts required to find an ICWA-compliant (i.e. Indian) placement, which

15  entails substantial delay, disruption, uncertainty, and emotional trauma—all as a

16  consequence of being subject to ICWA rather than state laws that otherwise would control

17  (¶¶ 22-24).  In other circumstances, children subject to ICWA are removed from caring,

18  loving homes and placed into less-stable environments (¶ 26).  Prospective adoptive

19  parents who otherwise would be allowed to adopt their foster children are deprived of the

20  opportunity to do so due to ICWA's rigid preference system (¶ 27).  Children subject to

21  ICWA are left in abusive and neglectful homes in circumstances that would warrant

22  removal under state laws (¶ 28).  Children and families who wish to adopt them are

23  subjected to delay, uncertainty, and distress because of the "active efforts" provisions

24  required by ICWA, that are far more burdensome than those under state law (¶ 29).

25        Contrary to defendants' suggestion, plaintiffs do not have to demonstrate certain

26  consequences flowing from the application of a policy when the policy on its face subjects

27  them to discriminatory treatment.  As the Court held in the context of contract set-asides

28  in *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995) (citation omitted), "[t]he

6

injury in cases of this kind is that a 'discriminatory classification prevent[s] the plaintiff from competing on an equal footing'." Hence, the "aggrieved party 'need not allege that he would have obtained the benefit but for the barrier in order to establish standing'." *Id.* (citation omitted). The Court stated the principle clearly in *Northeastern Fla. Chap. of Assoc. Gen. Contractors of Amer. v. City of Jacksonville*, 508 U.S. 656, 666 (1993):

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.[4]

Accord, *Worth v. Jackson*, 451 F.3d 854, 859-60 (D.C. Cir. 2006) (finding standing in similar circumstances).

Here, plaintiff parents have made the requisite allegations that they dearly would love to adopt their foster children, and that the challenged provisions of ICWA on their face—through a more-stringent standard for terminating parental rights, a right for third-party tribes to intervene or assume jurisdiction, required "active efforts" to find ICWA-compliant placements, and adoption preferences—make that far more difficult.[5] For the children, the injuries as alleged in the Complaint are even more direct and palpable.

Defendants make a number of claims asserting that plaintiffs lack standing to challenge specific provisions of ICWA, all of which are unavailing. Citing *Hodgers-Durgin v. De La Vina*, 199 F.3d 1037 (9th Cir. 1999) (*en banc*), which found that plaintiffs lacked standing to challenge border stops as they had been stopped only once in ten years,

---

[4] Note that the Court did not restrict this principle to challenges of racial classifications.

[5] Two recent cases illustrate ICWA's perverse consequences that are far afield from "reunifying" Indian families. In both, *non*-Indian parents invoked ICWA to thwart the adoption of children by the spouse of the *Indian* moms. See *In re Adoption of T.A.W.,* 354 P.3d 46 (Wash. App. 2015); *In the Matter of Adoption of J.R.D.*, No. 113,228, slip op. (Okla. Ct. Civ. App. Apr. 21, 2015) (unpublished) (attached as Ex. B for citation as to facts, not as legal precedent).

1    defendants oddly assert that injuries sustained by plaintiffs here are likewise "not likely to

2    recur" (Mot. at 8 n.2).  To the contrary, once inside the ICWA penalty box, children, foster,

3    and prospective adoptive families are continuously subject to its disabilities.  The

4    applicable ICWA standards apply to *every* child custody determination.  The threat of

5    tribal intervention is omnipresent.  The requirement of "active efforts" to locate an ICWA-

6    compliant placement *always* exists.  The placement preferences are *always* operative.

7    Defendants' argument is akin to denying standing to a plaintiff challenging segregated

8    streetcar laws because she was only kicked off once.  So long as the laws operate upon

9    her, she has standing to challenge them—indeed, even if on occasion she is allowed to

10   remain on the streetcar.

11           Defendants argue (Mot. at 8) that neither C. nor A.D. has been forced to enroll in

12   a tribe or that participation by the tribes has harmed them.  Of course, ICWA by its terms

13   applies to children who are "eligible" for membership.  And as the Complaint alleges (¶

14   65), the BIA Guidelines, followed by the State, provide that ICWA-eligible children

15   should be enrolled in tribes even against their parents' wishes. 80 Fed. Reg. 10153, §

16   B.4(d)(iii).  This imposition of the law upon non-member children coupled with

17   involuntary tribal enrollment are key elements of plaintiffs' equal protection, due process,

18   federalism, and freedom of association claims.  The plaintiffs are harmed by being

19   subjected to a legal regime in which a third-party that otherwise would have no jurisdiction

20   or role in the child custody proceedings is invested with what defendants aptly depict as

21   "numerous prerogatives."  Plaintiffs seek to be able to participate, like other Americans,

22   in a legal system that does not provide such prerogatives to Indian tribes that can be

23   exercised in ways adverse to their interests.  Indeed, both sets of individual plaintiffs have

24   alleged tangible harm—the prospect of a de facto veto of an adoption placement by the

25   tribe in one instance, and the prolonging of "active efforts" and delay in termination of

26   parental rights and eligibility for adoption in the other.

27           Defendants (Mot. at 9-10) cite *Lipscomb v. Simmons*, 962 F.2d 1374 (9th Cir. 1992)

28   for the proposition that children suffer no harm when children remain with their preferred

1   foster-care placements.  *Lipscomb* is not a standing case but involved a challenge to the
2   state's decision to subsidize foster placements with non-relatives but not relatives.
3   Although the individual plaintiffs here remain in their foster care placements, by being
4   subjected to ICWA, the families and children endure great uncertainty and delay in
5   forming permanent family relationships.  And as alleged in the Complaint (¶¶ 26, 28),
6   many children are removed from good homes or forced to stay in bad environments as a
7   consequence of ICWA.

8          Defendants cite *San Diego Cnty. Gun Rights Comm'n v. Reno*, 98 F.3d 1121 (9th
9   Cir. 1996), which held that plaintiffs lacked standing to challenge the Crime Control Act
10  absent a showing that it "is actually being enforced" against them (Mot. at 10).  Here, by
11  contrast, the Complaint is replete with allegations that the plaintiffs encounter different
12  standards and burdens precisely because they are subject to ICWA.  Apart from the tribes,
13  whose presence in child custody proceedings is facilitated by ICWA, there is no third party
14  lurking outside the proceedings that is inflicting upon plaintiffs the injuries that are the
15  subject of this lawsuit.

16         Defendants attack (Mot. at 11-12) many of plaintiffs' claims as hypothetical and
17  not imminent, citing *Mont. Envtl. Info. Ctr. v. Stone-Manning*, 766 F.3d 1184, 1189 (9th
18  Cir. 2014), which dismissed on standing grounds a lawsuit challenging "the anticipated
19  approval" of an application.  See also *Clapper v. Amnesty Int'l*, 133 S.Ct. 1138, 1150
20  (2013) ("[I]t is just not possible for a litigant to prove in advance that the . . . system will
21  lead to any particular result in his case").  Again, that is not the basis for this lawsuit.
22  Plaintiffs here are challenging the ongoing application of ICWA standards.  The outcomes
23  of the ICWA child custody process in particular cases is not what is at issue; the fact that
24  plaintiffs are subject to ICWA is.  Hence, whether suitable adoption placements are found,
25  whether cases are transferred to the tribes, and so on, are not the core source of the
26  constitutional injury—rather, absent ICWA, plaintiffs would be subject to a different set
27  of rules and procedures that they allege are more favorable to them.  As in the *Adarand*

28

9

1    line of cases, plaintiffs have standing to challenge policies that on their face subject them
2    to disparate treatment.

3        Defendants then point to the plaintiff children's natural and foster parents as the
4    cause of their injuries.  Were plaintiff A.D. to be made subject to tribal jurisdiction,
5    defendants assert (Mot. at 12), "it would not require that A.D. submit to a forum with
6    which she has *no* contact" (emphasis added).  Rather, "her contacts with Gila River are
7    comparable to those she enjoys with the State of Arizona: citizenship by operation of
8    choices made by her biological parents." *Id.*  Thus, "A.D. is not injured by ICWA or the
9    transfer provisions." *Id.*

10       What a remarkable set of assertions.  They go, of course, to the substantive due
11   process, equal protection, and federalism causes of action in this case.  The citizenship
12   that is relevant here is American citizenship.  Membership does not equal citizenship, nor
13   does it confer jurisdiction—except by operation of ICWA.  Children who have never set
14   foot on a reservation, nor are related to anyone living on a reservation, can be made subject
15   to ICWA.  Nor, as we have explained earlier, must a parent voluntarily assent to a child's
16   enrollment in ICWA.  There is no question that but for ICWA, the individual and class
17   plaintiff children would be subject to *state* jurisdiction in their child custody proceedings.
18   It is only through federal fiat in the form of ICWA that tribes can assert jurisdiction over
19   them or have any entitlement to participate in state court proceedings.

20       Even more remarkable is the assertion (Mot. at 14) that "engagement with the tribal
21   forum is voluntary."  After all, the argument goes, the foster parents knew about ICWA
22   and therefore implicitly waive any constitutional objections if they choose to foster a child
23   who might have the requisite quantum of Indian blood—or if they come to love the child
24   and try to adopt.  To this proposition, defendants cite no case authority.  Even if the foster
25   families fully appreciated the impact of ICWA on certain children (who they may not even
26   know are "Indian"), certainly their decision to bring a child into their home does not strip
27   them (or their foster children) of their constitutional rights.

28

10

1    Unsurprisingly, defendants trivialize the harm suffered by prospective adoptive

2 families, asserting (Mot. at 13) that "their unrealized desire to adopt" their foster children

3 does not constitute an "injury in fact."  In fact, the relationship between foster parents and

4 children can be as strong as natural families, and its arbitrary disruption (or delay in

5 culminating an adoption) can inflict grievous injury.  "No one would seriously dispute that

6 a deeply loving and interdependent relationship between an adult and a child in his or her

7 care may exist even in the absence of a blood relationship," the Court declared in *Smith v.*

8 *Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 844 (1977).  "At least where

9 a child has been placed in foster care as an infant, has never known his natural parents,

10 and has remained continuously for several years in the care of the same foster parents, it

11 is natural that the foster family should hold the same place in the emotional life of the

12 foster child, and fulfill the same socializing functions, as a natural family."  *Id.*  It is that

13 type of relationship that the individual plaintiffs have established with their foster children

14 and that ICWA places at grave risk.

15    Again, defendants misstate the nature of the cause of action.  Plaintiffs object to

16 the two-track system of child custody.  In the state court, the foster parents have alleged,

17 they likely would be able to adopt their foster children.  Indeed, once parental rights have

18 been terminated (which ICWA renders more difficult), state law establishes a preference

19 for adoption by "a person who has a significant relationship with the child," including a

20 "foster parent." A.R.S. §§ 8-103(B)(3), 8-862(H)(1); *Antonio M. v. Ariz. Dept. of Econ. §*,

21 214 P.3d 1010 (Ariz. App. 2009).  By contrast, even when jurisdiction over a child custody

22 proceeding is not transferred to a tribe, ICWA creates a statutory pecking order in which

23 non-Indian foster parents are placed at the bottom: below relatives, tribal families, and

24 even non-tribal Indian families—even if they are complete strangers.  The parent plaintiffs

25 are not seeking to establish a right to adopt—they assert an *equal opportunity* to adopt,

26 consistent with the rules that apply to all non-Indian custody proceedings and would apply

27 to Plaintiffs absent ICWA.  Unquestionably that is a cognizable interest that confers

28 standing.  See, e.g., *Heckler v. Mathews*, 465 U.S. 728, 729 (1984) (standing to vindicate

11

1    "the right to equal treatment," which is not necessarily "coextensive with any substantive

2    rights to the benefits denied the party discriminated against").

3          Indeed, contrary to defendants' assertion (Mot. at 12), the foster parents here also

4    have third-party standing to assert the rights of their foster children.  As the case cited by

5    defendants establishes, plaintiffs may assert the interests of others where "there is some

6    genuine obstacle" to the assertion of rights by the individuals themselves and where "the

7    closeness of the relationship is patent." *Singleton v. Wulff*, 428 U.S. 106, 116-17 (1976)

8    (holding that a physician may assert a patient's right to an abortion).  Indeed, the Court

9    recognized third-party standing of foster parents to assert the rights of their foster children

10   *even where they have independent court-ordered representatives*.  "We believe it would

11   be most imprudent to leave entirely to court-appointed counsel the choices that neither the

12   named foster children nor the class they represent are capable of making for themselves,

13   especially in litigation in which all parties have sufficient attributes of guardianship that

14   their views on the rights of the children should at least be heard." *Smith*, 431 U.S. at 841

15   n.44.  Here, of course, the children's interests are represented by next friend Carol Couglan

16   Carter; but were her standing found lacking, the foster parents would have standing to

17   assert them.  Indeed, the situation is less complicated than in *Smith* given that no one

18   whose views are adverse to the plaintiffs purports to represent the children's interests in

19   this case.

20         Defendants assert (Mot. at 14-16) that Carter lacks standing to act as next friend

21   for the child plaintiffs.  They cite *Safouane v. Fleck*, 226 Fed. App'x 753, 758 (9th Cir.

22   2007), which held that minor children lacked standing without "appropriate" next friend

23   representation, begging the question of what constitutes "appropriate."

24         Under Fed. R. Civ. P. 17(c), a "next friend is one who, without being regularly

25   appointed guardian, represents an infant plaintiff. . . . [T]he next friend of his own initiative

26   commences the action and is under the supervision of the court." *Russick v. Hicks*, 85 F.

27   Supp. 281, 283 (W.D. Mich. 1949) (citing 3 Moore's Fed. Prac., 2d ed., § 17.26).  There

28   are two prerequisites:  the next friend must (1) provide an adequate explanation of why

the real parties in interest cannot represent themselves, and (2) be truly dedicated to the person's best interests. *Whitmore v. Ark.*, 495 U.S. 149, 163 (1990) (holding that a death row inmate could not be next friend for a capital defendant in the absence of a showing that the real party in interest was unable to represent himself). Citing a district court case, the Court observed "it has been further suggested that a 'next friend' must have some significant relationship with the real party in interest." *Id.* at 163-64.

Here, next friend Carter alleges (Comp. ¶ 11) that she is an attorney who has practiced family law for several decades; and that she has represented children, including children of Indian ancestry, at every stage of child custody proceedings. Certainly the children cannot represent themselves.[6] That Carter is committed to the best interests of the children is evidenced by her positions in this lawsuit on their behalf; most notably, that as a matter of law the best interests of the children should be considered in all child custody proceedings.

Courts have allowed both foster parents and qualified experts like Carter to serve as next friend for infant parties. In *Sam M. ex rel. Elliott v. Carcieri*, 608 F.3d 77, 91-92 (1st Cir. 2010), a panel that included retired Supreme Court Justice David Souter ruled that

> because these foster care children lack significant ties with their parents and have been placed under the state's legal custody and guardianship, a significant relationship need not be required as a prerequisite to Next Friend status. Important social interests are advanced by allowing minors access to a judicial forum to vindicate their constitutional rights through a Next Friend that the court finds has a good faith interest in pursuing a federal claim on the minor's behalf. . . .

Accordingly, in addition to allowing the foster parent of one of the child plaintiffs to proceed as next friend, *id.* at 92, a professor of sociology at Brown University with a

---

[6] The cases do not require children in foster care to be represented by guardians ad litem, who of course in this case are paid by the State defendants. Under Arizona law, they are not general guardians but have specific authority to represent foster children in state child custody proceedings. See, e.g., A.R.S. §§ 8-221, 8-535(F), Ariz. R. P. Juv. Ct. 40.

1  focus on child maltreatment who had never met the children or relatives was allowed to

2  proceed given that he was "familiar with the circumstances foster care children face while

3  in the state's custody" and was "adequately prepared and willing to actively prosecute the

4  types of claims the children have raised" against the State. *Id.* at 93.

5  The Ninth Circuit too has held that "the contours of the requisite 'significant

6  relationship' do not remain static, but must necessarily adapt to the circumstances." *Coal.*

7  *of Clergy, Lawyers & Professors v. Bush*, 310 F.3d 1153, 1162 (9th Cir. 2002); accord,

8  *Nichols v. Nichols*, 2011 WL 2470135 at *2-6 (D. Ore. 2011) (approving a next friend

9  who had no prior relationship with the minor given that his "experience, objectivity, and

10  expertise in this role make him an exceptional candidate for such services").

11  Nor does the next friend need to be appointed by the Court.  In *Ad Hoc Comm. of*

12  *Concerned Teachers v. Greenburgh #11 Union Free Sch. Dist.*, 873 F.2d 25, 30-31 (2d

13  Cir. 1989)—a case cited by defendants—the court denied a teachers committee standing

14  to challenge racial discrimination in a school system in its own right, but permitted it to

15  represent the students as next friend given its expertise and involvement with the issues,

16  even though it had not been appointed to do so.  The court predicated its decision on the

17  children's inability to represent themselves, the committee's good faith in seeking justice

18  for the children, and its commitment and financial ability to prosecute the case.  Here,

19  Carter readily meets all of the criteria for next friend status.

20  Finally, defendants argue (Mot. at 16) that plaintiffs lack standing to challenge the

21  BIA Guidelines as they are "non-binding recommendations" and "state courts have full

22  discretion to reject, consider, or apply [them] if they find them persuasive."  We address

23  those arguments more fully in Part II-E, *infra*.  Regardless, as plaintiffs have alleged

24  (Comp. ¶¶ 103-106), Arizona has adopted the BIA Guidelines and given them the force

25  of official policy, and the application of the Guidelines exacerbates the injuries to the

26  plaintiffs as spelled out throughout the Complaint.  On March 10, 2015, the Attorney

27  General acting through Dawn Williams, the attorney who signed the State's Motion to

28  Dismiss, instructed all State attorneys and caseworkers to implement the 2015 BIA

Guidelines in all ICWA cases (Ex. A).  Hence plaintiffs are challenging the Guidelines not only as adopted by the Federal defendants but as adopted and enforced by the State defendants.  The Complaint is replete with allegations of the Guidelines' impacts on plaintiffs.

The plaintiffs satisfy standing requirements to prosecute the action in its entirety.

**B. Ripeness.**  Defendants assert (Mot. at 17 & n.6) that the case is not ripe because "the injury alleged is grounded in potential future harms," which will be determined through ongoing state court proceedings.  More specifically, the heading for the argument insists that the adjudication requires "factual assumptions about whether and how state courts will apply ICWA and the Guidelines and because plaintiffs will suffer no hardship from the delay" (a reprise of the argument in the standing section).  This argument fails for the same reason as the standing arguments fail: the harm is current and ongoing.  As plaintiffs have alleged, the State defendants and the courts in the child custody proceedings *are* applying ICWA—a legal regime in which a massive thumb is pressed upon the scale in favor of the tribes' interests and against the plaintiff children and foster families.

Again, the defendants simply reject plaintiffs' factual assertions and trivialize ICWA's impact.  For example, they contend (Mot. at 17 n.6) that ICWA and the Guidelines have neither altered Plaintiffs' existing foster-care placements nor had any effect on their prospects for adoption.  As alleged in the Complaint, thanks to ICWA, plaintiffs live in a perpetual state of fear and uncertainty.  They endure constant disruptions of their lives in the search for ICWA-compliant placements.  Their prospects for transforming their *de facto* family relationships into permanent ones are diminished by operation of the ICWA preferences.  All when compared to the system in which they would be operating but for the federal intervention triggered by the determination that the children are "Indian"—a status that is alleged in the Complaint.  Of course the case is ripe.

This is not a pre-enforcement action, see *Abbott Labs v. Gardner*, 387 U.S. 136 (1967), because enforcement is ongoing.  Nor does it depend upon future events but

current ones. For some of the plaintiff families, the ordeal visited upon them by ICWA may culminate in adoption. For others it may not. It is the disparate treatment itself, imposed upon plaintiffs by operation of federal and State law, that is the basis for this lawsuit, and that injury is ripe for judicial remediation.

"The 'injury' in fact in an equal protection case . . . is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Gratz*, 539 U.S. at 262. In *Davis v. Guam*, 785 F.3d 1311 (9th Cir. 2015), citing *Heckler*, *supra*, the Ninth Circuit found that a Guam law limiting participation in a plebiscite concerning the island's future was ripe for challenge on equal protection grounds even though the election was not certain to take place. "We read *Mathews* as holding that equal treatment under law is a judicially cognizable interest that satisfies the case or controversy requirement of Article III, even if it brings no tangible benefit to the party asserting it." *Id.* at 1315. By contrast, in *Tex. v. U.S.*, 523 U.S. 296 (1998), the case was not ripe because several events or actions would have to occur before any injury would occur. Here, the injury already is occurring. See *Davis*, 785 F.3d at 1315 (the alleged denial of equal treatment is a "judicially cognizable injury").

Defendants also misstate (Mot. at 17-18) the holding in *Fern v. Turman*, 736 F.2d 1367 (9th Cir. 1984). There, former husbands sought to invalidate their state-court divorce decrees in federal court. The court held that no federal question was presented and there were ongoing administrative and state court proceedings that would determine harm. No general constitutional challenge to state or federal laws or practices was made. This case fits squarely in the category of *Heckler*, *Gratz*, and *Davis*, in which separate and unequal treatment is alleged, and an action challenging the law requiring such treatment is ripe.[7]

---

[7] It is cold comfort to learn (Mot. at 18) that the Federal defendants "have not expressed any intent to enforce the statute." Unfortunately, the law (which defendants are aggressively defending) is made applicable to the states, and the State defendants here are enforcing it (along with the BIA Guidelines). Far from a "purely hypothetical situation," the Complaint alleges that the plaintiffs have been made subject to ICWA, and that they suffer its consequences every day.

**C.  Abstention.**  Defendants' abstention assertions are another variation of the arguments already addressed.  The Supreme Court's guidance in this context is unequivocal: "In the main, federal courts are obliged to decide cases within the scope of federal jurisdiction.  Abstention is not in order simply because a pending state-court proceeding involves the same subject matter."  *Sprint Commc'n, Inc. v. Jacobs*, 134 S.Ct. 584, 588 (2013).

Defendants recite (Mot. at 18, citing *L.H. v. Jamieson*, 643 F.2d 1351, 1354-56 (9th Cir. 1981)) the Ninth Circuit criteria for applying abstention under *R.R. Comm'n of Tex. v. Pullman Co.* 312 U.S. 496 (1941): (1) the complaint touches upon a sensitive area of social policy, (2) constitutional adjudication can be avoided if there were a definite ruling on the state issue, and (3) the determinative issue of state law is unclear.  Defendants cannot remotely satisfy those criteria, which perhaps is why the State defendants do not even mention *Pullman* abstention.

This case does indeed touch upon a sensitive area of state social policy—child custody proceedings---but it is one that the United States has hijacked through ICWA. See *Baby Girl*, 133 S.Ct. at 2571 (Thomas, J., concurring) ("there is simply no constitutional basis for Congress' assertion of authority over such proceedings"). Defendants focus on subsidiary, case-specific procedural rulings to satisfy the second criterion, such as state court transfers of jurisdiction to tribes.  Ultimately such individual determinations do not affect the larger question of ICWA's constitutionality.  So long as ICWA applies to the plaintiffs—and by its terms, and the State's enforcement of it, it does—abstention is inappropriate.  The relevant determination of State law is not unclear, nor will it be determined in individual child custody decisions: the State (as it must) applies ICWA; and the State (as it has chosen to do) applies the BIA Guidelines.  There are no constitutional questions, or questions of statutory interpretation, that Arizona courts need to answer in order for this Court to resolve the constitutional issues; hence *Pullman* abstention is inappropriate.

17

Defendants also urge the Court to abstain under *Younger v. Harris*, 401 U.S. 37 (1971), which is inapplicable as well.  While there are ongoing state proceedings in this case, they involve individualized child custody determinations, and do not meet the abstention criteria set forth in *Younger*.  They are not quasi-criminal enforcement actions nor do they involve a state's interest in enforcing orders and judgments of its courts.  *Id.* at 46.  Nor will this action have the effect, at all, of enjoining the state proceedings.  *Id.* Indeed, apart from identifying them, defendants do not address the *Younger* criteria at all.

As the Supreme Court emphasized in *Sprint*, 134 S.Ct. at 588 (citation omitted), "Circumstances fitting within the *Younger* doctrine, we have stressed, are 'exceptional'; they include . . . 'state criminal prosecutions,' 'civil enforcement proceedings,' and 'civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions'."  The ongoing state proceedings here, of course, fit into none of those categories. See, e.g., *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604-05 (civil enforcement proceedings are where a successful party in state court seeks enforcement in federal court); *Juidice v. Vail*, 430 U.S. 327, 335-36 (1977) (federal courts cannot reverse state civil contempt orders); *Lebbos v. Judges of Super. Ct.*, 883 F.2d 810, 815 (9th Cir. 1989).

Hence, in *Brian A. ex rel. Brooks v. Sundquist*, 149 F. Supp.2d 941, 957 (M.D. Tenn. 2000), the court refused to abstain on *Younger* grounds from considering a class action brought on behalf of African American children to challenge systemic deficiencies in a state foster care program on due process grounds, characterizing defendants' argument that there were ongoing individual child custody proceedings as "misleading."  Because the court's discussion is so instructive we quote it at length:

> It is true that there are ongoing and pending state proceedings concerning individual foster children; *but nothing about this litigation seeks to interfere with or enjoin those proceedings*. Rather, Plaintiffs seek injunctive relief against the Department of Children's Services, not the courts.
>
> Further, the Court finds that the juvenile courts of Tennessee are not more appropriate vehicles for adjudicating the claims raised in this putative class action.  Although technically

> Plaintiffs could raise constitutional questions in their individual juvenile proceedings, there is no pending judicial proceeding which could serve "as an adequate forum for the class of children in this case to present its multifaceted request for broad based injunctive relief" based on the Constitution and federal and state law. . . . Instead, Plaintiffs' federal constitutional claims herein represent . . . "the exact sort of disputes over citizens' rights with which the federal courts were created to deal."

*Id.* (emphasis added) (citations omitted).[8]  Accord, *La Shawn v. Kelly*, 990 F.2d 1319, 1322 (D.C. Cir. 1993).  Here there is no pendent state claim and the Complaint does not list courts as defendants.

The logical consequence of Defendants' abstention arguments is that the constitutionality of ICWA could *never* be filed in federal court.  If no child custody proceedings subject to ICWA were ongoing, defendants would argue that the challenge either would be unripe or moot and plaintiffs lack standing.  If the proceedings were ongoing, defendants would, as they do here, argue the Court should abstain.  Rule 12(b)(1) is not intended to thwart individuals from vindicating their most precious rights.

In this regard, defendants make a concession (Mot. at 20) that perhaps they did not intend: the relief sought by plaintiffs "would necessarily change the outcome of the state-court proceedings."  Actually that may or may not be true; but unquestionably plaintiffs would be freed from the ICWA penalty box and given the same opportunities as other foster families to potentially form permanent families.  Nothing this Court has been asked to do would interrupt or displace ongoing proceedings---rather, it is the federal government that has displaced state laws and policies in the context of plaintiffs.  That

---

[8] In Arizona, as well, state courts are not "more appropriate" forums in which to raise federal constitutional challenges to ICWA.  "The juvenile court derives its jurisdiction solely from statute . . . and compliance with the statutory provisions concerning adoption is mandatory."  *Matter of Pima Cty. Juv. Action No. B-8736*, 647 P.2d 1181, 1182 (Ariz. App. 1982).  "[P]rovisions concerning adoption" include the State's ICWA carve-out, A.R.S. § 8-105.01(B), which is at issue in this litigation.  Foster parents are not parties in many proceedings unless granted intervention.  *William Z. v. Ariz. Dept. of Econ. Sec.*, 965 P.2d 1224 (Ariz. App. 1998).  Adoption proceedings are separate from other child custody proceedings, and they cannot be used to collaterally attack what happened in those proceedings.  For all of those reasons, although challenges to ICWA may be raised in state child custody proceedings, they are far less fitting forums in which to raise a broad-based challenge.  See also discussion at p. 50, *infra*.

1    defendants have acknowledged that the different sets of rules could (much less would)

2    result in different outcomes demonstrates why all of the procedural obstacles interposed

3    by defendants---standing, ripeness, and abstention—are red herrings and the Motion

4    should be denied..

5                                    **II.  RULE 12(B)(6)**

6            "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

7    accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*,

8    556 U.S. 662, 678-79 (2009).  "The plausibility standard is not akin to a 'probability

9    requirement,' but it asks for a sheer possibility that a defendant has acted unlawfully." *Id.*

10   at 678.  While plaintiffs will present their constitutional arguments in much greater detail

11   in a forthcoming Motion for Summary Judgment, we discuss below why their claims are

12   more than plausible.

13           Indeed, it is not the constitutional challenge that is remarkable but the law it

14   challenges.  In the year 2016 it is astounding that a two-track system of child custody

15   proceedings, based upon a racial classification, making individuals subject to a jurisdiction

16   against their will, and imposed by federal dictate upon a field traditionally devoted to state

17   autonomy, could exist.  Merely describing it makes its constitutional infirmities obvious.

18           **A.  <u>Equal Protection</u>.**  We finally get to the sole issue that defendants identified

19   when the Court asked the grounds for the Motion to Dismiss at the status conference.

20   Their basic argument (Mot. at 20) is simple: "ICWA's application does not turn on a

21   child's race or ancestry."   For that proposition, the government relies on *Morton v.*

22   *Mancari*, 417 U.S. 535 (1974) and *U.S. v. Antelope*, 430 U.S. 641 (1977).

23           In *Mancari*, 417 U.S. at 551, the Court upheld employment preferences for Indians

24   at the BIA pursuant to the "plenary power of Congress . . . to legislate on behalf of

25   federally recognized Indian tribes."   Emphasizing that the preferences were limited to

26   employment in the BIA, the Court held that they were "granted to Indians not as a discrete

27   racial group, but, rather, as members of quasi-sovereign tribal entities whose lives and

28   activities are governed by the BIA in a unique fashion." *Id.* at 554.

                                              20

In *Antelope*, the Court upheld the application of federal criminal procedures to enrolled Indians who allegedly murdered a non-Indian within the tribal boundaries, even though non-Indians committing the same crime in the same place would have been subject to more favorable rules under state law.  Finding that the law constituted "federal regulation of criminal conduct within Indian country implicating Indian interests," 430 U.S. at 646, the Court held there was no discrimination because the law applied equally to all people subject to federal jurisdiction.  *Id.* at 647-649.

Defendants attempt to apply the narrow rule of *Mancari* and *Antelope* far too broadly.  They assert correctly (Mot. at 23) that "the political relationship of the United States with Indian tribes is inextricably bound up in the status of those tribes as sovereigns predating the formation of the United States. . . ."  From there it takes not a step but a giant leap.  "Accordingly, blood descent is typically shorthand for the social, cultural, and communal ties a person has with a sovereign tribal entity" *Id.*

That sentence distills the essence of ICWA's equal protection problem: the government is not permitted to use "shorthand" to separate people into racial categories and subject them to different treatment.  ICWA encompasses people who have such ties and people who don't.  As applied by the Federal and State defendants, the law presumes that a child whose biological parent is a member of an Indian tribe is socially, culturally, and communally tied to a tribe regardless of the weight of contrary evidence.  Indeed, the BIA Guidelines instruct courts to "not consider . . . [t]he Indian child's contacts with the tribe or reservation."  80 Fed. Reg. at 10156, C.3(d).  On the basis of that presumption, it confers great discretion upon the tribe—even to the point of forcing the state to cede jurisdiction under specified circumstances—and applies a legal regime that divests children of important rights and opportunities.

Although defendants have attempted to craft a categorical rule that any federal law affecting "Indians" is immune from challenge as a racial classification, the Court created no such rule.  Certainly tribes may determine the rules affecting custody of Indian children who live on reservations, and the federal government may regulate such conduct.  See

*Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 36 (1989) (tribal courts have jurisdiction over children who are domiciled on reservation); *Fisher v. Dist. Ct.*, 424 U.S. 382 (1976).[9]  But the cases do not give either the tribes or the federal government power to deprive non-reservation children of rights and opportunities through a sweeping and race-based definition of eligibility for tribal membership.

Apparently Justice Sotomayor agrees with the categorical rule advanced by defendants, contending that *Mancari* and *Antelope* "squarely hold that classifications based on Indian tribal membership are not impermissible racial classifications."  *Baby Girl*, 133 S. Ct. at 2584 (Sotomayor, J., dissenting).  However, she then goes on to identify the central flaw in her conclusion, acknowledging that "the Federal government requires Indian tribes, as a prerequisite for official recognition, to make 'descen[t] from a historical Indian tribe' a condition of membership."  *Id.* at 2585 (citing 25 C.F.R. § 83.7(e) (2012)).[10]

Regardless, the majority disagreed.  The Court recognized repeatedly that Baby Girl and her adoptive parents were placed in a bind because of her race as defined by the tribe and made determinative by ICWA.  The Court noted that a construction of ICWA that gave preference to an absent birth parent who had attempted to relinquish his rights over an adoptive couple with whom the child had bonded "would put certain vulnerable children at a great disadvantage solely because an ancestor—even a remote one—was an Indian."  *Baby Girl*, 133 S. Ct. at 2565 (majority).  That consequence "would raise equal

---

[9] Likewise, all of the cases cited in Mot. at 21-22 n.9 deal with on-reservation Indians or conduct, whereas this case deals with extending the federal government's and tribes' reach over individuals who are not domiciled on reservations and off-reservation conduct.  Of special note is *U.S. v. Zepeda*, 792 F.3d 1103, 1110 (9th Cir. 2015), dealing with the Indian Major Crimes Act (IMCA), whose elements include proof of some quantum of Indian blood *and* membership in a tribe.  By contrast, ICWA sweeps in children who are merely "eligible" for membership. 25 U.S.C. § 1903(4).  Moreover, IMCA applies only to crimes committed in Indian country, *Zepeda*, 792 F.3d at 1106, whereas ICWA encompasses children even if their tribal connections are nonexistent.  Both of those factors remove this case from the *Mancari* ambit.  Ultimately, as Judge Kozinski emphasized in *Zepeda*, 792 F.3d 1119 (Kozinski, J., concurring), "[w]hatever complexities may be inherent in the federal regulation of Indian tribes, the equal protection clause permits no exceptions.  Racial classifications must survive the strictest scrutiny.  Those that cannot have no place in our law."

[10] Indeed, plaintiffs have alleged as a factual matter that most tribes require a specified blood quantum for eligibility for membership (Comp. ¶ 40).

protection concerns." *Id.* Though defendants somehow fail to discuss *Baby Girl*, that decision establishes unequivocally that an equal protection challenge is very much in play.

Indeed, in *Rice v. Cayetano*, 528 U.S. 495 (2000), the Court struck down a Hawaii scheme that restricted voting for certain public offices to people of Hawaiian ancestry. The restriction was justified on the basis of a trust relationship. The defendants argued that the classification was not racial, but the Court disagreed. "Ancestry can be a proxy for race." *Id.* at 514. The Court elaborated:

> One of the principal reasons race is treated as a forbidden classification is that it demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities. . . . Ancestral tracing of this sort achieves its purpose by creating a legal category which employs the same mechanisms, and causes the same injuries, as laws or statutes that use race by name.

*Id.* at 517. The Court thus condemned precisely the type of ancestral "shorthand" that undermines equal protection.

The premise underlying ICWA—that the interests of non-reservation children deemed to be Indian based on blood quantum are the same as interests of tribes—is antithetical to the guarantee of equal protection. "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Hirabayashi v. U.S.*, 320 U.S. 81, 100 (1943). That principle has been applied to government-imposed racial classifications in family relationships. See, e.g., *Loving v. Va.*, 388 U.S. 1 (1967); *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) (invalidating child custody decision that had a different outcome based on the race of the man the child's mother married and holding that the "goal of granting custody based on the best interests of the child is indisputably a substantial governmental interest for purposes of the Equal Protection Clause").

Defendants switch gears to argue (Mot. at 22) that because individuals who do not meet blood quantum requirements are excluded from membership and thus unscathed by ICWA, the classification is political rather than racial. "Simply because a class defined by ancestry does not include all members of the race does not suffice to make the

classification race neutral." *Rice*, 528 U.S. at 516-17. Indeed, many Jim Crow laws were based on blood quantum. See, e.g., Fla. Laws, 14th Gen. Ass., 1865-66, Ch. 1, 468 § 1-3 (defining a person with at least one-eighth African ancestry as black). The fact that not all persons of a certain ancestry are affected does not defeat equal protection scrutiny; rather, affixing a racial classification and assigning benefits or burdens on that basis triggers such scrutiny.

Defendants' contention that ICWA's disparate treatment of Indian children is based on a political rather than racial classification is further belied by the fact that ICWA gives a preference to "Indian foster home[s]" and "Indian families" that do not come from the tribe with which the child is associated. 25 U.S.C. § 1915(a)(3), (b)(iii). Thus, for example, in a Navajo child's adoption proceedings, prospective adoptive parents who are Cherokee receive a preference over prospective adoptive parents who are African American. Plainly the function of this preference is to lump all Indian children together according to race, not to acknowledge their political affiliation with a particular tribe.

Finally, defendants argue (Mot. at 24-26) that ICWA's contested provisions are "narrowly tailored" to its objectives. Plainly they are not. The Supreme Court in *Adarand*, 515 U.S. at 227 (emphasis in original), recognized the "basic principle that the Fifth and Fourteenth Amendments to the Constitution protect *persons*, not *groups*," and held that unequal treatment on the basis of race "should be subjected to detailed judicial inquiry to ensure that the *personal* right to equal protection of the laws has not been infringed." *Id.* In *Gratz*, 539 U.S. at 271, the Court held that a racial preference in university admissions was not narrowly tailored because it lacked "individualized consideration." See also *id.* at 276 (O'Connor, J., concurring) (admissions procedures "do not provide for a meaningful individualized review of applicants").

ICWA suffers the same infirmity but on a much grander scale. In *Holyfield*, 490 U.S. at 37 (emphasis added), the Court observed that ICWA's modest purpose was to protect the "rights of the Indian community and tribe in *retaining* its children in its society." But it reaches far beyond that. The law sweeps within its "protection" children

24

1   who do not have significant ties—indeed, in many cases children who have no ties

2   whatsoever—to a reservation or Indian culture, or whose primary ties (including

3   jurisdiction) are outside of the tribe.  It conflates the best interest of the child with that of

4   the tribe, precluding precisely the type of individualized determinations that the equal

5   protection clause requires.

6        The Complaint extensively documents six sets of provisions in ICWA and the BIA

7   Guidelines that prejudice plaintiff children and families:  transfer of jurisdiction, active

8   efforts, burden of proof in foster care placement orders, burden of proof in termination of

9   parental rights, foster and preadoptive care placement preferences, and adoption

10  placement preferences.  Ultimately, defendants must demonstrate not only that those rules

11  are narrowly tailored to a compelling governmental interest, but that there are no less-

12  restrictive alternatives. *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280 n.6 (1986)

13  (plurality opinion).  At the Motion to Dismiss stage, it is enough that plaintiffs have

14  alleged that they are subjected because of race to a separate and unequal legal regime, and

15  that defendants have confessed that the disparate treatment may lead to different outcomes

16  in their child custody proceedings.

17       **B. <u>Due Process</u>.**  Defendants correctly identify (Mot. at 26-27) three discrete due

18  process claims in the Complaint: the jurisdiction-transfer provision, the children's and

19  families' liberty interest in individualized determinations under uniform standards, and

20  the failure of ICWA and BIA Guidelines to adequately consider the individual children's

21  best interests.  Each states a due process cause of action.  We address each in turn.

22       **1.  *<u>Jurisdiction-transfer provision</u>*.**  It is conceptually important to

23  differentiate ICWA's exclusive jurisdiction provision, 25 U.S.C. § 1911(a), which was at

24  issue in *Holyfield*, from § 1911(b), which assumes a tribal forum has *in personam*

25  jurisdiction over litigants brought before it.  The latter is at issue here and presents a classic

26  example of an impermissible "long-arm" statute.

27       It is extremely well-established that a forum may not establish *in personam*

28  jurisdiction absent minimum contacts.  See, e.g., *World-wide Volkswagen Corp. v.*

25

1   *Woodson*, 444 U.S. 286 (1980); *Int'l Shoe Co. v. State of Washington*, 326 U.S. 310

2   (1945).   The contacts must be "continuous and systematic" and the litigation must be

3   related to or arise from the contacts.  *Helicopteros Nacionales De Colombia, S.A. v. Hall*,

4   466 U.S. 408, 414-16 (1984).  Moreover, the minimum contacts must be "purposefully

5   directed at the forum" by the person who is being hailed into the forum.  *Asahi Metal*

6   *Indus. Co. v. Super. Ct.*, 480 U.S. 102, 110 (1987).

7           Under ICWA, state courts are required to transfer certain child custody proceedings

8   involving Indian children not residing on a reservation to a tribe's jurisdiction "in the

9   absence of good cause to the contrary" and "absent objection by either parent" if a parent,

10  Indian custodian, or the tribe petitions for it.  25 U.S.C. § 1911(b).  The BIA Guidelines,

11  adopted by Arizona, extend the provision to all child custody proceedings.  80 Fed. Reg.

12  at 10156, C.1(c).

13          The "contacts" required by ICWA to trigger transfer of child custody proceedings

14  to a tribal court on their face do not remotely meet the requirements for *in personam*

15  jurisdiction.  Indeed, the required contacts may be nonexistent (i.e., mere "eligibility" for

16  membership in a tribe).  Even volitional membership, which of course is impossible for

17  minors, is not the same as "continuous and systematic" contacts.  Certainly the foster

18  families have not engaged in actions "purposefully directed at the forum," and the child

19  custody proceedings may well not arise from the forum.  Yet this is exactly where the

20  "shorthand" that defendants refer to comes in: ICWA's core assumption that any child

21  with the requisite ancestry who is eligible for membership in a tribe necessarily should be

22  made subject to a tribe's jurisdiction.  That is a clear and profound due process violation,

23  compounded by imposing the burden of proof on the party contesting it rather than the

24  entity seeking it.  Indeed, defendants do not even suggest it does not state a claim (Mot. at

25  26).

26          **2. *Individualized determination*.**  Contrary to defendants' cursory assertion

27  (Mot. at 26-27) that this claim simply restates their equal protection claim, foster parents

28  and children do have a recognized interest in protecting their bonds against the type of

arbitrary disruption so often inflicted by ICWA.  Foster parents who are the psychological parents of a child have a liberty interest that cannot be deprived without due process.  As the Court recognized in *Smith*, 431 U.S. at 844, "the importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association."  No less than biological families, foster families—while not possessing a "property" interest or entitlement—nonetheless possess due process rights that may not lightly be discarded.

> **3. *Children's best interests*.**  It is beyond ironic that a law entitled Indian Child Welfare Act does not make paramount the best interests of the children who are subject to it.  To the contrary, in establishing foster/preadoptive placements, ICWA establishes preferences to be effectuated, "in the absence of good cause to the contrary," for members of the child's extended family, Indian foster homes, and Indian-approved or Indian-operated institutions.  25 U.S.C. § 1915(b).  For adoption placements, ICWA establishes preferences, "in the absence of good cause to the contrary," for placements with the child's extended family, other members of the tribe, or other Indian families.  25 U.S.C. § 1915(a).

Though ICWA does not define good cause, the BIA Guidelines, adopted by the State, provide that in all of these instances, the agency "must always follow the placement preferences" unless it can prove through "clear and convincing evidence" why they could not be met.  80 Fed. Reg. at 10157, F.1(b).  Moreover, the Guidelines state, "The good cause determination does not include an independent consideration of the best interest of the Indian child because the preferences reflect the best interests of an Indian child in light of the purposes of the Act."  80 Fed. Reg. at 10158, F.4(c)(3).  Nor may "good cause" include "ordinary bonding or attachment that may have occurred as a result of a placement or the fact that the child has, for an extended amount of time, been in another placement that does not comply with the Act."  *Id.*

Consider the implications of those words.  They are breathtaking.  A child with the most attenuated blood, cultural, or physical connection to a tribe *should* be removed from

1    a foster home in which he or she has resided since birth and in which the child has formed

2    a psychological family, in favor of an extended family or unrelated tribal member, an

3    institution, or even an Indian member of another tribe in a distant state.  Those preferences

4    are *mandatory* unless someone stands up for the child and demonstrates good cause, which

5    comprises a limited set of conditions under the BIA Guidelines and does not include

6    psychological and physical bonding.  The child's best interests are presumed to be the

7    same as a tribe that the child may never even have encountered and, indeed, of which the

8    child may not even be eligible for membership.  If those laws and policies do not state a

9    due process violation, nothing does.

10       Defendants seek to shut down this cause of action by misstating it.  Plaintiffs do

11   not assert that a child's best interests should be the sole consideration in child custody

12   proceedings.  State custody laws and procedures recognize a variety of interests in such

13   proceedings.  But there is no state in the country that does not consider the child's best

14   interests in child custody proceedings.  There is no state in the country that elevates the

15   placement preference of a complete stranger in a distant state over a loving foster family

16   that has attached to a child since birth.  It goes without saying that these decisions are the

17   most important that will ever be made on behalf of the child.  Why would a court require

18   the appointment of a guardian ad litem in child custody cases if not to advocate for the

19   child's best interests?  But ICWA and the BIA Guidelines impose a straitjacket on what

20   state courts and children's appointed representatives can do.

21       "Certain basic principles are agreed upon," the Ninth Circuit declared in *Lipscomb*,

22   962 F.2d at 1379.  "Once the state assumes wardship of a child, the state owes the child,

23   as part of that person's protected liberty interest, reasonable safety and minimally adequate

24   care and treatment appropriate to the age and circumstances of the child."  *Id.*  The default

25   rule that would apply in Arizona, absent ICWA's intervention, was set forth in *Clifford v.*

26   *Woodford*, 320 P.2d 452, 455 (Ariz. 1957) (citation omitted): "'[T]here can be no question

27   under all the authorities but that in answering the query, Who should have the custody of

28   the children? the pole star by which it is led to a decision is their best interest'."  *See also*

28

1  *Kent K. v. Bobby M.*, 110 P.3d 1013, 1020 (Ariz. 2005) (child "has an interest in a 'normal

2  family home'" (citing *Santosky v. Kramer*, 455 U.S. 745, 759 (1982)); *Kent K.*, 110 P.3d

3  at 1021) (child has an "interest in obtaining a loving, stable home").

4      A child's best interests, based on an individualized determination, cannot be

5  excluded from child custody decisions without violating that child's due process rights.

6  Through ICWA's displacement of state policies that protect children's best interests, and

7  the State's adoption of the BIA Guidelines that exclude such considerations, plaintiff

8  children have a due process cause of action.

9      **C.   Federalism.**   We begin with two basic propositions that appear to be

10  undisputed.   First, plaintiffs have standing to challenge a violation of the Tenth

11  Amendment when the State declines to do so and the violation directly affects their

12  interests.  In so holding, the Court observed in *Bond v. U.S.*, 131 S.Ct. 2355, 2364 (2011),

13  "Federalism secures the freedom of the individual.  It allows States to respond, through

14  the enactment of positive law, to the initiative of those who seek a voice in shaping the

15  destiny of their own times without having to rely solely upon the political processes that

16  control a remote central power."  In this case, the people of Arizona did exactly that in

17  crafting their child custody laws, whose protection plaintiffs would enjoy were they not

18  displaced by ICWA.

19      Second, it is undisputed that "domestic relations" is "an area that has long been

20  regarded as a virtually exclusive province of the States."  *Sosna v. Iowa*, 419 U.S. 393,

21  404 (1975).  Indeed, the "whole subject of the domestic relations of husband and wife,

22  parent and child, belongs to the laws of the states, and not to the laws of the United States."

23  *Ex parte Burrus*, 136 U.S. 586, 593-94 (1890).

24      Had ICWA merely been extended to the tribes as quasi-sovereign entities acting

25  within their jurisdiction, this lawsuit would not be necessary.  However, the federal

26  government went much further, doing great violence to principles of federalism in three

27  distinct ways: replacing otherwise applicable state child custody rules and procedures with

28

1   federal dictates, commandeering state resources to effectuate those dictates, and

2   displacing state jurisdiction over certain child custody proceedings.

3   Defendants' answer (Mot. at 28-29) that the Indian Commerce Clause confers

4   "plenary and exclusive" authority to legislate in the field of Indian affairs.  But such

5   power, no matter how extensive, should by definition not place federal regulation on a

6   collision course with state prerogatives.  As Justice Thomas put it, the "threshold question,

7   then, is whether the Constitution grants Congress power to override state custody law

8   whenever an Indian is involved." *Baby Girl*, 133 S. Ct. at 2566 (Thomas, J., concurring).

9   Justice Thomas' concurrence in *Baby Girl* is reminiscent of his earlier separate

10  decision in *N.W. Austin Mun. Util. Dist. No. 1 v. Holder*, 557 U.S. 193, 212-229 (2009)

11  (Thomas, J., concurring and dissenting), when he urged that portions of the Voting Rights

12  Act were unconstitutional, even as his colleagues found a way to interpret the law to avoid

13  the constitutional question.  Four years later, the Court resolved the constitutional

14  question, invalidating the provision on federalism grounds.  *Shelby Cnty. v. Holder*, 133

15  S.Ct. 2612 (2013).  Plaintiffs hope that Justice Thomas' opinion in *Baby Girl* will

16  demonstrate his prescience again; certainly his analysis underscores the plausibility of

17  plaintiffs' federalism claims.

18  To begin with, the Indian Commerce Clause, U.S. Const. Art. I, § 8, cl. 3, by its

19  terms provides authority to regulate commerce "with the Indian tribes."[11]  As Justice

20  Thomas explains, "neither the text nor the original understanding of the Clause supports

21  Congress' claim to . . . 'plenary' power."  *Baby Girl*, 133 S. Ct. at 2567 (Thomas, J.,

22  concurring).  Commerce is not an open-ended term; it does not encompass child custody

23  proceedings.  Moreover, the contested portions of ICWA "do not regulate Indian tribes as

24  tribes."  *Id.* at 2570.  Indeed, the tribes often are not even involved in the proceedings.

25

26  [11] Defendants also cite the Indian treaty power as a source of authority for ICWA, but it
    cites no treaties that require the federal government to displace child custody proceedings

27  over which states have authority, nor could they bargain away the constitutional powers
    of states or individual constitutional rights. *Bond v. United States*, 134 S. Ct. 2077 (2014

28  ) (*Bond II*).

The children often were never domiciled on Indian reservations and the tribes had no jurisdiction over them. *Id.* As a result, "there is simply no constitutional basis for Congress' assertion of authority over such proceedings." *Id.* at 2571.

Additionally, the Tenth Amendment prohibits the federal government from "commandeering" state resources. *N.Y. v. U.S.*, 505 U.S. 144 (1992). In *Printz v. U.S.*, 521 U.S. 898 (1997), the Court struck down a federal law obligating state officials to conduct background checks on prospective handgun purchases. Among other things, and far more odious, if a child is suspected to be Indian, the State defendants may be required to provide "genograms or ancestry charts for both parents, . . . maternal and paternal grandparents and great grandparents or Indian custodians; birthdates . . . [and] tribal affiliation including all known Indian ancestry for individuals listed on the charts[.]" 80 Fed. Reg. at 10152, B.2(b)(1)(i). Also, state officials are required to enroll children with the tribes. 80 Fed. Reg. at 10153, B.4(d)(iii).

Finally, deep federal incursions into state prerogatives to alleviate specific conditions, even if constitutionally authorized, have a limited shelf-life. Observing that "'current burdens' must be justified by 'current needs,'" the Court in *Shelby Cty.*, 113 S. Ct. at 2627, found that certain provisions of the Voting Rights Act were "based on decades-old data and eradicated practices." *Id.* Because current impositions on the states were "based on 40-year old facts having no logical relation to the present day," *id.* at 2629, the provisions exceeded the bounds of appropriate federal remedial power.

ICWA, coincidentally, will soon turn 40. Its sweeping displacement of state authority over child custody proceedings that otherwise would be subject to state jurisdiction cannot be justified based on conditions that existed when most current Americans were not yet born. As Justice Thomas has observed, ICWA's reach exceeded congressional authority in the first place. Plaintiffs have stated a cause of action under the Tenth Amendment.

**D. <u>Freedom of Association</u>.** Defendants assert (Mot. at 32) that "ICWA does not require association, but rather protects associations that already exist." Except, of course,

1 when it doesn't, and instead compels individuals to associate with tribes.  Complaint ¶

2 116, which must be taken as true as defendants have chosen to contest the claim in a

3 Motion to Dismiss, states as follows:

> Many children who are subject to ICWA have few, if any, ties to the tribe upon which ICWA confers jurisdiction over them. Some but not all are members of the tribes but do not thereby consent to surrender their constitutional rights.  Some are enrolled in the tribes as a result of the mandates of ICWA and the [BIA] Guidelines.  Others are not members and have virtually no connection to the tribes other than a prescribed blood quantum.

9       The jurisdiction-shifting provisions of ICWA require individuals who have few

10 contacts with a tribe to submit to its jurisdiction.  The array of preferences ICWA

11 establishes for foster and adoption placements is calculated to lead to *creation* of a tie to

12 tribes even if one did not previously exist.  That is what *Baby Girl* was all about. Moreover,

13 under the BIA Guidelines, the State is obligated to "take the steps necessary to obtain

14 membership for the child in the tribe" if the child is not enrolled.  80 Fed. Reg. at 10153,

15 B.4(d)((iii).

16       The government goes on to say (Mot. at 32 n.16) that "the tribe also has closer ties

17 to the children than the proposed 'next friend' because the children are members of *or the*

18 *offspring of* members politically affiliated with the sovereign tribe."  Really?  A parent's

19 *political affiliation*, as defendants describe it, is more important than someone who is

20 advocating that the child's best interests should be paramount?  If Congress passed a law

21 and federal guidelines decreed that infants born to Republican parents must be enrolled in

22 the Grand Old Party, and should be adopted by Republican families, would the

23 Department defend it so tenaciously?

24       Whatever ICWA's intent, Congress did not write it merely to reunite Indian

25 families.  It encompasses individuals who merely are "members," regardless of how close

26 or remote their attachment to the tribe, or who are eligible for membership.  Once that

27 status is established, free will and an individual's best interests are made subordinate to

28 the federal government's goal of compelling association.  That far it cannot go.

1    Freedom of association also protects the freedom not to associate.  *Boy Scouts of*

2    *America v. Dale*, 530 U.S. 640 (2000).  To compromise that freedom, the government

3    must establish "compelling state interests" that "cannot be achieved through means

4    significantly less restrictive of associational freedoms."  *Roberts v. U.S. Jaycees*, 468 U.S.

5    609, 623 (1984); see also *Knox v. Serv. Emps. Int'l Union, Local 1000*, 132 S. Ct. 2277,

6    2289 (2012).  Plaintiffs have stated a freedom of association cause of action.

7    **E.   BIA Guidelines.**   There is no doubt the revised BIA Guidelines reflect

8    defendants' application of ICWA and have the force of law through the State's adoption

9    of them.  Hence, they broaden and intensify the violations of plaintiffs' constitutional

10   rights as alleged throughout the Complaint.  The only question raised by defendants'

11   motion to dismiss Count 6 of the Complaint is whether it is plausible to argue that the

12   Guidelines themselves have the force of law and exceed agency authority.  It is.

13   The Guidelines constitute final agency action and defendants fail at this preliminary

14   stage to overcome the presumption of reviewability under 5 U.S.C. § 704.  In drafting the

15   Administrative Procedure Act (APA), it was the intent of Congress to provide for the

16   review of "a broad spectrum of administrative actions."  *Abbott Labs*, 387 U.S. at 140.

17   For that reason, the APA's "'generous review provisions' must be given a 'hospitable'

18   interpretation."  *Id.* at 140-41 (citation omitted).  Courts should give access to judicial

19   review unless defendants make a showing of contrary intent by "clear and convincing

20   evidence."  *Id.* at 141.

21   Two criteria must be satisfied for an agency action to be final.  "First, the action

22   must mark the 'consummation' of the agency's decisionmaking process. . . .  And second,

23   the action must be one by which 'rights or obligations have been determined,' or from

24   which 'legal consequences will flow'."  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)

25   (citations omitted).

26   The first criterion is satisfied and defendants do not argue otherwise.  See 80 Fed.

27   Reg. at 10147 ("Effective immediately, these guidelines supersede and replace the

28   guidelines published in 1979").  As to the second criterion, it "can be met through different

kinds of agency actions, not only one that alters an agency's legal regime." *Or. Natural Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 987 (9th Cir. 2006).

It is not what an agency action purports to be, but rather what it is, that determines its status as a final action.  In *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000), the court found that self-styled "Guidance," which by its terms recited it was guidance only and not a final agency action, was in fact final agency action. The court looked at the actual effect, finding that although some states had not adopted it, "[t]hrough the Guidance, EPA has given the States their 'marching orders' and EPA expects the States to fall in line." *Id.*  The Ninth Circuit has cited *Appalachian Power* favorably. *Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084, 1095 (9th Cir. 2014).

Defendants rely primarily on precedents that pre-date the current Guidelines, which have become significantly more coercive, using the word "must" 101 times in their instructions to state courts and agencies.  The Guidelines' stated purpose is to "clarify the *minimum* Federal standards, and best practices, governing implementation of the [Act] to *ensure that ICWA is applied in all States* consistent with the Act's express language, Congress' intent in enacting the statute, and the canon of construction that statutes enacted for the benefit of Indians are to be liberally construed to their benefit."  80 Fed. Reg. 10150 A.1 (emphasis added).  As the Guidelines state, "These guidelines provide *minimum* Federal standards and best practices to ensure compliance with ICWA and *should be applied in all child custody proceedings in which the Act applies*."  80 Fed. Reg. at 10152 A.5(a) (emphasis added).  Mere suggestions or marching orders?  It surely seems more than plausible that their intended effect is the latter.

Unlike cases cited by defendants (see, e.g., *BBK Tobacco & Foods, LLP v. U.S. Food & Drug Admin.*, 672 F. Supp.2d 969, 975 (D. Ariz. 2009) (no final agency action where guidance does not provide legal basis on which to institute legal proceedings)), here tribes can invoke the Guidelines to intervene in child custody proceedings at all stages, whereas ICWA by its own terms gives them a legal basis to do so only in foster care

34

placement and termination of parental rights proceedings, but not in preadoption or adoption proceedings.  *Compare* 25 U.S.C. § 1911(b), *with* 80 Fed. Reg. at 10156, C.1(c).

It is unsurprising that defendants would seek to shield the Guidelines from judicial review, for they greatly exceed statutory authority and expand ICWA's impact.  ICWA is unique in many ways, among them that it reflects a direct mandate to state courts and child services officials to set aside state laws and procedures and substitute federal laws and procedures.  When the federal enforcement agency issues "guidelines" that reflect "minimum federal standards" that "should be" enforced in all proceedings, a state court or agency can be excused for considering them mandatory.  Whatever benign label defendants might ascribe to them, the Guidelines operate directly upon plaintiffs to their detriment.  They have stated a cause of action that the Guidelines represent final agency action that exceeds agency authority.

## RESPONSE TO STATE DEFENDANT'S MOTION

Most of the State defendant's arguments parallel those made by the Federal defendants, so we will address here only the different or additional arguments made by the State.  Echoing the Federal defendants, the State mischaracterizes the claims, suggesting that they reflect a series of individual disputes.  Rather, all of the claims are aimed at a common injury: being segregated into a separate and unequal legal regime.

### I.  RULE 12(B)(1)

**A.  <u>Abstention.</u>**  The State (Mot. at 10) cites *Moore v. Sims*, 442 U.S. 415 (1979) for the proposition that a challenge to a complex state statutory scheme traditionally has militated in favor of abstention.  Plaintiffs do not challenge a *state* statutory scheme.  They challenge a *federal* scheme that operates as an overlay on the state statutory scheme for child custody proceedings.  As the State itself repeatedly points out, the primary source of harm here emanates from the federal statute.  The relief sought by plaintiffs would restore the State to hegemony over child custody proceedings, with a single, unitary system applying to all of the children within its jurisdiction.  All that would be altered is the State's compelled adoption of ICWA and its embrace of the BIA Guidelines.

1       *Moore* also differs in that the federal court in that case barred further state

2  proceedings.  Here, the impact of the federal lawsuit on ongoing state child custody

3  proceedings is exactly none.[12]  All relief sought is prospective.  Oddly, in light of its

4  professed concern for ongoing state child custody proceedings, the State seems to think

5  that the proper course for plaintiffs is to raise constitutional objections in all such state

6  juvenile court proceedings implicating the individual plaintiffs and class members.  Quite

7  to the contrary, the proper place for a class action constitutional challenge to a federal

8  statutory scheme is federal court.

9       Much more helpful is the State's citation (Mot. at 10-11 n.4) of Judge Silver's

10  recent opinion in *Tinsley v. McKay*, slip op., No. CV-15-00185-PHX-ROS (Sept. 29,

11  2015) (attached as Ex. C).  The lawsuit is a broad-based challenge to "widespread systemic

12  failures in state child welfare agencies."[13]  *Id.* at 1.  Judge Silver held that after the four

13  criteria to invoke the "exceptional" abstention under *Younger* are satisfied, a fifth factor

14  must be considered: "whether '[t]he requested relief [] seek[s] to enjoin—or ha[s] the

15  practical effect of enjoining—ongoing state proceedings." *Id.* at 11-12 (citing *ReadyLink*

16  *Healthcare, Inc. v. State Comp. Ins. Fund*, 754 F.3d 754, 759 (9th Cir. 2014)).  Although

17  the relief sought in *Tinsley* was far more intrusive than the injunctive relief sought here,

18  Judge Silver concluded that the court should not abstain given that the case did not involve

19  quasi-criminal proceedings, enforcement of state orders, or an injunction against ongoing

20  juvenile court cases.  *Tinsley*, slip op. at 12-25.  "[P]rinciples of federalism and comity

21  warrant restraint and respect when the target of a federal court injunction is a state agency.

22

23  [12] It is thus not a case where a plaintiff seeks to "remove an open, active and ongoing State

24  of Arizona juvenile dependency proceeding" to federal court, see *Dema v. Ariz.*, 2008 WL 2437939 at *1 (D. Ariz. 2008); or a case that would place "decisions that are now in the hands of the state courts under the direction of the federal district court," see *31 Foster*

25  *Children v. Bush*, 329 F.3d 1255, 1278 (11th Cir. 2003); nor one in which the "federal court would, in effect, assume an oversight role over the entire state program," see *J.B. ex*

26  *rel. Hart v. Valdez*, 186 F.3d 1280, 1291-92 (10th Cir. 1999).

27  [13] Here as in *Tinsley*, slip op. at 18, "the complaint includes anecdotal evidence from

28  individual children's cases, [which are] examples of the alleged broader phenomena the complaint describes and for which [federal] relief is requested."

But this Court . . . is fully capable of practicing such restraint and hewing to the direction provided by the Supreme Court . . . for managing the competing requirements of federal jurisdiction and state sovereignty." *Id.* at 29.

The court also rejected the notion that plaintiffs could viably pursue their challenges in juvenile court. *Id.* at 24-25. Everything about the state court proceedings, the court observed, "is tailored to the specific facts and circumstances of a particular child's life. Nothing in the statutes governing the authority or procedures of the juvenile court envisions or authorizes the court's adjudication of class action cases." *Id.* at 25 n.18. Regardless, the existence of such state forums does not mandate abstention. "Jurisdiction existing, this Court has cautioned, a federal court's 'obligation' to hear and decide a case is 'virtually unflagging.' . . . Parallel state-court proceedings do not detract from that obligation." *Sprint*, 134 S. Ct. at 591 (citation omitted).

Here, of course, the ongoing state cases likewise are not "quasi-criminal enforcement actions or involve a state's interest in enforcing the orders and judgments of its courts." *ReadyLink* , 754 F.3d at 759. As in *Tinsley*, slip op. at 19 (emphasis in original), "each aspect of Plaintiffs' requested relief . . . concerns *systemic* problems not individual cases." The lawsuit seeks prospective relief only. See *Oglala Sioux Tribe v. Van Hunnik*, 993 F. Supp. 2d 1017, 1024 (D.S.D. 2014) (where relief sought is prospective and does not interfere with ongoing state proceedings, abstention is inappropriate). Nor does the case enjoin or have the effect of enjoining ongoing state proceedings. Applying *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350 (1989) (*NOPSI*), courts repeatedly have held that federal complaints seeking systemic relief against problems in state child welfare agencies "aid the ongoing state proceedings" and do "not interfere with them." *M.D. v. Perry,* 799 F. Supp.2d 712, 720 (S.D. Tex. 2011); accord, *Kenny A. ex rel. Winn v. Perdue*, 218 F.R.D. 277, 286 (N.D. Ga. 2003); *Dwayne B. v. Granholm*, 2007 WL 114920 at *6 (E.D. Mich. 2007).

For all of those reasons, the Court should not abstain.

37

**B.   Standing.**   Defendants make no new or additional arguments regarding standing, hence plaintiffs rely on their arguments in Part I-A, *supra*.   Like the Federal defendants, the State argues that no one has suffered an injury.   But the Complaint identifies specific harms to both the individual and class plaintiffs by virtue of being directed to a system that imposes greater burdens and provides fewer protections to children and foster families alike.

Defendants assert (Mot. at 25) that as to all of the individual plaintiffs, no motion to transfer jurisdiction to a tribe has been made and active efforts were "completed" prior to the lawsuit.   To the contrary, since the lawsuit was filed, the tribe has made a motion to transfer jurisdiction as to Baby Girl A.D. and her foster family; and active efforts to identify an ICWA-compliant placement persist.   Defendants' factual error underscores the dynamic circumstances of child custody proceedings subject to ICWA: a number of adverse and injurious actions are possible *only because* the child has been made subject to the law.   Different individual plaintiffs and prospective class members will experience different injuries and different outcomes; but for all of them, the system imposes disparate treatment from start to finish.

Consider this hypothetical.   Both blacks and whites are allowed to travel on the state highway system.   (To indulge defendants' insistence that this is about political affiliation rather than race, the hypothetical can be changed to Republicans and Democrats to the same effect.)   Once a person's status is confirmed based on blood quantum (or parents' political affiliation), different sets of rules apply.   The first class of drivers is given full constitutional protections for traffic infractions, while the second receives substantially less.   For good measure, at the instigation of a different state, the second set of drivers can be hailed into court in a different jurisdiction even if they have never driven there.   Does a driver in the second class have to wait to get a ticket, or go through the court system, before he can challenge the law?   Does his decision to drive waive his rights because he doesn't have a "right" to drive and his action is "voluntary"?   Of course not: being subjected to a separate and unequal system itself is a cognizable injury.   Magnify

38

1  the hypothetical by making it about the lives, futures, and well-being of vulnerable

2  children and the injury is even more palpable.

3        This lawsuit is a classic civil rights disparate treatment challenge to a system of *de*

4  *jure* segregation. For the reasons set forth in Part I-A, plaintiffs have standing to pursue

5  it.

6        **C. <u>Ripeness</u>.** Defendants acknowledge (Mot. at 27) that ripeness depends on the

7  state of the factual record and that straightforward legal questions tend to be ripe. The

8  legal questions presented here are straightforward and require little if any factual

9  development. The law on its face divides individuals into categories of "Indian" and non-

10  Indian, then assigns different rights and opportunities to different entities and individuals

11  based on that classification. The plaintiffs fall into the disadvantaged category and are

12  subject to separate and unequal policies and opportunities. There are no contingencies

13  regarding whether that has occurred. Their case is ripe for resolution.[14]  As set forth in

14  Part I-B, *supra*, no resolution of state proceedings is a necessary antecedent to this lawsuit

15  because plaintiffs already are subject to ICWA.

16        As to the applicability of the Guidelines, defendants already have established that

17  they are binding upon the State defendants (Ex. A). As a consequence, DCS will apply

18  them in all of their actions (for instance, "active efforts" to reunify the family, and foster,

19  preadoptive, and adoptive placement preferences), regardless of whether state courts

20  render decisions based on them. State courts often have relied on BIA Guidelines in

21  enforcing ICWA. See, e.g., *Matter of Maricopa Cnty. Juv. Action No. JS-8287*, 828 P.2d

22  1245 (Ariz. App. 1991) (relying on Guidelines to interpret ICWA's transfer of jurisdiction

23  provision); *Matter of Appeal in Pima Cnty. Juv. Act. No. S-903*. 635 P.2d 187 (Ariz. App.

24  1981) (same); *Matter of Appeal in Maricopa Cnty. Juv. Act. No. A-25525*, 667 P.2d 228

25

---

26  [14] Any "confusion" relating to the proposed class definition owes to the decision of the
27  defendants to proceed with a Motion to Dismiss before class certification. The class
   clearly is intended to consist only of off-reservation children deemed to be Indian, and
28  their non-Indian foster, preadoptive, and prospective adoptive parents.

(Ariz. App. 1983) (definition of Indian child).[15]  What state courts ultimately decide is less significant than the fact that DCS, which has legal *custody* over the children and makes day-to-day decisions on their behalf, considers the Guidelines binding.  The Complaint alleges significant harm flowing directly from the Guidelines as well as defendants' enforcement of them.

As the harms flowing from the State's enforcement of ICWA and the Guidelines are actual, ongoing, and continuous, the case is ripe for resolution.

## II.  RULE 12(B)(6)

As with the Federal defendants, the State argues the merits of plaintiffs' constitutional claims without seriously arguing that they fail to meet the standard of plausibility required for a Motion to Dismiss.

**A.  Equal protection.**  Defendants recite (Mot. at 18-19) the *Morton v. Mancari* catechism to which plaintiffs have replied in Part II-A, *supra*.[16]  They acknowledge (*id.* at 20) that if the classification is racial, strict scrutiny applies and the government bears the burden of proving that no less drastic means exist to achieve the legislation's goals.  As discussed previously, for purposes of defining "Indian" children, ancestral lineage is a prerequisite under the law and blood quantum is used by most tribes to determine membership.  Only children of Indian heritage are made subject to ICWA.

---

[15] One of the cases cited by defendants, *Ariz. Dep't of Econ. Sec. v. Bernini*, 48 P.3d 512, 515 (Ariz. App. 2002), actually did apply certain of the Guidelines.  Of note, DCS's predecessor agency strongly protested the trial court's order requiring it "to establish by clear and convincing evidence rather than a preponderance that the continued removal of Noah J. from the custody of his parents . . . was 'clearly necessary to protect the child from suffering abuse or neglect'."  *Id.* at 512.  Here we have a clear acknowledgment by the State that subjecting children to the less-protective ICWA standards exposes them to greater risk of harm and abuse.

[16] A dispute over the applicable standard of review is not a basis for dismissing a complaint.  In fact it is not even necessary to plead the applicable level of scrutiny.  See, e.g., *Dadian v. Village of Wilmette*, 1999 WL 299887 (N.D. Ill. 1999).  The appropriate level of scrutiny often is heavily disputed and goes to the merits.  See, e.g., *Cornwell v. Hamilton*, 80 F. Supp.2d 1101 (S.D. Cal. 1999).

1    Given the relatively modest goals attributed by State defendants to Congress—

2    responding to "the insensitivity of 'many social workers [to] . . . Indian cultural values

3    and social norms' which led to misevaluation of parenting skills and to unequal application

4    of considerations such as parent alcohol abuse" (Mot. at 4 (citation omitted))—one

5    wonders why Congress employed a sledgehammer approach to the perceived problems.

6    The BIA Guidelines have only broadened ICWA's scope and impact.  Are the problems

7    today as acute as they were nearly four decades ago?  Is DCS saying that, left to its own

8    devices, it would raid Indian tribes and place children with non-native families based on

9    stereotypes and insensitivity?

10    Why does ICWA sweep so broadly to encompass children with few if any ties to

11    tribes?  Instead of using "shorthand," why can't courts employ *Holyfield*-style evaluations

12    to determine whether jurisdiction over a particular child lies appropriately with the State

13    or the tribe?  If the object is family reunification, why do the placement preferences extend

14    far past the point of termination of parental rights and encompass non-relatives and even

15    Indians outside of the tribe, to the exclusion of non-native foster families?  (Indeed,

16    ICWA's racial classifications go not only to defining who is *included* in the law but to

17    who is *excluded* from placement preferences.)  If the purpose is to protect Indian children,

18    why are their individual best interests not considered as a matter of course, and why are

19    their opportunities to be free of abusive homes and to form permanent loving families

20    restricted in ways that similar opportunities for other American children are not?  In all of

21    these respects, it will be difficult for the government to demonstrate narrow tailoring.

22    Plaintiffs do not independently challenge the State statutes that implement ICWA

23    (see Mot. at 20-21), but merely use them to illustrate that the State has adopted ICWA and

24    is jointly liable with the Federal defendants for the constitutional violations flowing from

25    those actions.  The State (*id.*) depicts the relationship as when "a state merely follows a

26    federal statute," which highlights the subordinate position into which ICWA relegates the

27    states in an area traditionally reserved to state autonomy.

28

41

1   "Indians like other citizens are embraced within our Nation's 'great solicitude that

2   its citizens be protected . . . from unwarranted intrusions on their personal liberty'." *Duro*

3   *v. Reina*, 495 U.S. 676, 692 (1990).  They do not shed their constitutional rights by virtue

4   of "political affiliation."  If they wish to be bound by tribal jurisdiction they have complete

5   freedom to do so.  But the converse is, or should be, true as well.  By extending the law to

6   encompass individuals who have not chosen to be so bound through a classification based

7   on ancestry, the federal government (and by affirmative extension of the law, the State as

8   well) have transgressed the boundaries of equal protection.

9   **B. Due process.**  The State asserts (Mot. at 18) that ICWA applies "only [to] those

10   children who can demonstrate the requisite political affiliation to a federally recognized

11   Indian tribe."  That assertion is wrong on dual levels.  As discussed earlier, it is not the

12   child who is doing the "demonstrating" but, in many instances, DCS officials following

13   federal instructions to register children who are eligible for membership.  Nor is the

14   political affiliation "requisite" for due process purposes.  As set forth in Part II-B, *supra*,

15   mere "membership" in a tribe is insufficient to deprive individuals of rights and

16   opportunities available to other citizens nor to confer power and jurisdiction upon third

17   parties to influence or determine their futures.

18   Defendants' argument (Mot. at 21-22) regarding its abandonment of the otherwise-

19   sacrosanct "best interests" standard in child custody proceedings is a model of circular

20   reasoning.  ICWA's explicit purpose is to protect the best interests of Indian children,

21   defendants assert; therefore, "by complying with ICWA's mandates with respect to Indian

22   children in its care, the State is considering and acting upon those children's best

23   interests."  Put aside that, left to its own devices, Arizona has decreed that for all children

24   within its jurisdiction, a child's individual best interests must be taken into account in all

25   custody proceedings.  In the ICWA context, that standard is subordinated to another

26   entity's interests and desires; yet by complying with ICWA, the State is still serving the

27   child's best interests.

28

42

The children beg to differ.  And in so doing, they assert an actionable due process claim.

**C.  <u>Freedom of association.</u>**  It is either a racial classification or a forced political affiliation (or both).  Either triggers judicial scrutiny.

The State contends (Mot. at 23) that plaintiffs have not alleged that the State is compelling association with a tribe.  To the contrary, Complaint ¶¶ 43, 57-69, 114-118 alleges exactly that.  Further, as set forth in the Complaint, ICWA's forum-transfer provisions force individuals to submit to the jurisdiction of a different governmental entity.

Ironically, defendants cite (Mot. at 24) *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 71-72 (1978) for the proposition that the Court is "'restrained' in any attempt to 'adjust[] relations between and among tribes and their members' because to do so 'may substantially interfere with a tribe's ability to maintain itself as a culturally and politically distinct entity'."  *Id.* at 23-24.  If this Court orders the requested relief, it will not be "adjusting" relations between tribes and their members.[17]  Rather, it will put an end to the federal government's latest efforts—reminiscent of some of the ugliest episodes of American history—to force people to associate with others against their will.  Such a practice offends constitutional principles set forth in cases such as *Roberts* and *Knox*, *supra*.

None of the arguments presented by the State defendants divest this Court of the authority to proceed nor defeat the causes of action alleged by plaintiffs.

---

[17] Tribes will continue to be notified about pending foster care placement and termination proceedings in state court as well as any time an Indian child enters the DCS system under ICWA's notice provisions, which are not challenged here. 25 U.S.C. § 1912(a), (b). Their ability to intervene under state rules of civil procedure is similarly not challenged here. See Ariz. R. Civ. P. 24; *William Z., supra.*  Nor do Plaintiffs challenge ICWA's expert witness requirement, 25 U.S.C. § 1912(e), thus not preventing a state court from making an individualized best interest determination in all child custody proceedings involving Indian children that is not skewed by discriminatory provisions of ICWA that are challenged here.

1

**CONCLUSION**

2       Plaintiffs express to the Court their gratitude for its alacrity in considering and

3   resolving the Motions to Dismiss.  The claims presented in this lawsuit are serious and

4   important and affect thousands of people, including some of the most vulnerable

5   American children, who deserve the chance to form permanent, loving families.  The

6   obstacles interposed by the Motions to Dismiss should not deprive them of their chance

7   to proceed.

8

9   **RESPECTFULLY SUBMITTED** this 13th day of November, 2015 by:

10

11                   /s/ Clint Bolick

                Clint Bolick (021684)

12                   Aditya Dynar (031583)

13                   **Scharf-Norton Center for Constitutional Litigation**

                **at the GOLDWATER INSTITUTE**

14

15                   Michael W. Kirk (admitted *pro hac vice*)

                Brian W. Barnes (admitted *pro hac vice*)

16                   Harold S. Reeves (admitted *pro hac vice*)

                **COOPER & KIRK, PLLC**

17

18                   *Attorneys for Plaintiffs*

19                 **CERTIFICATE OF SERVICE**

20       Document Electronically Filed and Served by ECF this 13th day of November,

21   2015.

22   MARK BRNOVICH

23   ATTORNEY GENERAL

John S. Johnson

24   Dawn R. Williams

Gary N. Lento

25   1275 West Washington Street

Phoenix, Arizona 85007

26   John.Johnson@azag.gov

Dawn.Williams@azag.gov

27   Gary.Lento@azag.gov

28

44

Steven M. Miskinis
Ragu-Jara Gregg
U.S. Department of Justice
ENRD/ Indian Resources Section
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044-7611
Steven.miskinis@usdoj.gov
RGregg@ENRD.USDOJ.GOV


/s/ Kris Schlott
Kris Schlott

45

# Exhibit A

**Metelits, Rachel**

| | |
|---|---|
| **From:** | Bowling, Debbie |
| **Sent:** | Tuesday, March 10, 2015 4:42 PM |
| **To:** | DL-Flagstaff; DL-Kingman; DL-MesaPSS; DL-Phoenix-PSS; DL-PhoenixPSS2; DL-PinalPSS; DL-PrescottPSS; DL-Sierra Vista; DL-Tucson PSS; DL-Tucson PSS2; DL-Yuma PSS |
| **Cc:** | Manjencich, Zora; Roberts, Monica |
| **Subject:** | Practice Tip 015:  New February 2015 BIA Guidelines for ICWA Cases |
| **Attachments:** | PHX-#4362961-v1-2015_BIA_Guidelines_for_ICWA_Cases.PDF; PHX-#4346033-v1-PSS_Practice_Tip_015_-_New_BIA_Guidelines_-_ICWA.DOC; PHX-#4345127-v1-BIA_Guidelines_(ICWA)_Crosswalk.DOCX |

**The following Practice Tip has been implemented and posted to Sharepoint.**

**PRACTICE TIP 015:  NEW FEBRUARY 2015 BIA GUIDELINES FOR ICWA CASES**

BIA Guidelines for ICWA Cases
HDM #4346033
Effective 3/10/2015
Author:  Dawn Williams

Attachment 1:  2015 Federal Register - BIA Guidelines for ICWA Cases HDM #4362961
Attachment 2:  Crosswalk:  BIA Guidelines for State Courts in ICWA Proceedings  2015 vs. 1979  HDM #4345127Crosswalk:  BIA Guidelines for State Courts in ICWA Proceedings  2015 vs. 1979  HDM #4345127

1



ENFORCEMENT ACTIONS TAKEN BY TSA IN CALENDAR YEAR 2014—Continued

| TSA Case number/type of violation | Penalty proposed/assessed |
|---|---|
| TSA Case # 2014IAD0082—TWIC—Fraudulent Use or Manufacture (49 CFR 1570.7) ........................................ | $4,000/$4,000. |
| TSA Case # 2014IAD0083—TWIC—Fraudulent Use or Manufacture (49 CFR 1570.7) ........................................ | $4,000/$2,000. |

[FR Doc. 2015–03798 Filed 2–24–15; 8:45 am]
BILLING CODE 9110–05–P

---

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

[Docket No. FR–5851–N–01]

**Rental Assistance Demonstration (RAD)—Alternative Requirements or Waivers: Waiving and Specifying Alternative Requirements for the 20 Percent Portfolio Cap on Project-Basing and Certain Tenant Protection and Participation Provisions for the San Francisco Housing Authority's RAD Projects**

**AGENCY:** Office of the Assistant Secretary for Public and Indian Housing, and Office of the Assistant Secretary for Housing—Federal Housing Commissioner, HUD.

**ACTION:** Notice.

**SUMMARY:** The RAD statute gives HUD authority to establish waivers and alternative requirements. Pursuant to this authority, HUD has waived, to date, the statutory 20 percent cap on project-basing of a PHA's tenant-based voucher funding for RAD-converted units. This notice advises that HUD is waiving for the San Francisco Housing Authority (SFHA), to a limited extent and subject to certain conditions, the 20 percent cap on project-basing and certain other provisions governing project-based assistance with respect to an identified portfolio that includes RAD funding. These waivers are in response to plans submitted by SFHA to address capital needs of the portfolio and preserve available affordable housing for the SFHA's jurisdiction. Without this waiver, SFHA states that its plan for improving its affordable housing portfolio with RAD would not be workable, and the conversion of units under RAD would not be effective for its purpose.

**DATES:** *Effective Date:* March 9, 2015.

**FOR FURTHER INFORMATION CONTACT:** Janet Golrick, Acting Director of the Office of Recapitalization, Office of Housing, Department of Housing and Urban Development, 451 7th Street SW., Washington, DC 20410–7000; telephone number 202–708–0001 (this is *not* a toll-free number). Hearing- and speech-

impaired persons may access these numbers through TTY by calling the Federal Relay Service at 800–877–8339 (this is a toll-free number).

**Background and Action**

The RAD statute (Pub. L. 112–55, approved November 18, 2011) gives HUD authority to waive or specify alternative requirements for, among other things, section 8(o)(13) of the United States Housing Act of 1937 (the 1937 Act). In order to utilize this authority, the RAD statute requires HUD to publish by notice in the Federal Register any waiver or alternative requirement no later than 10 days before the effective date of such notice. This notice meets this publication requirement.

On July 2, 2013, notice 2012–32 Rev-1(as corrected by the technical correction issued February 6, 2014) ("the revised notice") superseded PIH Notice 2012–32. The revised notice is found at the following URL: *http://portal.hud.gov/hudportal/HUD?src=/program_offices/public_indian_housing/publications/notices/2012.*

The revised notice at section 1.9, paragraph F, entitled "Portfolio Awards," also sets forth a new option of a "portfolio award," which allows PHAs to apply for RAD conversions affecting a group of projects. This type of award is meant to enable PHAs to create a comprehensive revitalization plan for multiple buildings they oversee. SFHA has submitted an application for a portfolio award under RAD.

The revised notice contains a waiver of 8(o)(13)(B) and other sections of the 1937 Act. Section 1.6, "Special Provisions Affecting Conversions to PBVs," at paragraph A.1, allows a project that converts from one form of rental assistance to another under RAD to exceed the 20 percent project-basing cap. Section 1.6.A.2 allows sets alternate requirements for the percent limitation on the number of units in a project that may receive PBV assistance. Section 1.6.C. sets forth alternative requirements for resident rights and participation. (Collectively, the waivers and alternative requirements set forth in Sections 1.6.A.1, 1.6.A.2 and 1.6.C are referred to herein as the "Applicable Alternative Tenanting Requirements.")

As part of its application for a portfolio award, SFHA's comprehensive

revitalization planning contemplates not only the conversion of assistance pursuant to RAD, but also to supplement such converted projects by project-basing additional voucher assistance. SFHA has submitted a waiver request that seeks permission to apply the Applicable Alternative Tenanting Requirements to all units in those projects with assistance converted under RAD. HUD has granted that request, subject to certain conditions which SFHA has agreed to carry out.

Dated: February 13, 2015.

**Jemine A. Bryon,**
*Acting Assistant Secretary for Public and Indian Housing.*

**Biniam T. Gebre,**
*Acting Assistant Secretary for Housing—Federal Housing Commissioner.*

[FR Doc. 2015–03780 Filed 2–24–15; 8:45 am]
BILLING CODE 4210–67–P

---

## DEPARTMENT OF THE INTERIOR

**Bureau of Indian Affairs**

[K00103 12/13 A3A10; 134D0102DR–DS5A300000–DR.5A311.IA000113]

**Guidelines for State Courts and Agencies in Indian Child Custody Proceedings**

**AGENCY:** Bureau of Indian Affairs, Interior.

**ACTION:** Notice.

**SUMMARY:** These updated guidelines provide guidance to State courts and child welfare agencies implementing the Indian Child Welfare Act's (ICWA) provisions in light of written and oral comments received during a review of the Bureau of Indian Affairs (BIA) *Guidelines for State Courts in Indian Child Custody Proceedings* published in 1979. They also reflect recommendations made by the Attorney General's Advisory Committee on American Indian/Alaska Native Children Exposed to Violence and significant developments in jurisprudence since ICWA's inception. The updated BIA *Guidelines for State Courts and Agencies in Indian Child Custody Proceedings* promote compliance with ICWA's stated goals and provisions by providing a framework for State courts and child

**10147**

welfare agencies to follow, as well as best practices for ICWA compliance. Effective immediately, these guidelines supersede and replace the guidelines published in 1979.

**DATES:** These guidelines are effective on February 25, 2015.

**FOR FURTHER INFORMATION CONTACT:** Hankie Ortiz, Deputy Director—Indian Services, Bureau of Indian Affairs, U.S. Department of the Interior, 1849 C Street, NW., Washington, DC 20240, (202) 208–2874; *hankie.ortiz@bia.gov.*

**SUPPLEMENTARY INFORMATION:**

## I. Background

These updated BIA guidelines provide standard procedures and best practices to be used in Indian child welfare proceedings in State courts. The updated guidelines are issued in response to comments received during several listening sessions, written comments submitted throughout 2014, and recommendations of the Attorney General's Advisory Committee on American Indian/Alaska Native Children Exposed to Violence.

Congress enacted ICWA in 1978 to address the Federal, State, and private agency policies and practices that resulted in the "wholesale separation of Indian children from their families." H. Rep. 95–1386 (July 24, 1978), at 9. Congress found "that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions . . . ." 25 U.S.C. 1901(4). Congress determined that cultural ignorance and biases within the child welfare system were significant causes of this problem and that state administrative and judicial bodies "have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." 25 U.S.C. 1901(5); H. Rep. 95–1386, at 10. Congress enacted ICWA to "protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by establishing minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes or institutions which will reflect the unique values of Indian culture." H. Rep. 95–1386, at 8. ICWA thus articulates a strong "federal policy that, where possible, an Indian child should remain in the Indian community." *Mississippi Band of*

*Choctaw Indians* v. *Holyfield*, 490 U.S. 30 (1989) (citing H. Rep. 95–1386 at 24).

Following ICWA's enactment, in July 1979, the Department of the Interior (Department) issued regulations addressing notice procedures for involuntary child custody proceedings involving Indian children, as well as governing the provision of funding for and administration of Indian child and family service programs as authorized by ICWA. *See* 25 CFR part 23. Those regulations did not address the specific requirements and standards that ICWA imposes upon State court child custody proceedings, beyond the requirements for contents of the notice. Also, in 1979, the BIA published guidelines for State courts to use in interpreting many of ICWA's requirements in Indian child custody proceedings. 44 FR 67584 (Nov. 26, 1979). Although there have been significant developments in ICWA jurisprudence, the guidelines have not been updated since they were originally published in 1979. Much has changed in the 35 years since the original guidelines were published, but many of the problems that led to the enactment of ICWA persist.

In 2014, the Department invited comments to determine whether to update its guidelines and what changes should be made. The Department held several listening sessions, including sessions with representatives of federally recognized Indian tribes, State court representatives (e.g., the National Council of Juvenile and Family Court Judges and the National Center for State Courts' Conference of Chief Justices Tribal Relations Committee), the National Indian Child Welfare Association, and the National Congress of American Indians. The Department received comments from those at the listening sessions and also received written comments, including comments from individuals and additional organizations, such as the Christian Alliance for Indian Child Welfare and the American Academy of Adoption Attorneys. An overwhelming proportion of the commenters requested that the Department update its ICWA guidelines and many had suggestions for revisions that have been included. The Department reviewed and considered each comment in developing these revised Guidelines.

## II. Statutory Authority

The Department is issuing these updated guidelines under ICWA, 25 U.S.C. 1901 *et seq.*, and its authority over the management of all Indian affairs under 25 U.S.C. 2.

## III. Summary of Updates

The 1979 guidelines included "commentary" for each section, which was intended to explain the requirements of each section. The updated guidelines are clearer, making the commentary unnecessary. Recognizing the important role that child welfare agencies play in ICWA compliance, these updated guidelines broaden the audience of the guidelines to include both State courts and any agency or other party seeking placement of an Indian child. The guidelines identify procedures to address circumstances in which a parent desires anonymity in a voluntary proceeding. Those procedures clarify that a parent's desire for anonymity does not override the responsibility to comply with ICWA. The guidelines also establish that agencies and courts should document their efforts to comply with ICWA. The following paragraphs include section-by-section highlights of the substantive updates that these guidelines make to the 1979 version.

*Section A. General Provisions (formerly, entitled "Policy")*

The updated guidelines add several provisions to section A, to provide better context for the guidelines and clear direction on implementing the guidelines. For example, this section includes definitions of key terms used throughout the guidelines, such as "active efforts" and "child custody proceeding." The phrase "active efforts" has been inconsistently interpreted. The guidelines' definition is intended to provide clarity—particularly in establishing that "active efforts" require a level of effort beyond "reasonable efforts."

Section A also includes an applicability section, which incorporates many of the provisions of the 1979 guidelines' section B.3. In addition, section A:

• Clarifies that agencies and State courts must ask, in every child custody proceeding, whether ICWA applies;

• Clarifies that courts should follow ICWA procedures even when the Indian child is not removed from the home, in order to allow tribes to intervene as early as possible to assist in preventing a breakup of the family; and

• Provides that, where agencies and State courts have reason to know that a child is an Indian child, they must treat that child as an Indian child unless and until it is determined that the child is not an Indian child.

These clarifications are necessary to ensure that the threshold question for determining whether ICWA applies (is

the child an Indian child?) is asked, and asked as soon as possible. If such inquiry is not timely made, a court proceeding may move forward without appropriate individuals aware that ICWA applies and that certain procedures must be followed. Tragic consequences may result.

The updated guidelines also add a section regarding how to contact a tribe, in case the agency or State court is unfamiliar with whom to contact.

Section A is intended to make clear that there is no existing Indian family (EIF) exception to application of ICWA. The EIF doctrine is a judicially-created exception to the application of ICWA. Since first recognition of the EIF in 1982, the majority of State appellate courts that have considered the EIF have rejected it as contrary to the plain language of ICWA. Some State legislatures have also explicitly rejected the EIF within their State ICWA statutes. The Department agrees with the States that have concluded that there is no existing Indian family exception to application of ICWA.

Section A also clarifies that ICWA and the guidelines apply in certain voluntary placements.

*Section B. Pretrial Requirements*

The updated guidelines, and section B in particular, promote the early identification of ICWA applicability. Such identifications will promote proper implementation of ICWA at an early stage, to prevent—as much as possible—delayed discoveries that ICWA applies. Often, those circumstances resulting from delayed discoveries have caused heartbreaking separations and have sometimes led to noncompliance with ICWA's requirements. By requiring agencies and courts to consider, as early as possible, whether ICWA applies, the updated guidelines will ensure that proper notice is given to parents/Indian custodians and tribes, that tribes have the opportunity to intervene or take jurisdiction over proceedings, as appropriate, and that ICWA's placement preferences are respected.

With regard to early discovery, section B requires agencies and courts to consider whether the child is an Indian child, and sets out the steps for verifying the tribe(s) and providing notice to the parents/Indian custodians and tribe(s). Section B also adds guidance regarding the evidence a court may require an agency to provide of the agency's investigations into whether the child is an Indian child.

With regard to application of ICWA, the updated section B clarifies when the Act's requirement to conduct "active

efforts" begins. ICWA requires "active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family." *See* 25 U.S.C. 1912(d). The updated section B clarifies that active efforts must begin from the moment the possibility arises that the Indian child may be removed. This updated section also clarifies that active efforts should be conducted while verifying whether the child is an Indian child; this clarification ensures compliance with ICWA in cases in which the status of whether the child is an Indian child is not verified until later in the proceedings.

Section B adds a new paragraph clarifying that the tribe alone retains the responsibility to determine tribal membership. This section makes clear that there is no requirement for the child to have a certain degree of contact with the tribe or for a certain blood degree, and notes that a tribe may lack written rolls. The updated guidelines delete the provision allowing BIA, in lieu of the tribe, to verify the child's status. This provision has been deleted because it has become increasingly rare for the BIA to be involved in tribal membership determinations, as tribes determine their own membership. *See e.g., Santa Clara Pueblo v. Martinez,* 436 U.S. 49 (1978). ("Congress' authority over Indian matters is extraordinarily broad, and the role of courts in adjusting relations between and among tribes and their members correspondingly restrained.") BIA may assist in contacting the tribe to ensure a determination, however.

The updated section B also expands upon procedures for determining a child's tribe in the event that more than one tribe is identified as the child's tribe. Specifically, it changes the criteria for determining with which tribe the child has "significant contacts," adding that the parents' preference for membership will be considered, and deleting factors that are subjective or inapplicable to infants.

With regard to providing notice to Indian tribes and the child's parents/ Indian custodians, the updated section B:

• Clarifies that notice is required for each proceeding (not just for the first or last proceeding);

• States that notice must be sent, at a minimum, by registered mail, return receipt requested, and that personal service or other types of service may be in addition to, but not in lieu of, such mail; and

• Clarifies that the tribe has the right to intervene at any time.

This section also clarifies how guidelines apply if the child is transferred interstate.

The updated guidelines expand upon the emergency procedure provisions in light of evidence that some States routinely rely upon emergency removals and placements in a manner that bypasses implementation of ICWA. *See Oglala Sioux Tribe v. Hunnik,* Case No. 5:13–cv–05020–JLV, *Amicus Brief of the United States,* at *5–6 (D.S.D. Aug. 14, 2014) (involving allegations that: (1) Defendants are conducting perfunctory 48-hour hearings that do not adequately gather or evaluate information necessary to determine whether emergency removals or placements should be terminated, and that the orders issued at the end of the 48-hour hearing do not adequately instruct State officials to return the child to the home as soon as the emergency has ended; (2) Defendants are violating the Due Process Clause by preventing parents from testifying, presenting evidence, or cross-examining the State's witnesses at the 48-hour hearing; and (3) parents are not being provided adequate notice or the opportunity to be represented by appointed counsel and that the State courts are issuing orders to remove Indian children from their homes without basing those orders on evidence adduced in the hearing). Because ICWA was intended to help prevent the breakup of Indian families; therefore, emergency removals and emergency placements of Indian children should be severely limited, applying only in circumstances involving imminent physical damage or harm. The updated section B clarifies that the guidelines for emergency removal or placement apply regardless of whether the Indian child is a resident of or domiciled on a reservation. This section also explicitly states the standard for determining whether emergency removal or emergency placement is appropriate— *i.e.,* whether it is necessary to prevent imminent physical damage or harm to the child—and provides examples. The guidelines clearly state that the emergency removal/placement must be as short as possible, and provides guidance on how to ensure it is as short as possible. It also shortens the time period for temporary custody without a hearing or extraordinary circumstances from 90 days to 30 days. This shortened timeframe promotes ICWA's important goal of preventing the breakup of Indian families.

*Section C. Procedures for Transfer to Tribal Court*

The updated section C deletes the requirement that requests to transfer to

tribal court be made "promptly after receiving notice of the proceeding" because there is no such requirement in ICWA. Instead, the updated guidelines clarify that the right to transfer is available at any stage of a proceeding, including during an emergency removal. The updated section C also clarifies that the right to request a transfer occurs with each distinct proceeding. ICWA contains no restriction on the right to request a transfer occurring at the first, last, or any specific child custody proceeding. A tribe may decide that transfer is not appropriate until it reaches the stage where parental termination is being determined.

The updated section C also updates the "good cause" factors for denying transfer to tribal court. The updated criteria are more general; in summary, good cause may be found if either parent objects, the tribal court declines, or the State court otherwise determines that good cause exists. The updated guidelines specifically omit some of the factors that were the basis for finding that "good cause" exists under the 1979 guidelines. One such factor that should no longer be considered is whether the proceeding was at an advanced stage. As mentioned above, there may be valid reasons for waiting to transfer a proceeding until it reaches an advanced stage. Another factor that should no longer be considered is the level of contacts the child has had with the tribe—this factor unnecessarily introduces an outsider's evaluation of the child's relationship with the tribe and cannot sensibly be applied to infants.

The updated guidelines also specify that it is inappropriate to conduct an independent analysis, inconsistent with ICWA's placement preferences, of the "best interest" of an Indian child. The provisions of ICWA create a presumption that ICWA's placement preferences are in the best interests of Indian children; therefore, an independent analysis of "best interest" would undermine Congress's findings. Finally, the updated guidelines provide that the tribal court's prospective placement of an Indian child should not be considered, because it invites speculation regarding the tribal court's findings and conclusions and, therefore, undermines the independence of tribal court decision making.

*Section D. Adjudication of Involuntary Placements, Adoptions, or Terminations or Terminations of Parental Rights*

The updated section D establishes that parties have the right to examine records and reports in a timely manner; this ensures that parents/Indian custodians and tribes have the opportunity to examine information necessary to protect their rights under ICWA. This updated section also expands significantly on how to comply with the Act's "active efforts" requirement. Specifically, the updated guidelines:

• Require demonstration that "active efforts" were made, not only "prior to" the commencement of the proceeding, but also "until" the commencement of the proceeding;

• Require documentation of what "active efforts" were made; and

Require a showing that active efforts have been unsuccessful. The updated section D also provides guidance regarding how to identify an appropriate "qualified expert witness." Commenters indicated that some States rely on witnesses' qualifications as child care specialists, or on other areas of expertise, but do not require any expert knowledge related to the tribal community. The updated guidelines establish a preferential order for witnesses who are experts in the culture and customs of the Indian child's tribe. This will ensure that the expert witness with the most knowledge of the Indian child's tribe is given priority.

*Section E. Voluntary Proceedings*

ICWA applies to voluntary proceedings that operate to prohibit an Indian child's parent or Indian custodian from regaining custody of the child upon demand; nevertheless, evidence suggests that ICWA is sometimes ignored or intentionally bypassed in voluntary proceedings. The updated section E clarifies that, even in voluntary proceedings, it is necessary to determine whether ICWA applies, and to comply with ICWA's provisions. To ensure that parents and Indian custodians understand the significance of their consent, the updated section E requires the consent document to identify any conditions to the consent and requires the court to explain the consequences of the consent before its execution. It also addresses steps for withdrawal of consent. The updated section E further restates the statutory restriction that a consent given prior to or within 10 days after birth of an Indian child is not valid.

*Section F. Dispositions*

The updated guidelines provide more information regarding when and how to apply ICWA's placement preferences for foster and adoptive placements. In some cases, agencies fail to conduct any investigation of whether placements that conform to ICWA's placement preferences are available. The updated section F requires that:

• The agency bears the burden of proof if it departs from any of the placement preferences and must demonstrate that it conducted a diligent search to identify placement options that satisfy the placement preferences, including notification to the child's parents or Indian custodians, extended family, tribe, and others; and

• The court determines whether "good cause" to deviate from the placement preferences exists before departing from the placement preferences.

The updated section F also adds provisions to ensure that "good cause" determinations are explained to all parties and documented.

Evidence suggests that "good cause" has been liberally relied upon to deviate from the placement preferences in the past. Commenters noted that, in some cases, a State court departed from the placement preferences because an Indian child has spent significant time in a family's care, despite the fact that the placement was made in violation of ICWA. The guidelines attempt to prevent such circumstances from arising by encouraging early compliance with ICWA (see sections A and B, in particular). The guidelines also specify in section F that "good cause" does not include normal bonding or attachment that may have resulted from a placement that failed to comply with the Act. As in other parts of the guidelines, this section clarifies that an independent consideration of the child's "best interest" is inappropriate for this determination because Congress has already addressed the child's best interest in ICWA. Because ICWA does not allow for consideration of socio-economic status in the placement preferences, this section also now clarifies that the court may not depart from the preferences based on the socio-economic status of one placement relative to another, except in extreme circumstances.

*Section G. Post-Trial Rights*

ICWA is intended to protect the rights, not only of Indian children, parents and Indian custodians, but also of Indian tribes. The updated guidelines establish that an Indian child, parent or Indian custodian, or tribe may petition to invalidate an action if the Act or guidelines have been violated, regardless of which party's rights were violated. This approach promotes compliance with ICWA and reflects that ICWA is intended to protect the rights of each of these parties.

Adults who had been adopted by non-Indian families and seek to reconnect with their tribes often face significant hurdles in obtaining needed information. The updated guidelines attempt to protect those adults' rights to obtain information about their tribal relationship by specifying that, even in States where adoptions remain closed, the relevant agency should facilitate communication directly with the tribe's enrollment office.

The guidelines also recommend that courts work with tribes to identify tribal designees who can assist adult adoptees to connect with their tribes.

Finally, the updated guidelines clarify that the requirement to maintain records on foster care, preadoptive placement and adoptive placements applies not only in involuntary proceedings, but also in voluntary proceedings.

## IV. Guidance

These guidelines supersede and replace the guidelines published at 44 FR 67584 (November 28, 1979).

### Guidelines for State Courts and Agencies in Indian Child Custody Proceedings

*A. General Provisions*
1. What is the purpose of these guidelines?
2. What terms do I need to know?
3. When does ICWA apply?
4. How do I contact a tribe under these guidelines?
5. How do these guidelines interact with State laws?

*B. Pretrial Requirements*
1. When does the requirement for active efforts begin?
2. What actions must an agency and State court undertake to determine whether a child is an Indian child?
3. Who makes the determination as to whether a child is a member of a tribe?
4. What is the procedure for *determining* an Indian child's tribe when the child is a member or eligible for membership in more than one tribe?
5. When must a State court dismiss an action?
6. What are the notice requirements for a child custody proceeding involving an Indian child?
7. What time limits and extensions apply?
8. What is the process for emergency removal of an Indian child?
9. What are the procedures for determining improper removal?

*C. Procedures for Making Requests for Transfer to Tribal Court*
1. How are petitions for transfer of proceeding made?
2. What are the criteria and procedures for ruling on transfer petitions?
3. How is a determination of "good cause" made?
4. What happens when a petition for transfer is made?

*D. Adjudication of Involuntary Placements, Adoptions, or Terminations of Parental Rights*

1. Who has access to reports or records?
2. What steps must a party take to petition a State court for certain actions involving an Indian child?
3. What are the applicable standards of evidence?
4. Who may serve as a qualified expert witness?

*E. Voluntary Proceedings*
1. What actions must an agency and State court undertake in a voluntary proceedings?
2. How is consent obtained?
3. What information should the consent document contain?
4. How is withdrawal of consent achieved in a voluntary foster care placement?
5. How is withdrawal of consent to a voluntary adoption achieved?

*F. Dispositions*
1. When do the placement preferences apply?
2. What placement preferences apply in adoptive placements?
3. What placement preferences apply in foster care or preadoptive placements?
4. How is a determination for "good cause" to depart from placement procedures made?

*G. Post-Trial Rights*
1. What is the procedure for petitioning to vacate an adoption?
2. Who can make a petition to invalidate an action?
3. What are the rights of adult adoptees?
4. When must notice of a change in child's status be given?
5. What information must States furnish to the Bureau of Indian Affairs?
6. How must the State maintain records?

### Guidelines for State Courts and Agencies in Indian Child Custody Proceedings

*A. General Provisions*

**A.1. What is the purpose of these guidelines?**

These guidelines clarify the minimum Federal standards, and best practices, governing implementation of the Indian Child Welfare Act (ICWA) to ensure that ICWA is applied in all States consistent with the Act's express language, Congress' intent in enacting the statute, and the canon of construction that statutes enacted for the benefit of Indians are to be liberally construed to their benefit. In order to fully implement ICWA, these guidelines should be applied in all proceedings and stages of a proceeding in which the Act is or becomes applicable.

**A.2. What terms do I need to know?**

*Active efforts* are intended primarily to maintain and reunite an Indian child with his or her family or tribal community and constitute more than reasonable efforts as required by Title IV–E of the Social Security Act (42 U.S.C. 671(a)(15)). Active efforts include, for example:

(1) Engaging the Indian child, the Indian child's parents, the Indian child's extended family members, and the Indian child's custodian(s);
(2) Taking steps necessary to keep siblings together;
(3) Identifying appropriate services and helping the parents to overcome barriers, including actively assisting the parents in obtaining such services;
(4) Identifying, notifying, and inviting representatives of the Indian child's tribe to participate;
(5) Conducting or causing to be conducted a diligent search for the Indian child's extended family members for assistance and possible placement;
(6) Taking into account the Indian child's tribe's prevailing social and cultural conditions and way of life, and requesting the assistance of representatives designated by the Indian child's tribe with substantial knowledge of the prevailing social and cultural standards;
(7) Offering and employing all available and culturally appropriate family preservation strategies;
(8) Completing a comprehensive assessment of the circumstances of the Indian child's family, with a focus on safe reunification as the most desirable goal;
(9) Notifying and consulting with extended family members of the Indian child to provide family structure and support for the Indian child, to assure cultural connections, and to serve as placement resources for the Indian child;
(10) Making arrangements to provide family interaction in the most natural setting that can ensure the Indian child's safety during any necessary removal;
(11) Identifying community resources including housing, financial, transportation, mental health, substance abuse, and peer support services and actively assisting the Indian child's parents or extended family in utilizing and accessing those resources;
(12) Monitoring progress and participation in services;
(13) Providing consideration of alternative ways of addressing the needs of the Indian child's parents and extended family, if services do not exist or if existing services are not available;
(14) Supporting regular visits and trial home visits of the Indian child during any period of removal, consistent with the need to ensure the safety of the child; and
(15) Providing post-reunification services and monitoring.

"Active efforts" are separate and distinct from requirements of the Adoption and Safe Families Act

(ASFA), 42 U.S.C. 1305. ASFA's exceptions to reunification efforts do not apply to ICWA proceedings.

*Agency* means a private State-licensed agency or public agency and their employees, agents or officials involved in and/or seeking to place a child in a child custody proceeding.

*Child custody proceeding* means and includes any proceeding or action that involves:

(1) *Foster care placement,* which is any action removing an Indian child from his or her parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator *where the parent or Indian custodian cannot have the child returned upon demand,* although parental rights have not been terminated;

(2) *Termination of parental rights,* which is any action resulting in the termination of the parent-child relationship;

(3) *Preadoptive placement,* which is the temporary placement of an Indian child in a foster home or institution after the termination of parental rights, but prior to or in lieu of adoptive placement; or

(4) *Adoptive placement,* which is the permanent placement of an Indian child for adoption, including any action resulting in a final decree of adoption.

*Continued custody* means physical and/or legal custody that a parent already has or had at any point in the past. The biological mother of a child has had custody of a child.

*Custody* means physical and/or legal custody under any applicable tribal law or tribal custom or State law. A party may demonstrate the existence of custody by looking to tribal law or custom or State law.

*Domicile* means:

(1) For a parent or any person over the age of eighteen, physical presence in a place and intent to remain there;

(2) For an Indian child, the domicile of the Indian child's parents. In the case of an Indian child whose parents are not married to each other, the domicile of the Indian child's mother. Under the principle for determining the domicile of an Indian child, it is entirely logical that "[o]n occasion, a child's domicile of origin will be in a place where the child has never been." *Holyfield,* 490 U.S. at 48. *Holyfield* notes that tribal jurisdiction under 25 U.S.C. 1911(a) was not meant to be defeated by the actions of individual members of the tribe, because Congress was concerned not solely about the interests of Indian children and families, but also about the impact of large numbers of Indian children adopted by non-Indians on the tribes themselves. *Id.* at 49.

*Extended family member* is defined by the law or custom of the Indian child's tribe or, in the absence of such law or custom, is a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent.

*Imminent physical damage or harm* means present or impending risk of serious bodily injury or death that will result in severe harm if safety intervention does not occur.

*Indian* means any person who is a member of an Indian tribe, or *who is an* Alaska Native and a member of a Regional Corporation as defined in 43 CFR part 1606.

*Indian child* means any unmarried person who is under age eighteen and is either: (1) a member of an Indian tribe; or (2) eligible for membership in an Indian tribe and the biological child of a member of an Indian tribe.

*Indian child's tribe* means: (1) the Indian tribe in which an Indian child is a member or eligible for membership; or (2) in the case of an Indian child who is a member of or eligible for membership in more than one tribe, the Indian tribe with which the Indian child has more significant contacts.

*Indian Child Welfare Act (ICWA)* or *Act* means 25 U.S.C. 1901 *et seq.*

*Indian custodian* means any person who has legal custody of an Indian child under tribal law or custom or under State law, whichever is more favorable to the rights of the parent, or to whom temporary physical care, custody, and control has been transferred by the parent of such child.

*Indian organization* means any group, association, partnership, corporation, or other legal entity owned or controlled by Indians or a tribe, or a majority of whose members are Indians.

*Indian tribe* means any Indian tribe, band, nation, or other organized group or community of Indians recognized as eligible for the services provided to Indians by the Secretary because of their status as Indians, including any Alaska Native village as defined in 43 U.S.C. 1602(c).

*Parent* means any biological parent or parents of an Indian child or any Indian person who has lawfully adopted an Indian child, including adoptions under tribal law or custom. It does not include an unwed father where paternity has not been acknowledged or established. To qualify as a parent, an unwed father need only take reasonable steps to establish or acknowledge paternity. Such steps may include acknowledging paternity in the action at issue or establishing paternity through DNA testing.

*Reservation* means Indian country as defined in 18 U.S.C 1151, including any lands, title to which is held by the United States in trust for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to a restriction by the United States against alienation.

*Secretary* means the Secretary of the Interior or the Secretary's authorized representative acting under delegated authority.

*Status offenses* mean offenses that would not be considered criminal if committed by an adult; they are acts prohibited only because of a person's status as a minor (*e.g.,* truancy, incorrigibility).

*Tribal court* means a court with jurisdiction over child custody proceedings, including a Court of Indian Offenses, a court established and operated under the code or custom of an Indian tribe, or any other administrative body of a tribe vested with authority over child custody proceedings.

*Upon demand* means that the parent or Indian custodians can regain custody simply upon request, without any contingencies such as repaying the child's expenses.

*Voluntary placement* means a placement that either parent has, of his or her free will, chosen for the Indian child, including private adoptions.

A.3. When does ICWA apply?

(a) ICWA applies whenever an Indian child is the subject of a State child custody proceeding as defined by the Act. ICWA also applies to proceedings involving status offenses or juvenile delinquency proceedings if any part of those proceedings results in the need for placement of the child in a foster care, preadoptive or adoptive placement, or termination of parental rights.

(b) There is no exception to application of ICWA based on the so-called "existing Indian family doctrine." Thus, the following non-exhaustive list of factors should not be considered in determining whether ICWA is applicable: the extent to which the parent or Indian child participates in or observes tribal customs, votes in tribal elections or otherwise participates in tribal community affairs, contributes to tribal or Indian charities, subscribes to tribal newsletters or other periodicals of special interest in Indians, participates in Indian religious, social, cultural, or political events, or maintains social contacts with other members of the tribe; the relationship between the Indian child and his/her Indian parents;

the extent of current ties either parent has to the tribe; whether the Indian parent ever had custody of the child; and the level of involvement of the tribe in the State court proceedings.

(c) Agencies and State courts, in every child custody proceeding, must ask whether the child is or could be an Indian child and conduct an investigation into whether the child is an Indian child. Even in those cases in which the child is not removed from the home, such as when an agency opens an investigation or the court orders the family to engage in services to keep the child in the home as part of a diversion, differential, alternative response or other program, agencies and courts should follow the verification and notice provisions of these guidelines. Providing notice allows tribes to intervene as early as possible in a child custody proceeding and provides an opportunity for the tribe to bring resources to bear to assist the family in preventing a breakup of the family.

(d) If there is any reason to believe the child is an Indian child, the agency and State court must treat the child as an Indian child, unless and until it is determined that the child is not a member or is not eligible for membership in an Indian tribe.

(e) ICWA and these guidelines or any associated Federal guidelines do not apply to:

(1) Tribal court proceedings;

(2) Placements based upon an act by the Indian child which, if committed by an adult, would be deemed a criminal offense; or

(3) An award, in a divorce proceeding, of custody of the Indian child to one of the parents.

(f) Voluntary placements that do not operate to prohibit the child's parent or Indian custodian from regaining custody of the child upon demand are not covered by the Act.

(1) Such placements should be made pursuant to a written agreement, and the agreement should state explicitly the right of the parent or Indian custodian to regain custody of the child upon demand.

(2) Nevertheless, it is a best practice to follow the procedures in these guidelines to determine whether a child is an Indian child and to notify the tribe.

(g) Voluntary placements in which a parent consents to a foster care placement or seeks to permanently terminate his or her rights or to place the child in a preadoptive or adoptive placement are covered by the Act.

A.4. How do I contact a tribe under these guidelines?

To contact a tribe to provide notice or obtain information or verification under these Guidelines, you should direct the notice or inquiry as follows:

(1) Many tribes designate an agent for receipt of ICWA notices. The Bureau of Indian Affairs publishes a list of tribes' designated tribal agents for service of ICWA notice in the **Federal Register** each year and makes the list available on its Web site at *www.bia.gov.*

(2) For tribes without a designated tribal agent for service of ICWA notice, contact the tribe(s) to be directed to the appropriate individual or office.

(3) If you do not have accurate contact information for the tribe(s) or the tribe(s) contacted fail(s) to respond to written inquiries, you may seek assistance in contacting the Indian tribe(s) from the Bureau of Indian Affairs' Regional Office and/or Central Office in Washington DC (see *www.bia.gov*).

A.5. How do these guidelines interact with State laws?

(a) These guidelines provide minimum Federal standards and best practices to ensure compliance with ICWA and should be applied in all child custody proceedings in which the Act applies.

(b) In any child custody proceeding where applicable State or other Federal law provides a higher standard of protection to the rights of the parent or Indian custodian than the protection accorded under the Act, ICWA requires that the State court must apply the higher standard.

*B. Pretrial Requirements*

B.1. When does the requirement for active efforts begin?

(a) The requirement to engage in "active efforts" begins from the moment the possibility arises that an agency case or investigation may result in the need for the Indian child to be placed outside the custody of either parent or Indian custodian in order to prevent removal.

(b) Active efforts to prevent removal of the child must be conducted while investigating whether the child is a member of the tribe, is eligible for membership in the tribe, or whether a biological parent of the child is or is not a member of a tribe.

B.2. What actions must an agency and State court undertake in order to determine whether a child is an Indian child?

(a) Agencies must ask whether there is reason to believe a child that is subject to a child custody proceeding is

an Indian child. If there is reason to believe that the child is an Indian child, the agency must obtain verification, in writing, from all tribes in which it is believed that the child is a member or eligible for membership, as to whether the child is an Indian child.

(b) State courts must ask, as a threshold question at the start of any State court child custody proceeding, whether there is reason to believe the child who is the subject of the proceeding is an Indian child by asking each party to the case, including the guardian ad litem and the agency representative, to certify on the record whether they have discovered or know of any information that suggests or indicates the child is an Indian child.

(1) In requiring this certification, the court may require the agency to provide:

(i) Genograms or ancestry charts for both parents, including all names known (maiden, married and former names or aliases); current and former addresses of the child's parents, maternal and paternal grandparents and great grandparents or Indian custodians; birthdates; places of birth and death; tribal affiliation including all known Indian ancestry for individuals listed on the charts, and/or other identifying information; and/or

(ii) The addresses for the domicile and residence of the child, his or her parents, or the Indian custodian and whether either parent or Indian custodian is domiciled on or a resident of an Indian reservation or in a predominantly Indian community.

(2) If there is reason to believe the child is an Indian child, the court must confirm that the agency used active efforts to work with all tribes of which the child may be a member to verify whether the child is in fact a member or eligible for membership in any tribe, under paragraph (a).

(c) An agency or court has reason to believe that a child involved in a child custody proceeding is an Indian child if:

(1) Any party to the proceeding, Indian tribe, Indian organization or public or private agency informs the agency or court that the child is an Indian child;

(2) Any agency involved in child protection services or family support has discovered information suggesting that the child is an Indian child;

(3) The child who is the subject of the proceeding gives the agency or court reason to believe he or she is an Indian child;

(4) The domicile or residence of the child, parents, or the Indian custodian is known by the agency or court to be, or is shown to be, on an Indian

reservation or in a predominantly Indian community; or

(5) An employee of the agency or officer of the court involved in the proceeding has knowledge that the child may be an Indian child.

(d) In seeking verification of the child's status, in a voluntary placement proceeding where a consenting parent evidences a desire for anonymity, the agency or court must keep relevant documents confidential and under seal. A request for anonymity does not relieve the obligation to obtain verification from the tribe(s) or to provide notice.

**B.3. Who makes the determination as to whether a child is a member of a tribe?**

(a) Only the Indian tribe(s) of which it is believed a biological parent or the child is a member or eligible for membership may make the determination whether the child is a member of the tribe(s), is eligible for membership in the tribe(s), or whether a biological parent of the child is a member of the tribe(s).

(b) The determination by a tribe of whether a child is a member, is eligible for membership, or whether a biological parent is or is not a member of that tribe, is solely within the jurisdiction and authority of the tribe.

(c) No other entity or person may authoritatively make the determination of whether a child is a member of the tribe or is eligible for membership in the tribe.

(1) There is no requirement that the child maintain a certain degree of contacts with the tribe or for a certain blood quantum or degree of Indian blood.

(2) A tribe need not formally enroll its members for a child to be a member or eligible for membership. In some tribes, formal enrollment is not required for tribal membership. Some tribes do not have written rolls and others have rolls that list only persons that were members as of a certain date. *See United States v. Broncheau,* 597 F.2d 1260, 1263 (9th Cir. 1979). The only relevant factor is whether the tribe verifies that the child is a member or eligible for membership.

(d) The State court may not substitute its own determination regarding a child's membership or eligibility for membership in a tribe or tribes.

**B.4. What is the procedure for determining an Indian child's tribe when the child is a member or eligible for membership in more than one tribe?**

(a) Agencies are required to notify all tribes, of which the child may be a member or eligible for membership, that the child is involved in a child custody proceeding. The notice should specify the other tribe or tribes of which the child may be a member or eligible for membership.

(b) If the Indian child is a member or eligible for membership in only one tribe, that tribe should be designated as the Indian child's tribe.

(c) If an Indian child is a member or eligible for membership in more than one tribe, ICWA requires that the Indian tribe with which the Indian child has the more significant contacts be designated as the Indian child's tribe.

(1) In determining significant contacts, the following may be considered:

(i) Preference of the *parents* for membership of the child;

(ii) Length of past domicile or residence on or near the reservation of each tribe;

(iii) Tribal membership of custodial parent or Indian custodian; and

(iv) Interest asserted by each tribe in response to the notice that the child is involved in a child custody proceeding;

(d) When an Indian child is already a member of a tribe, but is also eligible for membership in another tribe, deference should be given to the tribe in which the Indian child is a member, unless otherwise agreed to by the tribes. However, if the Indian child is not a member of any tribe, an opportunity should be provided to allow the tribes to determine which of them should be designated as the Indian child's tribe.

(i) If the tribes are able to reach an agreement, the agreed upon tribe should be designated as the Indian child's tribe.

(ii) If the tribes do not agree, the *following factors* should be considered in designating the Indian child's tribe:

(A) The preference of the parents or extended family members who are likely to become foster care or adoptive placements; and/or

(B) Tribal membership of custodial parent or Indian custodian; and/or

(C) If applicable, *length* of past domicile or residence on or near the reservation of each tribe; and/or

(D) Whether there has been a previous adjudication with respect to the child by a court of one of the tribes; and/or

(E) Self-identification by the child; and/or

(F) Availability of placements.

(iii) In the event the child is eligible for membership in a tribe but is not yet a member of any tribe, the agency should take the steps necessary to obtain membership for the child in the tribe that is designated as the Indian child's tribe.

(3) Once an Indian tribe is designated as the child's Indian tribe, all tribes which received notice of the child

custody proceeding must be notified in writing of the determination and a copy of that document must be filed with the court and sent to each party to the proceeding and to each person or governmental agency that received notice of the proceeding.

(4) A determination of the Indian child's tribe for purposes of ICWA and these guidelines does not constitute a determination for any other purpose or situation.

(d) The tribe designated as the Indian child's tribe may authorize another tribe to act as a representative for the tribe in a child custody case, including, for example, having the representative tribe perform home studies or expert witness services for the Indian child's tribe.

**B.5. When must a State court dismiss an action?**

Subject to B.8 (emergency procedures), the following limitations on a State court's jurisdiction apply:

(a) The court must dismiss any child custody proceeding as soon as the court determines that it lacks jurisdiction.

(b) The court must make a determination of the residence and domicile of the Indian child. If either the residence or domicile is on a reservation where the tribe exercises exclusive jurisdiction over child custody proceedings, the State court must dismiss the State court proceedings, the agency must notify the tribe of the dismissal based on the tribe's exclusive jurisdiction, and the agency must transmit all available information regarding the Indian child custody proceeding to the tribal court.

(c) If the Indian child has been domiciled or previously resided on an Indian reservation, the State court must contact the tribal court to determine whether the child is a ward of the tribal court. If the child is a ward of a tribal court, the State court must dismiss the State court proceedings, the agency must notify the tribe of the dismissal, and the agency must transmit all available information regarding the Indian child custody proceeding to the tribal court.

**B.6. What are the notice requirements for a child custody proceeding involving an Indian child?**

(a) When an agency or court knows or has reason to know that the subject of an involuntary child custody proceeding is an Indian child, the agency or court must send notice of each such proceeding (including but not limited to a temporary custody hearing, any removal or foster care placement, any adoptive placement, or any termination of parental or custodial

rights) by registered mail with return receipt requested to:

(1) Each tribe where the child may be a member or eligible for membership;

(2) The child's parents; and

(3) If applicable, the Indian custodian.

(b) Notice may be sent via personal service or electronically in addition to the methods required by the Act, but such alternative methods do not replace the requirement for notice to be sent by registered mail with return receipt requested.

(c) Notice must be in clear and understandable language and include the following:

(1) Name of the child, the child's birthdate and birthplace;

(2) Name of each Indian tribe(s) in which the child is a member or may be eligible for membership;

(3) A copy of the petition, complaint or other document by which the proceeding was initiated;

(4) Statements setting out:

(i) The name of the petitioner and name and address of petitioner's attorney;

(ii) The right of the parent or Indian custodian to intervene in the proceedings.

(iii) The Indian tribe's right to intervene at any time in a State court proceeding for the foster care placement of or termination of a parental right.

(iv) If the Indian parent(s) or, if applicable, Indian custodian(s) is unable to afford counsel based on a determination of indigency by the court, counsel will be appointed to represent the parent or Indian custodian where authorized by State law.

(v) The right to be granted, upon request, a specific amount of additional time (up to 20 additional days) to prepare for the proceedings due to circumstances of the particular case.

(vi) The right to petition the court for transfer of the proceeding to tribal court under 25 U.S.C. 1911, absent objection by either parent: *Provided, that* such transfer is subject to declination by the tribal court.

(vii) The mailing addresses and telephone numbers of the court and information related to all parties to the proceeding and individuals notified under this section.

(viii) The potential legal consequences of the proceedings on the future custodial and parental rights of the Indian parents or Indian custodians.

(d) In order to assist the Indian tribe(s) in making a determination regarding whether the child is a member or eligible for membership, the agency or court should include additional information in the notice, such as:

(1) Genograms or ancestry charts for both parents, including all names . .

known (maiden, married and former names or aliases); current and former addresses of the child's parents, maternal and paternal grandparents and great grandparents or Indian custodians; birthdates; places of birth and death; tribal affiliation including all known Indian ancestry for individuals listed on the charts, and/or other identifying information; and/or

(2) The addresses for the domicile and residence of the child, his or her parents, or the Indian custodian and whether either parent or Indian custodian is domiciled on or a resident of an Indian reservation or in a predominantly Indian community.

(3) In the event that a parent has requested anonymity, the agency and court must take steps to keep information related to the parent confidential and sealed from disclosure.

(e) If the identity or location of the Indian parents, Indian custodians or tribes in which the Indian child is a member or eligible for membership cannot be ascertained, but there is reason to believe the child is an Indian child, notice of the child custody proceeding must be sent to the appropriate Bureau of Indian Affairs Regional Director (see *www.bia.gov*). To establish tribal identity, as much information as is known regarding the child's direct lineal ancestors should be provided (see section B.6.(c) of these guidelines regarding notice requirements). The Bureau of Indian Affairs will not make a determination of tribal membership, but may, in some instances, be able to identify tribes to contact.

(f) Because child custody proceedings are usually conducted on a confidential basis, information contained in the notice should be kept confidential to the extent possible.

(g) The original or a copy of each notice sent under this section should be filed with the court together with any return receipts or other proof of service.

(h) If a parent or Indian custodian appears in court without an attorney, the court must inform him or her of the right to appointed counsel, the right to request that the proceeding be transferred to tribal court, the right to object to such transfer, the right to request additional time to prepare for the proceeding and the right (if the parent or Indian custodian is not already a party) to intervene in the proceedings.

(i) If the court or an agency has reason to believe that a parent or Indian custodian possesses limited English proficiency and is therefore not likely to understand the contents of the notice, the court or agency must, at no cost,

provide a translated version of the notice or have the notice read and explained in a language that the parent or Indian custodian understands. To secure such translation or interpretation support, a court or agency should contact the Indian child's tribe or the local BIA agency for assistance in locating and obtaining the name of a qualified translator or interpreter.

(j) In voluntary proceedings, notice should also be sent in accordance with this section because the Indian tribe might have exclusive jurisdiction and/or the right to intervene. Further, notice to and involvement of the Indian tribe in the early stages of the proceedings aids the agency and court in satisfying their obligations to determine whether the child is an Indian child and in complying with 25 U.S.C. 1915.

(k) If the child is transferred interstate, regardless of whether the Interstate Compact on the Placement of Children (ICPC) applies, both the originating State court and receiving State court must provide notice to the tribe(s) and seek to verify whether the child is an Indian child.

(l) The notice requirement includes providing responses to requests for additional information, where available, in the event that a tribe indicates that such information is necessary to determine whether a child is an Indian child.

**B.7. What time limits and extensions apply?**

(a) No hearings regarding decisions for the foster care or termination of parental rights may begin until the waiting periods to which the parents or Indian custodians and to which the Indian child's tribe are entitled have passed. Additional extensions of time may also be granted beyond the minimum required by the Act.

(b) A tribe, parent or Indian custodian entitled to notice of the pendency of a child custody proceeding has a right, upon request, to be granted an additional 20 days from the date upon which notice was received in accordance with 25 U.S.C. 1912(a) to prepare for participation in the proceeding.

(c) The proceeding may not begin until all of the following dates have passed:

(1) 10 days after each parent or Indian custodian (or Secretary where the parent or Indian custodian is unknown to the petitioner) has received notice in accordance with 25 U.S.C. 1912(a);

(2) 10 days after the Indian child's tribe (or the Secretary if the Indian child's tribe is unknown to the party

seeking placement) has received notice in accordance with 25 U.S.C. 1912(a);

(3) 30 days after the parent or Indian custodian has received notice in accordance with 25 U.S.C. 1912(a), if the parent or Indian custodian has requested an additional 20 days to prepare for the proceeding; and

(4) 30 days after the Indian child's tribe has received notice in accordance with 25 U.S.C. 1912(a), if the Indian child's tribe has requested an additional 20 days to prepare for the proceeding.

(d) The court should allow, if it possesses the capability, alternative methods of participation in State court proceedings by family members and tribes, such as participation by telephone, videoconferencing, or other methods.

## B.8. What is the process for the emergency removal of an Indian child?

(a) The emergency removal and emergency placement of an Indian child in a foster home or institution under applicable State law is allowed only as necessary to prevent imminent physical damage or harm to the child. This requirement applies to all Indian children regardless of whether they are domiciled or reside on a reservation. This does not, however, authorize a State to remove a child from a reservation where a tribe exercises exclusive jurisdiction.

(b) Any emergency removal or emergency placement of any Indian child under State law must be as short as possible. Each involved agency or court must:

(1) Diligently investigate and document whether the removal or placement is proper and continues to be necessary to prevent imminent physical damage or harm to the child;

(2) Promptly hold a hearing to hear evidence and evaluate whether the removal or placement continues to be necessary whenever new information is received or assertions are made that the emergency situation has ended; and

(3) Immediately terminate the emergency removal or placement once the court possesses sufficient evidence to determine that the emergency has ended.

(c) If the agency that conducts an emergency removal of a child whom the agency knows or has reason to know is an Indian child, the agency must:

(1) Treat the child as an Indian child until the court determines that the child is not an Indian child;

(2) Conduct active efforts to prevent the breakup of the Indian family as early as possible, including, if possible, before removal of the child;

(3) Immediately take and document all practical steps to verify whether the child is an Indian child and to verify the Indian child's tribe;

(4) Immediately notify the child's parents or Indian custodians and Indian tribe of the removal of the child;

(5) Take all practical steps to notify the child's parents or Indian custodians and Indian tribe about any hearings regarding the emergency removal or emergency placement of the child; and

(6) Maintain records that detail the steps taken to provide any required notifications under section B.6 of these guidelines.

(d) A petition for a court order authorizing emergency removal or continued emergency physical custody must be accompanied by an affidavit containing the following information:

(1) The name, age and last known address of the Indian child;

(2) The name and address of the child's parents and Indian custodians, if any;

(3) If such persons are unknown, a detailed explanation of what efforts have been made to locate them, including notice to the appropriate Bureau of Indian Affairs Regional Director (see www.bia.gov);

(4) Facts necessary to determine the residence and the domicile of the Indian child;

(5) If either the residence or domicile is believed to be on an Indian reservation, the name of the reservation;

(6) The tribal affiliation of the child and of the parents and/or Indian custodians;

(7) A specific and detailed account of the circumstances that led the agency responsible for the emergency removal of the child to take that action;

(8) If the child is believed to reside or be domiciled on a reservation where the tribe exercises exclusive jurisdiction over child custody matters, a statement of efforts that have been made and are being made to transfer the child to the tribe's jurisdiction;

(9) A statement of the specific active efforts that have been taken to assist the parents or Indian custodians so the child may safely be returned to their custody; and

(10) A statement of the imminent physical damage or harm expected and any evidence that the removal or emergency custody continues to be necessary to prevent such imminent physical damage or harm to the child.

(e) At any court hearing regarding the emergency removal or emergency placement of an Indian child, the court must determine whether the removal or placement is no longer necessary to prevent imminent physical damage or

harm to the child. The court should accept and evaluate all information relevant to the agency's determination provided by the child, the child's parents, the child's Indian custodians, the child's tribe or any participants in the hearing.

(f) Temporary emergency custody should not be continued for more than 30 days. Temporary emergency custody may be continued for more than 30 days only if:

(1) A hearing, noticed in accordance with these guidelines, is held and results in a determination by the court, supported by clear and convincing evidence and the testimony of at least one qualified expert witness, that custody of the child by the parent or Indian custodian is likely to result in imminent physical damage or harm to the child; or

(2) Extraordinary circumstances exist.

(g) The emergency removal or placement must terminate as soon as the imminent physical damage or harm to the child which resulted in the emergency removal or placement no longer exists, or, if applicable, as soon as the tribe exercises jurisdiction over the case, whichever is earlier.

(h) Once an agency or court has terminated the emergency removal or placement, it must expeditiously:

(1) Return the child to the parent or Indian custodian within one business day; or

(2) Transfer the child to the jurisdiction of the appropriate Indian tribe if the child is a ward of a tribal court or a resident of or domiciled on a reservation; or

(3) Initiate a child custody proceeding subject to the provisions of the Act and these guidelines.

(i) The court should allow, if it possesses the capability, alternative methods of participation in State court proceedings by family members and tribes, such as participation by telephone, videoconferencing, or other methods.

## B.9. What are the procedures for determining improper removal?

(a) If, in the course of any Indian child custody proceeding, any party asserts or the court has reason to believe that the Indian child may have been improperly removed from the custody of his or her parent or Indian custodian, or that the Indian child has been improperly retained, such as after a visit or other temporary relinquishment of custody, the court must immediately stay the proceeding until a determination can be made on the question of improper removal or retention, and such

determination must be conducted expeditiously.

(b) If the court finds that the Indian child was improperly removed or retained, the court must terminate the proceeding and the child must be returned immediately to his or her parents or Indian custodian, unless returning the child to his parent or custodian would subject the child to imminent physical damage or harm.

## C. Procedures for Making Requests for Transfer to Tribal Court

C.1. How are petitions for transfer of proceeding made?

(a) Either parent, the Indian custodian, or the Indian child's tribe may request, orally on the record or in writing, that the State court transfer each distinct Indian child custody proceeding to the tribal court of the child's tribe.

(b) The right to request a transfer occurs with each proceeding. For example, a parent may request a transfer to tribal court during the first proceeding for foster placement and/or at a proceeding to determine whether to continue foster placement, and/or at a later proceeding, for example at a hearing for termination of parental rights.

(c) The right to request a transfer is available at any stage of an Indian child custody proceeding, including during any period of emergency removal.

(d) The court should allow, if possible, alternative methods of participation in State court proceedings by family members and tribes, such as participation by telephone, videoconferencing, or other methods.

C.2. What are the criteria and procedures for ruling on transfer petitions?

(a) Upon receipt of a petition to transfer by a parent, Indian custodian or the Indian child's tribe, the State court must transfer the case unless any of the following criteria are met:

(1) Either parent objects to such transfer;

(2) The tribal court declines the transfer; or

(3) The court determines that good cause exists for denying the transfer.

(b) To minimize delay, the court should expeditiously provide all records related to the proceeding to the tribal court.

C.3. How is a determination of "good cause" made?

(a) If the State court believes, or any party asserts, that good cause not to transfer exists, the reasons for such belief or assertion must be stated on the record or in writing and made available to the parties who are petitioning for transfer.

(b) Any party to the proceeding must have the opportunity to provide the court with views regarding whether good cause to deny transfer exists.

(c) In determining whether good cause exists, the court may not consider whether the case is at an advanced stage or whether transfer would result in a change in the placement of the child because the Act created concurrent, but presumptively, tribal jurisdiction over proceedings involving children not residing or domiciled on the reservation, and seeks to protect, not only the rights of the Indian child as an Indian, but the rights of Indian communities and tribes in retaining Indian children. Thus, whenever a parent or tribe seeks to transfer the case it is presumptively in the best interest of the Indian child, consistent with the Act, to transfer the case to the jurisdiction of the Indian tribe.

(d) In addition, in determining whether there is good cause to deny the transfer, the court may not consider:

(1) The Indian child's contacts with the tribe or reservation;

(2) Socio-economic conditions or any perceived inadequacy of tribal or Bureau of Indian Affairs social services or judicial systems; or

(3) The tribal court's prospective placement for the Indian child.

(e) The burden of establishing good cause not to transfer is on the party opposing the transfer.

C.4. What happens when a petition for transfer is made?

(a) Upon receipt of a transfer petition the State court must promptly notify the tribal court in writing of the transfer petition and request a response regarding whether the tribal court wishes to decline the transfer. The notice should specify how much time the tribal court has to make its decision; provided that the tribal court has at least 20 days from the receipt of notice of a transfer petition to decide whether to accept or decline the transfer.

(b) The tribal court should inform the State court of its decision to accept or decline jurisdiction within the time required or may request additional time; provided that the reasons for additional time are explained.

(c) If the tribal court accepts the transfer, the State court should promptly provide the tribal court with all court records.

## D. Adjudication of Involuntary Placements, Adoptions, or Terminations or Terminations of Parental Rights

D.1. Who has access to reports or records?

(a) The court must inform each party to a foster care placement or termination of parental rights proceeding under State law involving an Indian child of his or her right to timely examination of all reports or other documents filed with the court and all files upon which any decision with respect to such action may be based.

(b) Decisions of the court may be based only upon reports, documents or testimony presented on the record.

D.2. What steps must a party take to petition a State court for certain actions involving an Indian child?

(a) Any party petitioning a State court for foster care placement or termination of parental rights to an Indian child must demonstrate to the court that prior to, and until the commencement of, the proceeding, active efforts have been made to avoid the need to remove the Indian child from his or her parents or Indian custodians and show that those efforts have been unsuccessful.

(b) Active efforts must be documented in detail and, to the extent possible, should involve and use the available resources of the extended family, the child's Indian tribe, Indian social service agencies and individual Indian care givers.

D.3. What are the applicable standards of evidence?

(a) The court may not issue an order effecting a foster care placement of an Indian child unless clear and convincing evidence is presented, including the testimony of one or more qualified expert witnesses, demonstrating that the child's continued custody with the child's parents or Indian custodian is likely to result in serious harm to the child.

(b) The court may not order a termination of parental rights unless the court's order is supported by evidence beyond a reasonable doubt, supported by the testimony of one or more qualified expert witnesses, that continued custody of the child by the parent or Indian custodian is likely to result in serious harm to the child.

(c) Clear and convincing evidence must show a causal relationship between the existence of particular conditions in the home that are likely to result in serious emotional or physical damage to the particular child who is the subject of the proceeding. Evidence that shows only the existence of

community or family poverty or isolation, single parenthood, custodian age, crowded or inadequate housing, substance abuse, or nonconforming social behavior does not by itself constitute clear and convincing evidence that continued custody is likely to result in serious emotional or physical damage to the child.

**D.4. Who may serve as a qualified expert witness?**

(a) A qualified expert witness should have specific knowledge of the Indian tribe's culture and customs.

(b) Persons with the following characteristics, in descending order, are presumed to meet the requirements for a qualified expert witness:

(1) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices.

(2) A member of another tribe who is recognized to be a qualified expert witness by the Indian child's tribe based on their knowledge of the delivery of child and family services to Indians and the Indian child's tribe.

(3) A layperson who is recognized by the Indian child's tribe as having substantial experience in the delivery of child and family services to Indians, and knowledge of prevailing social and cultural standards and childrearing practices within the Indian child's tribe.

(4) A professional person having substantial education and experience in the area of his or her specialty who can demonstrate knowledge of the prevailing social and cultural standards and childrearing practices within the Indian child's tribe.

(c) The court or any party may request the assistance of the Indian child's tribe or the Bureau of Indian Affairs agency serving the Indian child's tribe in locating persons qualified to serve as expert witnesses.

**E. Voluntary Proceedings**

**E.1. What actions must an agency and State court undertake in voluntary proceedings?**

(a) Agencies and State courts must ask whether a child is an Indian child in any voluntary proceeding under sections B.2. to B.4. of these guidelines.

(b) Agencies and State courts should provide the Indian tribe with notice of the voluntary child custody proceedings, including applicable pleadings or executed consents, and their right to intervene under section B.6. of these guidelines.

**E.2. How is consent to termination of parental rights, foster care placement or adoption obtained?**

(a) A voluntary termination of parental rights, foster care placement or adoption must be executed in writing and recorded before a court of competent jurisdiction.

(b) Prior to accepting the consent, the court must explain the consequences of the consent in detail, such as any conditions or timing limitations for withdrawal of consent and, if applicable, the point at which such consent is irrevocable.

(c) A certificate of the court must accompany a written consent and must certify that the terms and consequences of the consent were explained in detail in the language of the parent or Indian custodian, if English is not the primary language, and were fully understood by the parent or Indian custodian.

(d) Execution of consent need not be made in open court where confidentiality is requested or indicated.

(e) A consent given prior to or within 10 days after birth of the Indian child is not valid.

**E.3. What information should a consent document contain?**

(a) The consent document must contain the name and birthdate of the Indian child, the name of the Indian child's tribe, identifying tribal enrollment number, if any, or other indication of the child's membership in the tribe, and the name and address of the consenting parent or Indian custodian. If there are any conditions to the consent, the consent document must clearly set out the conditions.

(b) A consent to foster care placement should contain, in addition to the information specified in subsection (a), the name and address of the person or entity by or through whom the placement was arranged, if any, or the name and address of the prospective foster parents, if known at the time.

**E.4. How is withdrawal of consent achieved in a voluntary foster care placement?**

(a) Withdrawal of consent must be filed in the same court where the consent document was executed.

(b) When a parent or Indian custodian withdraws consent to foster care placement, the child must be returned to that parent or Indian custodian immediately.

**E.5. How is withdrawal of consent to a voluntary adoption achieved?**

(a) A consent to termination of parental rights or adoption may be withdrawn by the parent at any time

prior to entry of a final decree of voluntary termination or adoption, whichever occurs later. To withdraw consent, the parent must file, in the court where the consent is filed, an instrument executed under oath asserting his or her intention to withdraw such consent.

(b) The clerk of the court in which the withdrawal of consent is filed must promptly notify the party by or through whom any preadoptive or adoptive placement has been arranged of such filing and the child must be returned to the parent or Indian custodian as soon as practicable.

**F. Dispositions**

**F.1. When do the placement preferences apply?**

(a) In any preadoptive, adoptive or foster care placement of an Indian child, the Act's placement preferences apply; except that, if the Indian child's tribe has established by resolution a different order of preference than that specified in the Act, the agency or court effecting the placement must follow the tribe's placement preferences.

(b) The agency seeking a preadoptive, adoptive or foster care placement of an Indian child must always follow the placement preferences. If the agency determines that any of the preferences cannot be met, the agency must demonstrate through clear and convincing evidence that a diligent search has been conducted to seek out and identify placement options that would satisfy the placement preferences specified in sections F.2. or F.3. of these guidelines, and explain why the preferences could not be met. A search should include notification about the placement hearing and an explanation of the actions that must be taken to propose an alternative placement to:

(1) The Indian child's parents or Indian custodians;

(2) All of the known, or reasonably identifiable, members of the Indian child's extended family members;

(3) The Indian child's tribe;

(4) In the case of a foster care or preadoptive placement:

(i) All foster homes licensed, approved, or specified by the Indian child's tribe; and

(ii) All Indian foster homes located in the Indian child's State of domicile that are licensed or approved by any authorized non-Indian licensing authority.

(c) Where there is a request for anonymity, the court should consider whether additional confidentiality protections are warranted, but a request for anonymity does not relieve the

agency or the court of the obligation to comply with the placement preferences.

(d) Departure from the placement preferences may occur only after the court has made a determination that good cause exists to place the Indian child with someone who is not listed in the placement preferences.

(e) Documentation of each preadoptive, adoptive or foster care placement of an Indian child under State law must be provided to the State for maintenance at the agency. Such documentation must include, at a minimum: the petition or complaint; all substantive orders entered in the proceeding; the complete record of, and basis for, the placement determination; and, if the placement deviates from the placement preferences, a detailed explanation of all efforts to comply with the placement preferences and the court order authorizing departure from the placement preferences.

**F.2. What placement preferences apply in adoptive placements?**

(a) In any adoptive placement of an Indian child under State law, preference must be given in descending order, as listed below, to placement of the child with:

(1) A member of the child's extended family;

(2) Other members of the Indian child's tribe; or

(3) Other Indian families, including families of unwed individuals.

(b) The court should, where appropriate, also consider the preference of the Indian child or parent.

**F.3. What placement preferences apply in foster care or preadoptive placements?**

In any foster care or preadoptive placement of an Indian child:

(a) The child must be placed in the least restrictive setting that:

(1) Most approximates a family;

(2) Allows his or her special needs to be met; and

(3) Is in reasonable proximity to his or her home, extended family, and/or siblings.

(b) Preference must be given, in descending order as listed below, to placement of the child with:

(1) A member of the Indian child's extended family;

(2) A foster home, licensed, approved or specified by the Indian child's tribe, whether on or off the reservation;

(3) An Indian foster home licensed or approved by an authorized non-Indian licensing authority; or

(4) An institution for children approved by an Indian tribe or operated by an Indian organization which has a

program suitable to meet the child's needs.

**F.4. How is a determination for "good cause" to depart from the placement preferences made?**

(a) If any party asserts that good cause not to follow the placement preferences exists, the reasons for such belief or assertion must be stated on the record or in writing and made available to the parties to the proceeding and the Indian child's tribe.

(b) The party seeking departure from the preferences bears the burden of proving by clear and convincing evidence the existence of "good cause" to deviate from the placement preferences.

(c) A determination of good cause to depart from the placement preferences must be based on one or more of the following considerations:

(1) The request of the parents, if both parents attest that they have reviewed the placement options that comply with the order of preference.

(2) The request of the child, if the child is able to understand and comprehend the decision that is being made.

(3) The extraordinary physical or emotional needs of the child, such as specialized treatment services that may be unavailable in the community where families who meet the criteria live, as established by testimony of a qualified expert witness; provided that extraordinary physical or emotional needs of the child does not include ordinary bonding or attachment that may have occurred as a result of a placement or the fact that the child has, for an extended amount of time, been in another placement that does not comply with the Act. The good cause determination does not include an independent consideration of the best interest of the Indian child because the preferences reflect the best interests of an Indian child in light of the purposes of the Act.

(4) The unavailability of a placement after a showing by the applicable agency in accordance with section F.1., and a determination by the court that active efforts have been made to find placements meeting the preference criteria, but none have been located. For purposes of this analysis, a placement may not be considered unavailable if the placement conforms to the prevailing social and cultural standards of the Indian community in which the Indian child's parent or extended family resides or with which the Indian child's parent or extended family members maintain social and cultural ties.

(d) The court should consider only whether a placement in accordance with the preferences meets the physical, mental and emotional needs of the child; and may not depart from the preferences based on the socio-economic status of any placement relative to another placement.

**G. Post-Trial Rights**

**G.1. What is the procedure for petitioning to vacate an adoption?**

(a) Within two years after a final decree of adoption of any Indian child by a State court, or within any longer period of time permitted by the law of the State, a parent who executed a consent to termination of paternal rights or adoption of that child may petition the court in which the final adoption decree was entered to vacate the decree and revoke the consent on the grounds that consent was obtained by fraud or duress, or that the proceeding failed to comply with ICWA.

(b) Upon the filing of such petition, the court must give notice to all parties to the adoption proceedings and the Indian child's tribe.

(c) The court must hold a hearing on the petition.

(d) Where the court finds that the parent's consent was obtained through fraud or duress, the court must vacate the decree of adoption, order the consent revoked and order that the child be returned to the parent.

**G.2. Who can make a petition to invalidate an action?**

(a) Any of the following may petition any court of competent jurisdiction to invalidate an action for foster care placement or termination of parental rights where it is alleged that the Act has been violated:

(1) An Indian child who is the subject of any action for foster care placement or termination of parental rights;

(2) A parent or Indian custodian from whose custody such child was removed; and

(3) The Indian child's tribe.

(b) Upon a showing that an action for foster care placement or termination of parental rights violated any provision of 25 U.S.C. 1911, 1912, or 1913, the court must determine whether it is appropriate to invalidate the action.

(c) There is no requirement that the particular party's rights under the Act be violated to petition for invalidation; rather, any party may challenge the action based on violations in implementing the Act during the course of the child custody proceeding. For example, it is acceptable for the tribe to petition to invalidate an action because

it violated the rights of a parent, or for a parent to petition to invalidate an action because the action violated the statutory rights of the tribe. ICWA is designed to provide rights to ensure that tribes, parents, and children are protected. In light of Congressional findings in ICWA, it is presumed that the Indian child is disadvantaged if any of those rights are violated.

(d) The court should allow, if it possesses the capability, alternative methods of participation in State court proceedings by family members and tribes, such as participation by telephone, videoconferencing, or other methods.

G.3. What are the rights of adult adoptees?

(a) Upon application by an Indian individual who has reached age 18 who was the subject of an adoptive placement, the court that entered the final decree must inform such individual of the tribal affiliations, if any, of the individual's biological parents and provide such other information necessary to protect any rights, which may include tribal membership, resulting from the individual's tribal relationship.

(b) This section should be applied regardless of whether the original adoption was subject to the provisions of the Act.

(c) Where State law prohibits revelation of the identity of the biological parent, assistance of the Bureau of Indian Affairs should be sought to help an adoptee who is eligible for membership in a tribe to become a tribal member without breaching the Privacy Act or confidentiality of the record.

(d) In States where adoptions remain closed, the relevant agency should, at a minimum, communicate directly with the tribe's enrollment office and provide the information necessary to facilitate the establishment of the adoptee's tribal membership.

(e) Agencies should work with the tribe to identify at least one tribal designee familiar with 25 U.S.C. 1917 to assist adult adoptees statewide with the process of reconnecting with their tribes and to provide information to State judges about this provision on an annual basis.

G.4. When must notice of a change in child's status be given?

(a) Notice by the court, or an agency authorized by the court, must be given to the child's biological parents or prior Indian custodians and the Indian child's tribe whenever:

(1) A final decree of adoption of an Indian child has been vacated or set aside; or

(2) The adoptive parent has voluntarily consented to the termination of his or her parental rights to the child; or

(3) Whenever an Indian child is removed from a foster care home or institution to another foster care placement, preadoptive placement, or adoptive placement.

(b) The notice must inform the recipient of the right to petition for return of custody of the child.

(c) A parent or Indian custodian may waive his or her right to such notice by executing a written waiver of notice filed with the court. The waiver may be revoked at any time by filing with the court a written notice of revocation. A revocation of the right to receive notice does not affect any proceeding which occurred before the filing of the notice of revocation.

G.5. What information must States furnish to the Bureau of Indian Affairs?

(a) Any state entering a final adoption decree or order must furnish a copy of the decree or order to the Bureau of Indian Affairs, Chief, Division of Human Services, 1849 C Street NW., Mail Stop 4513 MIB, Washington, DC 20240, along with the following information:

(1) Birth name of the child, tribal affiliation and name of the child after adoption;

(2) Names and addresses of the biological parents;

(3) Names and addresses of the adoptive parents;

(4) Name and contact information for any agency having files or information relating to the adoption;

(5) Any affidavit signed by the biological parent or parents asking that their identity remain confidential; and

(6) Any information relating to the enrollment or eligibility for enrollment of the adopted child.

(b) Confidentiality of such information must be maintained and is not subject to the Freedom of Information Act, 5 U.S.C. 552, as amended.

G.6. How must the State maintain records?

(a) The State must establish a single location where all records of every voluntary or involuntary foster care, preadoptive placement and adoptive placement of Indian children by courts of that State will be available within seven days of a request by an Indian child's tribe or the Secretary.

(b) The records must contain, at a minimum, the petition or complaint, all

substantive orders entered in the proceeding, and the complete record of the placement determination.

Dated: February 19, 2015.
**Kevin K. Washburn,**
*Assistant Secretary—Indian Affairs.*
[FR Doc. 2015–03925 Filed 2–24–15; 8:45 am]
BILLING CODE 4310–4J–P

## DEPARTMENT OF THE INTERIOR

### National Park Service

[NPS–PWR–PWRO–17253;
PX.PD077160I.00.4]

### Draft Environmental Impact Statement for Alcatraz Ferry Embarkation Plan, San Francisco County, California.

**AGENCY:** National Park Service, Interior.
**ACTION:** Notice of availability.

**SUMMARY:** The National Park Service (NPS) has prepared a Draft Environmental Impact Statement (DEIS) for the Alcatraz Ferry Embarkation project. The project would establish a new, long-term ferry embarkation site for passenger service between the northern San Francisco waterfront and Alcatraz Island. It would also establish occasional special ferry service between the selected Alcatraz ferry embarkation site and the existing Fort Baker pier, as well as between Fort Mason and other destinations in San Francisco Bay.

**DATES:** All comments must be postmarked or transmitted not later than 90 days from the date of publication in the **Federal Register** of the Environmental Protection Agency's notice of filing and release of the DEIS. Upon confirmation of this date, we will notify all entities on the project mailing list, and public announcements about the DEIS review period will be posted on the project Web site (*http://parkplanning.nps.gov/ALCAembarkation*) and distributed via local and regional press media.

**FOR FURTHER INFORMATION CONTACT:** Please contact the Golden Gate National Recreation Area Planning Division at (415) 561–4930 or *goga_planning@nps.gov*.

**SUPPLEMENTARY INFORMATION:** The purpose and need for the project is driven by the following factors: (1) Alcatraz Island ferry service has been subject to location changes every 10 years, which has led to visitor confusion, community concerns, and inconsistency in visitor support services. The site and associated connections should be a consistent feature for visitors to Golden Gate National Recreation Area (GGNRA). (2)



Office of Attorney General Mark Brnovich

Child and Family Protection Division

Protective Services Section

PSS PRACTICE TIP 015

TIP FROM:          DAWN WILLIAMS

DATE:              3/10/15

PRACTICE TIP TITLE:   NEW FEBRUARY 2015 BIA GUIDELINES FOR ICWA CASES

## SUMMARY OF TIP:

On February 25, 2015, the Bureau of Indian Affairs (Dep't of the Interior) published revised Guidelines for State Courts and Agencies in Indian Child Custody Proceedings in the Federal Register. *See* 80 Fed. Reg. 10,146 (Feb. 25, 2015), available here: http://www.gpo.gov/fdsys/pkg/FR-2015-02-25/pdf/2015-03925.pdf (and HDM# 4362961). This tip (along with the Crosswalk found at HDM# 4345127) will highlight the differences in the new BIA Guidelines for ICWA cases.

## ANALYSIS OF TIP:

### General Changes
- The new Guidelines do not contain the same explicit caveat that they are non-binding that was found in the prior Guidelines. Nevertheless, that was based on the fact that the Guidelines haven't gone through the formal rulemaking process to be codified in the Code of Federal Regulations. Because these new Guidelines have also not been codified in the CFR, presumably they are also non-binding, although Arizona's courts typically rely on them to interpret ICWA.
- The "Commentary" sections are integrated into the text, where appropriate.
- The new Guidelines are effective 2/25/15 and supersede and replace the 1979 Guidelines.
- The new Guidelines have sections on background and a summary of the changes that is more expansive than this Practice Tip.

### Section A. General Provisions
- This section expands on the former Section A. Policy.
- There is a new section containing definitions of various ICWA terms.
- It clarifies that courts and agencies should follow ICWA's procedures even when the child is not removed from the home. This is consistent with DCS Policy—that is, efforts should be made to notify tribes, engage tribal social services and extended family, provide culturally appropriate services via active efforts, etc.
- This section also provides that the case should be treated as an ICWA case from the outset if the court/agency have reason to know that a child is an Indian child unless and

1

hdm #4346033

until it is determined that the child is <u>not</u> an Indian child. Although this seems to contradict *ADES v. Bernini*, it doesn't explicitly do so. Under *Bernini*, only the notice provisions apply if the child <u>may be</u> an Indian child. This new provision covers those cases where the court/DCS/parties assert or believe that the child is an Indian child but formal proof of the child's status isn't yet available.
- A section was added to provide guidance for how to contact a tribe.
- The Guidelines now explicitly reject the Existing Indian Family doctrine.

**Section B. Pretrial Requirements**
- New steps are laid out for how to determine whether a child is an Indian child and requires Agency documentation of its efforts to make that determination.
- Clarifies that active efforts begin at the inception of an investigation and should be conducted while verifying the child's Indian status.
- Removes the option for the BIA to determine a child's Indian status, placing that duty solely with the tribe.
- Expands procedures for determining which of several possible tribes should be the child's tribe for purposes of ICWA.
- Provides examples of information that should be included in notice to tribe or request for tribal determination of membership.
- Requires notice to the parent for each proceeding, not just first and last.
- Specifies notice to BIA for parents whose identities or locations cannot be determined.
- Clarifies that personal or electronic service may be made <u>in addition to</u>, but not <u>in lieu of</u> service by registered mail.
- References application in conjunction with ICPC transfers.
- Expanded discussion of emergency removal procedures.
- Encourages court to allow alternative methods of participation (phone, videoconference, etc.) for tribes and family members.

**Section C. Procedures for Transfer to Tribal Court**
- Deletes the requirement that transfer requests be made "promptly" since there is no such requirement in ICWA.
- Clarifies that transfer is available at any stage of the proceeding.
- Updates the "good cause" factors for denying transfer to tribal court (deletes the "advanced stage" factor from the old Guidelines and specifies that courts should not engage in a "best interests" analysis regarding transfer or consider the tribal court's proposed placement for the child if transfer is granted).

**Section D. Adjudication of Involuntary Placements, Adoptions, or Terminations of Parental Rights**
- Significantly expands on what "active efforts" are, when they are made, how they are documented, etc.
- Specifies that "active efforts" are more than "reasonable efforts" under ASFA.
- Updates qualified expert witness qualifications and establishes preferential order for types of QEWs.

**Section E. Voluntary Proceedings**
- Clarifies requirements of ICWA in voluntary proceedings (courts and agencies must inquire if the child is an Indian child and, if so, provide notice to the tribe).
- Updates consent requirements.

**Section F. Dispositions**
- Requires agency to demonstrate (by clear & convincing evidence) that it conducted a diligent search to identify placement options before seeking to depart from placement preferences.
- Parent's request for anonymity does not eliminate the placement preferences requirements.
- The court must determine good cause before the placement is made.
- Encourages early compliance with placement preferences to avoid problem where "good cause" is based on child's bond with non-preferred placement due to length of improper placement.
- Clarifies that court should not conduct an independent "best interests" assessment to determine "good cause."

**Section G. Post-Trial Rights**
- Contains a new section on procedures for moving to invalidate proceedings for ICWA violations (including that a party may move to invalidate the proceedings even if that party's rights were not the ones violated).
- Updates information for adult adoptees to obtain information about tribal connections.
- Clarifies records requirements (including requiring that records be kept for voluntary, as well as involuntary, proceedings).

==This practice tip is effective 3/10/15 and replaces any prior directives on this matter.==

3

# Crosswalk: BIA Guidelines for State Courts in ICWA Proceedings
## 2015 vs. 1979

| 2015 GUIDELINES[1] | 1979 GUIDELINES[2] |
|---|---|
| I.      **Background** | Introduction |
| II.     **Statutory Authority** | Introduction |
| III.    **Summary of Updates** | N/A |
| IV.    **Guidance** | N/A |
| **A. General Provisions** | (mostly A. Policy) |
| A.1  What is the purpose of these guidelines? | A. Policy; A. Commentary |
| A.2  What terms do I need to know? | (various) |
| A.2 "Active efforts" | (see D.2 and D.2 Commentary) |
| A.2 "Agency" | N/A |
| A.2 "Child custody proceeding" | (see B.3; B.3 Commentary) |
| A.2 "Continued custody" | N/A |
| A.2 "Custody" | N/A |
| A.2 "Domicile" | N/A |
| A.2 "Extended family member" | N/A (but see 25 USC § 1903(2)) |
| A.2 "Imminent physical damage or harm" | N/A |
| A.2 "Indian" | N/A (but see § 1903(3)) |
| A.2 "Indian child" | N/A (but see § 1903(4)) |
| A.2 "Indian child's tribe" | N/A (but see § 1903(5)) |
| A.2 "Indian Child Welfare Act" | N/A |
| A.2 "Indian custodian" | N/A (but see § 1903(6)) |
| A.2 "Indian organization" | N/A (but see § 1903(7)) |
| A.2 "Indian tribe" | N/A (but see § 1903(8)) |
| A.2 "Parent" | N/A (but see § 1903(9) & *Adoptive Couple*) |
| A.2 "Reservation" | N/A (but see § 1903(10)) |
| A.2 "Secretary" | N/A (but see § 1903(11)) |
| A.2 "Status offenses" | (see B.3 and B.3 Commentary) |
| A.2 "Tribal court" | N/A (but see § 1903(12)) |

[1] 80 Fed. Reg. 10,146 (February 25, 2015).
[2] 44 Fed. Reg. 67,584 (November 26, 1979).

# Crosswalk: BIA Guidelines for State Courts in ICWA Proceedings

## 2015 vs. 1979

| 2015 GUIDELINES[1] | 1979 GUIDELINES[2] |
|---|---|
| A.2 "Upon demand" | N/A |
| A.2 "Voluntary placement" | (see E., E.1, E.1 Commentary, E.2, E.2 Commentary) |
| A.3 When does ICWA apply? | B.3, B.3 Commentary, B.5 Commentary, E. Voluntary Proceedings |
| A.3(a) | B.3, B.3 Commentary, B.5 Commentary |
| A.3(b) | N/A |
| A.3(c) | (see B.5 Commentary) |
| A.3(d) | N/A |
| A.3(e) | B.3, B.3 Commentary |
| A.3(f) | E. Voluntary Proceedings |
| A.3(g) | E. Voluntary Proceedings |
| A.4 How do I contact a tribe under these guidelines? | N/A (see B.5, B.5 Commentary) |
| A.5 How do these guidelines interact with State laws? | A. Policy, A. Commentary |
| **B. Pretrial Requirements** | |
| B.1 When does the requirement for active efforts begin? | N/A |
| B.2 What actions must an agency and State court undertake in order to determine whether a child is an Indian child? | N/A (see B.1, B.1 Commentary) |
| B.3 Who makes the determination as to whether a child is a member of a tribe? | N/A (see B.2, B.2 Commentary) |
| B.4 What is the procedure for determining an Indian child's tribe when the child is a member or eligible for membership in more than one tribe? | B.2, B.2 Commentary |
| B.5 When must a State court dismiss an action? | B.4, B.4 Commentary |
| B.6 What are the notice requirements for a child custody proceeding involving an Indian child? | B.5, B.5 Commentary |
| B.6(a) | B.5 |

# Crosswalk: BIA Guidelines for State Courts in ICWA Proceedings

## 2015 vs. 1979

| 2015 GUIDELINES[1] | 1979 GUIDELINES[2] |
|---|---|
| B.6(b) | B.5(e), B.5 Commentary |
| B.6(c) | B.5(b) |
| B.6(d) | N/A |
| B.6(e) | N/A |
| B.6(f) | B.5(b)(xi), B.5 Commentary |
| B.6(g) | B.5(d) |
| B.6(h) | B.5(f) |
| B.6(i) | B.5(g) |
| B.6(j) | N/A |
| B.6(k) | N/A |
| B.6(l) | N/A |
| B.7 What time limits and extensions apply? | B.6, B.6 Commentary |
| B.7(a) | B.6 |
| B.7(b) | B.6(a) |
| B.7(c) | B.6(b) |
| B.7(d) | N/A |
| B.8 What is the process for the emergency removal of an Indian child? | B.7, B.7 Commentary |
| B.8(a) | N/A (see B.7 Commentary) |
| B.8(b) | N/A |
| B.8(c) | N/A (see B.7(a)) |
| B.8(d) | B.7(b) |
| B.8(e) | N/A (see B.7 Commentary) |
| B.8(f) | B.7(d) |
| B.8(g) | B.7(c) |
| B.8(h) | B.7(c)(d) |
| B.8(i) | N/A |
| B.9 What are the procedures for determining improper removal? | B.8, B.8 Commentary |
| C. Procedures for Making Requests for Transfer to Tribal Court | |
| C.1 How are petitions for transfer of proceeding made? | C.1 |
| C.1(a) | C.1 |
| C.1(b) | N/A (see C.1 Commentary) |

# Crosswalk: BIA Guidelines for State Courts in ICWA Proceedings

## 2015 vs. 1979

| 2015 GUIDELINES[1] | 1979 GUIDELINES[2] |
|---|---|
| C.1(c) | N/A |
| C.1(d) | N/A |
| C.2 What are the criteria and procedures for ruling on transfer petitions? | C.2, C.2 Commentary |
| C.2(a) | C.2(a) |
| C.2(b) | N/A |
| C.3 How is a determination of "good cause" made? | C.2, C.2 Commentary, C.3, C.3 Commentary |
| C.3(a) | C.2(b) |
| C.3(b) | C.2 Commentary |
| C.3(c) | C.3(b), C.3 Commentary |
| C.3(d) | C.3(c) |
| C.3(e) | C.3(d) |
| C.4 What happens when a petition for transfer is made? | C.4, C.4 Commentary |
| **D. Adjudication of Involuntary Placements, Adoptions, or Terminations of Parental Rights** | |
| D.1 Who has access to reports or records? | D.1, D.1 Commentary |
| D.2 What steps must a party take to petition a State court for certain actions involving an Indian child? | D.2, D.2 Commentary |
| D.3 What are the applicable standards of evidence? | D.3, D.3 Commentary |
| D.4 Who may serve as a qualified expert witness? | D.4, D.4 Commentary |
| **E.  Voluntary Proceedings** | |
| E.1 What actions must an agency and State court undertake in voluntary proceedings? | N/A |
| E.2 How is consent obtained? | E.1, E.1 Commentary |
| E.3 What information should the consent document contain? | E.2, E.2 Commentary |

# Crosswalk: BIA Guidelines for State Courts in ICWA Proceedings

## 2015 vs. 1979

| 2015 GUIDELINES[1] | 1979 GUIDELINES[2] |
|---|---|
| I.      Background | Introduction |
| II.     Statutory Authority | Introduction |
| III.    Summary of Updates | N/A |
| IV.    Guidance | N/A |
| A. General Provisions | (mostly A. Policy) |
| A.1  What is the purpose of these guidelines? | A. Policy; A. Commentary |
| A.2  What terms do I need to know? | (various) |
| A.2 "Active efforts" | (see D.2 and D.2 Commentary) |
| A.2 "Agency" | N/A |
| A.2 "Child custody proceeding" | (see B.3; B.3 Commentary) |
| A.2 "Continued custody" | N/A |
| A.2 "Custody" | N/A |
| A.2 "Domicile" | N/A |
| A.2 "Extended family member" | N/A (but see 25 USC § 1903(2)) |
| A.2 "Imminent physical damage or harm" | N/A |
| A.2 "Indian" | N/A (but see § 1903(3)) |
| A.2 "Indian child" | N/A (but see § 1903(4)) |
| A.2 "Indian child's tribe" | N/A (but see § 1903(5)) |
| A.2 "Indian Child Welfare Act" | N/A |
| A.2 "Indian custodian" | N/A (but see § 1903(6)) |
| A.2 "Indian organization" | N/A (but see § 1903(7)) |
| A.2 "Indian tribe" | N/A (but see § 1903(8)) |
| A.2 "Parent" | N/A (but see § 1903(9) & *Adoptive Couple*) |
| A.2 "Reservation" | N/A (but see § 1903(10)) |
| A.2 "Secretary" | N/A (but see § 1903(11)) |
| A.2 "Status offenses" | (see B.3 and B.3 Commentary) |
| A.2 "Tribal court" | N/A (but see § 1903(12)) |

---

[1] 80 Fed. Reg. 10,146 (February 25, 2015).
[2] 44 Fed. Reg. 67,584 (November 26, 1979).

# Crosswalk: BIA Guidelines for State Courts in ICWA Proceedings
## 2015 vs. 1979

| 2015 GUIDELINES¹ | 1979 GUIDELINES² |
|---|---|
| A.2 "Upon demand" | N/A |
| A.2 "Voluntary placement" | (see E., E.1, E.1 Commentary, E.2, E.2 Commentary) |
| A.3 When does ICWA apply? | B.3, B.3 Commentary, B.5 Commentary, E. Voluntary Proceedings |
| A.3(a) | B.3, B.3 Commentary, B.5 Commentary |
| A.3(b) | N/A |
| A.3(c) | (see B.5 Commentary) |
| A.3(d) | N/A |
| A.3(e) | B.3, B.3 Commentary |
| A.3(f) | E. Voluntary Proceedings |
| A.3(g) | E. Voluntary Proceedings |
| A.4 How do I contact a tribe under these guidelines? | N/A (see B.5, B.5 Commentary) |
| A.5 How do these guidelines interact with State laws? | A. Policy, A. Commentary |
| **B. Pretrial Requirements** | |
| B.1 When does the requirement for active efforts begin? | N/A |
| B.2 What actions must an agency and State court undertake in order to determine whether a child is an Indian child? | N/A (see B.1, B.1 Commentary) |
| B.3 Who makes the determination as to whether a child is a member of a tribe? | N/A (see B.2, B.2 Commentary) |
| B.4 What is the procedure for determining an Indian child's tribe when the child is a member or eligible for membership in more than one tribe? | B.2, B.2 Commentary |
| B.5 When must a State court dismiss an action? | B.4, B.4 Commentary |
| B.6 What are the notice requirements for a child custody proceeding involving an Indian child? | B.5, B.5 Commentary |
| B.6(a) | B.5 |

# Crosswalk: BIA Guidelines for State Courts in ICWA Proceedings

## 2015 vs. 1979

| 2015 GUIDELINES¹ | 1979 GUIDELINES² |
|---|---|
| B.6(b) | B.5(e), B.5 Commentary |
| B.6(c) | B.5(b) |
| B.6(d) | N/A |
| B.6(e) | N/A |
| B.6(f) | B.5(b)(xi), B.5 Commentary |
| B.6(g) | B.5(d) |
| B.6(h) | B.5(f) |
| B.6(i) | B.5(g) |
| B.6(j) | N/A |
| B.6(k) | N/A |
| B.6(l) | N/A |
| B.7 What time limits and extensions apply? | B.6, B.6 Commentary |
| B.7(a) | B.6 |
| B.7(b) | B.6(a) |
| B.7(c) | B.6(b) |
| B.7(d) | N/A |
| B.8 What is the process for the emergency removal of an Indian child? | B.7, B.7 Commentary |
| B.8(a) | N/A (see B.7 Commentary) |
| B.8(b) | N/A |
| B.8(c) | N/A (see B.7(a)) |
| B.8(d) | B.7(b) |
| B.8(e) | N/A (see B.7 Commentary) |
| B.8(f) | B.7(d) |
| B.8(g) | B.7(c) |
| B.8(h) | B.7(c)(d) |
| B.8(i) | N/A |
| B.9 What are the procedures for determining improper removal? | B.8, B.8 Commentary |
| C. Procedures for Making Requests for Transfer to Tribal Court | |
| C.1 How are petitions for transfer of proceeding made? | C.1 |
| C.1(a) | C.1 |
| C.1(b) | N/A (see C.1 Commentary) |

# Crosswalk: BIA Guidelines for State Courts in ICWA Proceedings

## 2015 vs. 1979

| 2015 GUIDELINES[1] | 1979 GUIDELINES[2] |
|---|---|
| C.1(c) | N/A |
| C.1(d) | N/A |
| C.2 What are the criteria and procedures for ruling on transfer petitions? | C.2, C.2 Commentary |
| C.2(a) | C.2(a) |
| C.2(b) | N/A |
| C.3 How is a determination of "good cause" made? | C.2, C.2 Commentary, C.3, C.3 Commentary |
| C.3(a) | C.2(b) |
| C.3(b) | C.2 Commentary |
| C.3(c) | C.3(b), C.3 Commentary |
| C.3(d) | C.3(c) |
| C.3(e) | C.3(d) |
| C.4 What happens when a petition for transfer is made? | C.4, C.4 Commentary |
| **D. Adjudication of Involuntary Placements, Adoptions, or Terminations of Parental Rights** | |
| D.1 Who has access to reports or records? | D.1, D.1 Commentary |
| D.2 What steps must a party take to petition a State court for certain actions involving an Indian child? | D.2, D.2 Commentary |
| D.3 What are the applicable standards of evidence? | D.3, D.3 Commentary |
| D.4 Who may serve as a qualified expert witness? | D.4, D.4 Commentary |
| **E. Voluntary Proceedings** | |
| E.1 What actions must an agency and State court undertake in voluntary proceedings? | N/A |
| E.2 How is consent obtained? | E.1, E.1 Commentary |
| E.3 What information should the consent document contain? | E.2, E.2 Commentary |

# Crosswalk: BIA Guidelines for State Courts in ICWA Proceedings

## 2015 vs. 1979

| 2015 GUIDELINES | 1979 GUIDELINES² |
|---|---|
| E.4 How is withdrawal of consent achieved in a voluntary foster care placement? | E.3, E.3 Commentary |
| E.5 How is withdrawal of consent to a voluntary adoption achieved? | E.4, E.4 Commentary |
| **F.  Dispositions** | |
| F.1 When do the placement preferences apply? | F.1, F.1 Commentary, F.2, F.2 Commentary |
|    F.1(a) | F.1, F.1 Commentary, F.2, F.2 Commentary |
|    F.1(b) | N/A |
|    F.1(c) | N/A |
|    F.1(d) | F.3, F.3 Commentary |
|    F.1(e) | See G.4 |
| F.2 What placement preferences apply in adoptive placements? | F.1, F.1 Commentary |
| F.3 What placement preferences apply in foster care or preadoptive placements? | F.2, F.2 Commentary |
| F.4 How is a determination for "good cause" to depart from placement procedures made? | F.3, F.3 Commentary |
| **G. Post-Trial Rights** | |
| G.1 What is the procedure for petitioning to vacate an adoption? | G.1, G.1 Commentary |
| G.2 Who can make a petition to invalidate an action? | N/A (see 25 U.S.C. § 1914) |
| G.3 What are the rights of adult adoptees? | G.2, G.2 Commentary |
| G.4 When must notice of a change in child's status be given? | G.3, G.3 Commentary |
| G.5 What information must States furnish to the Bureau of Indian Affairs? | N/A |
| G.6 How must the State maintain records? | G.4, G.4 Commentary |

**Exhibit B**

NOT FOR OFFICIAL PUBLICATION

IN THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA

DIVISION I

FILED
COURT OF CIVIL APPEALS
STATE OF OKLAHOMA

APR 24 2015

MICHAEL S. RICHIE
CLERK

| | |
|---|---|
| IN THE MATTER OF THE ADOPTION OF J.R.D., A MINOR CHILD:<br><br>DERICK PRICE HASSELL,<br><br>               Appellant,<br><br>vs.<br><br>JUSTIN RYAN DUKE,<br><br>               Appellee,<br><br>and<br><br>THE CHEROKEE NATION,<br><br>           Intervenor/Appellee. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )<br><br>Case No. 113,228 |

APPEAL FROM THE DISTRICT COURT OF
ROGERS COUNTY, OKLAHOMA

HONORABLE DAVID SMITH, TRIAL JUDGE

<u>AFFIRMED</u>

Nancy Nesbitt Blevins,
Paul E. Blevins,
Emily Blevins McLean,
BLEVINS LAW OFFICE, INC.,
Pryor, Oklahoma,

For Appellant,

William G. LaSorsa,
Bradley J. Brown,
JONES, GOTCHER & BOGAN, P.C.,
Tulsa, Oklahoma,                                    For Appellee,

Robert Garcia,
ASSISTANT ATTORNEY GENERAL,                         For Intervenor/
Tahlequah, Oklahoma,                                Appellee.

OPINION BY BRIAN JACK GOREE, PRESIDING JUDGE:

¶1     In this adoption proceeding, Petitioner, Derek Price Hassell, appeals the

trial court's sustension of Respondent Father's demurrer to evidence based

on its finding that Petitioner did not meet the requirements of §1912(d) and (f)

of the Indian Child Welfare Act.  We affirm.

¶2     This is an action for the adoption of J.R.D. (Child) brought by his

stepfather, Petitioner, Derek Price Hassell.  The Indian Child Welfare Act

(ICWA) is generally applicable to this proceeding.  25 U.S.C. §1901-1963.

Child's mother, Leia Shea Hassell (Mother) is a citizen of the Cherokee

Nation.  Child is a citizen of the Cherokee Nation and is an "Indian child."  25

U.S.C. §1903(4).  Respondent, Justin Ryan Duke (Father), not a member of

a tribe, is a "parent." 25 U.S.C. §1903(9).  The adoption proceeding is a "child

custody proceeding."  25 U.S.C. §1903(1)(ii),(iv).

2

¶3     In January 2004, Mother and Father were married, and in September 2004, Child was born.  In February 2006, they divorced.  Pursuant to the divorce decree, Father was ordered to pay monthly child support payments to Mother.  He was granted visitation with Child supervised by Father's mother on alternating weekends and some holidays.  After the first visitation, Father did not visit Child at his mother's home.  Instead, Mother arranged for her and Child to meet Father for visitation once or twice a month for thirty minutes to an hour and a half.

¶4     In February 2007, Father enlisted in the Navy.  Mother, Father, Child, and Father's father spent the weekend with Father in Chicago following his basic training graduation there.  In June 2007, Father visited with Child twice before he traveled to his new duty station.  This was the last time Father had any physical contact with Child.  He sent Child gifts for Thanksgiving and Christmas 2007, and for Valentine's Day 2008.

¶5     In June 2008, Father was discharged from the Navy.  Mother informed Father she would not bring Child to visit him because she believed he was using drugs and that Child would not be safe around him.  She told him if he wanted to visit with Child, he would have to get a court order requiring

3

visitation.  Father did not commence any court proceedings, nor did he request visitation with Child.

¶6    In June 2010, Mother married Petitioner.  On September 10, 2012, Petitioner filed his Petition for Adoption and his Application for Adoption without Consent.  On March 5, 2013, the trial court granted Petitioner's Application for Adoption without Consent.  It ruled:

> [W]e can . . .not prevent this child from moving forward in his life. He has been put on hold for far too long while he waits for his natural father to get his life in order, and he deserves to be adopted by the man that has been put in the position of his father. Therefore, this Court grants and sustains the application that his adoption may proceed without the consent of the natural father.

¶7    The Cherokee Nation (Nation) intervened, objecting to the adoption of Child by Petitioner.  On June 10, 2014, following briefing and oral arguments, the trial court determined that §1912(d) and §1912(f) of ICWA are applicable to this case.  Title 25 U.S.C. §1912(d) provides:

> Any party seeking to effect a foster care placement of, or termination of parental rights to an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

Section 1912(f) provides:

> No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by

4

evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

¶8   On August 25-28, 2014, trial was held to determine whether the adoption by Petitioner was in Child's best interests. The trial court granted Father's demurrer to Petitioner's evidence, ruling that Petitioner did not satisfy the requirements of §1912(d) and (f).

¶9   In its September 15, 2014 Journal Entry of Judgment, the trial court recited its previous ruling that §1912(d) and (f) are applicable to this case. In sustaining Father's demurrer to the evidence, it determined that Petitioner failed to prove the requirements of §1912(d) by clear and convincing evidence and failed to prove the requirements of §1912(f) beyond a reasonable doubt. Petitioner appeals.[1]

¶10   Petitioner contends the trial court erred as a matter of law in finding that §1912(d) and §1912(f) of ICWA are applicable to this proceeding.

¶11   The determination of the applicability of §1912(d) and (f) to this child custody proceeding is a question of law. Legal questions are subject to *de novo* review. *Fulsom v. Fulsom*, 2003 OK 96, ¶2, 81 P.3d 652.

---

[1] Petitioner's reply brief included a motion to strike Nation's answer brief for failure to comply with Oklahoma Supreme Court Rules. Okla.Sup.Ct.R. 1.2. Petitioner's motion to strike Nation's answer brief is denied.

5

¶12   Title 25 U.S.C. §1902 provides the Congressional policy for enacting ICWA:

> . . . to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance as Indian tribes in the operation of child and family service programs.

¶13   In *Adoptive Couple v. Baby Girl,* _____ U.S. _____, 133 S.Ct. 2552, 186 L.Ed.2d 729 (2013), the United State Supreme Court stated:

> "The Indian Child Welfare Act of 1978 . . . was the product of rising concern in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes." *Mississippi Band of Choctaw Indians v. Holyfield,* 490 U.S. 30, 32, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989). Congress found that "an alarmingly high percentage of Indian families [were being] broken up by the removal, often unwarranted, of their children from them by non-tribal public and private agencies." §1901(4). This "wholesale removal of Indian children from their homes" prompted Congress to enact the ICWA, which establishes federal standards that govern state-court child custody proceedings involving Indian children. *Id.,* at 32, 36, 109 S.Ct. 1597. . . .

¶14   The policy of the State of Oklahoma, set forth in the Oklahoma Indian Children Welfare Act (OICWA) 10 O.S. 2011 §40.1 *et seq,* is to "ensure that the intent and provisions of the federal [ICWA] are enforced."   Title10 O.S.

6

2011 §40.1.  The OICWA, in accordance with [ICWA], applies to all child custody proceedings involving any Indian child except those arising from marriage dissolution proceedings or delinquency adjudications.  10 O.S. 2011 §40.3(A), 25 U.S.C. §1903(1).  A "child custody proceeding" is specifically defined by ICWA to include: 1) foster care placement, 2) termination of parental rights, 3) preadoptive placement, and 4) adoptive placement.  *See* 25 U.S.C. §1903(1)(I)-(iv).  "Termination of parental rights" means " . . . any action resulting in the termination of the parent-child relationship."  "Adoptive placement" means ". . .the permanent placement of an Indian child for adoption, including any action resulting in a final decree of adoption."

¶15   Specifically, Petitioner submits that §1912(f) does not apply to these proceedings.  He points out that in *Baby Girl,* the United State Supreme Court held that §1912(f) is applicable only to a custodial parent.[2]  Petitioner explains that Father had legal and physical custody of Child for approximately one year and nine months between Child's birth and the divorce, but it has been more than seven years since Father has had any physical contact with Child.  Therefore, the "continued custody" requirement for application of §1912(f) does not exist.

_____

[2] In the *Baby Girl* case, the biological father never had legal or physical custody of the child.

7

¶16   In *Baby Girl,* the United States Supreme Court defined "continued custody." The meaning of "continued" includes "carried on or kept up without cessation," or "resumed after interruption." It concluded that " . . . [t]he phrase 'continued custody' therefore refers to custody that a parent already has (or at least had at some point in the past). As a result, §1912(f), does not apply in cases where the Indian parent *never* had custody of the Indian child."

¶17   Although Father has had no physical contact with Child for several years, after the divorce, he was awarded supervised visitation rights and has a standing child support order for the care and support of Child. "[A]t some point in the past," Father did have physical custody and legal custody and, following the divorce, continues to have supervised visitation rights to Child. Father has "continued custody" of Child, according to the Supreme Court's interpretation of that phrase in *Baby Girl*. Therefore, §1912(f) applies to these proceedings. *Fulsom v. Fulsom,* 2003 OK 96, ¶2. The trial court did not err in determining that §1912(f) applies to these proceedings.

¶18   Nevertheless, Petitioner urges the trial court erred in granting Father's demurrer to the evidence when it determined Petitioner failed to prove the requirements of §1912(f) beyond a reasonable doubt.

8

¶19   When a trial court considers a demurrer to the evidence, it must take as true all evidence (together with all reasonable inferences) favorable to the party against whom relief is sought and disregard any conflicting evidence that may favor the demurrant.  A demurrer should be overruled unless there is an entire absence of proof tending to show a right to recover.  In short, the demurrer must be denied if the opponent has made out a prima facie case. A reviewing court will examine the record in the light most favorable to the plaintiff (disregarding conflicts or contrary inferences) but will disturb the trial court's sustention of a demurrer only if there is competent evidence to support the material elements of the plaintiff's cause of action.  *Jackson v. Jones,* 1995 OK 131, ¶4, 907 P.2d 1067.

¶20   In order to ascertain whether the trial court erred in sustaining Father's demurrer to the evidence, this Court must determine if Petitioner met his burden to prove, beyond a reasonable doubt, that the continued custody of Child by Father is likely to result in serious emotional or physical damage to Child.  Evidence of this must include the testimony of a qualified expert witness.

9

¶21   At trial, Catherine Chalmers, a licensed marriage and family therapist and member of the Cherokee tribe, testified that she has been an expert witness many times in cases involving adoption and ICWA.

¶22   Ms. Chalmers testified that in her opinion, continued custody of Child by Father likely would result in severe emotional damage to Child.[3]   She based her opinion on attachment theory.   She explained that because of Father's drug and alcohol abuse, Child had not attached to Father during the one year and two months Father lived with him and Mother prior to the divorce.

¶23   Ms. Chalmers testified that if the adoption were not granted, and Father were to involve himself in Child's life, Child's attachment to him would cause Child to regress to the earlier development stage in order to recoup that attachment.   This regression would cause him serious damage.

¶24   Although Ms. Chalmers has never met Child, she stated that based on information provided her by Mother, she believes Child has formed healthy attachments with Mother and Petitioner.   She further stated that, according to the attachment theory, the successful attachments Child already has formed will help him have more successful relationships in the future.

---

[3]   Ms. Chalmers testified it was not likely that continued custody of Child by Father would result in serious physical damage to Child.

¶25   During cross-examination, Ms. Chalmers agreed with counsel that people can and do overcome the negative effects of an insecure attachment given the right circumstances.   To form attachments besides parental attachments, which Child has formed with Mother and to a degree with Petitioner, regression is not required.

¶26   Counsel stated that it had been suggested that Father is seeking "some kind of relationship" with Child.   He asked Ms. Chalmers what kind of relationship a parent would be seeking if he stated he wanted "some kind of relationship."

¶27   Ms. Chalmers responded that Father did not want a parental relationship with Child, but that he wanted Child to have knowledge of him. She testified, "[Father] wanted a relationship where [Child] knew who he was, knew that he cared about him, and that he was someone who felt for him, felt love for him, and he wanted him to have that awareness is what it was expressed early on in the time line, I believe."

¶28   Counsel asked if Ms. Chalmers could state "... with any degree of certainty that establishing some kind of relationship with [Father] is going to cause [Child] to suffer a regression."   She replied, "I'm uncertain about that, given both parties' willingness to do that."

¶29   After reviewing the record, this Court finds that Petitioner did not prove beyond a reasonable doubt that Father's continued custody of Child is likely to result in serious emotional damage to Child.   Therefore, we find the trial court's decision sustaining Father's demurrer to the evidence as to §1912(f) to be correct.   *Jackson v. Jones,* 1995 OK 131, ¶4.

¶30   Because this Court affirms the trial court's sustention of Father's demurrer to the evidence as to §1912(f), we find it is not necessary for us to consider also whether the trial court erred in sustaining Father's demurrer to the evidence as to §1912(d).

¶31   AFFIRMED.

BUETTNER, J., and BELL, J., concur.

12

**Exhibit C**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Margaret Tinsley, et al., | No. CV-15-00185-PHX-ROS |
| Plaintiffs, | **ORDER** |
| v. | |
| Gregory McKay, et al., | |
| Defendants. | |

Plaintiffs, minors in the custody of the Arizona foster care system, allege widespread systemic failures in state child welfare agencies "expos[e] them to . . . physical and emotional harm and unreasonable risk of harm" in violation of their constitutional rights. (Doc. 37 at 2). Defendants moved the Court abstain and dismiss the second amended complaint (the "complaint") pursuant to Federal Rule of Civil Procedure 12(b)(1) and the *Younger* and *O'Shea* abstention doctrines. (Doc. 41).

## BACKGROUND

According to the complaint, the number of children involved in foster care in Arizona has substantially increased since 2003. Consequently, as of September 30, 2014, 16,990 children were receiving out-of-home care through Arizona's foster care system. The complaint alleges the increases were precipitated by budget cuts affecting programs which provide in-home services to children and support services for families.

The complaint recounts in detail the experiences of the ten named Plaintiffs, children ranging from three to fourteen years of age in foster care custody. There are several common threads in their statements. All named Plaintiffs allegedly failed to

receive necessary physical and/or mental healthcare, were separated from siblings who were also in the foster care system, and experienced frequent relocations and school transfers. Many allegedly suffered ill-prepared, neglectful, and abusive foster parents and inattentive caseworkers. As a result, Plaintiffs allegedly became suicidal, including a 9-year-old child, suffered physical and mental trauma, and experienced significant educational disruption.

Plaintiffs claim their experiences were caused by a number of "structural and operational failures [which] continue to plague the state's child welfare system." (Doc. 37). These failures include: 1) a shortage of and inaccessibility to physical, mental, and behavioral health services; 2) widespread failure to conduct timely investigations of reports that children have been maltreated while in state foster care; 3) a shortage of family foster homes; and 4) widespread failure to engage in basic child welfare practices aimed at maintaining family relationships, such as placing siblings together, placing children with their biological parents on a trial reunification basis, coordinating visits between children in state foster care and their biological families, and having caseworkers make regular visits with the biological parents of children to monitor progress toward family reunification.

Defendants are the directors of three state agencies: Defendant Gregory McKay is Director of the Department of Child Safety ("DCS"), which is responsible for managing the state's child welfare system; Defendant Cara M. Christ is Director of the Department of Health Services ("DHS"), which provides mental and behavioral health services to children in the state foster care system; and Defendant Thomas J. Betlach is Director of the Arizona Health Care Cost Containment System ("AHCCCS"), which administers and supervises the state's Medicaid program. Plaintiffs maintain these individuals are responsible for administering the foster care system and they have been aware of but have failed to address the problems outlined in the complaint. Plaintiffs seek declaratory and injunctive relief for alleged violations of substantive due process rights under the

Fourteenth Amendment;[1] rights under the Medicaid Act;[2] and the right to family integrity under the First, Ninth, and Fourteenth Amendments.[3] The prayer for relief requests a permanent injunction barring Defendants from violating their rights, the establishment and implementation of policies and practices addressing each of the alleged violations, and appointment of a neutral expert to monitor progress and compliance.

Defendants move to dismiss the complaint because the Court allegedly lacks subject matter jurisdiction under Rule 12(b)(1), arguing the *Younger* and *O'Shea* abstention doctrines apply. Defendants maintain the foster children's ongoing dependency proceedings in the Arizona juvenile courts preclude the relief sought by Plaintiffs. However, Plaintiffs argue their claims rest solely on actions of the child welfare agencies and they are not challenging any aspect of any particular dependency proceeding. Preliminary background regarding Arizona juvenile courts and agencies is required.

**I. Role of Juvenile Courts**

In Arizona, "[a]ny interested party may file a petition to commence proceedings in the juvenile court alleging that a child is dependent." A.R.S. § 8-841. Typically, such a petition is filed by DCS after an investigation into the child's living conditions and removal of the child from the home. *See* A.R.S. §§ 8-222; 8-223. After a child is removed, the juvenile court holds a preliminary protective hearing to decide whether the child should remain in DCS's temporary custody pending a determination of dependency. A.R.S. § 8-824. The juvenile court then holds a dependency hearing to determine whether the child is in need of assistance or placement either because the child has no guardian

---

[1] Including, but not limited to, the right to protection from harm and unreasonable risk of harm while in state custody as a result of lack of medical care, failure to investigate mistreatment, and failure to provide adequate foster homes. (*See* Doc. 37 at 29).

[2] Specifically, the early and periodic screening, diagnostic, and treatment provisions. 42 U.S.C. § 1396a, *et seq.*

[3] Plaintiffs define the right to family integrity as including Plaintiffs' liberty interests, privacy interests, and associational rights under these amendments.

responsible for care or the guardian is unable to provide the necessary care. *See* A.R.S. § 8-844. If the child is determined dependent, the juvenile court "may enter orders awarding a dependent child," subject to the supervision of DCS, to the care of the parents or to another member of the child's family, or to an institution, association, agency (such as DCS), a school, an independent living program, or to a "reputable citizen of good moral character." A.R.S. § 8-845(A). In deciding where to place the child, the juvenile court must consider the goals of the placement and appropriateness of the case plan. A.R.S. § 8-845(B). The juvenile court is required to seek to reunite families, where possible, and order a permanency plan that maximizes the child's contact with siblings, either through co-placement or frequent visitation, unless doing so would not be in the child's best interest. A.R.S. § 8-845(C).[4] "[I]f the child has been removed from the home, the court shall order [DCS] to make reasonable efforts to provide services to the child and the child's parent." A.R.S. § 8-846(A).

After the dependency hearing, the juvenile court reviews the child's case every six months. A.R.S. § 8-447(A). The periodic review hearings are an opportunity for the juvenile court to reassess the well-being of the child, monitor progress toward the child's goals, and determine if the child continues to be dependent. A.R.S. § 8-847(D)-(E) ("At [the] periodic review hearing, the [juvenile] court shall consider the health and safety of the child as a paramount concern. . . . [and] shall determine[] [w]hether [DCS] has identified and assessed placement of the child with a relative or person who has a significant relationship with the child. . . . [and] [w]hether the [child's] guardian has complied with the court order . . . ").

At each six-month review, the court also determines whether the child's guardian has complied with court orders and whether the child is still dependent. A.R.S. § 8-447(D), (E). And the court has the authority to "punish a person for contempt of court for wilfully [sic] violating, neglecting or refusing to obey or perform any lawful order of

---

[4] Although the juvenile court ultimately approves and issues the permanency plan in the form of a court order, it appears the plan is created and presented to the court by DCS. *See* A.R.S. § 8-845(C).

- 4 -

the juvenile court or for obstructing or interfering with the proceedings of the juvenile court or the enforcement of its orders." A.R.S. § 8-247. Within twelve months of removal of a child older than three years, the juvenile court must hold a permanency hearing to determine the "most appropriate plan" for the child's permanent guardianship. A.R.S. § 8-862.

The six-month reviews are based on progress reports prepared and submitted by DCS, which must include:

> 1. An assessment of the extent to which the division or agency is accomplishing the purpose of foster care for the child as described in the case plan.
> 2. An assessment of the appropriateness of the case plan.
> 3. The length of time the child has been in foster care.
> 4. The number of foster home placements the child has experienced while in foster care and the length of each placement.

A.R.S. § 8-516(E). At each six-month review, the juvenile court also receives findings and recommendations from a local foster care review board; and the court must address these findings and recommendations on the record.[5] A.R.S. § 8-515.03.

## II. Role of Child Welfare Agencies

DCS's "primary purpose . . . is to protect children." A.R.S. § 8-451(B). It is charged with placing children in safe living environments and coordinating with DHS, AHCCCS, and others to provide children with court-ordered healthcare and other services aimed at promoting the safety and well-being of all children. *See* A.R.S. §§ 8-451(B)(2), (4); 8-457; 8-512.

If the juvenile court assigns custody of a removed child to DCS, the agency may

---

[5] The local foster care review board consists of at least five members appointed by the presiding judge of the juvenile court in each county. A.R.S. § 8-515.01(A) ("Each board shall, to the maximum extent feasible, represent the various socioeconomic, racial and ethnic groups of the county in which it serves."). These boards also report to the court the progress of DCS and child welfare agencies in carrying out orders of the court and "[p]romote and encourage" the agencies to "maximize stability and family continuity for children in foster care by discouraging unnecessary changes in the placement of foster children and by recruiting foster parents who may be suitable and eligible as adoptive parents." A.R.S. § 8-515.03.

subsequently place the child with a parent or relative, in a licensed foster home, therapeutic foster care, group home, or a residential treatment facility. A.R.S. § 8-514(A), (B). DCS and its subdivisions determine the eligibility and licensing procedures for foster parents and foster homes and maintain responsibility for providing training and supervision of such homes. A.R.S. §§ 8-503(4)(b)-(h); 8-509; 8-516. DCS is responsible for investigating all allegations and risks of harm involving children, including those in foster homes. *See* A.R.S. §§ 8-503(4)(h)(i); 8-453(A)(19); 8-456. And DCS may deny an application, suspend, or revoke a foster parent's license for violations of state statutes governing child welfare. A.R.S. § 8-506. If the agency decides to extend a child's stay in a foster home for more than three weeks, it must obtain the approval of the juvenile court. A.R.S. § 8-515(A).

DCS may remove a child from a foster home without prior court approval. A.R.S. § 8-515.05(A). *See also* A.R.S. § 8-517 ("The division or agency that placed the child may withdraw a child from a foster home [] when the division or agency determines that withdrawal is according to written, specific standards and is clearly necessary for the child's interests and welfare."). If a foster parent disagrees with the removal, the parent can challenge it at a case conference before the juvenile court and members of a foster care review board. A.R.S. § 8-515.05(B), (C). If, at the conclusion of the case conference, both sides still disagree and the child is currently in the physical custody of the foster parent, a member of the foster care review board is required to make a recommendation to the court and the court then decides whether the physical custody should change. A.R.S. § 8-515.05(D).

If a child has been removed from the home, DCS must "make reasonable efforts to place that child with the child's siblings or, if that is not possible, to maintain frequent visitation or other ongoing contact between the child and the child's siblings unless a court determines . . . [either] would be contrary to the child's or a sibling's safety or well-being." A.R.S. § 8-513(D). A child in foster care also has a "right to maintain contact with friends and other relatives unless the court has determined that contact is not in the

child's best interests." A.R.S. § 8-513(C).

For all children in voluntary placement, DCS custody, or custody of the probation department, DCS collaborates with DHS and AHCCCS to "provide comprehensive medical and dental care," A.R.S. § 8-512(A), and to "determine the most efficient and effective way to provide [that care]." A.R.S. § 8-512(B).

## ANALYSIS

### I. Legal Standard for Rule 12(b)(1) Motion and Request to Abstain

Plaintiffs describe Defendants' motion as presenting a "facial" rather than "factual" challenge to the Court's jurisdiction. *Courthouse News Serv. v. Planet*, 750 F.3d 776, 780 (9th Cir. 2014). Defendants do not contest this characterization. Assuming it is accurate, the Court must accept the allegations in the complaint "as true and draw[] all reasonable inferences in [Plaintiffs'] favor." *Leite v. Crane Co.*, 749 F.d 1117, 1121 (9th Cir. 2014). "Once challenged, the party asserting subject matter jurisdiction has the burden of proving its existence." *Rattlesnake Coal. v. E.P.A.*, 509 F.3d 1095, 1102 n. 1 (9th Cir. 2007). Therefore, accepting Defendants' motion as framed by Plaintiffs, it is Plaintiffs' burden to establish abstention is not required or should not be granted.

Though not raised by the parties, the Court notes that there is debate about whether invoking abstention is a challenge to federal jurisdiction.[6] Typically this matters because the party bearing the burden may differ depending on how the challenge is categorized. For example, unlike a challenge to jurisdiction, the Second Circuit has noted

---

[6] The Ninth Circuit, like the Supreme Court, has alternatively described abstention as jurisdictional and not jurisdictional. *Compare Canatella v. California*, 404 F.3d 1106, 1113 (9th Cir. 2005) ("*Younger* abstention is essentially a jurisdictional doctrine.") *with Benavidez v. Eu*, 34 F.3d 825, 829 (9th Cir. 1994) ("*Younger* abstention is *not* jurisdictional, but reflects a court's prudential decision not to exercise jurisdiction which it in fact possesses . . . ."). *Compare Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. 619, 626 (1986) (explaining *Younger* abstention "does not arise from lack of jurisdiction in the District Court, but from strong policies counseling against the exercise of such jurisdiction where particular kinds of state proceedings have already been commenced") *with Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 100 n.3 (1998) (noting Supreme Court has treated *Younger* abstention as "jurisdictional"). *See also* Erwin Chemerinsky, *Federal Jurisdiction* § 13.2, at 828-829 (5th ed. 2007) (noting lack of clarity regarding whether *Younger* "announce[d] a constitutional bar to federal court relief" or a prudential one).

a defendant bears the burden of establishing one of the prerequisites for abstention. *Philip Morris, Inc. v. Blumenthal*, 123 F.3d 103, 106 (2d Cir. 1997) (placing burden on the state to establish *Younger* abstention). In this case, however, determining precisely who bears the burden of proof is unnecessary because the result is the same even assuming the burden of proof rests solely with Plaintiffs.

## II. *Younger* and *O'Shea* Abstentions

The motion to dismiss invokes two closely related abstention doctrines: abstention under *Younger v. Harris*, 401 U.S. 37 (1971), and abstention under *O'Shea v. Littleton*, 414 U.S. 488 (1974). These two doctrines will be analyzed separately, but the background for both begins with the recognition that federal courts have a "virtually unflagging" obligation to exercise the jurisdiction given to them by Congress and the Constitution. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) ("Abstention from the exercise of federal jurisdiction is the exception, not the rule."). Only in unusual instances do principles of comity in relation to state courts warrant federal court abstention. *See generally Younger v. Harris*, 401 U.S. 37 (1971).

### A. Background of *Younger* and Its Progeny

In *Younger v. Harris*, the Supreme Court held a federal court could not enjoin a pending state court criminal prosecution absent extraordinary circumstances, namely bad faith or harassment. 401 U.S. 37, 41, 54 (1971) ("[N]ational policy forbid[s] federal courts [from] stay[ing] or enjoin[ing] pending state court proceedings *except under special circumstances*.") (emphasis added). The "underlying reason" for the ruling was:

> [T]he notion of "comity," that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.

*Id.* at 44.

*Younger* doctrine has both expanded and contracted over the years. In *Huffman v. Pursue, Ltd.*, the Supreme Court extended *Younger* doctrine to a state civil enforcement

proceeding. 420 U.S. 592 (1975). The decision was based, in part, on the Court's finding that the state proceedings were "in important respects [] more akin to a criminal prosecution than are most civil cases" because the state was a party to the action and the nuisance statute involved was closely related to criminal statutes on obscenity.[7] *Id.* at 604-605 ("[W]hile in this case the District Court's injunction has not directly disrupted Ohio's criminal justice system, it has disrupted that State's efforts to protect the very interests which underlie its criminal laws and to obtain compliance with precisely the standards which are embodied in its criminal laws.").[8]

The Supreme Court has also classified "the temporary removal of a child *in a child-abuse context*" as a state proceeding "in aid of and closely related to criminal statutes." *Moore v. Sims*, 442 U.S. 415, 423 (1979) (citing *Huffman*, 420 U.S. at 604) (emphasis added). In *Moore*, the Court characterized *Huffman* as standing for the proposition that *Younger* applied to "civil proceedings in which important state interests are involved." *Id.* at 423. The importance of a state's interest in a particular proceeding may be due to the state's presence as a party; the statute or executive action involved is "in aid of and closely related to [state] criminal statutes"; "the presence of such other vital concerns as enforcement of contempt proceedings"; "or the vindication of 'important state policies such as safeguarding the fiscal integrity of [public assistance] programs.'" *Id.* Even if one of these factors applies, however, the Supreme Court held abstention is only proper if the plaintiff will be able "to press his claim in the state courts." *Id.* at 432.

In *Juidice v. Vail*, the Supreme Court once again clarified and expanded *Younger*,

---

[7] The civil statute in question provided for the closure of any place which exhibited obscene films pursuant to nuisance law, while other state criminal statutes prohibited the dissemination of obscene materials. *Id.* at 596, 604.

[8] The Supreme Court clarified that *Younger* abstention applies both to pre- and post-trial state court proceedings where a litigant has not yet exhausted state appellate remedies. *Id.* at 609 ("Federal post-trial intervention, in a fashion designed to annul the results of a state trial, also deprives the States of a function which quite legitimately is left to them, that of overseeing trial court dispositions of constitutional issues which arise in civil litigation over which they have jurisdiction.").

holding the "principles . . . [were] not confined solely to the types of state actions which were sought to be enjoined in [*Younger* and *Huffman*], . . . [but that] the 'more vital consideration' . . . [lay] in 'the notion of 'comity,' . . . [and that] [t]hese principles apply to a case in which the State's contempt process is involved." 430 U.S. 327, 334-335 (1977). The plaintiffs in *Juidice* had been held in contempt by state court judges for disobeying subpoenas to appear at proceedings brought by their creditors in an attempt to collect a judgment. The debtors brought a class action in federal court seeking to enjoin enforcement of the statutes granting state courts the power of contempt, arguing the statutes violated the Fourteenth Amendment. *Id.* at 329-330. In holding *Younger* precluded the injunction, the Court reasoned:

> A State's interest in the contempt process, through which it vindicates the regular operation of its judicial system, so long as that system itself affords the opportunity to pursue federal claims within it, is surely an important interest. Perhaps it is not quite as important as is the State's interest in the enforcement of its criminal laws, *Younger*, [] or even its interest in the maintenance of a quasi-criminal proceeding such as was involved in *Huffman*[]. But we think it is of sufficiently great import to require application of the principles of those cases. The contempt power lies at the core of the administration of a State's judicial system.

*Id.* at 335.

The Supreme Court later summarized *Younger* jurisprudence as applying to three types of cases: 1) criminal proceedings; 2) quasi-criminal proceedings; and 3) "proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 368 (1989) *(NOPSI)*.

But in *NOPSI*, the Supreme Court emphasized a limitation of the *Younger* doctrine material to this case: It does not "require[] abstention in deference to a state judicial proceeding reviewing legislative or executive action. [As] [s]uch a broad abstention requirement would make a mockery of the rule that only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States." *Id.*

- 10 -

Not long after *NOPSI*, in *Middlesex County Ethics Committee v. Garden State Bar Association*, the Court further identified three factors that together warrant abstention: 1) "an ongoing state judicial proceeding"; 2) which "implicate[s] important state interests"; and 3) in which "there [is] an adequate opportunity . . . to raise constitutional challenges." 457 U.S. 423, 432 (1982). For many years, lower courts treated these factors as the established test for *Younger* abstention. However very recently, in *Sprint Communications Inc. v. Jacobs*, the Supreme Court made clear that the three factors enumerated in *Middlesex* are actually *additional* factors to be considered once a court establishes the ongoing state proceeding is quasi-criminal in nature. 134 S. Ct. 584, 593 (2013) ("Divorced from their quasi-criminal context, the three *Middlesex* conditions would extend *Younger* to virtually all parallel state and federal proceedings, at least where a party could identify a plausibly important state interest.").

Thus, *Sprint* arguably narrowed the application of *Younger* abstention. In doing so, the Supreme Court emphasized *Younger* is "exceptional," that federal courts have an overarching duty to "entertain and resolve on the merits [actions] within the scope of a jurisdictional grant," and the "general rule" that "[t]he pendency of an action in [a] state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." 134 S. Ct. 584, 588 (2013) (citations and internal quotation marks omitted). Once again, the Supreme Court established "*Younger* extends [only] to [] three 'exceptional circumstances'": 1) ongoing state criminal prosecutions; 2) ongoing state civil enforcement proceedings; and 3) ongoing state civil proceedings involving certain orders uniquely in furtherance of state courts' ability to perform judicial functions. *Id.* at 594.

Following *Sprint*, the Ninth Circuit held *Younger* abstention is appropriate in civil cases "only when the state proceedings: (1) are ongoing, (2) are quasi-criminal enforcement actions or involve a state's interest in enforcing the orders and judgments of its courts, (3) implicate an important state interest, and (4) allow litigants to raise federal challenges." *ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund*, 754 F.3d 754, 759

(9th Cir. 2014). Once these threshold requirements are met, the Ninth Circuit considers a fifth issue involving abstention; that is, whether "[t]he requested relief [] seek[s] to enjoin—or ha[s] the practical effect of enjoining—ongoing state proceedings." *Id.* at 758. Accordingly, while the test for invoking *Younger* abstention has varied over time, it is now clearly established that analysis of each factor in relation to the facts alleged in the complaint is required.

## B. Whether *Younger* Applies to the Present Case

Defendants contend *Younger* requires abstention in this case pursuant to the two categories of civil cases to which the doctrine applies. They argue the injunctive relief Plaintiffs seek would interfere with the state juvenile court's ability to perform its judicial functions *and* that the case is related to ongoing proceedings in the state juvenile court which are quasi-criminal in nature. Plaintiffs maintain *Younger* abstention is not required because the relief sought is "systemic" in nature and targets state agencies, not the juvenile court.

### i. There are ongoing state court proceedings.

In order for *Younger* to apply, Plaintiffs must be involved in an ongoing state court proceeding. Defendants argue each named Plaintiff and putative class member is presently involved in an ongoing, individual juvenile court proceeding. Plaintiffs do not appear to dispute they are *subject* to the ongoing oversight of the juvenile courts. This Court then will assume the juvenile courts ongoing jurisdiction over dependent children and case-by-case periodic review hearings satisfy the first prong of *Younger*. *See* A.R.S. §§ 8-202(G); 8-447.

### ii. The ongoing state court proceedings are not quasi-criminal nor do they involve Arizona's interest in enforcing orders of its courts.

The next step is to determine whether the proceedings are either quasi-criminal or involve the state's interest in enforcing the orders of its courts. If the state court proceedings do not fall into either one of these two categories, *Younger* abstention is not appropriate. Defendants argue the juvenile court proceedings satisfy both categories

- 12 -

while Plaintiffs argue they satisfy neither.

### a. Quasi-Criminal

Defendants argue the proceedings are quasi-criminal because the juvenile court has "substantial and continuous *exclusive* authority in *all* aspects of child dependency cases," including those involving child abuse. (Doc 49 at 5). Plaintiffs argue the ongoing state court proceedings are not quasi-criminal because their purpose is to review executive action and not enforce criminal laws.

Defendants primarily rely on *Moore v. Sims*, in which the Supreme Court held proceedings ordering the temporary removal of children in the context of alleged child-abuse were quasi-criminal. 442 U.S. 415, 423 (1979). The *Moore* Court did not clarify the reasoning behind this decision other than to state: "the State [] was a party . . . [and] the temporary removal of a child in the child-abuse context is, like the public nuisance statute involved in *Huffman*, 'in aid of and closely related to criminal statutes.'" *Id.*

But in a class action on behalf of Massachusetts' foster children, *Connor B. ex rel. Vigurs v. Patrick*, a district court distinguished *Moore*, holding:

> Defendants' argument fails to appreciate that Plaintiffs' claims relate only to alleged injuries suffered while in [Massachusetts' Department of Children and Families ("DCF")] custody. [P]roceedings [whereby juvenile courts place children in state custody due to abuse or neglect by their parents] are the means by which Plaintiffs enter DCF custody, and Plaintiffs expressly state that they are not challenging any aspect of those proceedings in this case.

771 F. Supp. 2d 142, 154 (D. Mass. 2011).

Like the Massachusetts case, this case does not concern temporary removal proceedings but rather involves, to some extent, periodic review hearings which take place once a child is determined dependent and placed in state custody. In Arizona, proceedings to remove a child from the familial home and periodic reviews while in state custody are distinct. They are governed by different provisions of state law.[9] And the

---

[9] Removal proceedings are governed by Chapter 9 and periodic reviews by Chapter 10 of Title 8, Article 4 of the Arizona Revised Statutes.

- 13 -

procedures for affecting the temporary removal of a child in Arizona do not involve a finding of dependency.[10] *See* A.R.S. § 8-821. While the six-month status reviews only take place if a child has been determined dependent by the juvenile court. *See* A.R.S. § 8-841 *et seq.*

Although many of the children in the putative class may have entered the foster care system amid circumstances of abuse and neglect prohibited by the criminal law, as in the Massachusetts case, the complaint addresses the experiences children have after they are determined dependent and placed in state custody, not the proceedings which led to that custody. In *Moore*, by contrast, the state court proceeding was an emergency removal of children due to allegations of abuse. The proceedings had been and were ongoing because the children had only been removed on a temporary basis, pending further findings. The state court proceedings in *Moore* were not those described here.

The animating purpose of the ongoing dependency proceedings in this case is to plan for and monitor the development and well-being of children, not to investigate or penalize those who might have contributed to their dependency. A.R.S. § 8-847(D) ("At any periodic review hearing, the court shall consider the health and safety of the child as a paramount concern"). The type of proceedings here employs a conciliatory approach. In addition to representatives from state child welfare agencies, parents,[11] relatives, foster parents, shelter care facility personnel, and others are invited to participate in the review proceedings and share their views on the child's best interest. A.R.S. § 8-847(B).

---

[10] In Arizona, the temporary removal of a child may be affected in one of two ways. First, an interested person may petition the juvenile court for an order by stating, under oath, "reasonable grounds exist to believe that temporary custody is clearly necessary to protect the child from suffering abuse or neglect." A.R.S. § 8-821(A). Second, a peace officer, a child welfare investigator, or a child safety worker may take a child into temporary custody without an order from the juvenile court "if temporary custody is clearly necessary to protect the child because probable cause exists to believe that the child is: 1. A victim or will imminently become a victim of abuse or neglect[; or] 2. Suffering serious physical or emotional injury that can only be diagnosed by a medical doctor or psychologist[; or] 3. Physically injured as a result of living on premises where dangerous drugs or narcotic drugs are being manufactured[;] . . . [or] 4. Reported by the department to be a missing child at risk of serious harm." A.R.S. § 8-821(B). Children may not remain in temporary custody for more than 72 hours. A.R.S. § 8-821(F).

[11] As long as they have not relinquished or had their parental rights terminated.

Although the state is a party in the proceedings and is responsible for investigating children's circumstances and is required to produce a report for the court, the state's investigations and reports are not prepared for the primary or secondary purpose of enforcing criminal laws. *See* A.R.S. § 8-516(E). In sum, periodic reviews differ from emergency removals like the one at issue in *Moore*, where an immediate threat of criminal harm warranted the removal of children from the custody of the parents without a hearing. Rather, the juvenile court reviews here have an indirect relationship to the enforcement of criminal laws. They do not qualify as quasi-criminal for purposes of *Younger*.

### b. State Interest in Enforcing State Court Orders and Judgments

Even if the state court proceedings satisfactorily establish they are not quasi-criminal in nature, *Younger* abstention may apply if the proceedings involve the state's interest in enforcing the orders and judgments of its courts. Defendants argue the equitable relief Plaintiffs seek would interfere with the juvenile courts' determinations of foster children's placements, visitation, and health care services, as well as its power to enforce its own orders through contempt proceedings. Defendants cite references in the complaint to instances in which state agencies have allegedly failed to comply with juvenile court orders and Defendants maintain: "[T]he remedy for non-compliance with a *state* court judgment is contempt of *state* court, not a statewide class action in federal court." (Doc. 41 at 21) (emphasis in original). Plaintiffs argue this suit does not implicate orders uniquely in furtherance of the state court's ability to perform its judicial functions because reversal or challenge of court orders is not sought here.

In order to determine whether this action implicates or would interfere with the ability of state courts to perform judicial functions, the Court looks to the specific relief sought in the complaint. *See generally Gilbertson v. Albright*, 381 F.3d 965 (9th Cir. 2004) (discussing development of *Younger* from suits involving equitable relief to those involving declaratory and monetary relief). Plaintiffs seek an order directing Defendants

to establish and implement broad and comprehensive practices to ensure:

1. "[Foster children] receive the physical, mental and behavioral health services to which they are entitled" pursuant to substantive due process and the Medicaid Act;

2. "[A] minimally adequate capacity and array of [foster care] placements";

3. "[M]inimally adequate visitation between [family] members";

4. "[M]inimally adequate investigation into reports . . . [of] abuse[] or neglect[]";

5. "[M]inimally adequate caseworker visits with the biological parents . . . and for involvement of such parents in the case planning. . . ."

(Doc. 37 at 51-52). Plaintiffs also seek the appointment of a neutral monitor and the Court's continued oversight over compliance with its order of enforcement.

Plaintiffs argue the complaint targets only executive functions of Defendants' agencies, not the judicial functions of the juvenile courts. Therefore, abstention is not required relying on *NOPSI*. In *NOPSI*, the Supreme Court held *Younger* does not "require[] abstention in deference to a state judicial proceeding reviewing legislative or executive action." *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans (NOPSI)*, 491 U.S. 350, 368 (1989). Several district courts addressing the issue of whether a federal foster care class action interferes with ongoing state court dependency proceedings have similarly relied on *NOPSI*. *See, e.g.*, *M.D. v. Perry*, 799 F. Supp. 2d 712, 718 (S.D. Tex. 2011). Those courts have generally held complaints seeking relief from systemic problems in state foster care agencies "aid the ongoing state proceedings [in juvenile court], [and do] not interfere with them." *Id.* at 720. *See also Kenny A. ex rel. Winn v. Perdue*, 218 F.R.D. 277, 286 (N.D. Ga. 2003) ("Although plaintiffs all have periodic reviews before the state juvenile courts, the declaratory and injunctive relief plaintiffs seek is not directed at their review hearings, or at Georgia's juvenile courts, juvenile court judges, or juvenile court personnel. Rather, plaintiffs seek relief directed solely at *executive* branch defendants to remedy their alleged failures as plaintiffs' custodians.") (emphasis in original); *Dwayne B. v. Granholm*, No. 06-13548, 2007 WL 1140920, at *6 (E.D. Mich. Apr. 17, 2007) ("While it is true that Michigan has in place a

juvenile court system that sets out procedures for bringing and maintaining a child under that court's jurisdiction and there may be some ongoing juvenile court proceedings for individual foster care children, this lawsuit does not seek to interfere with any such proceedings. The relief sought here is not directed at the juvenile courts. It is directed at the executive branch.").[12]

In fact, the Ninth Circuit has specifically recognized the absence of inherent interference from a federal class action brought against the director of Arizona's executive agency in charge of foster care and proceedings before the Arizona juvenile court. In *L. H. v. Jamieson*, a class of juveniles "adjudged dependent, neglected or delinquent by Arizona state courts . . . [and] placed in private, child-caring facilities" sought declaratory and injunctive relief seeking additional funding for the private agencies caring for them while in state custody. 643 F.2d 1351 (9th Cir. 1981). Reversing the district court's decision to abstain under *Younger*, the court held "an order that would require Arizona to spend more money to fund dispositional alternatives for juveniles in state custody" may "affect pending and ongoing state juvenile proceedings" to the extent of "enrich[ing the variety of dispositional alternatives available to a juvenile court judge" but it would not "have the wholly disruptive consequences associated with enjoining a state judicial proceeding." *Id.* at 1354.[13]

Defendants also claim the prayer for relief is "artful pleading." They insist the allegations in the complaint tell a different story about the aims of the requested relief

---

[12] Although these cases were decided before *Sprint*, in applying the *Middlesex* factors, the courts essentially addressed the question the Supreme Court articulated in *Sprint*: whether the federal suit would interfere "with pending civil proceedings involving certain orders . . . uniquely in furtherance of the state courts' ability to perform their judicial functions." *Id.* at 586 (internal quotation marks and citation omitted). These rulings are relevant and consistent with *Sprint* because their analysis of interference involves many of the same factors considered in determining whether state court proceedings involve the state's interest in and ability to enforce the orders of courts.

[13] The Court is cognizant the question under this prong of *Younger* is not whether the federal case would "have the wholly disruptive consequences associated with enjoining [the] state judicial proceeding" but whether the federal suit would interfere with the functioning of the state court.

- 17 -

and ask the Court to use those allegations as the basis for an examination under *Younger*. Defendants argue Plaintiffs claims of harm coupled with allegations of frequent transfers between foster homes, placements far from family members, lack of visitation between children and family members, and more demonstrate the ultimate goal of interfering with the juvenile courts' power over placements, visitation, and health services through a federal court order. But this argument ignores the standard articulated in *31 Foster Children v. Bush*, a case Defendants otherwise cite as authority. 329 F.3d 1255 (11th Cir. 2003). Again, there the court held a court must "look to the relief requested and the effect it would have on the state proceedings," not the allegations in the complaint, to determine whether the federal action would interfere with the state court's proceedings. *Id.* at 1276 (citing *O'Shea v. Littleton,* 414 U.S. 488, 499–502 (1974)) (plaintiffs in *Foster Children* sought a district court-appointed panel with "authority to implement a systemwide plan to revamp and reform dependency proceedings in Florida, as well as the appointment of a permanent children's advocate to oversee that plan."). Furthermore, although the complaint includes anecdotal evidence from individual children's cases, these are examples of the alleged broader phenomena the complaint describes and for which its relief is requested.

Defendants also argue the juvenile court system of today bears no resemblance to the system in 1981, the year *Jamieson* was decided. It is alleged the legislature has since greatly expanded the juvenile courts' role in deciding children's placement, visitation, and health services. But even under today's statutes, although the juvenile courts can and do order DCS, its subdivisions, and related agencies to provide children with placements, visitation, and healthcare services, they do not have jurisdiction to monitor, or, more important, control how the agencies are organized to provide these services. In other words, the juvenile courts rule on individual cases, not how to remedy deficiencies in the overall administration of foster care. As such, the requested relief would not interfere with the functioning of the juvenile courts. *See M.D. v. Perry*, 799 F. Supp. 2d 712, 719 (S.D. Tex. 2011) ("Plaintiffs seek broad injunctive and declaratory relief aimed at

improving the Texas foster care system as a whole, not to interrupt, alter, or in any other manner change a particular state court placement review decision.").

The Court will examine each aspect of Plaintiffs' requested relief to ensure it concerns *systemic* problems not individual cases.[14]

*Placement:* Defendants claim "Arizona law mandates that juvenile courts make all placement decisions for dependent children." (Doc. 41 at 8, 16). However, though the juvenile court "may" order the placement of a child following a determination of dependency, Arizona law permits DCS under some circumstances to place children in foster homes subject only to ratification by the juvenile court. *See* A.R.S. § 8-514 ("[DCS] or a licensed child welfare agency if so authorized in its license may place a child in a licensed foster home for care or for adoption."); *Antonio P. v. Arizona Dep't of Econ. Sec.*, 218 Ariz. 402, 404 (Ct. App. 2008) (discussing the authority of the juvenile court to ratify or alter a foster placement). DCS does not need prior court approval to change a placement unless the change is challenged by a third party. *See* A.R.S. § 8-515.05 (statute governing challenges by foster parents to removal of foster children from their care). DCS also determines the eligibility and licensing procedures for foster homes and is responsible for supervising those homes. A.R.S. §§ 8-503(4)(b)-(h); 8-509; 8-516. DCS may deny an application, suspend, or revoke a foster parent's license for violations of state statutes governing child welfare. A.R.S. § 8-506.

The request by Plaintiffs for "practices to ensure a minimally adequate capacity and array of placements" by DCS does not interfere with the juvenile courts' authority or

---

[14] Defendants' reliance on *Peterson v. Babbitt*, decided two years after *Jamieson*, is misplaced. 708 F.2d 465 (9th Cir. 1983). In *Peterson*, a father brought suit in federal court alleging state child welfare agencies violated his constitutional rights by depriving him of visitation with his children. *Id.* Thus, the father was requesting relief from a single decision of the child welfare agencies expressly subject to the juvenile court's jurisdiction and review. By contrast, Plaintiffs are not challenging particular decisions directly applicable in the juvenile court. The executive practices Plaintiffs challenge, for example, include not having effective systems in place to provide children with necessary care. Although one could, in the course of a dependency proceeding, ask a juvenile court to review a *specific* agency decision regarding an individual child, the role of the court in that specific instance would be to evaluate the constitutionality of the decision but not the constitutionality of the agency's overall operating procedures, which affect all children in state custody.

ability to order initial child placements or to review the adequacy of placements. (Doc. 37). As such, the requested injunctive relief is not aimed at controlling the ultimate placement of individual children in a foster home. Those individual decisions are within the sole purview and oversight of the juvenile courts. This case focuses on DCS's processes for acquiring, screening, and licensing foster homes and its provision of enough foster homes to house children entrusted to its care. The decision of the Court will not disrupt individual placements or specific foster homes. *See Sam M. ex rel. Elliott v. Chafee*, 800 F. Supp. 2d 363, 380 (D.R.I. 2011) (holding "increase[ing] the array and types of available placements, are not within the province of the Family Court, although they would assist in implementing the Family Court's orders. [And] [w]ith respect to those measures, 'the mere possibility of inconsistent results in the future is insufficient to justify *Younger* abstention.'").

*Visitation:* Defendants argue because the juvenile courts have "broad discretion" to hear and decide issues of visitation, abstention is required. (Doc. 41 at 9, 17). The relief requested by Plaintiffs is for "DCS [to] establish . . . practices providing for minimally adequate visitation between [family] members." (Doc. 37).

DCS has an obligation to facilitate visitation between children, their siblings, and other family members, as long as the juvenile court has not declared it against the best interest of the child. A.R.S. § 8-613(C)-(D). In keeping with this obligation, the permanency plan ordered or approved by the juvenile court at the disposition hearing must "take[] into consideration the placement of the child with siblings or [] provide[] for frequent visitation or contact between siblings unless the court determines that either . . . would be contrary to the child's or a sibling's safety or well-being." A.R.S. § 8-845(C).

The complaint does not allege Defendants or the juvenile courts fail to include family visits in case plans. Rather, it discusses "poor performance in *coordinating* family visits" and the "475 families waiting for such visitation services." (Doc. 37 at 46) (emphasis added). Like systems for ensuring the availability of enough quality placements for foster children, creating systems for effectively coordinating visitation for

foster children and their families does not require ordering visitation in individual cases. An injunctive order addressing the broad-based issues described in the complaint would focus on the resources available for facilitating visitation already deemed appropriate by DCS and the juvenile courts.

*Healthcare Services:* Defendants likewise argue the juvenile courts have "day-to-day oversight" over the health care of foster children and, as such, the request for relief concerning health care services requires abstention. (Doc. 41 at 9, 17-18). Plaintiffs seek an order directing DCS, DHS, and AHCCCS to "establish and implement practices to ensure that all members of the [putative class] receive the physical, mental and behavioral health services to which they are entitled" under substantive due process and the Medicaid Act. (Doc. 37).

Defendants are presently obligated to provide foster children with a variety of healthcare services. And the juvenile courts may order additional services not specifically required by law, but which address the unique needs of a child serve the purpose of providing for the safety and best interest of the child. Juvenile courts may, in their discretion, order the parent, guardian or custodian of a child who "appears to be in need of medical or surgical care" to provide treatment for a child. A.R.S. § 8-245(A). "If the parent, guardian or custodian fails to provide the care as ordered, the juvenile court may enter an order therefor." A.R.S. § 8-245(A). The juvenile courts are also responsible for approving motions for psychiatric assessments and residential treatment services.  A.R.S. § 8-272(F), (D); A.R.S. § 8-273(A). DCS, DHS, and AHCCCS are also responsible not only for complying with orders from the juvenile courts, but also for independently planning and providing programs and services to protect the health and safety of Arizona children. *See* A.R.S. § 8-457. Specifically, DCS is obligated to provide "comprehensive medical and dental care" for foster children and to collaborate with DHS and AHCCCS to find the most effective way of delivering that care as well as behavioral health services. A.R.S. § 8-512(A)-(C). The agencies are also responsible for creating a system for identifying, licensing, and paying healthcare providers. A.R.S. § 8-512(D)-(K).

The requested relief concerns the systems for facilitating the provision of care already deemed necessary by Defendants and the juvenile courts. DCS and its related agencies are responsible for creating a system for effectively delivering care. This includes licensing and funding quality healthcare providers in a way that is similar to DCS's responsibilities regarding provision of foster homes. Defendants have presented no evidence the juvenile courts play a specific role in directing or monitoring those functions. An injunction directed towards the establishment and implementation of practices to ensure children receive healthcare services to which they are entitled does not require deciding an entitlement, but rather the delivering of entitled services.

*Investigating Abuse and Caseworker Contact:* Defendants make no claims regarding the request for relief aimed at investigating abuse and neglect or providing greater contact between caseworkers and biological parents, and these provisions involve no clear conflict or interference with the juvenile courts.

*Power of Contempt:* Defendants claim the relief sought targets compliance with juvenile court orders and as such interferes with the power of contempt and the ability of the court to enforce its orders. Defendants refer to instances in the complaint in which a juvenile court found lack of reasonable efforts to comply with orders as evidence that the requested relief would impose oversight over compliance with juvenile court orders. But the relief sought does not involve monitoring compliance with individual orders of the juvenile courts. Rather, the goal of the proposed relief is to oversee macro-level systems, which may involve overall rates of placement, visitation, and services. Furthermore, the purpose of the oversight is not to pinpoint individual cases of noncompliance for federal court intervention, but rather to implement system-wide remedial measures to help cure alleged chronic, widespread failures.

Defendants have not pointed to instances in which the juvenile courts have been involved with rooting out systemic causes of repeated agency failures. Nor do Defendants cite statutes imposing a duty on the courts to engage in such agency intervention. This type of federal oversight would not interfere with the functioning of the juvenile courts,

1  including the power of contempt. *See M.D. v. Perry*, 799 F. Supp. 2d 712, 720 (S.D. Tex.

2  2011) ("As this lawsuit focuses on systemic problems and seeks systemic solutions, it

3  would not 'duplicate' the individualized reviews that occur in the state courts.").

4        It is worth noting *Juidice v. Vail*, the case in which the Supreme Court first spoke

5  of the contempt power of a state court as grounds for *Younger* abstention, was a direct

6  challenge to the power of contempt. 430 U.S. 327 (1977). The plaintiffs in *Juidice* sought

7  specifically to invalidate a state statute which gave the state court the power of contempt.

8  The plaintiffs also sought to enjoin pending contempt proceedings. *Id.* In contrast to

9  *Juidice*, the potential interference Defendants posit with respect to the present lawsuit is

10 hypothetical.[15]

11       *Retroactive Effect:* Defendants express concern that any finding of past

12 constitutional violations by DCS, DHS, or AHCCCS could result in demands for

13 reversals or modifications of specific juvenile court orders in 16,990 pending dependency

14 proceedings. (Doc. 49 at 11). Defendants rely on *E.T. v. George*, 681 F. Supp. 2d 1151,

15 1172 (E.D. Cal. 2010). In *E.T.*, a class of dependent children brought an action alleging

16 attorney and judicial caseloads in dependency courts were excessive and violated federal

17 and state constitutional and statutory provisions by frustrating "the ability of the courts to

18 adjudicate and provide children with a meaningful opportunity to be heard and the

19 effective, adequate, and competent assistance of counsel." *Id.* The court concluded, "[t]he

20 requested declaratory relief call[ed] into question the validity of every decision made in

21 pending and future dependency court cases before the resolution of this litigation" and

22 stated it "[could not] overlook the practical impact of the proposed declaratory relief on

23 the *5,100 active dependency court cases*" in which the court predicted parties would seek

---

[15]  In those instances in the complaint in which a juvenile court found noncompliance with an order, there is no indication the court exercised its power of contempt. (*See, e.g.*, Doc. 37 at 16-17). Rather, the complaint states, in some instances, the juvenile court merely re-ordered the same relief previously directed. (Doc. 37 at 16-17). The Court "cannot overlook the practical impact of the proposed [] relief," which, here, would not interfere with the functioning of the juvenile court. *Cf. E.T. v. George*, 681 F. Supp. 2d 1151, 1172 (E.D. Cal. 2010).

to invalidate prior decisions by the juvenile court. *Id.*[16]

Unlike *E.T.*, the complaint and requested relief here do not call into question the validity of orders previously issued by the juvenile courts, nor the fairness of past juvenile court proceedings. Plaintiffs do not claim, nor do Defendants argue, the alleged constitutional violations resulted from adherence to certain juvenile court orders. Defendants have not shown how findings against them would have the effect of retroactively invalidating past orders of the juvenile courts.

In sum, the relief sought in each of the areas outlined in the complaint does not involve or interfere with the interest of the state in enforcing the orders and judgments of state courts. The Court does note that although the suit clearly involves an important state interest,[17] it does not appear Plaintiffs could raise their classwide claims or pursue the systemic reforms they seek within the framework of the periodic review hearings in the

---

[16] The "practical impact" of such a declaration was not the primary reason for the decision to abstain under *Younger*. The decision primarily rested on a finding that "[the proposed] injunction directed to remedying [violations based upon the amount of time or resources spent on juvenile dependency court cases] would require the [federal] court to ensure that in *each* case the child was receiving certain services or procedures that the court has declared constitutional." *Id.* (emphasis added).

[17] *See Santosky v. Kramer*, 455 U.S. 745, 766 (1982) ("the State has an urgent interest in the welfare of [its resident children]"). *See also Moore v. Sims*, 442 U.S. 415, 435, 99 S. Ct. 2371, 2383, 60 L. Ed. 2d 994 (1979) ("Family relations are a traditional area of state concern."); *Ginsberg v. State of New York*, 390 U.S. 629 (1968) ("State . . . has an independent interest in the well-being of its youth."); *Prince v. Commonwealth of Massachusetts*, 321 U.S. 158 (1944) (state acting to guard the interest in youth's well-being); *H.C. ex rel. Gordon v. Koppel*, 203 F.3d 610, 613 (9th Cir. 2000) (citing *Moore* on state's interest in family relations). Some courts have held a state's voluntary agreement to federal oversight of its foster care system under the Act *reduces* the comity concerns out of which this requirement of *Younger* arose. *M.D. v. Perry*, 799 F. Supp. 2d 712, 725 (S.D. Tex. 2011) ("[G]eneral concerns about comity and federalism underlying *Younger* are lessened in light of the state's submission to federal oversight under the Title IV-E foster care program. . . . The voluntary submission to such federal oversight greatly lessens the force of any complaints regarding unwarranted federal intrusion on state sovereignty."). But the cases do not hold federal oversight negates the state's interest entirely. *Id.* at 721 ("The mere fact that federal oversight also exists does not lessen the importance of this state interest."). *Cf. Hudson v. Campbell*, 663 F.3d 985, 988 (8th Cir. 2011) (holding state had important interest in administering Medicaid program because "[t]he Act 'confers broad discretion on the States to adopt standards for determining the extent of medical assistance, requiring only that such standards be "reasonable" and "consistent with the objectives" of the Act'" and program was partially funded by state).

juvenile courts.[18] Therefore, even if the relief sought could be construed to interfere with some ongoing proceedings, *Younger* abstention is inappropriate given the inadequacy of those proceedings to adjudicate the relief sought here.

### C. *O'Shea* Abstention

In addition to *Younger* abstention, Defendants invoke *O'Shea* abstention. *O'Shea* abstention is an outgrowth of *Younger*. Under *O'Shea v. Littleton*, a federal court may not issue an injunction which would result in "an ongoing federal audit of state [court] proceedings which would indirectly accomplish the kind of interference that *Younger v. Harris* . . . and related cases sought to prevent." 414 U.S. 488, 500 (1974).

*O'Shea* involved an action by a group of residents against a county magistrate and associate judge of the county circuit court in which the residents alleged a pattern and practice of illegal bond setting, sentencing, and jury fee practices in criminal cases. 414 U.S. 488 (1974). The Supreme Court dismissed the case for lack of standing and want of an actual case or controversy. The Court held none of the named plaintiffs had suffered the injury specified and the claimed injury was outlined in far too general terms to be cognizable. As an alternative holding, the Court stated that even if the complaint presented a case or controversy,

> [The requested] injunction [was] aimed at controlling or preventing the occurrence of specific events that might take place in the course of future state criminal trials[,] . . . would contemplate interruption of state proceedings to adjudicate assertions of noncompliance by petitioners[, and would result in] an ongoing federal audit of state criminal proceedings which would indirectly accomplish the kind of interference that *Younger v.*

---

[18] As discussed in the previous section, everything about dependency proceedings is tailored to the specific facts and circumstances of a particular child's life. Nothing in the statutes governing the authority or procedures of the juvenile court envisions or authorizes the court's adjudication of class action cases. *See* A.R.S. §§ 8-841 *et seq*.; 8-221. In fact, Defendants do not argue the *class* claims this case presents could be brought in the context of an ongoing juvenile dependency proceeding. Rather they argue the Court does not need to analyze this case as a class action because no class has yet been certified. Crucially, Defendants and the cases on which they rely, *31 Foster Children v. Bush*, 329 F.3d 1255, 1281 (11th Cir. 2003) and *Joseph A. ex rel. Corrine Wolfe v. Ingram*, 275 F.3d 1253, 1274 (10th Cir. 2002), do not embrace the unique and important functions of class actions and the relief they can afford.

> *Harris* . . . and related cases sought to prevent. [And a] federal court should not intervene to establish the basis for future intervention that would be so intrusive and unworkable.

*Id.* at 500.

*O'Shea* abstention is an equitable abstention related to *Younger*. "If the equitable relief requested requires intrusive follow-up into state court proceedings, it constitutes 'a form of the monitoring of the operation of state court functions that is antipathetic to established principles of comity.'" *E.T. v. George*, 681 F. Supp. 2d 1151, 1162 (E.D. Cal. 2010) *aff'd sub nom. E.T. v. Cantil-Sakauye*, 682 F.3d 1121 (9th Cir. 2012) (quoting *O'Shea*, 441 U.S. at 500).

"[I]nstitutional reform injunctions often raise sensitive federalism concerns." *Horne v. Flores*, 557 U.S. 433, 448 (2009). Those concerns are "heightened when . . . a federal-court decree has the effect of dictating state or local budget priorities." *Id.* To fulfill their obligation of enforcing federal law without overly hamstringing state and local officials with "overbroad or outdated [federal injunctive orders]" the Supreme Court directed federal courts to take a "flexible approach" to such orders, ensuring the orders are "limited to reasonable and necessary implementations of federal law" and "responsibility for discharging the State's obligations is returned promptly to the State and its officials when the circumstances warrant." *Id.* at 450 (internal quotation marks and citation omitted).

Defendants claim the injunctive relief Plaintiffs seek "necessarily requires this Court to create and then monitor, for purposes of enforcement, measurable criteria for placements, visitation, permanency, health care, and other facets of foster care that juvenile court judges adjudicate," and would thus constitute an ongoing federal audit of juvenile court proceedings. (Doc. 49 at 18). Plaintiffs insist "Defendants can be ordered to address their harmful practices 'without an ongoing intrusion into the state's administration of justice,'" and "*O'Shea* does not give federal courts license to turn away from claims like those asserted in this action." (Doc. 42 at 28).

In *E.T. v. Cantil-Sakauye*, the Ninth Circuit affirmed an abstention decision under *O'Shea*. 682 F.3d 1121 (9th Cir. 2012). There, the district court was asked to declare attorney caseloads in juvenile courts unconstitutional and issue accompanying injunctive relief. The court concluded:

> [T]he court would [] have to consider a myriad of administrative matters that affect the efficiency of the system. Further, in order to enforce any method of injunctive relief, the court would be required to act as a receiver for the Sacramento dependency court system, ensuring that judges were giving adequate time *to each individualized case* pursuant to the constitutional and/or statutory dictates established through this proceeding. Such involvement in any state institutional system is daunting, but the problems accompanying plaintiffs' requested relief is increased exponentially when applied to a state judicial system.

*E.T. v. George*, 681 F. Supp. 2d 1151, 1165 (E.D. Cal. 2010) (emphasis added).

The Ninth Circuit distinguished *Los Angeles County Bar Association v. Eu*, 979 F.2d 697 (9th Cir. 1992), which involved a challenge to a California statute prescribing the number of judges in Los Angeles Superior Court. The plaintiffs in that case claimed the statute led to a shortage of state court judges, which in turn, caused inordinate delays in civil litigation and deprived litigants of access to the courts. The *E.T.* court held the question in *Los Angeles County Bar Association* was "whether the *average* time to resolution in a case violated [the plaintiff's] rights." *E.T.*, 681 F. Sup. 2d at 1166. By contrast, the court held the question presented in *E.T.* was whether each individual plaintiff's rights had been violated "based upon their specific, individual circumstances." *Id.*

But in *Melendres v. Maricopa County*, a district court did not abstain in a class action seeking federal monitoring and sweeping reforms of a state executive agency, the Maricopa County Sheriff's Office. No. CV-07-2513-PHX-GMS, 2009 WL 2707241, at *5 (D. Ariz. Aug. 24, 2009). The defendants moved for judgment on the pleadings, arguing in part, that the principles of comity and federalism made adjudication of the claims in federal court improper. The court referenced *O'Shea* but held:

- 27 -

[P]rinciples of federalism counsel restraint in the granting of injunctive relief against state agencies. At this early stage in the litigation, however, principles of federalism do not dictate that the Court should terminate this case. Just as it is emphatically the province and duty of the judiciary to say what the law is, . . . so too is it emphatically the province and duty of the judiciary to vindicate the law where it has been violated. This principle requires enjoining constitutional violations that are likely to reoccur, even if the subject of the injunction is a state agency entitled to respect, deference, and latitude in conducting its own affairs. . . . Principles of federalism are not offended by a court performing this essential function—"to conclude otherwise would be to suggest that federal courts never ought to be concerned with the activities of state agencies under any circumstances."

*Id.* at \*5 (citations omitted). *Melendres* did not involve ongoing state court proceedings, but the holding is relevant because it clearly outlines the tension between Supreme Court precedents which, on the one hand, impose a duty on federal courts to adjudicate claims arising under federal laws, and on the other hand, warn against excessive intrusion into the operation of state government. The Supreme Court also addressed that tension in *Horne* when it discussed the "flexible approach" federal courts should take to address widespread violations of federal law by state institutions. 557 U.S. at 450.

The primary question under *O'Shea* is whether the proposed injunctive relief would result in an ongoing federal audit of state court proceedings. The complaint here does not. It is directed towards state agencies. Defendants express concern the obligation of juvenile courts to oversee these agencies will result in a federal injunction which will indirectly accomplish the interference *Younger* aims to avoid. But as discussed, although the juvenile courts play a significant role in overseeing the care of children within the custody and care of the Arizona child welfare agencies, the courts are not involved in adjudicating and remedying the types of claims raised here.

The complaint and proposed relief are distinguishable from *E.T.* because they are not directly aimed at the functioning of the juvenile courts.[19] Plaintiffs here do not allege

---

[19] For this reason, the case is also distinguishable from *Laurie Q. v. Contra Costa County*, another case on which Defendants rely. In *Laurie Q.*, a class of special needs foster children sued the county for violations of the Adoption Assistance and Child

any statutory or constitutional violations in the procedure or administration of the juvenile courts. Nor is Plaintiffs' suit an indictment of the juvenile courts for failing to address these constitutional issues.

Further, the failures of child welfare agencies to comply with juvenile court orders are the result of the broader problems Plaintiffs wish to address. Plaintiffs contend the absence of proper agency organization and resources results in constitutional violations, signified by insufficient delivery of services to foster children, including instances of direct violations of juvenile court orders, and those children's mental and physical health problems. If appropriate, the success of the injunctive relief Plaintiffs seek in this case will be measured by composite statistics showing rates of placements and services, including those ordered by juvenile courts.

As the *Melendres* court held, principles of federalism and comity warrant restraint and respect when the target of a federal court injunction is a state agency. But this Court, like that one, is fully capable of practicing such restraint and hewing to the direction provided by the Supreme Court in *Horne* for managing the competing requirements of federal jurisdiction and state sovereignty.

**III. *Pullman* Abstention**

Defendants also claim abstention is appropriate because Plaintiffs' claims could be resolved on state law grounds, thus avoiding unwarranted determinations of federal law. Plaintiffs argue there are no state grounds upon which to decide the issues they raise since they do not challenge the constitutionality or appropriateness of a state law or policy.

In *Railroad Commission of Texas v. Pullman Company*, the Supreme Court held

---

Welfare Act ("AACWA"), including failing to prepare compliant case plans. 304 F. Supp. 2d 1185 (N.D. Cal. 2004). Because the juvenile court held "ultimate authority over the formulation of the case plans . . . [at] which plaintiffs' prayer for injunctive relief [was] directed" . . . the court held *Younger* applied. *Id.* at 1203-08 ("[T]he allegations at issue here reach to the very heart of the Juvenile Court's responsibility and core competency, viz., determining the best program of services and placement for each individual child."). As discussed at length in this order, the relief Plaintiffs' seek is not aimed at a core competency of the juvenile court.

1   that when an unsettled question of state law could be dispositive of a federal
2   constitutional claim, the federal court should abstain in order to give the state courts an
3   opportunity to decide the underlying state law question, thus avoiding unnecessary
4   adjudication of constitutional questions. 312 U.S. 496 (1941).

5          Plaintiffs do not raise state law claims in their complaint. Although it is not
6   necessary for them to raise a state law claim in order to be subject to abstention under
7   *Pullman*, Defendants have not provided the Court with a state law basis under which
8   Plaintiffs' constitutional claims might be resolved. *Cf. Harris Cnty. Comm'rs Court v.*
9   *Moore*, 420 U.S. 77, 81 (1975). Therefore, the Court cannot conclude *Pullman* abstention
10  is appropriate.

11  **IV. Summary**

12         Obviously, as this Order demonstrates, the discussion and final decision of
13  whether a federal court should entertain suits related to state judicial proceedings can
14  never be marginalized. But in the end, if the Court abstained here, the effect would be
15  that Plaintiffs would not be allowed to seek relief in federal court for alleged egregious
16  broad and systemic federal constitutional violations. That would be a wrong result
17  because based on the allegations in the complaint, this Court could fashion a remedy that
18  would not impinge upon the decisions made by juvenile courts in specific individual
19  cases. And of course, this Court will always eschew forays into state judicial proceedings.

20         Accordingly,

21         **IT IS ORDERED** the motion to abstain and dismiss, (Doc. 41), is **DENIED.**

22         Dated this 29th day of September, 2015.

Honorable Roslyn O. Silver
Senior United States District Judge