1

**Scharf-Norton Center for Constitutional Litigation at the
GOLDWATER INSTITUTE**
Aditya Dynar (031583)
500 E. Coronado Rd.
Phoenix, Arizona 85004
(602) 462-5000
litigation@goldwaterinstitute.org

**COOPER & KIRK, PLLC**
Michael W. Kirk (admitted *pro hac vice*)
Brian W. Barnes (admitted *pro hac vice*)
Harold S. Reeves (admitted *pro hac vice*)
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
*Attorneys for Plaintiffs*

2

3

4

5

6

7

8

9

10

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA**

11

12

13

14

15

16

17

A.D., C.C., L.G., and C.R., by CAROL
COGHLAN CARTER, and DR. RONALD
FEDERICI, their next friends;
S.H. and J.H., a married couple;
M.C. and K.C., a married couple;
K.R. and P.R., a married couple;
for themselves and on behalf of a class of
similarly-situated individuals,
                    Plaintiffs,

18

            vs.

19

20

21

22

23

24

25

KEVIN WASHBURN, in his official
capacity as Assistant Secretary of Indian
Affairs, BUREAU OF INDIAN AFFAIRS;
SALLY JEWELL, in her official capacity as
Secretary of the Interior, U.S.
DEPARTMENT OF THE INTERIOR;
GREGORY A. McKAY, in his official
capacity as Director of ARIZONA
DEPARTMENT OF CHILD SAFETY,
                    Defendants.

No.  CV-15-1259-PHX-NVW

**FIRST AMENDED CIVIL RIGHTS
CLASS ACTION COMPLAINT
FOR DECLARATORY,
INJUNCTIVE, AND OTHER
RELIEF**

26

27

28

**INTRODUCTION**

1.      By honoring the moral imperatives enshrined in our Constitution, this nation has successfully shed much of its history of legally sanctioned discrimination on the basis of race or ethnicity. We have seen in vivid, shameful detail how separate treatment is inherently unequal. *Brown v. Board of Education*, 347 U.S. 483, 495 (1954). There can be no law under our Constitution that creates and applies pervasive separate and unequal treatment to individuals based on a quantum of blood tracing to a particular race or ethnicity. This country committed itself to that principle when it ratified the Fourteenth Amendment and overturned *Dred Scott v. Sandford*, 60 U.S. 393 (1857), and when it abandoned *Plessy v. Ferguson*, 163 U.S. 537 (1896).

2.      In 1994 and again in 1996, Congress recognized that race and ethnicity should play no role in state-approved adoptions when it enacted the Multiethnic Placement Act, Pub. L. 103-382, §§ 551–553, *codified at* 42 U.S.C. § 5115a (1994), and the Interethnic Placement Act, Pub. L. 104-188, § 1808, *codified at* 42 U.S.C. §§ 671(a), 674(d), 1996b (1996), which forbid discrimination in adoptions and foster care placements.

3.      Children with Indian ancestry, however, are still living in the era of *Plessy v. Ferguson*. Alone among American children, their adoption and foster care placements are determined not in accord with their best interests but by their ethnicity, as a result of a well-intentioned but profoundly flawed and unconstitutional federal law, the Indian Child Welfare Act ("ICWA"), *codified at* 25 U.S.C. §§ 1901–1963.

4.      This civil rights class action is filed by Plaintiffs baby girl A.D., baby boy C.C., baby girl L.G., and baby boy C.R., by Carol Coghlan Carter and Dr. Ronald Federici, their next friends, and S.H. and J.H., foster/adoptive parents of baby girl A.D., M.C. and K.C., adoptive parents of baby boy C.C., and P.R. and K.R., foster/adoptive parents of baby girl L.G. and baby boy C.R. They file this action on behalf of themselves and all off-reservation Arizona-resident children with Indian ancestry and all off-reservation

Arizona-resident foster, preadoptive, and prospective adoptive parents in child custody proceedings involving children with Indian ancestry.

5. They seek a declaration by this Court that certain provisions of ICWA, and Guidelines issued by the Bureau of Indian Affairs (BIA), both facially and as applied, violate the United States Constitution. They also seek an injunction from this Court against the application of certain provisions of ICWA and the accompanying BIA Guidelines, and nominal damages under Title VI of the Civil Rights Act (42 U.S.C. § 2000d–2000d-7).

**JURISDICTION AND VENUE**

6. This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

7. This Court is authorized to grant declaratory and injunctive relief under 5 U.S.C. §§ 701 through 706, 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983, Federal Rules of Civil Procedure ("FRCP") 57 and 65, and by the general and equitable powers of the federal judiciary. This Court is authorized to grant nominal damages, and declaratory and injunctive relief under Title VI of the Civil Rights Act (42 U.S.C. §§ 2000d–2000d-7).

8. Venue is proper under 28 U.S.C. § 1391(b), (e).

**PARTIES**

9. Plaintiff A.D. is a citizen of the United States and the State of Arizona, and domiciled in the State of Arizona. Baby girl A.D. is approximately 1 year and 6 months old. Baby girl A.D. is an enrolled member of the Gila River Indian Community, a federally-recognized tribe. Parental rights of A.D.'s birth parents have already been terminated by the state court properly having jurisdiction over the matter. Baby girl A.D., on information and belief, has more than 50% non-Indian blood.

10. Plaintiff C.C. is a citizen of the United States and the State of Arizona, and domiciled in the State of Arizona. Baby boy C.C. is 5 years old. Baby boy C.C is an enrolled member of the Navajo Nation, a federally-recognized tribe. Parental rights of C.C.'s birth parents were terminated by the state court properly having jurisdiction over the matter. Adoption of C.C. by M.C. and K.C. was finalized by the state court properly

having jurisdiction over the matter in November, 2015. Baby boy C.C., on information and belief, has more than 50% Hispanic blood.

11.     Plaintiff L.G. is a citizen of the United States and of the State of Arizona, and domiciled in the State of Arizona.  Baby girl L.G. is approximately 3.5 years old. Baby girl L.G., on information and belief, is not eligible for membership in the Pascua Yaqui Tribe of Arizona, a federally-recognized tribe.  Parental rights of L.G.'s birth parents have not been terminated by the state court properly having jurisdiction over the matter.  Baby girl L.G., on information and belief, has more than 50% non-Indian blood.

12.     Plaintiff C.R., baby girl L.G.'s half-sibling, is a citizen of the United States and of the State of Arizona, and domiciled in the State of Arizona. Baby boy C.R. is approximately 1.5 years old. Baby boy C.R., on information and belief, is eligible for membership in and is a child of a member of, or is already an enrolled member of, the Gila River Indian Community, a federally-recognized tribe. Parental rights of C.R.'s birth parents have not been terminated by the state court properly having jurisdiction over the matter. Baby boy C.R., on information and belief, has more than 50% non-Indian blood.

13.     Carol Coghlan Carter is a citizen of the United States and the State of Arizona, and domiciled in the State of Arizona. She is an attorney licensed to practice in the State of Arizona. She has practiced in the area of family law for several decades. In the course of her legal career, she has represented during all stages of child custody proceedings children, including children with Indian ancestry as their court-appointed guardian-ad-litem; birth parents, including birth parents with Indian ancestry; and foster/adoptive parents, including foster/adoptive parents with Indian ancestry and those in child custody proceedings involving children with Indian ancestry. She is "next friend" to baby girl A.D., baby boy C.C., baby girl L.G., and baby boy C.R., and all off-reservation children with Indian ancestry in the State of Arizona in child custody proceedings. *See* FRCP 17(c).

14.     Dr. Ronald Federici is a citizen of the United States and the State of Virginia, and domiciled in the State of Virginia. He is a clinical neuropsychologist and clinical

psychopharmacologist. He has over two decades of experience completing complex neuropsychiatric evaluations of adults and children. He is a professional consultant to physicians, schools, mental health clinics, pediatric and adolescent medicine clinics. He has served as an expert witness in child custody proceedings throughout the United States and abroad. He conducts training and education in Clinical Neuropsychology throughout the United States, and in Europe, Eastern Europe, United Kingdom, Australia, Canada, Iceland, and China. He serves as President of the Care for Children International, Inc., which is a humanitarian aid organization providing medical care, supplies, training and education to the Romanian Department of Child Protective Services. A short documentary on Dr. Federici's work in Romania is available at https://www.youtube.com/watch?v=AC37HlWlP1I (last visited February 18, 2016). He is "next friend" to baby girl A.D., baby boy C.C., baby girl L.G., and baby boy C.R., and all off-reservation children with Indian ancestry in the State of Arizona in child custody proceedings. *See* FRCP 17(c).

15.    Plaintiffs S.H. and J.H. are foster/preadoptive parents of baby girl A.D. Plaintiffs S.H. and J.H., a married couple, are both citizens of the United States and the State of Arizona, and are residents of and are domiciled in the State of Arizona. Neither S.H. nor J.H. are enrolled members of a tribe or eligible for membership in an Indian tribe. S.H. and J.H. are the only family baby girl A.D. has ever known as she was placed in foster care with them since her birth. Their petition to adopt baby girl A.D. is pending before the state court properly having jurisdiction over the matter.

16.    Plaintiffs M.C. and K.C., a married couple, are both citizens of the United States and the State of Arizona, and are residents of and are domiciled in the State of Arizona. Neither M.C. nor K.C. are enrolled members of a tribe or eligible for membership in an Indian tribe. M.C. and K.C. were foster parents to baby boy C.C. for approximately four years. M.C. and K.C. adopted baby boy C.C. in November, 2015.

17.    Plaintiffs K.R. and P.R. are foster parents of baby girl L.G. and baby boy C.R. Plaintiffs K.R. and P.R., a married couple, are both citizens of the United States and

the State of Arizona, and are residents of and are domiciled in the State of Arizona. Neither K.R. nor P.R. are enrolled members of a tribe or eligible for membership in an Indian tribe. K.R. and P.R. are the only family baby boy C.R. has ever known as he was placed in foster care with them since birth. K.R. and P.R. have been foster parents to baby girl L.G. and baby boy C.R. for approximately 1.5 years and want to adopt L.G. and C.R.

18.    Defendant Kevin Washburn is the Assistant Secretary of Indian Affairs of the Bureau of Indian Affairs ("BIA"). He has primary authority to enforce ICWA and the BIA Guidelines at issue. He is sued in his official capacity only.

19.    Defendant Sally Jewell is the Secretary of the Interior, United States Department of the Interior. The Department of the Interior is the cabinet agency of which BIA is a part and which is assigned enforcement powers under ICWA and Title 25 of United States Code. She is sued in her official capacity only.

20.    Defendant Gregory A. McKay is the Director of the Arizona Department of Child Safety ("DCS"). The Director has statutory duty under Ariz. Rev. Stat. ("A.R.S.") § 8-451 *et seq.* to "protect children." The Director is also required to "[e]nsure the department's compliance with the Indian child welfare act of 1978 (P.L. 95-608; 92 Stat. 3069; 25 United States Code §§ 1901 through 1963)." A.R.S. § 8-453(A)(20). He is sued in his official capacity only.

## FACTS COMMON TO ALL CLAIMS

## I.    Baby Girl A.D.

21.    DCS took baby girl A.D. into protective custody at birth as she was severely drug-exposed due to her biological mother's ingestion of several controlled substances, and placed her with S.H. and J.H. They have taken care of baby girl A.D. ever since, and although she has some developmental delays due to her exposure to controlled substances, she has shown remarkable recovery from the deleterious effects of second-hand addiction under the loving care of S.H. and J.H.

22.    A.D.'s biological mother named two possible birth fathers for baby girl A.D. Paternity tests on both ruled out the possibility that they were A.D.'s birth fathers.

Consequently, the state court severed parental rights of the birth mother and the absent birth father.

23.     S.H. and J.H., as foster parents, have taken care of baby girl A.D. since birth. S.H. and J.H., along with their adopted son who has Indian ancestry, are the only family that baby girl A.D. has ever known. The tribe sought in state court a transfer of the case to tribal court. The state juvenile court denied the tribe's motion to transfer jurisdiction to tribal court and the tribe appealed. That appeal is now pending in the Arizona Court of Appeals Case No. JV16-0038. If the appellate court reverses the state trial court's decision and their case is transferred to tribal court, it would force A.D., S.H. and J.H., who do not have any contact with the tribal forum, to submit to that forum's jurisdiction over them. Such transfer and the resulting exercise of jurisdiction, if successful, would be solely based on baby girl A.D.'s race.

24.     But for ICWA, A.D. would likely have been cleared for adoption by S.H. and J.H. If they are awarded adoption, they are willing to provide and encourage appropriate visitation and cultural acclimatization opportunities to A.D. DCS has and continues to follow, implement, and support the position that ICWA and the BIA Guidelines control all aspects of the state court child custody proceeding of A.D., S.H., and J.H., including but not limited to the provisions challenged here. In A.D.'s child custody proceeding, all actions were taken and decisions reached because of A.D., S.H., and J.H.'s race.

**II.     Baby Boy C.C.**

25.     DCS took baby boy C.C. into protective custody when he was less than one year old when his biological mother was convicted of a non-drug related felony. His birth father is unknown. The birth mother is on record saying she supports baby boy C.C.'s adoption by M.C. and K.C.

26.     The Navajo Nation repeatedly proposed alternative ICWA-compliant placements, all of which turned out to be inappropriate for placement of baby boy C.C. Baby boy C.C.'s extended family members expressly declined to have him placed with

them. Other ICWA-compliant placements the tribe proposed also declined to have baby boy C.C. placed with them. The tribe repeatedly asked for additional opportunities from state court to find other ICWA-compliant placements. Consequently, baby boy C.C. continuously remained in foster care with M.C. and K.C. for four years. M.C. and K.C. were not able to file a petition for adoption until the state court declared that baby boy C.C. is available for adoption and that there was good cause to deviate from ICWA's adoption placement preferences.

27.     Each time the tribe proposed an ICWA-compliant placement, pursuant to a court-supervised and DCS-supported case plan, M.C. and K.C. had to drive each week with baby boy C.C., sometimes over 100 miles, to visit with the proposed placement to give baby boy C.C. an opportunity to bond with the proposed placement until that placement became unavailable for any reason. Baby boy C.C. calls M.C. and K.C. "mommy" and "daddy," but he was reminded by some proposed placements that M.C. and K.C. are not his "mommy" and "daddy." This caused significant emotional and psychological harm to baby boy C.C. who, through no fault of his own, had to leave the security of his home and visit with strangers solely because he was born with Indian ancestry.

28.     Due to the application of ICWA, baby boy C.C. had languished in foster care for approximately four years. But for ICWA, baby boy C.C. would have likely been cleared for adoption by M.C. and K.C.

29.     M.C. and K.C. were not granted intervention in the dependency matter of C.C.

30.     In November 2015, after this lawsuit was filed, the state court properly having jurisdiction over the matter cleared C.C., with DCS and Navajo Nation consent, for adoption by M.C. and K.C.

31.     The Indian Child Welfare Act applied to all aspects of C.C.'s child custody proceeding. All actions that delayed or denied C.C.'s adoption by M.C. and K.C. were

taken because of C.C., M.C., and K.C.'s race. DCS continued to follow, enforce and support the application of ICWA in C.C.'s child custody proceeding.

### III.    Baby Girl L.G. and Baby Boy C.R.

32.    L.G. and C.R. are siblings who have the same birth mother but different birth fathers. L.G. was born in August, 2012, C.R. in August, 2014. During C.R.'s pregnancy, the birth mother tested positive for several controlled substances. Baby boy C.R. was born nine weeks premature, was drug-exposed when born, and spent three weeks in a ventilator. He is determined to be medically fragile. In or about August 2014, DCS took baby girl L.G. and baby boy C.R. into protective custody and placed the siblings in the care of P.R. and K.R. Thus, DCS took L.G. into protective custody when she was about 2 years old; DCS took C.R. into protective custody at birth. P.R. and K.R. is the only family that baby boy C.R. has ever known; L.G., on information and belief, lived with her birth mother before she was placed in the care of P.R. and K.R. If they are awarded adoption, P.R. and K.R. are willing to provide and encourage appropriate visitation and cultural acclimatization opportunities to L.G. and C.R.

33.    Both L.G. and C.R.'s birth fathers are known. On information and belief, both are in federal prison on conviction for violent felonies. L.G. and C.R.'s birth mother and maternal grandmother were arrested on charges of shoplifting. On information and belief, the maternal grandmother was given a two-year prison sentence and the birth mother is currently on probation.

34.    L.G. and C.R.'s birth mother, on information and belief, is a member of the Gila River Indian Community with 25% Indian blood.

35.    After L.G. and C.R. were placed in the foster care of P.R. and K.R., L.G.'s birth father, on information and belief, tried to obtain membership in the Pascua Yaqui Tribe, a federally-recognized tribe, but was unable to obtain membership. Consequently, L.G. is not eligible for membership in, nor is she a child of a member of, the Pascua Yaqui Tribe. L.G. is also not eligible for membership in, nor is she a member of, the Gila River Indian Community.

36.     C.R.'s birth mother and birth father are members of the Gila River Indian Community. C.R. is eligible for membership in, and is a child of a member of, the Gila River Indian Community.

37.     Initially, the case management plan for L.G. and C.R. was reunification with their birth mother. Due to C.R.'s low birth weight and medical complications due to in-utero exposure to controlled substances, DCS consented to, and the state court authorized, one weekly 4-hour-long visit with the birth mother that is supervised by DCS employees. In September 2015, the state court properly having jurisdiction over the child custody proceeding, changed the case management plan to severance. The parental rights of L.G. and C.R.'s birth parents have not been terminated.

38.     Foster parents P.R. and K.R. are not party intervenors in the state child custody proceeding of L.G. and C.R. Plaintiffs L.G., C.R., K.R. and P.R. do not have any contacts or ties with any tribal forum.

39.     The Gila River Indian Community has and will continue to propose alternative ICWA-compliant homes for C.R. in the consolidated child custody proceeding of L.G. and C.R. for the sole purpose of ensuring that C.R.'s child custody proceeding is subject to ICWA and the BIA Guidelines. DCS has and continues to follow, implement, and support the position that ICWA and the BIA Guidelines control all aspects of the state court child custody proceeding of C.R., including but not limited to the provisions challenged here.

40.     L.G. has Indian ancestry but is not an "Indian child" within the meaning of ICWA. However, she is discriminated against in her consolidated child custody proceeding because her half-sibling, C.R., is an "Indian child" within the meaning of ICWA. L.G. has known C.R. since birth, both share a strong sibling bond, and both consider K.R. and P.R. as *de facto* and psychological parents. Both call K.R. and P.R. their "mommy" and "daddy."

41.     Arizona state policy, mandated by state law, is to place well-bonded siblings with the same foster and adoptive parents. *See, e.g.*, A.R.S. § 8-513(D). But for ICWA

1   and the federal and state statutes and Guidelines that implement it, L.G. and C.R. would

2   be placed together due to their bonding and attachment, pursuant to state law.

3   42.   The relevant state court properly having jurisdiction over the matter has not

4   declared L.G. and C.R. as available for adoption. L.G. and C.R. have continuously

5   remained in foster care with P.R. and K.R. for about one year and six months. P.R. and

6   K.R. cannot file a petition for adoption until the state court declares that L.G. and C.R. are

7   available for adoption and that there is good cause to deviate from ICWA's adoption

8   placement preferences.

9   43.   Due to the application of ICWA, L.G. and C.R. have been languishing in

10   foster care for more than one and a half years. But for ICWA, they would likely have been

11   cleared for adoption by P.R. and K.R.

12   **IV.   All Plaintiffs**

13   44.   But for ICWA, a strong likelihood exists that these families – baby girl A.D.,

14   and her foster/preadoptive parents, S.H. and J.H., baby boy C.C., and his adoptive parents

15   M.C. and K.C., and L.G. and C.R., and their foster parents, K.R. and P.R. – would be

16   allowed to become permanent under race-neutral Arizona laws permitting individualized

17   race-neutral evaluation by state court of what is in the children's best interests. But under

18   ICWA, these families are subjected to different and more onerous procedural and

19   substantive provisions that are based solely on the race of the children and the adults

20   involved, which lead to severe disruption in their lives contrary to the children's best

21   interests.

22   45.   In many instances, children subject to ICWA are removed from caring,

23   loving homes and forced into placements, which sometimes leads to abuse, psychological

24   harm, or even physical trauma and death.

25   46.   In many instances, prospective adoptive parents who otherwise would be

26   allowed to adopt children they have raised since infancy and grown to love are deprived

27   of the opportunity to form permanent families as a result of ICWA.

28

47.   In many instances, children are left in abusive or neglectful Indian families where they are subjected to grave physical or psychological harm as a result of ICWA.

48.   Subjecting these children and families to ICWA creates delay and uncertainty in the journey to permanent family status, and the prospect and reality of displacement from stable, loving families causes great harm to children and great distress to prospective adoptive parents.

49.   All named children and parent plaintiffs, and the members of the class they seek to represent, have in the past been, are currently, or in the course of their constantly evolving state court child custody proceedings will surely be, subject to the separate, unequal and substandard treatment under provisions of ICWA and the BIA Guidelines challenged here: 25 U.S.C. §§ 1911(b), 1912(d), 1912(e), 1912(f), 1915(b), 1915(a); BIA Guidelines, 80 Fed. Reg. 10146 (February 25, 2015), §§ A.2, A.3, B.1, B.2, B.4, B.8, C.1, C.2, C.3, D.2, D.3, F.1, F.2, F.3, F.4. Once a determination is made that a child is an "Indian child" within the meaning of ICWA, all of the provisions of ICWA and the BIA Guidelines challenged here inexorably become applicable to that child's child custody proceeding beginning with DCS taking the child into protective custody up to and including either the finalization of the child's adoption or the child's reunification with birth family. DCS has and continues to follow, implement, and support the position that ICWA and the BIA Guidelines control all aspects of the state court child custody proceeding of Indian children, including but not limited to the provisions challenged here.

## CLASS ALLEGATIONS

50.   The named plaintiffs bring this lawsuit on behalf of themselves and a class of all off-reservation Arizona-resident children with Indian ancestry and all off-reservation non-Indian Arizona-resident foster, preadoptive, and prospective adoptive parents who are or will be in child custody proceedings involving a child with Indian ancestry and who are not members of the child's extended family.

51.   The Arizona Department of Child Safety's semi-annual Report to the Governor for the period of April 1, 2015 through September 30, 2015, attached as Exhibit

1        1      to      this      Amended      Complaint,      and      *available*      *at*

2 https://dcs.az.gov/sites/default/files/SEMIANNUAL-CHILD-WELFARE-

3 REPORTING-REQUIREMENTS-4-15-9-15_FINAL-Revised.pdf (last visited March 2,

4 2016), reports that as of September 30, 2015 there were 1,506 American Indian children

5 in out-of-home care in Arizona. *Id.* at 42. The number of foster, preadoptive, and

6 prospective adoptive parents of these children is similarly numerous. Their identities are

7 easily ascertainable through DCS records that are not open for inspection to the public.

8 This putative class is so numerous that joinder of all members is impracticable. *See* FRCP

9 23(a)(1).

10        52.      There are questions of law or fact common to the class, namely, the facial

11 and as-applied constitutionality of several provisions of ICWA and accompanying

12 Guidelines to the members of the class. *See* FRCP 23(a)(2).

13        53.      The circumstances of baby girl A.D., S.H. and J.H., baby boy C.C., M.C.

14 and K.C. and baby girl L.G., baby boy C.R., P.R. and K.R., are typical of children with

15 Indian ancestry and other foster, preadoptive and prospective adoptive families of children

16 with Indian ancestry. *See* FRCP 23(a)(3).

17        54.      The named plaintiffs will fairly and adequately protect the interests of the

18 class. *See* FRCP 23(a)(4).

19        55.      Plaintiffs' attorneys are experienced in representing litigants before federal

20 courts. Plaintiffs' counsel include nationally recognized constitutional lawyers who have

21 litigated extensively at every level of the federal judiciary. Plaintiffs' attorneys are well

22 qualified to be appointed class counsel by this Court.

23        56.      Separate actions by individual class members would create the risk of

24 inconsistent or incompatible standards of conduct for the defendants, and separate actions

25 by individual class members would substantially impair their ability to protect their

26 interests. *See* FRCP 23(b)(1).

27

28

57.     Defendants have acted or refused to act on grounds that apply generally to the putative class. Thus, final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. *See* FRCP 23(b)(2).

58.     Questions of law or fact common to the members of the class predominate over questions affecting individual class members as individual class members are denied equal protection under the law and deprived of their constitutional rights. A class action is superior to other available methods for the fair and efficient adjudication of the controversy, inasmuch as the individual class members are deprived of the same rights. *See* FRCP 23(b)(3).

## STATUTORY FRAMEWORK

## I.     Definitions

59.     ICWA defines "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe" 25 U.S.C. § 1903(4). "Indian tribe" is also statutorily defined at 25 U.S.C. § 1903(8).

60.     Most Indian tribes have only blood quantum or lineage requirements as prerequisites for membership. *See* Miss. Band of Choctaw Indians Const. art. III, § 1; Cherokee Nation Const. art. IV, § 1; Choctaw Nation of Okla. Const. art. II, § 1; Muscogee (Creek) Nation Const. art. III, § 2; Gila River Indian Community Const. art. III, § 1; Navajo Nation Code § 701; Guidelines for State Courts and Agencies in Indian Child Custody Proceedings, 80 Fed. Reg. 10146, 10153, B.3 (February 25, 2015) ("New Guidelines" or "BIA Guidelines"). Consequently, ICWA's definition of "Indian child" is based solely on the child's race or ancestry.

61.     Some of the tribes consider individuals with only a tiny percentage of Indian blood to be Indian, even if they have little or no contact or connection with the tribe. *See, e.g.*, Cherokee Nation Const. art. IV, § 1.

62.     Thus, in many instances, children with only a minute quantum of Indian blood and no connection or ties to the tribe are subject to ICWA and relegated to the tribe's

exclusive or concurrent jurisdiction. *See, e.g.*, *Nielson v. Ketchum*, 640 F.3d 1117, 1120 (10th Cir. 2011) (quoting Chapter 2, Section 11A of the Cherokee Nation Citizenship Act which automatically admits a child as citizen of the Cherokee Nation at birth "for the specific purpose of protecting the rights of the Cherokee Nation under the [ICWA]" (brackets in original)).

63.   The Guidelines for State Courts and Agencies in Indian Child Custody Proceedings, 80 Fed. Reg. 10146, 10153, B.4(d)(iii) (February 25, 2015), state, "In the event the child is eligible for membership in a tribe but is not yet a member of any tribe, the agency should take the steps necessary to obtain membership for the child in the tribe that is designated as the Indian child's tribe."

64.   "Agency" is defined in the New Guidelines as "a private State-licensed agency or public agency and their employees, agents or officials involved in and/or seeking to place a child in a child custody proceeding." 80 Fed. Reg. at 10151, A.2.

65.   ICWA defines "child custody proceeding" to include "foster care placement," "termination of parental rights," "preadoptive placement," and "adoptive placement." 25 U.S.C. § 1903(1).

66.   "Foster care placement" is defined as "any action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated." 25 U.S.C. § 1903(1)(i).

67.   "Termination of parental rights" is defined as "any action resulting in the termination of the parent-child relationship." 25 U.S.C. § 1903(1)(ii).

68.   "Preadoptive placement" is defined as "the temporary placement of an Indian child in a foster home or institution after the termination of parental rights, but prior to or in lieu of adoptive placement." 25 U.S.C. § 1903(1)(iii).

69.   "Adoptive placement" is defined as "the permanent placement of an Indian child for adoption, including any action resulting in a final decree of adoption." 25 U.S.C. § 1903(1)(iv).

70.   "Child custody proceeding," as defined, "shall not include a placement based upon an act which, if committed by an adult, would be deemed a crime or upon an award, in a divorce proceeding, of custody to one of the parents." 25 U.S.C. § 1903(1).

**II.   BIA Guidelines**

71.   The BIA first issued Guidelines in November of 1979. Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67584 (November 26, 1979) ("Old Guidelines" or "1979 Guidelines"). On February 25, 2015, the BIA issued new Guidelines to "supersede and replace" the 1979 Guidelines. Guidelines for State Courts and Agencies in Indian Child Custody Proceedings, 80 Fed. Reg. 10146, 10147 (February 25, 2015) ("New Guidelines", "2015 Guidelines", or "BIA Guidelines").

**III.   The Jurisdiction-Transfer Provision**

72.   ICWA requires state courts to "transfer" "foster care placement" or "termination of parental rights" "proceeding[s] to the jurisdiction of the tribe" of "an Indian child not domiciled or residing within the reservation of the Indian child's tribe" "in the absence of good cause to the contrary," and "absent objection by either parent," if the "parent or the Indian custodian or the Indian child's tribe" petitions for such transfer and the tribal court does not decline such transfer. 25 U.S.C. § 1911(b) ("jurisdiction-transfer provision"); 80 Fed. Reg. at 10156, C.2. The New Guidelines, however, state, "The right to request a transfer is available at *any stage* of an Indian *child custody proceeding*, including during any period of emergency removal." 80 Fed. Reg. at 10156, C.1(c) (emphasis added).

73.   Whereas ICWA's jurisdiction-transfer provision is available to transfer only foster care placement and termination of parental rights proceedings to the jurisdiction of the tribe, the BIA, in the New Guidelines, extended the jurisdiction-transfer provision to all child custody proceedings.

74.     "Good cause" to not transfer a foster care placement or termination of parental rights proceeding to tribal court is not defined in ICWA. The New Guidelines, however, state:

> In determining whether good cause exists, the court may not consider whether the case is at an advanced stage or whether transfer would result in a change in the placement of the child because the Act created concurrent, but presumptively, tribal jurisdiction over proceedings involving children not residing or domiciled on the reservation, and seeks to protect, not only the rights of the Indian child as an Indian, but the rights of Indian communities and tribes in retaining Indian children. Thus, whenever a parent or tribe seeks to transfer the case it is presumptively in the best interest of the Indian child, consistent with the Act, to transfer the case to the jurisdiction of the Indian tribe. [¶] In addition, in determining whether there is good cause to deny the transfer, the court may not consider: (1) The Indian child's contacts with the tribe or reservation; (2) Socio-economic conditions or any perceived inadequacy of tribal or Bureau of Indian Affairs social services or judicial systems; or (3) the tribal court's prospective placement for the Indian child.

80 Fed. Reg. at 10156, C.3(c)–(d).

75.     Under uniform Arizona law, when deciding whether to transfer a foster care placement or termination of parental rights proceeding to some other jurisdiction, an Arizona state court "that has made a child custody determination" has "exclusive, continuing jurisdiction over the determination until" either one of the two options is true:

1

2

3

4

5

> 1. A court of this state determines that neither the child, nor the child and one parent, nor the child and a person acting as a parent have a significant connection with this state and that substantial evidence is no longer available in this state concerning the child's care, protection, training and personal relationships.
> 2. A court of this state or a court of another state determines that the child, the child's parents and any person acting as a parent do not presently reside in this state.

6

A.R.S. § 25-1032(A).

7

8

9

10

76.     Thus, while Arizona law looks at the litigants' contacts with the forum in deciding whether to transfer a foster care placement or termination of parental rights proceeding to some other jurisdiction, ICWA and the New Guidelines explicitly instruct courts to not take into account the litigants' contacts with the tribal forum.

11

12

13

14

15

16

17

18

19

77.     The clear and convincing evidence standard is applied in Arizona to determine whether good cause exists to deviate from ICWA's *foster care placement preferences* of 25 U.S.C. § 1915(b). *Gila River Indian Community v. Department of Child Safety*, 363 P.3d 148 (2015). The state trial court in baby girl A.D.'s case, however, concluded that the same clear and convincing evidence standard must be met in order to establish good cause to deviate from ICWA's *jurisdiction-transfer provision*, 25 U.S.C. § 1911(b). *Contra Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 839 (9th Cir. 1986) (proponent must establish personal jurisdiction or lack thereof by preponderance of the evidence).

20

**IV.     The Active Efforts Provision**

21

22

23

24

25

26

78.     Further, ICWA states that "[a]ny party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that *active efforts* have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d) (emphasis added) ("active efforts provision").

27

28

79.     The New Guidelines state: "*Active efforts* are intended primarily to maintain and reunite an Indian child with his or her family or tribal community and constitute more

than reasonable efforts as required by Title IV-E of the Social Security Act (42 U.S.C. 671(a)(15))....'Active efforts' are separate and distinct from requirements of the Adoption and Safe Families Act (ASFA), 42 U.S.C. 1305. ASFA's exceptions to reunification efforts do not apply to ICWA proceedings." 80 Fed. Reg. at 10150–51, A.2 (emphasis in original). The ASFA exceptions provide that the reasonable efforts provision is *inapplicable* if there are "aggravated circumstances" such as "abandonment, torture, chronic abuse, and sexual abuse." 42 U.S.C. § 671(a)(15)(D). But because these exceptions do not apply under the "active efforts" provision, active efforts are required to be taken to reunify children deemed Indian with their family or members of the tribal community even when the children were abandoned, tortured, chronically abused or sexually abused by those individuals.

80.     DCS, under the active efforts provision, is required to "[i]dentify[], notify[], and invit[e] representatives of the Indian child's tribe to participate" in the active efforts to reunite the Indian child with the child's "family" and "tribal community." New Guidelines, 80 Fed. Reg. at 10150, A.2.

81.     DCS, under the active efforts provision, is required to "[t]ak[e] into account the Indian child's tribe's prevailing social and cultural conditions and way of life" even in situations where the child or the child's parents have never been exposed to or followed the tribe's prevailing social and cultural conditions or way of life. *Id.* DCS is also required "to assure cultural connections," "[s]upport[] regular visits and trial home visits of the Indian child during any period of removal," and "[o]ffer[] and employ[] all available and culturally appropriate family preservation strategies." *Id.*

82.     The New Guidelines provide details on when the requirement for active efforts begins and what actions an agency and State court must take in order to determine whether a child is an Indian child and how to comply with the active efforts requirement. 80 Fed. Reg. at 10152–153, A.3, B.1–B.2, B.4, B.8, D.2. The New Guidelines provide no details on when the requirement for active efforts ends; consequently, the active efforts provision remains applicable until the adoption is finalized. Additionally, the foster

placement preferences and adoption placement preferences require DCS to engage in active efforts every time the tribe proposes a new ICWA-compliant placement.

83.     The New Guidelines require DCS to "treat the child as an Indian child, unless and until it is determined that the child is not a member or is not eligible for membership in an Indian tribe," "[i]f there is any reason to believe the child is an Indian child." 80 Fed. Reg. at 10152, A.3(d).

84.     The New Guidelines require DCS to engage in active efforts "from the moment the possibility arises that … the Indian child [will] be placed outside the custody of either parent or Indian custodian" and also "while investigating" whether ICWA applies to a particular child. 80 Fed. Reg. at 10152, B.1(a)–(b).

85.     If a child is suspected to be an Indian child, DCS may be required to provide "[g]enograms or ancestry charts for both parents, … maternal and paternal grandparents and great grandparents or Indian custodians; birthdates; … tribal affiliation including all known Indian ancestry for individuals listed on the charts[.]" New Guidelines, 80 Fed. Reg. at 10152, B.2(b)(1)(i).

86.     "In the event the child is eligible for membership in a tribe but is not yet a member of any tribe," the New Guidelines require DCS to "take the steps necessary to obtain membership for the child in the tribe that is designated as the Indian child's tribe." 80 Fed. Reg. at 10153, B.4(d)(iii).

87.     In emergency removal situations where DCS "knows or has reason to know" that a child is an Indian child, DCS is required to "[t]reat the child as an Indian child until the court determines that the child is not an Indian child." New Guidelines, 80 Fed. Reg. at 10155, B.8(c)(1).

88.     Pursuant to 42 U.S.C. § 671(a)(15), as amended by ASFA, the "reasonable efforts" standard is pervasive under Arizona Law. *See, e.g.*, A.R.S. §§ 8-513 (foster care placement), 8-522 (dependency actions), 8-825 (preliminary protective hearing), 8-829 (same), 8-843 (initial dependency hearing), 8-845 (dependency determination), 8-846 (same), 8-862 (permanency hearing).

89.     Whereas "active efforts" are required not only to "maintain and reunite an Indian child with his or her family" but also with the child's "tribal community," New Guidelines, 80 Fed. Reg. at 10150, A.2, "reasonable efforts" under Arizona law are required only to maintain and reunite the child with the child's family. *See, e.g.*, A.R.S. § 8-522(E)(3).

90.     Arizona DCS applies the active efforts provision to children with Indian ancestry, and the "reasonable efforts" provision to all other children. The New Guidelines explicitly state that the active efforts provision is "more than" the reasonable efforts provision. Consequently, children with Indian ancestry are singled out and afforded separate, unequal treatment resulting in delayed resolution of child custody proceedings of children with Indian ancestry, based solely on their race.

**V.     Burden of Proof in Foster Care Placement Orders**

91.     ICWA further requires that "No foster care placement may be ordered in [an involuntary] proceeding in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(e).

92.     The New Guidelines state: "The court may not issue an order effecting a foster care placement of an Indian child unless clear and convincing evidence is presented, including the testimony of one or more qualified expert witnesses, demonstrating that the child's continued custody with the child's parents or Indian custodian is likely to result in serious harm to the child." 80 Fed. Reg. at 10156, D.3(a).

93.     The clear and convincing evidence standard is applied in Arizona to determine whether good cause exists to deviate from ICWA's foster care placement preferences. *Gila River Indian Community v. Department of Child Safety*, 363 P.3d 148 (2015).

94.     Under Arizona law, to take a child into temporary custody, there must be a showing that "reasonable grounds exist to believe that temporary custody is clearly

necessary to protect the child from suffering abuse or neglect" and that "probable cause exists to believe" that, inter alia, the child is or will imminently become a victim of abuse or neglect, or is suffering from serious physical or emotional injury. A.R.S. § 8-821(A)–(B); § 8-824(F) ("The petitioner has the burden of presenting evidence as to whether there is probable cause to believe that continued temporary custody is clearly necessary to prevent abuse or neglect pending the hearing on the dependency petition"); A.R.S. § 8-843 ("reasonable efforts" standard in initial dependency hearings); A.R.S. § 8-844 ("preponderance of the evidence" standard in dependency adjudication hearings).

95.     Thus, ICWA requires a showing of clear and convincing evidence whereas Arizona law requires a showing of "reasonable grounds," "probable cause," "reasonable efforts," or "preponderance of the evidence" at various stages of proceedings leading to foster care placement of children. Consequently, ICWA's higher burden of proof requires DCS to disregard to a greater extent the safety and security of children with Indian ancestry based solely on the race of these children.

**VI.     Burden of Proof in Termination of Parental Rights Orders**

96.     ICWA requires that "No termination of parental rights may be ordered in [an involuntary] proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f).

97.     The New Guidelines state: "The court may not order a termination of parental rights unless the court's order is supported by evidence beyond a reasonable doubt, supported by the testimony of one or more qualified expert witnesses, that continued custody of the child by the parent or Indian custodian is likely to result in serious harm to the child." 80 Fed. Reg. at 10156, D.3(b).

98.     Under Arizona law, "Arizona's statutes require that the party seeking termination of parental rights establish only the statutory grounds of section 8-533 by clear and convincing evidence and establish the best interests of the child by a preponderance

of the evidence." *Kent K. v. Bobby M.*, 110 P.3d 1013, 1018 (Ariz. 2005) (interpreting A.R.S. §§ 8-533, 8-537).

99.     Thus, ICWA requires a showing of beyond a reasonable doubt whereas Arizona law requires use of the clear and convincing evidence standard in termination of parental rights proceedings. Consequently, ICWA's higher burden of proof, which explicitly does not take into account the best interests of the child, places greater burdens on children with Indian ancestry than does Arizona law uniformly applied to all other children. This separate, unequal treatment of children with Indian ancestry is based solely on the child's race.

## VII.   Foster/Preadoptive Care Placement Preferences

100.    Under ICWA:

> In any foster care or preadoptive placement, a preference shall be given, *in the absence of good cause to the contrary*, to a placement with—
> (i) a member of the Indian child's extended family;
> (ii) a foster home licensed, approved, or specified by the Indian child's tribe;
> (iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or
> (iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs.

25 U.S.C. § 1915(b) (emphasis added).

101.    The New Guidelines state:

> The agency seeking a preadoptive, adoptive or foster care placement of an Indian child *must always follow* the placement preferences. If the agency determines that any of the preferences cannot be met, the agency must demonstrate through clear and convincing evidence that a diligent search has been conducted to seek out and identify placement options that would satisfy the placement preferences specified in sections F.2 or F.3 of these guidelines, and explain why the preferences could not be met.

80 Fed. Reg. at 10157, F.1(b) (emphasis added).

102.    Although "good cause" to not apply the foster care placement preferences is not defined in ICWA, the New Guidelines state:

(a) If any party asserts that good cause not to follow the placement preferences exists, the reasons for such belief or assertion must be stated on the record or in writing and made available to the parties to the proceeding and the Indian child's tribe.

(b) The party seeking departure from the preferences bears the burden of proving by clear and convincing evidence the existence of "good cause" to deviate from the placement preferences.

(c) A determination of good cause to depart from the placement preferences must be based on one or more of the following considerations:

(1) The request of the parents, if both parents attest that they have reviewed the placement options that comply with the order of preference.

(2) The request of the child, if the child is able to understand and comprehend the decision that is being made.

(3) The extraordinary physical or emotional needs of the child, such as specialized treatment services that may be unavailable in the community where families who meet the criteria live, as established by testimony of a qualified expert witness; provided that extraordinary physical or emotional needs of the child does not include ordinary bonding or attachment that may have occurred as a result of a placement or the fact that the child has, for an extended amount of time, been in another placement that does not comply with the Act. *The good cause determination does not include an independent consideration of the best interest of the Indian child* because the preferences reflect the best interests of an Indian child in light of the purposes of the Act.

(4) The unavailability of a placement after a showing by the applicable agency in accordance with section F.1, and a determination by the court that active efforts have been made to find placements meeting the preference criteria, but none have been located. For purposes of this analysis, a placement may not be considered unavailable if the placement conforms to the prevailing social and cultural standards of the Indian community in which the Indian child's parent or extended family resides or with which the Indian child's parent or extended family members maintain social and cultural ties.

(d) The court should consider only whether a placement in accordance with the preferences meets the physical, mental and emotional needs of the child; and may not depart from the preferences based on the socio-economic status of any placement relative to another placement.

80 Fed. Reg. at 10158, F.4 (emphasis added).

103.    The standard applied to all other children in Arizona is markedly different from the standard applied to children with Indian ancestry. For foster care placements, Arizona courts look at whether there was reasonable evidence to find that placing a child with the foster family instead of an extended family member was in the child's "best

interests." *Antonio M. v. Ariz. Dept. of Econ. Sec.*, 214 P.3d 1010, 1012 (Ariz. App. 2009). Courts in such situations also give weight to the fact that "the foster parents wished to adopt [the child]." *Id. See also Antonio P. v. Ariz. Dept. of Econ. Sec.*, 187 P.3d 1115, 1117 (Ariz. App. 2008) (analyzing what is in the child's best interest in foster care placements and giving weight to the fact that the child had an "undeniabl[y]" "longer relationship" with one placement than with the other).

**VIII.   Adoption Placement Preferences**

104.   Under ICWA,

> In any adoptive placement of an Indian child under State law, a preference shall be given, *in the absence of good cause to the contrary*, to a placement with
> (1) a member of the child's extended family;
> (2) other members of the Indian child's tribe; or
> (3) other Indian families.

25 U.S.C. § 1915(a).(emphasis added).

105.   The New Guidelines require state courts to follow ICWA's adoption placement preferences. 80 Fed. Reg. at 10157, F.1(b) ("The agency seeking a[n] … adoptive … placement of an Indian child *must always follow* the placement preferences") (emphasis added).

106.   Although "good cause" to not apply the adoption placement preferences is not defined in ICWA, the New Guidelines, as reproduced above, specifically state that the "good cause determination does not include an independent consideration of the best interest of the Indian child because the preferences reflect the best interests of an Indian child in light of the purposes of the Act." 80 Fed. Reg. at 10158, F.4.

107.   Due to the mandatory language of the New Guidelines, there is an inherent conflict between the duty of DCS, an "agency" within the meaning of the New Guidelines, to "protect children" and its application of ICWA to children with Indian ancestry.

108.   The placement preferences, as applied under the New Guidelines, do not look to the interests-of-the-child factors that state courts have traditionally applied in entering foster care placement, preadoption and adoption orders, and thereby deprive

children with Indian ancestry of an individualized race-neutral determination that all other children enjoy under state law.

109.    States cannot disregard a child's unique background in making an individualized and race-neutral foster, preadoptive or adoptive assessment, and in terminating parental rights. But the states cannot also turn a blind eye to the child's safety, security and best interests based solely on the child's or the adults' race, for such action is necessarily based on inherently demeaning, stereotypical assumptions about an individual's race or culture. Although the court did not reach constitutional issues, a core premise of the Baby Veronica decision, *Adoptive Couple v. Baby Girl*, __ U.S. __, 133 S. Ct. 2552 (2013), was that ICWA cannot force a child to create a racially-conforming relationship and that a child should not be made to sever existing relationships in order to create new racially-conforming ones.

## CLAIMS FOR RELIEF

### COUNT 1 – VIOLATION OF THE EQUAL PROTECTION GUARANTEE OF THE FIFTH AMENDMENT

110.    Plaintiffs reallege, adopt and incorporate by reference the preceding paragraphs as though fully set forth herein.

111.    The jurisdiction-transfer provision, 25 U.S.C. § 1911(b), New Guidelines at §§ C.1, C.2, C.3, is based solely on the race of the child and the adults involved.

112.    The active efforts provision, 25 U.S.C. § 1912(d), New Guidelines at §§ A.2, A.3, B.1, B.2, B.4, B.8, D.2, creates a separate set of procedures for children with Indian ancestry and all other children based solely on the child's race.

113.    The clear and convincing evidence burden of proof in foster care placement orders under ICWA, 25 U.S.C. § 1912(e), New Guidelines at § D.3, that is applicable to children with Indian ancestry as compared to Arizona's demonstrably lesser burden of proof that is applicable to all other children is a legally required, unequal treatment of children with Indian ancestry. Government cannot treat the safety and security of children with Indian ancestry less seriously than the safety and security of all other children.

114.    The beyond a reasonable doubt burden of proof in termination of parental rights proceedings under ICWA, 25 U.S.C. § 1912(f), New Guidelines at § D.3, that is applicable to children with Indian ancestry as compared to Arizona's demonstrably lesser burden of proof that is applicable to all other children is a legally required separate, unequal treatment of children with Indian ancestry. Government cannot treat the best interests of children with Indian ancestry differently and less seriously than those of all other children.

115.    The foster/preadoptive and adoption placement preferences under ICWA, 25 U.S.C. §§ 1915(b), (a), New Guidelines at §§ F.1, F.2, F.3, F.4, single out and treat differently children with Indian ancestry. They also single out and treat differently the non-Indian adults involved in the care and upbringing of children with Indian ancestry.

116.    The jurisdiction-transfer provision, active efforts provision, burden of proof in foster care placement orders provision, burden of proof in termination of parental rights orders provision, foster/preadoptive care placement preferences provision, and the adoption placement preferences provision of ICWA, and New Guidelines, all subject Plaintiffs to unequal treatment under the law based solely on the race of the child and the adults involved and are therefore unconstitutional under the equal protection guarantee of the Fifth Amendment.

117.    Because the foregoing provisions of ICWA and the New Guidelines do not serve a compelling governmental purpose in a narrowly tailored fashion, they violate the equal protection guarantee of the Fifth Amendment.

**COUNT 2 – VIOLATION OF THE DUE PROCESS GUARANTEE OF THE FIFTH AMENDMENT**

118.    Plaintiffs reallege, adopt and incorporate by reference the preceding paragraphs as though fully set forth herein.

119.    The jurisdiction-transfer provision forces Plaintiffs to submit to the personal jurisdiction of a forum with which they have no contacts or ties.

120.    The jurisdiction-transfer provision, 25 U.S.C. § 1911(b), New Guidelines at §§ C.1, C.2, C.3, disregards well-established Supreme Court pronouncements which require minimum contacts between the forum and the litigant for the forum to constitutionally exercise specific or general personal jurisdiction over the litigant, and are therefore, unconstitutional under the due process guarantee of the Fifth Amendment. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980); *Helicoptores Nationales de Colombia v. Hall*, 466 U.S. 408 (1984); *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102 (1987).

121.    Every child and adult deserves an individualized, race-neutral determination under uniform standards when courts make foster/preadoptive care and adoption placement decisions. Every child and adult has a right to be free from the use of race in their individualized foster/preadoptive care and adoption placement decisions. ICWA's jurisdiction-transfer provision, 25 U.S.C. § 1911(b), active efforts provision, 25 U.S.C. § 1912(d), foster care burden of proof, 25 U.S.C. § 1912(e), termination of parental rights burden of proof, 25 U.S.C. § 1912(f), foster/preadoptive care placement preferences provision, 25 U.S.C. § 1915(b), the adoption placement preferences provision, 25 U.S.C. § 1915(a), and New Guidelines at §§ A.2, A.3, B.1, B.2, B.4, B.8, C.1, C.2, C.3, D.2, D.3, F.1, F.2, F.3, F.4, violate the substantive due process rights of children with Indian ancestry, and those of adults involved in their care and upbringing who have an existing family-like relationship with the child. *See Troxel v. Granville*, 530 U.S. 57, 88 (2000) (Stevens, J., dissenting); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984); *Smith v. Org. of Foster Families for Equality & Reform*, 431 U.S. 816, 844 (1977); *In re Santos Y.*, 92 Cal. App. 4th 1274, 1314–1317 (Cal. App. 2001); *In re Bridget R.*, 41 Cal. App. 4th 1483, 1503–1504 (Cal. App. 1996); *In re Jasmon O.*, 878 P.2d 1297, 1307 (Cal. 1994).

122.    Any determination regarding removal of a child from home, active efforts, termination of parental rights, foster care placement, or adoption placement must take into account the child's best interests. The failure of ICWA as applied by the BIA Guidelines

1    to adequately consider the child's best interests deprives the class of plaintiff children of

2    liberty without due process of law in violation of the Fifth Amendment.

3    **COUNT 3 – VIOLATION OF THE SUBSTANTIVE DUE PROCESS AND
     EQUAL PROTECTION CLAUSES OF THE FOURTEENTH AMENDMENT**

4

5    123.    Plaintiffs reallege, adopt and incorporate by reference the preceding

6    paragraphs as though fully set forth herein.

7    124.    Defendant McKay, pursuant to his statutory duty to "[e]nsure the

8    department's compliance with the Indian child welfare act," A.R.S. § 8-453(A)(20),

9    complies with and enforces provisions of the Indian Child Welfare Act in Arizona.

10   125.    Defendant McKay complies with and enforces the active efforts provision,

11   25 U.S.C. § 1912(d), New Guidelines at §§ A.2, A.3, B.1, B.2, B.4, B.8, D.2, in Arizona.

12   126.    Defendant McKay complies with and enforces the clear and convincing

13   evidence burden of proof in foster care placements under ICWA, 25 U.S.C. § 1912(e),

14   New Guidelines at § D.3, in Arizona.

15   127.    Defendant McKay complies with and enforces the beyond a reasonable

16   doubt burden of proof in termination of parental rights proceedings under ICWA, 25

17   U.S.C. § 1912(f), New Guidelines at § D.3, in Arizona.

18   128.    Defendant McKay complies with and enforces the foster/preadoptive and

19   adoptive placement preferences under ICWA, 25 U.S.C. § 1915(b), (a), New Guidelines

20   at §§ F.1, F.2, F.3, F.4, A.R.S. §§ 8-105.01(B), 8-514(C), in Arizona.

21   129.    Defendant McKay's compliance with and enforcement of these provisions

22   subjects Plaintiffs to unequal treatment under color of state and federal law based solely

23   on the race of the child and the adults involved and therefore deprives Plaintiffs of equal

24   protection of the law under the Equal Protection Clause of the Fourteenth Amendment.

25   *See* 42 U.S.C. § 1983.

26   130.    Defendant McKay's compliance with and enforcement of the jurisdiction-

27   transfer provision, active efforts provision, burden of proof in foster care placements

28   provision, burden of proof in termination of parental rights proceedings provision,

1   foster/preadoptive and adoptive placement preferences provisions under state law, ICWA,

2   and New Guidelines, violate the substantive due process rights to be free from the use of

3   race in child custody proceedings and to an individualized race-neutral determination in

4   child custody proceedings of children with Indian ancestry, and those of adults involved

5   in their care and upbringing who have an existing family-like relationship with the child.

6   Defendant McKay's failure to adequately consider the child's best interests deprives the

7   class of plaintiff children of liberty without due process of law in violation of the

8   Fourteenth Amendment. *See* 42 U.S.C. § 1983.

9   **COUNT 4 – THE INDIAN CHILD WELFARE ACT EXCEEDS THE FEDERAL**
   **GOVERNMENT'S POWER UNDER THE INDIAN COMMERCE CLAUSE AND**
10  **THE TENTH AMENDMENT.**

11      131.    Plaintiffs reallege, adopt and incorporate by reference the preceding

12  paragraphs as though fully set forth herein.

13      132.    ICWA exceeds the federal government's power under the Indian Commerce

14  Clause and the Tenth Amendment. A child with Indian ancestry is not an item of

15  commerce, nor an instrumentality of commerce, nor tangible personal property the

16  possession of which by federally-recognized Indian tribes promotes "Indian self-

17  government." *Morton v. Mancari*, 417 U.S. 535, 555 (1974). Nor is a federal law dealing

18  with child custody proceedings "tied rationally to the fulfillment of Congress' unique

19  obligation toward the Indians." *Id.*; *Rice v. Cayetano*, 528 U.S. 495 (2000). Indeed, the

20  BIA and the Department of the Interior's position is that "ICWA and these regulations or

21  any associated Federal guidelines do not apply to … [t]ribal court proceedings[.]" Notice

22  of Proposed Rulemaking, Regulations for State Courts and Agencies in Indian Child

23  Custody Proceedings, 80 Fed. Reg. 14880, 14887, § 23.103(e) (March 20, 2015); New

24  Guidelines, 80 Fed. Reg. at A.3(e) (same). *See Adoptive Couple v. Baby Girl*, __ U.S. __,

25  133 S. Ct. 2552, 2566–2570 (2013) (Thomas, J., concurring).

26      133.    Congress cannot commandeer state resources to achieve federal policy

27  objectives or commandeer state officers to execute federal laws. *Printz v. United States*,

28  521 U.S. 898 (1997). ICWA impermissibly commandeers state courts and state agencies

1    to act as investigative and adjudicatory arms of the federal government or Indian tribes.

2    ICWA impermissibly commandeers state courts and state agencies to apply, enforce, and

3    implement an unconstitutional federal law. *Dodds v. Richardson*, 614 F.3d 1185, 1195–

4    1196 & n.3 (10th Cir. 2010); Ariz. Const. art. II, § 3.

5         134.   Child custody proceedings and domestic relations matters are a "virtually

6    exclusive province of the States" under the Tenth Amendment upon which the federal

7    government cannot intrude. *Sosna v. Iowa*, 419 U.S. 393, 404 (1975).

8         135.   ICWA displaces inherent state jurisdiction over specified child welfare,

9    custody, and adoption proceedings and therefore violates the Tenth Amendment. *Adoptive

10   Couple v. Baby Girl*, 133 S. Ct. at 2566 (Thomas, J., concurring).

11        **COUNT 5 – VIOLATION OF ASSOCIATIONAL FREEDOMS UNDER THE
         FIRST AMENDMENT**
12

13        136.   Plaintiffs reallege, adopt and incorporate by reference the preceding

14   paragraphs as though fully set forth herein.

15        137.   By virtue of ICWA, the tribes make the primary determination whether

16   children with a specified blood quantum will be brought within their jurisdiction, custody,

17   and control.

18        138.   Many children who are subject to ICWA have few, if any, ties to the tribe

19   upon which ICWA confers jurisdiction over them. Some but not all are members of the

20   tribes but do not thereby consent to surrender their constitutional rights. Some are enrolled

21   in the tribes as a result of the mandates of ICWA and the New Guidelines. Others are not

22   members and have virtually no connection to the tribes other than a prescribed blood

23   quantum. *See* New Guidelines, 80 Fed. Reg. at 10153, B.4(d)(3).

24        139.   By operation of the provisions of ICWA and the New Guidelines challenged

25   here, Plaintiff children like baby girl A.D. and baby boy C.R. are forced to associate with

26   tribes and tribal communities and be subject to tribal jurisdiction often against their will

27   and/or contrary to their best interests. *See id.* at 10150, A.2 (active efforts required to

28   reunify an Indian child not only with the child's family but also with the child's tribe).

140.     Under the active efforts provision, DCS is required to "take steps necessary to obtain membership for the child in the tribe that is designated as the Indian child's tribe." 80 Fed. Reg. at 10153, B.4(d)(iii). DCS, thus, forces children deemed Indian to associate with and become members of federally-recognized Indian tribes.

141.     This forced association violates Plaintiffs' freedom of association, which encompasses the freedom not to associate under the First Amendment. *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000); *Knox v. Service Employees Int'l Union, Local 1000*, __ U.S. __, 132 S. Ct. 2277 (2012).

### COUNT 6 – UNLAWFUL AGENCY ACTION

142.     Plaintiffs reallege, adopt and incorporate by reference the preceding paragraphs as though fully set forth herein.

143.     Whereas ICWA's jurisdiction-transfer provision is available to transfer only foster care placement and termination of parental rights proceedings to the jurisdiction of the tribe, 25 U.S.C. § 1911(b), the New Guidelines state, "The right to request a transfer is available at *any stage* of an Indian *child custody proceeding*, including during any period of emergency removal." 80 Fed. Reg. at 10156, C.1(c) (emphasis added). Further, the New Guidelines instruct state courts that they "must transfer" all child custody proceedings if the parent does not object to the transfer, the tribal court does not decline, and there is no good cause to deny transfer. New Guidelines, 80 Fed. Reg. 10156, C.2, C.3.

144.     BIA's enlargement of the jurisdiction-transfer provision, 25 U.S.C. § 1911(b), New Guidelines at C.1, C.2, C.3, making the provision available during preadoptive placement and adoptive placement proceedings, clearly contradicts the statutory provision. *See* 25 U.S.C. § 1903(1) (definitions).

145.     BIA overstepped its authority by extending, in the New Guidelines, the jurisdiction-transfer provision to all child custody proceedings. Such extension, which directly contradicts a Congress-enacted provision, harms children in cases where parental rights have been terminated. It gives tribes the "right to request a transfer," 80 Fed. Reg.

at 10156, C.1(c), in cases where Congress expressly did not give tribes a right to request transfer.

146.   Such agency action is unlawful, in excess of statutory authority, and not in accordance with law. 5 U.S.C. § 706; *see American Federation of Govt. Employees, AFL-CIO, Local 3669 v. Shinseki*, 821 F. Supp. 2d 337 (D.D.C. 2011), *affirmed by*, 709 F.3d 29 (D.C. Cir. 2012).

**COUNT 7 – DAMAGES UNDER TITLE VI**
**OF THE CIVIL RIGHTS ACT (42 U.S.C. §§ 2000d–2000d-7)**

147.   Plaintiffs reallege, adopt and incorporate by reference the preceding paragraphs as though fully set forth herein.

148.   DCS is a state agency, of which Defendant McKay is Director. DCS receives federal financial assistance.

149.   Defendant McKay has subjected and continues to subject Plaintiffs, and members of the class that Plaintiffs seek to represent, to *de jure* discrimination on the ground of the race, color, or national origin of the individuals involved.

150.   For this *de jure* discriminatory treatment, Plaintiffs request that the court award nominal damages of $1 each to each of the named Plaintiffs and to each of the members of the class they seek to represent under Title VI of the Civil Rights Act, 42 U.S.C. §§ 2000d–2000d-7.


**REQUEST FOR RELIEF**

Consequently, Plaintiffs respectfully request that the Court:

A.   Certify the Plaintiff class as defined.

B.   Declare that provisions of the Indian Child Welfare Act, specifically, 25 U.S.C. §§ 1911(b), 1912(d), 1912(e), 1912(f), 1915(a), 1915(b), and the New Guidelines, §§ A.2, A.3, B.1, B.2, B.4, B.8, C.1, C.2, C.3, D.2, D.3, F.1, F.2, F.3, F.4, violate the United States Constitution both facially and as applied to Plaintiffs and others similarly

situated, violate federal civil rights statutes, 42 U.S.C. §§ 1981, 1983, and violate Title VI of the Civil Rights Act, 42 U.S.C. §§ 2000d *et seq*.

C.    Permanently enjoin Defendant Washburn and Defendant Jewell from enforcing these provisions of the Indian Child Welfare Act and the New Guidelines.

D.    Permanently enjoin Defendant McKay from complying with and enforcing these unconstitutional provisions of the Indian Child Welfare Act, the New Guidelines, and state law.

E.    Hold unlawful and set aside New Guidelines, §§ C.1, C.2, C.3 under 5 U.S.C. § 706.

F.    Award nominal damages of $1 each to each of the named Plaintiffs and to each of the members of the class that they represent under 42 U.S.C. §§ 2000d–2000d-7.

G.    Award Plaintiffs their reasonable attorneys' fees, litigation expenses and costs, pursuant to 28 U.S.C. § 2412 (Equal Access to Justice Act) and 42 U.S.C. § 1988 (Civil Rights Act), and other applicable law.

H.    Grant such other relief as the Court may deem just and proper.

**RESPECTFULLY SUBMITTED** this <u>2nd</u> day of <u>March</u>, 2016 by:


                         /s/ Aditya Dynar
                         _____

                         Aditya Dynar (031583)
                         **Scharf-Norton Center for Constitutional Litigation**
                         **at the GOLDWATER INSTITUTE**

                         Michael W. Kirk (admitted *pro hac vice*)
                         Brian W. Barnes (admitted *pro hac vice*)
                         Harold S. Reeves (admitted *pro hac vice*)
                         **COOPER & KIRK, PLLC**

                         *Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

     Document Electronically Filed and Served by ECF this <u>2nd</u> day of <u>March</u>, 2016.

MARK BRNOVICH
ATTORNEY GENERAL
John S. Johnson
Dawn R. Williams
Gary N. Lento
Melanie G. McBride
Joshua R. Zimmerman
1275 West Washington Street
Phoenix, Arizona 85007
John.Johnson@azag.gov
Dawn.Williams@azag.gov
Gary.Lento@azag.gov
Melanie.McBride@azag.gov
Joshua.Zimmerman@azag.gov

Steven M. Miskinis
Ragu-Jara Gregg
U.S. Department of Justice
ENRD/ Indian Resources Section
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044-7611
Steven.miskinis@usdoj.gov
ragu-jara.gregg@usdoj.gov

     Courtesy Copy Mailed this <u>2nd </u> day of <u>March</u>, 2016 to:

Honorable Neil V. Wake
United States District Court
Sandra Day O'Connor U.S. Courthouse, Ste. 524
401 W. Washington St., SPC 52
Phoenix, AZ  85003-2154

<u>/s/ Kris Schlott          </u>
Kris Schlott

**Exhibit 1**



**Douglas A. Ducey**
Governor

*Arizona Department of Child Safety*

**Gregory McKay**
Director

December 31, 2015

The Honorable Douglas A. Ducey
Governor of Arizona
1700 West Washington
Phoenix, Arizona 85005

Re: Semi-Annual Child Welfare Reporting Requirements

Dear Governor Ducey:

Pursuant to A.R.S. § 8-526, the Arizona Department of Child Safety (DCS) submits the enclosed semi-annual report on child welfare for the period of April 1, 2015 through September 30, 2015. This report provides information relative to reports of child abuse and neglect, investigations, shelter and receiving home services, foster homes, length of care, and adoptions.

If you have any questions, please contact me at (602) 255-2500.

Sincerely,

Gregory McKay
Director

Enclosure

The Honorable Douglas A. Ducey
Page 2

cc:    President Andy Biggs, Arizona State Senate
       Speaker David M. Gowan Sr., Arizona State House of Representatives
       Senator Nancy Barto, Chairman, Senate Health and Human Services Committee
       Representative John M. Allen, Chairman, House Children and Family Affairs Committee
       Secretary of State Michele Reagan
       Kirk Adams, Chief of Staff, Office of the Governor
       Joan Clark, Director, Arizona State Library, Archives, and Public Records
       Lorenzo Romero, Director, Governor's Office of Strategic Planning and Budgeting
       Laura Johnson, Budget Manager, Governor's Office of Strategic Planning and Budgeting
       Christina Corieri, Health and Human Services Policy Advisor, Office of the Governor
       John Johnson, Division Chief Council, Child and Family Protection Division, Office of the
               Attorney General
       Emily Mercado, Analyst, Senate Health and Human Services Committee
       Ingrid Garvey, Analyst, House Children and Family Affairs Committee
       Wendy Baldo, Chief of Staff, Senate Majority Caucus
       Melissa Taylor, Senior Policy and Operations Advisor, Senate Majority Caucus
       Patsy Osmon, Policy Advisor, Senate Democratic Caucus
       Leslie Sorensen, Deputy Chief of Staff/Staff Attorney, House Majority Caucus
       Ryan Sullivan, Policy Advisor, House Majority Caucus
       Cynthia Aragon, Policy Advisor, House Democratic Caucus
       Representative Kate Brophy McGee, Arizona State House of Representatives

# CHILD WELFARE REPORTING REQUIREMENTS

# SEMI-ANNUAL REPORT

## FOR THE PERIOD OF

## APRIL 1, 2015 THROUGH SEPTEMBER 30, 2015



**ARIZONA REVISED STATUTES**

**[LAWS 2011, CHAPTER 147]**

**ARIZONA DEPARTMENT OF CHILD SAFETY**

## CHILD WELFARE REPORTING REQUIREMENTS

Arizona Revised Statute § 8-526 requires the Arizona Department of Child Safety (DCS) to compile information and produce a semi-annual report for the periods ending on March 31st and September 30th of each year regarding Child Welfare Services. This report is for the semi-annual reporting period beginning on April 1, 2015 and ending September 30, 2015.

## TABLE OF CONTENTS
(Reporting period: April 1, 2015 through September 30, 2015)

|  | Page |
|---|---|
| **EXECUTIVE SUMMARY**……………………………………………………………… | 4 |
| **SEMI-ANNUAL COMPARISONS**……………………………………………………….. | 7 |
| **REPORTS OF CHILD ABUSE AND NEGLECT** | |
| Reports by reporting period and type of child maltreatment – statewide data………….. | 8-9 |
| Sample communications to hotline, not meeting definition of a report…………………. | 10 |
| Reports received by priority - statewide data………………………………....…………… | 11 |
| Number of reports received by priority – county specific data…………………………. | 12 |
| Number of reports received by maltreatment – statewide data…………………………. | 13 |
| Number of reports received by maltreatment – county specific data…………………… | 14 |
| **ASSIGNMENT OF INVESTIGATIONS** | |
| Reports assigned for investigation by priority – statewide data……………….……….. | 15 |
| Reports assigned for investigation by priority – county specific data………………….. | 16 |
| Reports assigned for investigation by type of maltreatment – statewide data………….. | 17 |
| Reports assigned for investigation by type of maltreatment – county specific data……. | 18 |
| **INVESTIGATIONS OF CHILD ABUSE AND NEGLECT** | |
| Reports not responded to by priority – county specific data…………………………… | 19-20 |
| Investigations by priority – investigation open – statewide data……………………….. | 21 |
| Investigations by priority – investigation open – county specific data……..………….. | 22 |
| Investigations by type of child maltreatment – investigation open – statewide data........ | 22 |
| Investigations by type of child maltreatment – investigation open – county specific data……………………………………………………………………………………….. | 23 |
| Reports where removal occurred – county specific data………………………………… | 24-25 |
| **COMPLETED INVESTIGATIONS** | |
| Substantiation rate by reporting period…………………………………………………... | 25-26 |
| Investigations by priority – proposed substantiated reports – statewide data…………... | 27 |
| Investigations by priority – proposed substantiated reports – county specific data……... | 27-28 |
| Investigations by type of child maltreatment – proposed substantiated reports – statewide data………………………………………………………………………………. | 28 |
| Investigations by type of child maltreatment – proposed substantiated reports – county specific data………………………………………………………………………………... | 29 |
| Investigations by priority – substantiated reports – statewide data………..…………..… | 30 |

**TABLE OF CONTENTS (continued)**
(Reporting period: April 1, 2015 through September 30, 2015)

| | Page |
|---|---|
| Investigations by priority – substantiated reports county specific data…………….…... | 30-31 |
| Investigations by type of child maltreatment – substantiated reports – statewide data..… | 31 |
| Investigations by type of child maltreatment – substantiated reports – county specific data……………………………………………………………………………………… | 32 |
| Investigations by priority – unsubstantiated reports – statewide data………….……….. | 33 |
| Investigations by priority – unsubstantiated reports – county specific data……………… | 33-34 |
| Investigations by type of child maltreatment – unsubstantiated reports – statewide data.. | 34 |
| Investigations by type of child maltreatment – unsubstantiated reports – county specific data………………………………………………………………………………………... | 35 |

**SAFE HAVEN INFANTS**
| Number of Safe Haven infants delivered during reporting period……………………….. | 36 |

**CHILDREN ENTERING OUT-OF-HOME CARE**
| Total children entering out-of-home care……………………………………………….... | 36 |
| New entries by county – children under 18 years voluntary placement………………….. | 36-37 |
| New entries by county……………………………………………………………………... | 38-39 |
| New entries – statewide data……………………………………………………………... | 40 |

**CHILDREN IN OUT-OF-HOME CARE**
| Children in out-of-home care by reporting period……………………………………….. | 41 |
| All children in care by age and ethnicity………………………………………………….. | 42 |
| All children in care by case plan goal and placement type……………………………….. | 43 |
| All children in care by placement type and age………………………………………….. | 44 |
| Children in shelter or receiving homes for more than 21 days………………………….. | 45 |
| Children in out-of-home care by length of time in care………………………………….. | 45 |
| Children in out-of-home care by legal status…………………………………………….. | 46 |
| Children receiving and not receiving required visitation………………………………… | 47 |

**FOSTER HOME LICENSING, CLOSURES, AND VISITATIONS**
| Foster homes licensed…………………………………………………………………….. | 48 |
| Child bed spaces available……………………………………………………………….. | 48 |
| Foster homes closed and reason for closure ……………………………………………... | 48 |
| Number of foster homes receiving the required visitation……………………………….. | 49 |

**CHILDREN EXITING OUT-OF-HOME CARE**
| Semi-Annual comparisons of total number exiting care – for all reasons…………..……. | 50 |
| Total number exiting care…………………………………………………………………. | 51 |
| Total number exiting care – for reason of reunification with parents…………….……... | 52 |
| Total number exiting care – for reason of living with other relatives……………….…... | 53 |
| Total number exiting care – for reason of adoption………………………………………. | 54 |
| Total number exiting care – for reason of guardianship………………………………..... | 55 |

**Child Welfare Reporting Requirements**            **April 1, 2015 - September 30, 2015**

**TABLE OF CONTENTS (continued)**
(Reporting period: April 1, 2015 through September 30, 2015)

Page

Total number exiting care – for reason of reaching age of majority…………………….. 56
Total number exiting care – for reason of transfer to another agency…………………... 57
Total number exiting care – for reason of runaway…………………………….………... 58
Total number exiting care – for reason of death of child……………………………….. 59
Total number exiting care – by cause of death……………………………………………... 60
Total number exiting for reason of death of child – with alleged abuse…………………. 60

**CHILDREN WITH CASE PLAN GOALS OF ADOPTION**
Number of children with a petition for termination of parental rights…………………... 61
The placement and number of children with case plan goals of adoption by age……….. 61
The placement and number of children with case plan goals of adoption by ethnicity….. 62
The placement and number of children with case plan goals of adoption by legal status.. 62-63
Number of children – length of time from change of case plan goals of adoption to
adoptive placement…………………………………………………………………………. 64
Number of children in an adoptive placement by the marital status of the adoptive
parent……………………………………………………………………………………….. 64
Number of children in an adoptive placement by the relationship of the adoptive
parent……………………………………………………………………………………….. 65

**DISRUPTIONS**
Number of children with a case plan goal of adoption in an adoptive placement and
disrupted by age and ethnicity……………………………..………………………………. 65
Number of children with a case plan goal of adoption in an adoptive placement and
disrupted by the marital status of the adoptive parent…..…………………………………. 66
Number of children with a case plan goal of adoption in an adoptive placement and
disrupted by the relationship of the adoptive parent...…..………………………………… 66

**ADOPTIVE SERVICES**
Number of children with a finalized adoption………………………………………………. 67
Number of children with a finalized adoption by average length of time in out-of-home
placement before adoptive placement………………………………………………………. 67
Number of children with a finalized adoption by average length of time in adoptive
placement before the final order of adoption……………………………………………….. 68
Number of Children with a finalized adoption by the marital status of the adoptive
parent……………………………………………………………………………………….. 68
Number of children with a finalized adoption by the relationship of the adoptive parent. 69

## Executive Summary

The Arizona Department of Child Safety (DCS) is pleased to publish this semi-annual report for April 2015 through September 2015 in compliance with A.R.S. § 8-526.  In May 2014, the Department of Child Safety was created as a permanent, stand-alone agency with the express mission of safeguarding Arizona's abused and neglected children.

The data within this Semi-Annual Report assists with identifying areas for continued focus by the Department, stakeholders, policy makers, and advocacy groups. By working collaboratively toward shared goals, targeted resources and strategies will be implemented in a coordinated and purposeful manner, improving safety, permanency and well-being outcomes for children and families.

### Child Abuse Hotline and Investigations

The statewide Child Abuse Hotline received 26,455 calls that met the statutory criteria for a report. Of these, 433 were within the jurisdiction of military or tribal governments and were referred to those jurisdictions. The total number of reports represents a four percent increase over the prior reporting period, and a 5.5 percent increase over the same reporting period last year.   The Department continues to experience an increase in neglect reports, while the other maltreatment types have remained steady.

In addition to responding to all reports received in this reporting period, the Department closed more reports (15,076) this reporting period than any other reporting period in the past four years. This was accomplished even though DCS received more reports than it did in any other reporting period in the last four years.  This total number of reports closed is limited to reports that were received during the reporting period and subsequently closed.  Reports that were received in prior reporting periods and closed within this reporting period are not included in this total.

The DCS Strategic Plan was announced in July 2015 and identified several goals with deliverables for the Hotline and investigations.  To date, the Department has completed several deliverables, including, but not limited to:

- Instituted notification to callers to the Hotline about false reporting penalties;
- Hired dedicated audit staff at the Hotline for quality assurance;
- Completed policy analysis on the investigation/assessment of very low risk families;
- Created a new Hotline screening decision-making tool that clarifies report and prioritization requirements;
- Implemented a field guide that facilitates the collection and documentation of safety and risk assessment information;
- Created and implemented supervision guides for investigation and ongoing cases;
- Created a review guide for Assistant Program Managers aligned with the safety; assessment model for use in considered removals;
- Implemented Multidisciplinary Team (MDT) reviews of fatality/near fatality cases;
- Created a data dashboard to monitor open report volume and categorize reports by risk factors; and
- Created a dashboard to track overall investigation case management.

**Child Welfare Reporting Requirements**                **April 1, 2015 - September 30, 2015**

## Children in Out-of-Home Care

The Department remains committed to working with the community to keep children safe and prevent the need for children to be removed from their homes. Notwithstanding this commitment, the number of children in out-of-home care increased from 17,592 in the prior reporting period to 18,657 in September 2015.

The Department continues to make efforts to place children who have been removed from their home in the most family-like setting possible. In September 2015, 14,863 children – or approximately 80 percent of all children in out-of-home care – were placed with relatives, licensed foster parents, or trial home visit with a parent.  Efforts to increase the number of licensed foster parents who are able to meet the needs of children requiring out-of-home placement resulted in 774 new homes being licensed during the reporting period.

As part of the strategic plan, the Department is striving to improve capacity to place children in family environments and fully meet the needs of children in care and their families.  During this reporting period DCS was able to accomplish the following:

- Increased use of Placement Coordinators to identify available kinship placements upon removal;
- Expanded the use of software tools, e.g. Lexis Nexis, to find potential kinship placements;
- Established Fostering Inclusion Respect Support Trust Advisory (FIRST) Commission; and
- Established the Building Resilient Families program to deliver in-home prevention services in Maricopa County for low risk families who have been the subject of a DCS investigation.

The state requires monthly face-to-face visitation with children in foster care.  The current report shows that 84.4 percent of the children in foster care received their visitation during the last month of the reporting period. There is a strong correlation between caseworker visits with children and positive outcomes for these children, such as achieving permanency and other indicators of child well-being.  The Department continues to make efforts to improve our rate of visitation.

## Permanency for Children

Arizona is a national leader in the number of finalized adoptions. The Department remains committed to work toward achieving permanency for children placed in out-of-home care as demonstrated by increasing the total number of children achieving permanency through adoption. This number increased by two percent, from 1,576 during this reporting period compared to 1,552 during the same reporting period last year.

The Department demonstrated a significant increase in the number of children safely reunified with their families.  3,102 children exited DCS custody to reunify with their parents or primary caretakers this reporting period compared to 2,636 during the last reporting period, which is an 18% increase.

As part of the Strategic Plan, the Department continues recruitment efforts of foster and adoptive homes.  Recently, the Department adjusted foster care reimbursement rates for families who are

willing and capable of providing a home for youth ages 12 to 18 years old and sibling groups in this age group.

## Strategic Goals to Address Challenges

The Department continues to face both workload and process challenges in its efforts to ensure safety and promote permanency for abused and neglected children. Examples of the more pressing challenges the Department continues to pursue include the increased number of children in out-of-home care, the significant amount of overdue investigations, and the need to improve the hiring and training of qualified personnel.   The Department's Strategic Plan represents the leadership's commitment to refocus attention and resources on the safety, permanency, and well-being of children in Arizona.   Below are five strategic goals that address several of the most pressing challenges faced by the Department:

1. Improve objective decision-making at the Hotline and investigations.
2. Improve performance and quality of service through employee retention.
3. Reduce length of stay for children in out-of-home care.
4. Reduce recurrence of maltreatment by improving service delivery.
5. Improve capacity to place children in family environments.

As noted previously, the legislation enacted to create the Department included funding to increase the number of child safety specialists. Hiring these specialists during fiscal year 2015 presented a significant challenge to the Department.  However, in September 2015 the Department had filled nearly all of its budgeted positions for child safety specialists, including staff at the Hotline.

The Department continues to assess processes and program controls to identify ways to address these challenges. Solutions will include partnering with the community and stakeholders to ensure that the safety and wellbeing of the children is always the top priority.  The Department continues to work in partnership with the federal government to meet the federal Child and Family Service Review (CFSR) standards to improve outcomes for the children and families it serves.

The Department previously included three charts that were not required by A.R.S. § 8-526.  In order to better align this report with the requirements of the statute, the Department is not including these charts anymore.  Information on the number of children in care by placement type and by age is still included in Table 33 of this report.

**Child Welfare Reporting Requirements**                    **April 1, 2015 - September 30, 2015**

## Semi-Annual Comparisons

| | Oct 2011 through Mar 2012 | Apr 2012 through Sep 2012 | Oct 2012 through Mar 2013 | Apr 2013 through Sep 2013 | Oct 2013 through Mar 2014 | Apr 2014 through Sep 2014 | Oct 2014 through Mar 2015 | Apr 2015 through Sep 2015 |
|---|---|---|---|---|---|---|---|---|
| Number of Reports Received | 20,466 | 21,625 | 22,161 | 22,032 | 22,956 | 25,076 | 25,508 | 26,455 |
| Number of Reports Substantiated[1] | 2,748 | 2,809 | 2,588 | 2,704 | 3,190 | 3,456 | 3,535 | 1,926 |
| Substantiation Rate | 14% | 14% | 13% | 12% | 14% | 14% | 14% | 7% |
| Number of Reports Investigated & Closed | 10,345 | 9,168 | 10,923 | 11,212 | 11,392 | 12,038 | 13,045 | 15,076 |
| Number of Reports Responded to | 19,274 | 20,413 | 20,253 | 20,122 | 22,162 | 24,435 | 25,182 | 26,022 |
| Number of new removals | 4,968 | 5,716 | 5,101 | 5,702 | 5,701 | 6,461 | 5,935 | 6,819 |
| Number of new removals with Voluntary under 18 | 150 | 116 | 97 | 118 | 90 | 189 | 131 | 154 |
| Number of Children in Out-of-Home Care on the Last Day of Reporting Period | 12,453 | 14,111 | 14,314 | 15,037 | 15,751 | 16,990 | 17,592 | 18,657 |
| Number of Children in Shelter for More than 21 Days | 713 | 764 | 792 | 824 | 802 | 868 | 900 | 878 |
| Number and Percentage of Children Receiving Visitation In the Last Month of Reporting Period | 9,728 (78.1%) | 10,404 (73.7%) | 12,101 (84.5%) | 12,997 (86.4%) | 13,818 (87.7%) | 14,846 (87.4%) | 15,323 (87.1%) | 15,746 (84.4%) |
| Number and Percentage of Children not Receiving Visitation | 2,725 (21.9%) | 3,707 (26.3%) | 2,213 (15.5%) | 2,040 (13.6%) | 1,933 (12.3%) | 2,144 (12.6%) | 2,269 (12.9%) | 2,911 (15.6%) |
| Number and Percentage of Parents Receiving Visitation | 1,081 (57.1%) | 1,017 (51.2%) | 1,058 (50.9%) | 1,157 (52.4%) | 1,344 (53.8%) | 1,315 (52.0%) | 1,372 (55.7%) | 1,576 (50.9%) |
| Number of Licensed Foster Homes[2] | 3,480 | 3,748 | 3,516 | 3,900 | 4,329 | 4,397 | 4,497 | 4,551 |
| Number of Foster Home Spaces Available to DCS | 8,572 | 7,716 | 8,579 | 8,573 | 9,049 | 9,061 | 9,079 | 9,114 |
| Number of New Foster Homes | 663 | 999 | 722 | 717 | 1,050 | 756 | 821 | 774 |
| Number of Foster Homes Closed | 679 | 747 | 740 | 715 | 787 | 822 | 785 | 767 |
| Number and Percentage of Foster Homes Receiving Visitation In the Last Qtr. Of Reporting Period | 3,132 (79.9%) | 3,095 (82.6%) | 3,316 (92.7) | 3,491 (89.5%) | 3,689 (85.2%) | 3,949 (89.8%) | 3,881 (86.3%) | 3,925 (86.2%) |
| Number and Percentage of Foster Homes not Receiving Visitation | 790 (20.1) | 653 (17.4%) | 260 (7.3%) | 409 (10.5%) | 640 (14.8%) | 448 (10.2%) | 616 (13.7%) | 626 (13.8%) |
| Number of Children Leaving DCS Custody | 3,826 | 3,923 | 4,668 | 4,805 | 4,786 | 5,042 | 5,063 | 5,555 |
| Number of Children With a Case Plan Goal of Adoption | 2,663 | 2,719 | 2,852 | 3,311 | 3,417 | 3,377 | 3,449 | 3,878 |
| Number of Children With a Finalized Adoption | 1,224 | 1,025 | 1,270 | 1,215 | 1,518 | 1,552 | 1,629 | 1,576 |

---

[1] Since the appeals process delays the substantiation of reports, revisions to the substantiation rate for the prior reporting period will occur with every semi-annual report produced.

[2] The number of available foster homes includes homes reported by the Department's Home Recruitment, Study and Supervision contractors along with foster homes utilized for appropriate children in coordination with the Division of Developmental Disabilities.

**Child Welfare Reporting Requirements**                    **April 1, 2015 - September 30, 2015**

**Reports of Child Abuse & Neglect**

Child abuse and neglect are defined in A.R.S. §8-201 and A.R.S. §13-3623 (A).  These definitions provide the major categories in this report.

Between April 1, 2015 through September 30, 2015, there were 26,455 incoming communications to the Child Abuse Hotline that met the criteria for a report of abuse or neglect. Of these, 433 were within the jurisdiction of military or tribal governments and were referred to those jurisdictions. Compared to one year ago, there has been a 5.5 percent increase in reports received by the Child Abuse Hotline meeting the criteria of a report of abuse or neglect.

Table 1 shows the number of reports received by the Department by category of maltreatment for the current and past reporting periods. One consistent trend is the increase in the proportion of reports that meet the criteria of neglect. In accordance with Strategic Plan, the Department is examining current Child Abuse Hotline policies and procedures to improve objectivity within screening tools and improve inter-rater reliability.

**TABLE 1**
**REPORTS BY REPORTING PERIOD AND TYPE OF MALTREATMENT**

|  | Neglect | Physical Abuse | Sexual Abuse | Emotional Abuse | Total |
|---|---|---|---|---|---|
| October 2011 – March 2012 | 13,369 65.3% | 6,198 30.3% | 739 3.6% | 160 0.8% | 20,466 100.0% |
| April 2012 – September 2012 | 14,722 68.1% | 5,974 27.6% | 764 3.5% | 165 0.8% | 21,625 100.0% |
| October 2012 – March 2013 | 14,916 67.2% | 6,263 28.3% | 815 3.7% | 167 0.8% | 22,161 100.0% |
| April 2013 – September 2013 | 15,560 70.6% | 5,607 25.5% | 731 3.3% | 134 0.6% | 22,032 100.0% |
| October 2013 – March 2014 | 15,766 68.7% | 6,248 27.2% | 772 3.4% | 170 0.7% | 22,956 100.0% |
| April 2014 – September 2014 | 18,022 71.9% | 6,074 24.2% | 847 3.4% | 133 0.5% | 25,076 100.0% |
| October 2014 – March 2015 | 18,338 71.9% | 6,254 24.5% | 787 3.1% | 129 0.5% | 25,508 100.0% |
| April 2015 – September 2015 | 19,276 72.9% | 6,086 23.0% | 954 3.6% | 139 0.5% | 26,455 100.0% |

**Child Welfare Reporting Requirements**                    **April 1, 2015 - September 30, 2015**

Chart 1 illustrates that the number of reports received by the Centralized Intake Hotline has increased by 1,379 reports over the same reporting period last year. The chart below also shows that the significant upward trend in reports received by the Centralized Intake Hotline has continued since FY 2012. This in turn resulted in more children entering out-of-home care (see Chart 18 for information on the out-of-home population).

**CHART 1**
**REPORTS OF CHILD ABUSE AND NEGLECT BY REPORTING PERIOD**



**Child Welfare Reporting Requirements**                    **April 1, 2015 - September 30, 2015**

The Centralized Intake Hotline received a total of 78,531 calls during the reporting period. Of those, 75,482 were answered by a Hotline specialist and 2,658, or 3.5 percent, were abandoned calls.  The 75,482 yielded 49,027 communications (includes calls, court orders, online submissions, mail, faxes and/or emails) and 26,455 reports of abuse and neglect. Communications do not meet the statutory criteria of a report of maltreatment. A random sample of communications was reviewed to identify the types of calls that do not get classified as reports of abuse and neglect. The results of this review are contained in the chart below.

**CHART 2**
**SAMPLE OF COMMUNICATIONS TO THE CENTRALIZED INTAKE HOTLINE THAT DO NOT MEET THE STATUTORY REQUIREMENTS OF A REPORT OF ABUSE OR NEGLECT**



N=90

    A  =  Concern Only/No Allegation of Child Abuse or Neglect
    B  =  Out of DCS Jurisdiction
    C  =  Call Appropriate for Law Enforcement Jurisdiction[3]
    D  =  Non-Caretaker Neglect/Child No Longer at Risk
    E  =  Insufficient Information
    F  =  Truancy/Custody Issues
    G  =  Current Case Questions or Referrals

All communications that do not meet the statutory requirements for a field investigation of abuse or neglect are reviewed by supervisors or program specialists at the Hotline.

---

[3] The category "Call Appropriate for Law Enforcement Jurisdiction" refers to a situation where the alleged perpetrator is not a parent or primary caretaker and the allegations, if true, would constitute a crime.

Chart 3 below provides information on the number of reports that met each of the Centralized Intake Hotline priority classifications in the current and past reporting periods. In Table 2 and Table 3, data on total reports by priority is shown by county for the current and previous reporting periods. The priority determinations are made by personnel at the child abuse hotline after the review of multiple factors, however, below is a high level summary of each response time criteria.

PRIORITY 1: Present danger refers to an immediate, significant and clearly observable family condition present now that has resulted in or is likely to result in serious or severe harm requiring an immediate initial response.

PRIORITY 2: Impending danger may not be occurring in the present but is likely to occur in the immediate to near future and will likely result in serious or severe harm to a child.

PRIORITY 3: Reports that do not rise to the level of present or impending danger, but there is an incident of abuse or neglect that has happened in the past 30 days. This includes a current minor injury to the child.

PRIORITY 4: Reports that do not rise to the level of present or impending danger, but 1) there is an incident of abuse or neglect that happened more than 30 days ago, or 2) the date of last occurrence is unknown and there is no current physical indicator of maltreatment, or 3) there is unreasonable risk of harm to the child's health or welfare.

**CHART 3**
**NUMBER OF REPORTS RECEIVED BY PRIORITY**



**TABLE 2**
**NUMBER OF REPORTS RECEIVED BY PRIORITY AND COUNTY FOR PERIOD OF**
**APRIL 1, 2015 THROUGH SEPTEMBER 30, 2015**

| COUNTY | PRIORITY 1 | PRIORITY 2 | PRIORITY 3 | PRIORITY 4 | TOTAL | % OF TOTAL |
|---|---|---|---|---|---|---|
| APACHE | 31 | 20 | 44 | 30 | 125 | 0.5% |
| COCHISE | 78 | 95 | 217 | 58 | 448 | 1.7% |
| COCONINO | 89 | 73 | 165 | 81 | 408 | 1.5% |
| GILA | 70 | 65 | 98 | 42 | 275 | 1.0% |
| GRAHAM | 38 | 38 | 64 | 37 | 177 | 0.7% |
| GREENLEE | 0 | 0 | 0 | 0 | 0 | 0.0% |
| LA PAZ | 18 | 21 | 35 | 14 | 88 | 0.3% |
| MARICOPA | 3,014 | 2,736 | 6,201 | 3,621 | 15,572 | 58.9% |
| MOHAVE | 175 | 190 | 350 | 176 | 891 | 3.4% |
| NAVAJO | 114 | 80 | 177 | 114 | 485 | 1.8% |
| PIMA | 780 | 913 | 2,154 | 964 | 4,811 | 18.2% |
| PINAL | 311 | 327 | 700 | 378 | 1,716 | 6.5% |
| SANTA CRUZ | 33 | 19 | 65 | 77 | 194 | 0.7% |
| YAVAPAI | 101 | 146 | 308 | 159 | 714 | 2.7% |
| YUMA | 110 | 94 | 239 | 108 | 551 | 2.1% |
| STATEWIDE | 4,962 | 4,817 | 10,817 | 5,859 | 26,455 | 100.0% |
| % OF TOTAL | 18.8% | 18.2% | 40.8% | 22.2% | 100.0% | |

**TABLE 3**
**NUMBER OF REPORTS RECEIVED BY PRIORITY AND COUNTY FOR PERIOD OF**
**OCTOBER 1, 2014 THROUGH MARCH 31, 2015**

| COUNTY | PRIORITY 1 | PRIORITY 2 | PRIORITY 3 | PRIORITY 4 | TOTAL | % OF TOTAL |
|---|---|---|---|---|---|---|
| APACHE | 19 | 14 | 33 | 22 | 88 | 0.3% |
| COCHISE | 74 | 103 | 164 | 58 | 399 | 1.6% |
| COCONINO | 98 | 91 | 229 | 86 | 504 | 2.0% |
| GILA | 34 | 54 | 65 | 32 | 185 | 0.7% |
| GRAHAM | 31 | 36 | 65 | 48 | 180 | 0.7% |
| GREENLEE | 3 | 0 | 4 | 3 | 10 | <0.1% |
| LA PAZ | 20 | 10 | 21 | 16 | 67 | 0.3% |
| MARICOPA | 2,885 | 2,872 | 6,182 | 3,242 | 15,181 | 59.4% |
| MOHAVE | 145 | 176 | 308 | 133 | 762 | 3.0% |
| NAVAJO | 82 | 92 | 131 | 90 | 395 | 1.6% |
| PIMA | 782 | 868 | 2,099 | 944 | 4,693 | 18.4% |
| PINAL | 313 | 316 | 688 | 354 | 1,671 | 6.6% |
| SANTA CRUZ | 17 | 16 | 52 | 64 | 149 | 0.6% |
| YAVAPAI | 114 | 126 | 325 | 164 | 729 | 2.9% |
| YUMA | 83 | 105 | 216 | 91 | 495 | 1.9% |
| STATEWIDE | 4,700 | 4,879 | 10,582 | 5,347 | 25,508 | 100.0% |
| % OF TOTAL | 18.4% | 19.1% | 41.5% | 21.0% | 100.0% | |

**Child Welfare Reporting Requirements**                **April 1, 2015 - September 30, 2015**

The following chart and tables provide the number of reports categorized by type of maltreatment. The total number of reports received by type of maltreatment is displayed in Chart 4. In Table 4 and Table 5, data on the total reports by type of maltreatment is shown by county for the current and previous reporting periods.

**CHART 4**
**NUMBER OF REPORTS RECEIVED BY TYPE OF MALTREATMENT**



**TABLE 4**
**NUMBER OF REPORTS RECEIVED BY TYPE OF MALTREATMENT AND COUNTY FOR PERIOD OF APRIL 1, 2015 THROUGH SEPTEMBER 30, 2015**

| COUNTY | EMOTIONAL ABUSE | NEGLECT | PHYSICAL ABUSE | SEXUAL ABUSE | TOTAL | % OF TOTAL |
|---|---|---|---|---|---|---|
| APACHE | 0 | 98 | 21 | 6 | 125 | 0.5% |
| COCHISE | 1 | 320 | 107 | 20 | 448 | 1.7% |
| COCONINO | 2 | 302 | 85 | 19 | 408 | 1.5% |
| GILA | 2 | 221 | 42 | 10 | 275 | 1.0% |
| GRAHAM | 2 | 128 | 40 | 7 | 177 | 0.7% |
| GREENLEE | 0 | 0 | 0 | 0 | 0 | 0.0% |
| LA PAZ | 0 | 68 | 18 | 2 | 88 | 0.3% |
| MARICOPA | 79 | 11,182 | 3,740 | 571 | 15,572 | 58.9% |
| MOHAVE | 3 | 667 | 189 | 32 | 891 | 3.4% |
| NAVAJO | 3 | 385 | 77 | 20 | 485 | 1.8% |
| PIMA | 33 | 3,598 | 1,045 | 135 | 4,811 | 18.2% |
| PINAL | 8 | 1,235 | 408 | 65 | 1,716 | 6.5% |
| SANTA CRUZ | 1 | 134 | 46 | 13 | 194 | 0.7% |
| YAVAPAI | 2 | 536 | 136 | 40 | 714 | 2.7% |
| YUMA | 3 | 402 | 132 | 14 | 551 | 2.1% |
| STATEWIDE | 139 | 19,276 | 6,086 | 954 | 26,455 | 100.0% |
| % OF TOTAL | 0.5% | 72.9% | 23.0% | 3.6% | 100.0% | |

**TABLE 5**
**NUMBER OF REPORTS RECEIVED BY TYPE OF MALTREATMENT AND COUNTY FOR**
**PERIOD OF OCTOBER 1, 2014 THROUGH MARCH 31, 2015**

| COUNTY | EMOTIONAL ABUSE | NEGLECT | PHYSICAL ABUSE | SEXUAL ABUSE | TOTAL | % OF TOTAL |
|---|---|---|---|---|---|---|
| APACHE | 1 | 58 | 26 | 3 | 88 | 0.3% |
| COCHISE | 1 | 285 | 95 | 18 | 399 | 1.6% |
| COCONINO | 3 | 332 | 142 | 27 | 504 | 2.0% |
| GILA | 1 | 142 | 36 | 6 | 185 | 0.7% |
| GRAHAM | 1 | 132 | 39 | 8 | 180 | 0.7% |
| GREENLEE | 0 | 7 | 3 | 0 | 10 | <0.1% |
| LA PAZ | 0 | 59 | 6 | 2 | 67 | 0.3% |
| MARICOPA | 77 | 10,777 | 3,843 | 484 | 15,181 | 59.4% |
| MOHAVE | 4 | 569 | 171 | 18 | 762 | 3.0% |
| NAVAJO | 2 | 302 | 85 | 6 | 395 | 1.6% |
| PIMA | 26 | 3,461 | 1,086 | 120 | 4,693 | 18.4% |
| PINAL | 9 | 1,213 | 399 | 50 | 1,671 | 6.6% |
| SANTA CRUZ | 0 | 98 | 43 | 8 | 149 | 0.6% |
| YAVAPAI | 0 | 537 | 171 | 21 | 729 | 2.9% |
| YUMA | 4 | 366 | 109 | 16 | 495 | 1.9% |
| STATEWIDE | 129 | 18,338 | 6,254 | 787 | 25,508 | 100.0% |
| % OF TOTAL | 0.5% | 71.9% | 24.5% | 3.1% | 100.0% | |

**Child Welfare Reporting Requirements**                     **April 1, 2015 - September 30, 2015**

## ASSIGNMENT OF INVESTIGATIONS

During the current reporting period, there were 26,455 calls to the Hotline that met the statutory criteria for a report. Of those, 433 reports fell within the jurisdiction of military or tribal governments. All reports had response data entered at the time this report was compiled. The assignment of the remaining 26,022 reports for investigation is report in this section.

The tables and charts in this section provide statewide and county level information on these reports assigned to DCS. Of these, DCS completed 15,076 (57.9%) of their assigned investigations. Those not completed remain open when the investigation is still in process, when the specialist is waiting for the results of a law enforcement investigation and/or receipt of records that impact the investigation finding, or when the investigation has been completed but is awaiting supervisory review and approval.

**CHART 5**
**NUMBER OF REPORTS ASSIGNED FOR INVESTIGATION BY PRIORITY AND**
**REPORTING PERIOD**



**TABLE 6**
**NUMBER OF REPORTS ASSIGNED FOR INVESTIGATION BY PRIORITY AND COUNTY**
**FOR PERIOD OF APRIL 1, 2015 THROUGH SEPTEMBER 30, 2015**

| COUNTY | PRIORITY 1 | PRIORITY 2 | PRIORITY 3 | PRIORITY 4 | TOTAL | % OF TOTAL |
|---|---|---|---|---|---|---|
| APACHE | 24 | 16 | 28 | 19 | 87 | 0.3% |
| COCHISE | 78 | 95 | 217 | 58 | 448 | 1.7% |
| COCONINO | 68 | 63 | 142 | 71 | 344 | 1.3% |
| GILA | 52 | 57 | 87 | 34 | 230 | 0.9% |
| GRAHAM | 32 | 35 | 58 | 33 | 158 | 0.6% |
| GREENLEE | 0 | 0 | 0 | 0 | 0 | 0.0% |
| LA PAZ | 11 | 15 | 24 | 12 | 62 | 0.2% |
| MARICOPA | 3,000 | 2,725 | 6,191 | 3,615 | 15,531 | 59.8% |
| MOHAVE | 170 | 188 | 349 | 174 | 881 | 3.4% |
| NAVAJO | 80 | 69 | 150 | 96 | 395 | 1.5% |
| PIMA | 771 | 903 | 2,141 | 957 | 4,772 | 18.3% |
| PINAL | 298 | 320 | 687 | 366 | 1,671 | 6.4% |
| SANTA CRUZ | 33 | 19 | 65 | 77 | 194 | 0.8% |
| YAVAPAI | 99 | 141 | 304 | 156 | 700 | 2.7% |
| YUMA | 108 | 94 | 239 | 108 | 549 | 2.1% |
| STATEWIDE | 4,824 | 4,740 | 10,682 | 5,776 | 26,022 | 100.0% |
| % OF TOTAL | 18.5% | 18.2% | 41.1% | 22.2% | 100.0% | |

**TABLE 7**
**NUMBER OF REPORTS ASSIGNED FOR INVESTIGATION BY PRIORITY AND COUNTY**
**FOR PERIOD OF OCTOBER 1, 2014 THROUGH MARCH 31, 2015**

| COUNTY | PRIORITY 1 | PRIORITY 2 | PRIORITY 3 | PRIORITY 4 | TOTAL | % OF TOTAL |
|---|---|---|---|---|---|---|
| APACHE | 11 | 9 | 23 | 14 | 57 | 0.2% |
| COCHISE | 74 | 103 | 164 | 58 | 399 | 1.6% |
| COCONINO | 78 | 80 | 214 | 76 | 448 | 1.8% |
| GILA | 26 | 50 | 62 | 30 | 168 | 0.7% |
| GRAHAM | 30 | 35 | 61 | 48 | 174 | 0.7% |
| GREENLEE | 3 | 0 | 4 | 3 | 10 | <0.1% |
| LA PAZ | 17 | 7 | 18 | 14 | 56 | 0.2% |
| MARICOPA | 2,870 | 2,864 | 6,178 | 3,232 | 15,144 | 60.1% |
| MOHAVE | 142 | 173 | 308 | 132 | 755 | 3.0% |
| NAVAJO | 57 | 74 | 117 | 78 | 326 | 1.3% |
| PIMA | 771 | 862 | 2,088 | 940 | 4,661 | 18.5% |
| PINAL | 294 | 311 | 672 | 350 | 1,627 | 6.5% |
| SANTA CRUZ | 17 | 16 | 52 | 64 | 149 | 0.6% |
| YAVAPAI | 112 | 126 | 316 | 161 | 715 | 2.8% |
| YUMA | 83 | 104 | 215 | 91 | 493 | 2.0% |
| STATEWIDE | 4,585 | 4,814 | 10,492 | 5,291 | 25,182 | 100.0% |
| % OF TOTAL | 18.2% | 19.1% | 41.7% | 21.0% | 100.0% | |

**CHART 6**
**NUMBER OF REPORTS ASSIGNED FOR INVESTIGATION BY TYPE OF MALTREATMENT AND REPORTING PERIOD**



**TABLE 8**
**NUMBER OF REPORTS ASSIGNED FOR INVESTIGATION BY TYPE OF MALTREATMENT AND COUNTY FOR PERIOD OF APRIL 1, 2015 THROUGH SEPTEMBER 30, 2015**

| COUNTY | EMOTIONAL ABUSE | NEGLECT | PHYSICAL ABUSE | SEXUAL ABUSE | TOTAL | % OF TOTAL |
|---|---|---|---|---|---|---|
| APACHE | 0 | 69 | 15 | 3 | 87 | 0.3% |
| COCHISE | 1 | 320 | 107 | 20 | 448 | 1.7% |
| COCONINO | 2 | 253 | 73 | 16 | 344 | 1.3% |
| GILA | 2 | 181 | 37 | 10 | 230 | 0.9% |
| GRAHAM | 2 | 113 | 36 | 7 | 158 | 0.6% |
| GREENLEE | 0 | 0 | 0 | 0 | 0 | 0.0% |
| LA PAZ | 0 | 48 | 12 | 2 | 62 | 0.2% |
| MARICOPA | 79 | 11,147 | 3,736 | 569 | 15,531 | 59.8% |
| MOHAVE | 3 | 659 | 187 | 32 | 881 | 3.4% |
| NAVAJO | 3 | 309 | 66 | 17 | 395 | 1.5% |
| PIMA | 33 | 3,567 | 1,039 | 133 | 4,772 | 18.3% |
| PINAL | 8 | 1,201 | 398 | 64 | 1,671 | 6.4% |
| SANTA CRUZ | 1 | 134 | 46 | 13 | 194 | 0.8% |
| YAVAPAI | 2 | 522 | 136 | 40 | 700 | 2.7% |
| YUMA | 3 | 400 | 132 | 14 | 549 | 2.1% |
| STATEWIDE | 139 | 18,923 | 6,020 | 940 | 26,022 | 100.0% |
| % OF TOTAL | 0.5% | 23.1% | 23.1% | 3.6% | 100.0% | |

**Child Welfare Reporting Requirements**                          **April 1, 2015 - September 30, 2015**

**TABLE 9**
**NUMBER OF REPORTS ASSIGNED FOR INVESTIGATION BY TYPE OF MALTREATMENT**
**AND COUNTY FOR PERIOD OF OCTOBER 1, 2014 THROUGH MARCH 31, 2015**

| COUNTY | EMOTIONAL ABUSE | NEGLECT | PHYSICAL ABUSE | SEXUAL ABUSE | TOTAL | % OF TOTAL |
|---|---|---|---|---|---|---|
| APACHE | 1 | 35 | 19 | 2 | 57 | 0.2% |
| COCHISE | 1 | 285 | 95 | 18 | 399 | 1.6% |
| COCONINO | 3 | 291 | 129 | 25 | 448 | 1.8% |
| GILA | 1 | 128 | 33 | 6 | 168 | 0.7% |
| GRAHAM | 1 | 126 | 39 | 8 | 174 | 0.7% |
| GREENLEE | 0 | 7 | 3 | 0 | 10 | <0.1% |
| LA PAZ | 0 | 50 | 4 | 2 | 56 | 0.2% |
| MARICOPA | 77 | 10,750 | 3,835 | 482 | 15,144 | 60.1% |
| MOHAVE | 4 | 563 | 170 | 18 | 755 | 3.0% |
| NAVAJO | 1 | 245 | 75 | 5 | 326 | 1.3% |
| PIMA | 26 | 3,437 | 1,079 | 119 | 4,661 | 18.5% |
| PINAL | 9 | 1,178 | 391 | 49 | 1,627 | 6.5% |
| SANTA CRUZ | 0 | 98 | 43 | 8 | 149 | 0.6% |
| YAVAPAI | 0 | 526 | 168 | 21 | 715 | 2.8% |
| YUMA | 4 | 364 | 109 | 16 | 493 | 2.0% |
| STATEWIDE | 128 | 18,083 | 6,192 | 779 | 25,182 | 100.0% |
| % OF TOTAL | 0.5% | 71.8% | 24.6% | 3.1% | 100.0% |  |

## INVESTIGATIONS OF CHILD ABUSE AND NEGLECT

Responding to all reports that come into the Hotline remains a priority to the Department because it is essential to ensuring the safety of children.  For the second consecutive reporting period, the Department responded to all reports received during this reporting period.  Therefore, no data will be displayed in Table 10 and Chart 7 below.

**TABLE 10**
**NUMBER OF REPORTS WITHOUT RESPONSE DATA BY PRIORITY AND COUNTY FOR PERIOD OF APRIL 1, 2015 THROUGH SEPTEMBER 30, 2015**

| COUNTY | PRIORITY 1 | PRIORITY 2 | PRIORITY 3 | PRIORITY 4 | TOTAL | % OF TOTAL |
|---|---|---|---|---|---|---|
| APACHE | 0 | 0 | 0 | 0 | 0 | 0.0% |
| COCHISE | 0 | 0 | 0 | 0 | 0 | 0.0% |
| COCONINO | 0 | 0 | 0 | 0 | 0 | 0.0% |
| GILA | 0 | 0 | 0 | 0 | 0 | 0.0% |
| GRAHAM | 0 | 0 | 0 | 0 | 0 | 0.0% |
| GREENLEE | 0 | 0 | 0 | 0 | 0 | 0.0% |
| LA PAZ | 0 | 0 | 0 | 0 | 0 | 0.0% |
| MARICOPA | 0 | 0 | 0 | 0 | 0 | 0.0% |
| MOHAVE | 0 | 0 | 0 | 0 | 0 | 0.0% |
| NAVAJO | 0 | 0 | 0 | 0 | 0 | 0.0% |
| PIMA | 0 | 0 | 0 | 0 | 0 | 0.0% |
| PINAL | 0 | 0 | 0 | 0 | 0 | 0.0% |
| SANTA CRUZ | 0 | 0 | 0 | 0 | 0 | 0.0% |
| YAVAPAI | 0 | 0 | 0 | 0 | 0 | 0.0% |
| YUMA | 0 | 0 | 0 | 0 | 0 | 0.0% |
| STATEWIDE | 0 | 0 | 0 | 0 | 0 | 0.0% |
| % OF TOTAL | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | |

By statute, a random sample of reports that do not have data on an investigative response in each reporting period is required. In addition, short descriptions of these reports are also required. As all reports were responded to during this period, there is no data to be sampled and displayed in Chart 7.

**CHART 7**
**NUMBER OF REPORTS WITHOUT RESPONSE DATA BY CATEGORY FOR THE PERIOD
OF APRIL 1, 2015 THROUGH SEPTEMBER 30, 2015**



N=0

**A  =  Adolescent, Past Abuse, No Current Injuries**
**B  =  Inadequate Housekeeping Standards**
**C  =  Inappropriate Vehicle Operation**
**D  =  No Specific Allegations**
**E  =  Past Abuse no current injuries**
**F  =  Adolescent, current minor injuries**
**G  =  Non-adolescent, current minor injuries**
**H =  Poor parenting skills**
**I  =   Left with inappropriate caregiver**
**J  =  Law Enforcement Issue**
**K = Out of Control Teenager**

**Child Welfare Reporting Requirements**                    **April 1, 2015 - September 30, 2015**

**CHART 8**
**NUMBER OF REPORTS ASSIGNED FOR INVESTIGATION BY PRIORITY AND**
**REPORTING PERIOD FOR REPORTS OPEN FOR INVESTIGATION**



**TABLE 11**
**NUMBER OF REPORTS BY PRIORITY AND COUNTY FOR REPORTS OPEN FOR**
**INVESTIGATION FOR PERIOD OF APRIL 1, 2015 THROUGH SEPTEMBER 30, 2015**

| COUNTY | PRIORITY 1 | PRIORITY 2 | PRIORITY 3 | PRIORITY 4 | TOTAL | % OF TOTAL |
|---|---|---|---|---|---|---|
| APACHE | 0 | 1 | 4 | 4 | 9 | 0.1% |
| COCHISE | 48 | 61 | 161 | 44 | 314 | 2.9% |
| COCONINO | 16 | 17 | 41 | 21 | 95 | 0.9% |
| GILA | 32 | 47 | 72 | 29 | 180 | 1.6% |
| GRAHAM | 19 | 22 | 39 | 20 | 100 | 0.9% |
| GREENLEE | 0 | 0 | 0 | 0 | 0 | 0.0% |
| LA PAZ | 5 | 5 | 11 | 5 | 26 | 0.2% |
| MARICOPA | 956 | 1,230 | 3,237 | 1,806 | 7,229 | 66.0% |
| MOHAVE | 58 | 74 | 169 | 94 | 395 | 3.6% |
| NAVAJO | 3 | 4 | 15 | 7 | 29 | 0.3% |
| PIMA | 166 | 217 | 629 | 313 | 1,325 | 12.1% |
| PINAL | 84 | 121 | 357 | 151 | 713 | 6.5% |
| SANTA CRUZ | 23 | 11 | 52 | 68 | 154 | 1.4% |
| YAVAPAI | 28 | 52 | 101 | 67 | 248 | 2.3% |
| YUMA | 18 | 18 | 64 | 29 | 129 | 1.2% |
| STATEWIDE | 1,456 | 1,880 | 4,952 | 2,658 | 10,946 | 100.0% |
| % OF TOTAL | 13.3% | 17.2% | 45.2% | 24.3% | 100.0% | |

**Child Welfare Reporting Requirements**                    **April 1, 2015 - September 30, 2015**

**TABLE 12**
**NUMBER OF REPORTS BY PRIORITY AND COUNTY FOR REPORTS OPEN FOR**
**INVESTIGATION FOR PERIOD OF OCTOBER 1, 2014 THROUGH MARCH 31, 2015**

| COUNTY | PRIORITY 1 | PRIORITY 2 | PRIORITY 3 | PRIORITY 4 | TOTAL | % OF TOTAL |
|---|---|---|---|---|---|---|
| APACHE | 0 | 0 | 0 | 0 | 0 | 0.0% |
| COCHISE | 25 | 41 | 85 | 33 | 184 | 3.1% |
| COCONINO | 1 | 9 | 7 | 6 | 23 | 0.4% |
| GILA | 17 | 27 | 43 | 22 | 109 | 1.8% |
| GRAHAM | 2 | 4 | 7 | 4 | 17 | 0.3% |
| GREENLEE | 0 | 0 | 0 | 0 | 0 | 0.0% |
| LA PAZ | 0 | 0 | 0 | 0 | 0 | 0.0% |
| MARICOPA | 494 | 772 | 1,832 | 911 | 4,009 | 67.4% |
| MOHAVE | 6 | 17 | 27 | 8 | 58 | 1.0% |
| NAVAJO | 1 | 2 | 2 | 0 | 5 | 0.1% |
| PIMA | 83 | 144 | 366 | 143 | 736 | 12.4% |
| PINAL | 60 | 103 | 278 | 136 | 577 | 9.7% |
| SANTA CRUZ | 6 | 8 | 38 | 48 | 100 | 1.7% |
| YAVAPAI | 12 | 17 | 42 | 21 | 92 | 1.6% |
| YUMA | 2 | 7 | 13 | 7 | 29 | 0.5% |
| STATEWIDE | 709 | 1,151 | 2,740 | 1,339 | 5,939 | 100.0% |
| % OF TOTAL | 11.9% | 19.4% | 46.1% | 22.6% | 100.0% | |

**CHART 9**
**NUMBER OF REPORTS ASSIGNED FOR INVESTIGATION BY TYPE OF MALTREATMENT**
**FOR REPORTS OPEN FOR INVESTIGATION**



The number of reports assigned for investigation for reports open for investigation will change each reporting period as investigations are completed and closed by next reporting period.

**TABLE 13**
**NUMBER OF REPORTS BY TYPE OF MALTREATMENT AND COUNTY FOR REPORTS**
**OPEN FOR INVESTIGATION FOR PERIOD OF**
**APRIL 1, 2015 THROUGH SEPTEMBER 30, 2015**

| COUNTY | EMOTIONAL ABUSE | NEGLECT | PHYSICAL ABUSE | SEXUAL ABUSE | TOTAL | % OF TOTAL |
|---|---|---|---|---|---|---|
| APACHE | 0 | 7 | 2 | 0 | 9 | 0.1% |
| COCHISE | 1 | 216 | 81 | 16 | 314 | 2.9% |
| COCONINO | 0 | 62 | 30 | 3 | 95 | 0.9% |
| GILA | 2 | 138 | 31 | 9 | 180 | 1.6% |
| GRAHAM | 1 | 66 | 26 | 7 | 100 | 0.9% |
| GREENLEE | 0 | 0 | 0 | 0 | 0 | 0.0% |
| LA PAZ | 0 | 21 | 3 | 2 | 26 | 0.2% |
| MARICOPA | 43 | 4,974 | 1,880 | 332 | 7,229 | 66.0% |
| MOHAVE | 3 | 289 | 85 | 18 | 395 | 3.6% |
| NAVAJO | 0 | 24 | 5 | 0 | 29 | 0.3% |
| PIMA | 10 | 957 | 285 | 73 | 1,325 | 12. % |
| PINAL | 3 | 511 | 174 | 25 | 713 | 6.5% |
| SANTA CRUZ | 1 | 103 | 40 | 10 | 154 | 1.4% |
| YAVAPAI | 2 | 182 | 47 | 17 | 248 | 2.3% |
| YUMA | 1 | 87 | 36 | 5 | 129 | 1.2% |
| STATEWIDE | 67 | 7,637 | 2,725 | 517 | 10,946 | 100.0% |
| % OF TOTAL | 0.6% | 69.8% | 24.9% | 4.7% | 100.0% |  |

**TABLE 14**
**NUMBER OF REPORTS BY TYPE OF MALTREATMENT AND COUNTY FOR REPORTS**
**OPEN FOR INVESTIGATION FOR PERIOD OF**
**OCTOBER 1, 2014 THROUGH MARCH 31, 2015**

| COUNTY | EMOTIONAL ABUSE | NEGLECT | PHYSICAL ABUSE | SEXUAL ABUSE | TOTAL | % OF TOTAL |
|---|---|---|---|---|---|---|
| APACHE | 0 | 0 | 0 | 0 | 0 | 0.0% |
| COCHISE | 1 | 121 | 53 | 9 | 184 | 3.1% |
| COCONINO | 0 | 15 | 6 | 2 | 23 | 0.4% |
| GILA | 1 | 82 | 20 | 6 | 109 | 1.8% |
| GRAHAM | 0 | 14 | 3 | 0 | 17 | 0.3% |
| GREENLEE | 0 | 0 | 0 | 0 | 0 | 0.0% |
| LA PAZ | 0 | 0 | 0 | 0 | 0 | 0.0% |
| MARICOPA | 21 | 2,686 | 1,134 | 168 | 4,009 | 67.4% |
| MOHAVE | 0 | 42 | 14 | 2 | 58 | 1.0% |
| NAVAJO | 0 | 5 | 0 | 0 | 5 | 0.1% |
| PIMA | 3 | 516 | 184 | 33 | 736 | 12.4% |
| PINAL | 2 | 398 | 165 | 12 | 577 | 9.7% |
| SANTA CRUZ | 0 | 62 | 33 | 5 | 100 | 1.7% |
| YAVAPAI | 0 | 74 | 15 | 3 | 92 | 1.6% |
| YUMA | 1 | 21 | 7 | 0 | 29 | 0.5% |
| STATEWIDE | 29 | 4,036 | 1,634 | 240 | 5,939 | 100.0% |
| % OF TOTAL | 0.5% | 68.0% | 27.5% | 4.0% | 100.0% |  |

**Child Welfare Reporting Requirements**                    **April 1, 2015 - September 30, 2015**

**CHART 10**
**NUMBER OF REPORTS ASSIGNED FOR INVESTIGATION WHERE A REMOVAL OCCURRED**



April 1, 2015 - September 30, 2015, N=3,280

**TABLE 15**
**NUMBER OF REPORTS ASSIGNED FOR INVESTIGATION BY COUNTY WHERE A REMOVAL OCCURRED FOR THE PERIOD APRIL 1, 2015 THROUGH SEPTEMBER 30, 2015**

| COUNTY | NUMBER OF REPORTS ASSIGNED | NUMBER OF REPORTS ASSIGNED WITH A REMOVAL | % OF REPORTS WHERE A CHILD REMOVED |
|---|---|---|---|
| APACHE | 87 | 13 | 14.9% |
| COCHISE | 448 | 43 | 9.6% |
| COCONINO | 344 | 50 | 14.5% |
| GILA | 230 | 19 | 8.3% |
| GRAHAM | 158 | 10 | 6.3% |
| GREENLEE | 0 | 0 | 0.0% |
| LA PAZ | 62 | 5 | 8.1% |
| MARICOPA | 15,531 | 2,021 | 13.0% |
| MOHAVE | 881 | 114 | 12.9% |
| NAVAJO | 395 | 40 | 10.1% |
| PIMA | 4,772 | 627 | 13.1% |
| PINAL | 1,671 | 198 | 11.8% |
| SANTA CRUZ | 194 | 21 | 10.8% |
| YAVAPAI | 700 | 65 | 9.3% |
| YUMA | 549 | 54 | 9.8% |
| STATEWIDE | 26,022 | 3,280 | 12.6% |

Page **24** of **69**

**Child Welfare Reporting Requirements**                          **April 1, 2015 - September 30, 2015**

**TABLE 16**
**NUMBER OF REPORTS ASSIGNED FOR INVESTIGATION BY COUNTY WHERE A**
**REMOVAL OCCURRED FOR THE PERIOD OCTOBER 1, 2014 THROUGH MARCH 31, 2015**

| COUNTY | NUMBER OF REPORTS ASSIGNED | NUMBER OF REPORTS ASSIGNED WITH A REMOVAL | % OF REPORTS WHERE A CHILD WAS REMOVED |
|---|---|---|---|
| APACHE | 57 | 6 | 10.5% |
| COCHISE | 399 | 20 | 5.0% |
| COCONINO | 448 | 44 | 9.8% |
| GILA | 168 | 14 | 8.3% |
| GRAHAM | 174 | 16 | 9.2% |
| GREENLEE | 10 | 0 | 0.0% |
| LA PAZ | 56 | 6 | 10.7% |
| MARICOPA | 15,144 | 1,746 | 11.5% |
| MOHAVE | 755 | 81 | 10.7% |
| NAVAJO | 326 | 23 | 7.1% |
| PIMA | 4,661 | 589 | 12.6% |
| PINAL | 1,627 | 218 | 13.4% |
| SANTA CRUZ | 149 | 12 | 8.1% |
| YAVAPAI | 715 | 82 | 11.5% |
| YUMA | 493 | 48 | 9.7% |
| STATEWIDE | 25,182 | 2,905 | 11.5% |

## COMPLETED INVESTIGATIONS

Substantiated reports are reports where the Department has determined that at least one of the allegations in the report of abuse and/or neglect is true.  The number of reports that are considered substantiated are a subset of the total number of reports that were received, investigated, and closed during the reporting period.

The preliminary number of reports that are substantiated for the current reporting period is 1,926.  For the prior reporting period, the number of reports that were assigned for investigation that resulted in substantiated findings was revised from 1,606 to 3,535.  This number will change each reporting period as a result of subsequent decisions based on parents' rights to due process as well as the completion of investigations and findings.

- The preliminary substantiation rate for the current reporting period is 7%. However, the substantiation rate for the current period is anticipated to be revised upwards in the next semi-annual report.

- The substantiation rate for the prior reporting period is 14%. However, when initially reported, the September 2014 – March 2015 substantiation rate was 6%.

**CHART 11**
**SUBSTANTIATION RATE BY REPORTING**
**PERIOD**



Information on both proposed substantiations and finalized substantiations is provided in the charts and tables below:

- For information on the proposed substantiated investigation findings—classified by priority—for the current and prior reporting period, see Chart 12, Table 17, and Table 18.

- For information on the proposed substantiated investigation findings—classified by type of maltreatment—for the current and prior reporting period, see Chart 13, Table 19, and Table 20.

- For information on the substantiated investigation findings—classified by priority—for the current and prior reporting period, see Chart 14, Table 21, and Table 22.

- For information on the substantiated investigation findings—classified by type of maltreatment—for the current and prior reporting period, see Chart 15, Table 23, and Table 24.

**Child Welfare Reporting Requirements**                    **April 1, 2015 - September 30, 2015**

**CHART 12**
**NUMBER OF REPORTS ASSIGNED FOR INVESTIGATION BY PRIORITY AND**
**REPORTING PERIOD THAT RESULTED IN PROPOSED SUBSTANTIATION**



**TABLE 17**
**NUMBER OF REPORTS ASSIGNED FOR INVESTIGATION BY PRIORITY AND COUNTY**
**THAT RESULTED IN PROPOSED SUBSTANTIATION FOR PERIOD OF**
**APRIL 1, 2015 THROUGH SEPTEMBER 30, 2015**

| COUNTY | PRIORITY 1 | PRIORITY 2 | PRIORITY 3 | PRIORITY 4 | TOTAL | % OF TOTAL |
|---|---|---|---|---|---|---|
| APACHE | 3 | 0 | 0 | 0 | 3 | 0.2% |
| COCHISE | 8 | 11 | 8 | 2 | 29 | 1.8% |
| COCONINO | 12 | 4 | 7 | 3 | 26 | 1.6% |
| GILA | 4 | 3 | 0 | 0 | 7 | 0.4% |
| GRAHAM | 3 | 0 | 1 | 0 | 4 | 0.2% |
| GREENLEE | 0 | 0 | 0 | 0 | 0 | 0.0% |
| LA PAZ | 0 | 0 | 2 | 0 | 2 | 0.1% |
| MARICOPA | 424 | 218 | 224 | 198 | 1,064 | 64.4% |
| MOHAVE | 32 | 23 | 22 | 3 | 80 | 4.9% |
| NAVAJO | 15 | 3 | 6 | 1 | 25 | 1.5% |
| PIMA | 98 | 79 | 59 | 18 | 254 | 15.3% |
| PINAL | 39 | 18 | 15 | 20 | 92 | 5.6% |
| SANTA CRUZ | 2 | 1 | 5 | 0 | 8 | 0.5% |
| YAVAPAI | 20 | 8 | 14 | 2 | 44 | 2.7% |
| YUMA | 7 | 2 | 3 | 1 | 13 | 0.8% |
| STATEWIDE | 667 | 370 | 366 | 248 | 1,651 | 100.0% |
| % OF TOTAL | 40.4% | 22.4% | 22.2% | 15.0% | 100.0% |  |

**Child Welfare Reporting Requirements**          **April 1, 2015 - September 30, 2015**

TABLE 18
NUMBER OF REPORTS ASSIGNED FOR INVESTIGATION BY PRIORITY AND COUNTY
THAT RESULTED IN PROPOSED SUBSTANTIATION FOR PERIOD OF
OCTOBER 1, 2014 THROUGH MARCH 31, 2015

| COUNTY | PRIORITY 1 | PRIORITY 2 | PRIORITY 3 | PRIORITY 4 | TOTAL | % OF TOTAL |
|---|---|---|---|---|---|---|
| APACHE | 0 | 0 | 0 | 1 | 1 | 0.1% |
| COCHISE | 5 | 2 | 1 | 0 | 8 | 1.3% |
| COCONINO | 3 | 3 | 3 | 1 | 10 | 1.7% |
| GILA | 1 | 1 | 0 | 0 | 2 | 0.3% |
| GRAHAM | 0 | 0 | 0 | 0 | 0 | 0.0% |
| GREENLEE | 0 | 0 | 0 | 0 | 0 | 0.0% |
| LA PAZ | 0 | 0 | 0 | 0 | 0 | 0.0% |
| MARICOPA | 123 | 67 | 114 | 77 | 381 | 63.3% |
| MOHAVE | 15 | 11 | 8 | 1 | 35 | 5.8% |
| NAVAJO | 0 | 0 | 2 | 1 | 3 | 0.5% |
| PIMA | 49 | 29 | 17 | 7 | 102 | 16.9% |
| PINAL | 11 | 2 | 8 | 6 | 27 | 4.5% |
| SANTA CRUZ | 0 | 0 | 1 | 1 | 2 | 0.3% |
| YAVAPAI | 12 | 5 | 13 | 2 | 32 | 5.3% |
| YUMA | 0 | 0 | 0 | 0 | 0 | 0.0% |
| STATEWIDE | 219 | 120 | 167 | 97 | 603 | 100.0% |
| % OF TOTAL | 36.3% | 19.9% | 27.7% | 16.1% | 100.0% | |

CHART 13
NUMBER OF REPORTS ASSIGNED FOR INVESTIGATION BY TYPE OF MALTREATMENT
THAT RESULTED IN PROPOSED SUBSTANTIATION



**Child Welfare Reporting Requirements**                    April 1, 2015 - September 30, 2015

**TABLE 19**
**NUMBER OF REPORTS ASSIGNED FOR INVESTIGATION BY TYPE OF MALTREATMENT**
**BY COUNTY THAT RESULTED IN PROPOSED SUBSTANTIATION FOR PERIOD OF**
**APRIL 1, 2015 THROUGH SEPTEMBER 30, 2015**

| COUNTY | EMOTIONAL ABUSE | NEGLECT | PHYSICAL ABUSE | SEXUAL ABUSE | TOTAL | % OF TOTAL |
|---|---|---|---|---|---|---|
| APACHE | 0 | 3 | 0 | 0 | 3 | 0.2% |
| COCHISE | 0 | 24 | 5 | 0 | 29 | 1.8% |
| COCONINO | 0 | 25 | 1 | 0 | 26 | 1.6% |
| GILA | 0 | 7 | 0 | 0 | 7 | 0.4% |
| GRAHAM | 0 | 3 | 1 | 0 | 4 | 0.2% |
| GREENLEE | 0 | 0 | 0 | 0 | 0 | 0.0% |
| LA PAZ | 0 | 1 | 1 | 0 | 2 | 0.1% |
| MARICOPA | 1 | 967 | 78 | 18 | 1,064 | 64.4% |
| MOHAVE | 0 | 76 | 4 | 0 | 80 | 4.9% |
| NAVAJO | 0 | 25 | 0 | 0 | 25 | 1.5% |
| PIMA | 0 | 231 | 22 | 1 | 254 | 15.3% |
| PINAL | 0 | 83 | 9 | 0 | 92 | 5.6% |
| SANTA CRUZ | 0 | 8 | 0 | 0 | 8 | 0.5% |
| YAVAPAI | 0 | 38 | 5 | 1 | 44 | 2.7% |
| YUMA | 0 | 11 | 1 | 1 | 13 | 0.8% |
| STATEWIDE | 1 | 1,502 | 127 | 21 | 1,651 | 100.0% |
| % OF TOTAL | 0.1% | 90.9% | 7.7% | 1.3% | 100.0% | |

**TABLE 20**
**NUMBER OF REPORTS ASSIGNED FOR INVESTIGATION BY TYPE OF MALTREATMENT**
**BY COUNTY THAT RESULTED IN PROPOSED SUBSTANTIATION FOR PERIOD OF**
**OCTOBER 1, 2014 THROUGH MARCH 31, 2015**

| COUNTY | EMOTIONAL ABUSE | NEGLECT | PHYSICAL ABUSE | SEXUAL ABUSE | TOTAL | % OF TOTAL |
|---|---|---|---|---|---|---|
| APACHE | 0 | 1 | 0 | 0 | 1 | 0.2% |
| COCHISE | 0 | 8 | 0 | 0 | 8 | 1.3% |
| COCONINO | 0 | 9 | 0 | 1 | 10 | 1.7% |
| GILA | 0 | 2 | 0 | 0 | 2 | 0.3% |
| GRAHAM | 0 | 0 | 0 | 0 | 0 | 0.0% |
| GREENLEE | 0 | 0 | 0 | 0 | 0 | 0.0% |
| LA PAZ | 0 | 0 | 0 | 0 | 0 | 0.0% |
| MARICOPA | 0 | 314 | 53 | 14 | 381 | 63.2% |
| MOHAVE | 0 | 30 | 5 | 0 | 35 | 5.8% |
| NAVAJO | 0 | 2 | 1 | 0 | 3 | 0.5% |
| PIMA | 0 | 98 | 4 | 0 | 102 | 16.9% |
| PINAL | 0 | 25 | 1 | 1 | 27 | 4.5% |
| SANTA CRUZ | 0 | 1 | 1 | 0 | 2 | 0.3% |
| YAVAPAI | 0 | 28 | 3 | 1 | 32 | 5.3% |
| YUMA | 0 | 0 | 0 | 0 | 0 | 0.0% |
| STATEWIDE | 0 | 518 | 68 | 17 | 603 | 100.0% |
| % OF TOTAL | 0.0% | 85.9% | 11.3% | 2.8% | 100.0% | |

**CHART 14**
**NUMBER OF REPORTS ASSIGNED FOR INVESTIGATION BY PRIORITY AND REPORTING PERIOD THAT RESULTED IN SUBSTANTIATION**



**TABLE 21**
**NUMBER OF REPORTS ASSIGNED FOR INVESTIGATION BY PRIORITY AND COUNTY THAT RESULTED IN SUBSTANTIATION FOR PERIOD OF APRIL 1, 2015 THROUGH SEPTEMBER 30, 2015**

| COUNTY | PRIORITY 1 | PRIORITY 2 | PRIORITY 3 | PRIORITY 4 | TOTAL | % OF TOTAL |
|---|---|---|---|---|---|---|
| APACHE | 2 | 0 | 0 | 0 | 2 | 0.1% |
| COCHISE | 5 | 1 | 1 | 0 | 7 | 0.3% |
| COCONINO | 6 | 4 | 4 | 1 | 15 | 0.8% |
| GILA | 7 | 0 | 0 | 0 | 7 | 0.3% |
| GRAHAM | 2 | 0 | 0 | 0 | 2 | 0.1% |
| GREENLEE | 0 | 0 | 0 | 0 | 0 | 0.0% |
| LA PAZ | 2 | 2 | 1 | 1 | 6 | 0.3% |
| MARICOPA | 573 | 270 | 255 | 135 | 1,233 | 64.0% |
| MOHAVE | 18 | 10 | 7 | 1 | 36 | 1.9% |
| NAVAJO | 22 | 5 | 14 | 3 | 44 | 2.3% |
| PIMA | 136 | 104 | 99 | 11 | 350 | 18.2% |
| PINAL | 41 | 42 | 34 | 11 | 128 | 6.7% |
| SANTA CRUZ | 5 | 0 | 1 | 0 | 6 | 0.3% |
| YAVAPAI | 8 | 5 | 15 | 2 | 30 | 1.6% |
| YUMA | 32 | 15 | 9 | 4 | 60 | 3.1% |
| STATEWIDE | 859 | 458 | 440 | 169 | 1,926 | 100% |
| % OF TOTAL | 44.5% | 23.8% | 22.9% | 8.8% | 100.0% |  |

**TABLE 22**
**NUMBER OF REPORTS ASSIGNED FOR INVESTIGATION BY PRIORITY AND COUNTY**
**THAT RESULTED IN SUBSTANTIATION FOR PERIOD OF**
**OCTOBER 1, 2014 THROUGH MARCH 31, 2015**

| COUNTY | PRIORITY 1 | PRIORITY 2 | PRIORITY 3 | PRIORITY 4 | TOTAL | % OF TOTAL |
|---|---|---|---|---|---|---|
| APACHE | 3 | 2 | 2 | 0 | 7 | 0.2% |
| COCHISE | 14 | 7 | 6 | 1 | 28 | 0.8% |
| COCONINO | 19 | 13 | 10 | 1 | 43 | 1.2% |
| GILA | 6 | 6 | 0 | 0 | 12 | 0.3% |
| GRAHAM | 15 | 7 | 5 | 2 | 29 | 0.8% |
| GREENLEE | 0 | 0 | 0 | 0 | 0 | 0.0% |
| LA PAZ | 9 | 1 | 2 | 1 | 13 | 0.4% |
| MARICOPA | 941 | 511 | 537 | 262 | 2,251 | 63.6% |
| MOHAVE | 47 | 23 | 18 | 3 | 91 | 2.6% |
| NAVAJO | 19 | 13 | 14 | 3 | 49 | 1.4% |
| PIMA | 240 | 178 | 163 | 40 | 621 | 17.6% |
| PINAL | 75 | 68 | 54 | 29 | 226 | 6.4% |
| SANTA CRUZ | 5 | 3 | 3 | 1 | 12 | 0.3% |
| YAVAPAI | 24 | 15 | 19 | 4 | 62 | 1.8% |
| YUMA | 39 | 22 | 25 | 5 | 91 | 2.6% |
| STATEWIDE | 1,456 | 869 | 858 | 352 | 3,535 | 100.0% |
| % OF TOTAL | 41.1% | 24.6% | 24.3% | 10.0% | 100.0% | |

**CHART 15**
**NUMBER OF REPORTS ASSIGNED FOR INVESTIGATION BY TYPE OF MALTREATMENT**
**THAT RESULTED IN SUBSTANTIATION**



**Child Welfare Reporting Requirements**                    **April 1, 2015 - September 30, 2015**

TABLE 23
**NUMBER OF REPORTS ASSIGNED FOR INVESTIGATION BY TYPE OF MALTREATMENT
BY COUNTY THAT RESULTED IN SUBSTANTIATION FOR PERIOD OF
APRIL 1, 2015 THROUGH SEPTEMBER 30, 2015**

| COUNTY | EMOTIONAL ABUSE | NEGLECT | PHYSICAL ABUSE | SEXUAL ABUSE | TOTAL | % OF TOTAL |
|---|---|---|---|---|---|---|
| APACHE | 0 | 2 | 0 | 0 | 2 | 0.1% |
| COCHISE | 0 | 6 | 1 | 0 | 7 | 0.4% |
| COCONINO | 0 | 13 | 0 | 2 | 15 | 0.8% |
| GILA | 0 | 5 | 2 | 0 | 7 | 0.4% |
| GRAHAM | 0 | 2 | 0 | 0 | 2 | 0.1% |
| GREENLEE | 0 | 0 | 0 | 0 | 0 | 0.0% |
| LA PAZ | 0 | 6 | 0 | 0 | 6 | 0.3% |
| MARICOPA | 0 | 1,061 | 145 | 27 | 1,233 | 63.9% |
| MOHAVE | 0 | 32 | 4 | 0 | 36 | 1.9% |
| NAVAJO | 1 | 36 | 6 | 1 | 44 | 2.3% |
| PIMA | 0 | 297 | 48 | 5 | 350 | 18.1% |
| PINAL | 0 | 109 | 15 | 4 | 128 | 6.7% |
| SANTA CRUZ | 0 | 5 | 1 | 0 | 6 | 0.3% |
| YAVAPAI | 0 | 24 | 3 | 3 | 30 | 1.6% |
| YUMA | 0 | 52 | 7 | 1 | 60 | 3.1% |
| STATEWIDE | 1 | 1,650 | 232 | 43 | 1,926 | 100.0% |
| % OF TOTAL | 0.1% | 85.6% | 12.1% | 2.2% | 100.0% | |

TABLE 24
**NUMBER OF REPORTS ASSIGNED FOR INVESTIGATION BY TYPE OF MALTREATMENT
BY COUNTY THAT RESULTED IN SUBSTANTIATION FOR PERIOD OF
OCTOBER 1, 2014 THROUGH MARCH 31, 2015**

| COUNTY | EMOTIONAL ABUSE | NEGLECT | PHYSICAL ABUSE | SEXUAL ABUSE | TOTAL | % OF TOTAL |
|---|---|---|---|---|---|---|
| APACHE | 0 | 5 | 2 | 0 | 7 | 0.2% |
| COCHISE | 0 | 25 | 2 | 1 | 28 | 0.8% |
| COCONINO | 0 | 35 | 7 | 1 | 43 | 1.2% |
| GILA | 0 | 11 | 1 | 0 | 12 | 0.3% |
| GRAHAM | 0 | 20 | 7 | 2 | 29 | 0.8% |
| GREENLEE | 0 | 0 | 0 | 0 | 0 | 0.0% |
| LA PAZ | 0 | 11 | 1 | 1 | 13 | 0.4% |
| MARICOPA | 3 | 1,891 | 303 | 54 | 2,251 | 63.6% |
| MOHAVE | 0 | 79 | 11 | 1 | 91 | 2.6% |
| NAVAJO | 0 | 41 | 8 | 0 | 49 | 1.4% |
| PIMA | 1 | 539 | 70 | 11 | 621 | 17.6% |
| PINAL | 0 | 176 | 43 | 7 | 226 | 6.4% |
| SANTA CRUZ | 0 | 12 | 0 | 0 | 12 | 0.3% |
| YAVAPAI | 0 | 49 | 12 | 1 | 62 | 1.8% |
| YUMA | 0 | 75 | 13 | 3 | 91 | 2.6% |
| STATEWIDE | 4 | 2,969 | 480 | 82 | 3,535 | 100.0% |
| % OF TOTAL | 0.1% | 84.0% | 13.6% | 2.3% | 100.0% | |

**Child Welfare Reporting Requirements**                    **April 1, 2015 - September 30, 2015**

The preliminary number of investigations that resulted in an unsubstantiated finding for this reporting period was 10,017. Charts 16 and 17 display information on unsubstantiated reports classified by priority and type of maltreatment for the current and prior reporting periods. Tables 25 and 26 provide information on the unsubstantiated investigation findings classified by priority for each county in the current and prior reporting periods. Tables 27 and 28 provide information on the unsubstantiated investigation findings classified by type of maltreatment for each county in the current and prior reporting periods. These figures will change over time as investigations are completed and findings are entered.

**CHART 16**
**NUMBER OF REPORTS ASSIGNED FOR INVESTIGATION BY PRIORITY AND REPORTING PERIOD THAT RESULTED IN UNSUBSTANTIATION**



**TABLE 25**
**NUMBER OF REPORTS ASSIGNED FOR INVESTIGATION BY PRIORITY AND COUNTY THAT RESULTED IN UNSUBSTANTIATION FOR PERIOD OF**
**APRIL 1, 2015 THROUGH SEPTEMBER 30, 2015**

| COUNTY | PRIORITY 1 | PRIORITY 2 | PRIORITY 3 | PRIORITY 4 | TOTAL | % OF TOTAL |
|---|---|---|---|---|---|---|
| APACHE | 19 | 15 | 24 | 15 | 73 | 0.6% |
| COCHISE | 17 | 22 | 47 | 12 | 98 | 0.9% |
| COCONINO | 34 | 38 | 90 | 46 | 208 | 1.8% |
| GILA | 9 | 7 | 15 | 5 | 36 | 0.3% |
| GRAHAM | 8 | 13 | 18 | 13 | 52 | 0.5% |
| GREENLEE | 0 | 0 | 0 | 0 | 0 | 0.0% |
| LA PAZ | 4 | 8 | 10 | 6 | 28 | 0.2% |
| MARICOPA | 1,047 | 1,007 | 2,475 | 1,476 | 6,005 | 52.3% |
| MOHAVE | 62 | 81 | 151 | 76 | 370 | 3.2% |
| NAVAJO | 40 | 57 | 115 | 85 | 297 | 2.6% |
| PIMA | 371 | 503 | 1,354 | 615 | 2,843 | 24.7% |
| PINAL | 134 | 139 | 281 | 184 | 738 | 6.4% |
| SANTA CRUZ | 3 | 7 | 7 | 9 | 26 | 0.2% |
| YAVAPAI | 43 | 76 | 174 | 85 | 378 | 3.3% |
| YUMA | 51 | 59 | 163 | 74 | 347 | 3.0% |
| STATEWIDE | 1,842 | 2,032 | 4,924 | 2,701 | 11,499 | 100.0% |
| % OF TOTAL | 16.0% | 17.7% | 42.8% | 23.5% | 100.0% | |

**Child Welfare Reporting Requirements**                    **April 1, 2015 - September 30, 2015**

TABLE 26
**NUMBER OF REPORTS ASSIGNED FOR INVESTIGATION BY PRIORITY AND COUNTY
THAT RESULTED IN UNSUBSTANTIATION FOR PERIOD OF
OCTOBER 1, 2014 THROUGH MARCH 31, 2015**

| COUNTY | PRIORITY 1 | PRIORITY 2 | PRIORITY 3 | PRIORITY 4 | TOTAL | % OF TOTAL |
|---|---|---|---|---|---|---|
| APACHE | 8 | 8 | 22 | 13 | 51 | 0.3% |
| COCHISE | 30 | 53 | 72 | 24 | 179 | 1.2% |
| COCONINO | 52 | 49 | 175 | 62 | 338 | 2.2% |
| GILA | 2 | 16 | 19 | 9 | 46 | 0.3% |
| GRAHAM | 11 | 20 | 40 | 27 | 98 | 0.7% |
| GREENLEE | 2 | 0 | 4 | 3 | 9 | 0.1% |
| LA PAZ | 8 | 6 | 16 | 13 | 43 | 0.3% |
| MARICOPA | 1,323 | 1,516 | 3,634 | 1,950 | 8,423 | 55.8% |
| MOHAVE | 75 | 118 | 248 | 121 | 562 | 3.7% |
| NAVAJO | 40 | 74 | 129 | 80 | 323 | 2.1% |
| PIMA | 411 | 529 | 1,544 | 753 | 3,237 | 21.4% |
| PINAL | 159 | 144 | 370 | 193 | 866 | 5.7% |
| SANTA CRUZ | 6 | 5 | 9 | 13 | 33 | 0.2% |
| YAVAPAI | 64 | 82 | 234 | 132 | 512 | 3.4% |
| YUMA | 44 | 76 | 186 | 81 | 387 | 2.6% |
| STATEWIDE | 2,235 | 2,696 | 6,702 | 3,474 | 15,107 | 100.0% |
| % OF TOTAL | 14.8% | 17.9% | 44.3% | 23.0% | 100.0% | |

CHART 17
**NUMBER OF REPORTS ASSIGNED FOR INVESTIGATION BY TYPE OF MALTREATMENT
THAT RESULTED IN UNSUBSTANTIATION BY REPORTING PERIOD**



Page **34** of **69**

**Child Welfare Reporting Requirements**                    **April 1, 2015 - September 30, 2015**

**TABLE 27**
**NUMBER OF REPORTS ASSIGNED FOR INVESTIGATION BY TYPE OF MALTREATMENT BY COUNTY THAT RESULTED IN UNSUBSTANTIATION FOR PERIOD OF APRIL 1, 2015 THROUGH SEPTEMBER 30, 2015**

| COUNTY | EMOTIONAL ABUSE | NEGLECT | PHYSICAL ABUSE | SEXUAL ABUSE | TOTAL | % OF TOTAL |
|---|---|---|---|---|---|---|
| APACHE | 0 | 57 | 13 | 3 | 73 | 0.6% |
| COCHISE | 0 | 74 | 20 | 4 | 98 | 0.9% |
| COCONINO | 2 | 15331 | 42 | 11 | 208 | 1.8% |
| GILA | 0 | 42 | 4 | 1 | 36 | 0.3% |
| GRAHAM | 1 | 0 | 9 | 0 | 52 | 0.5% |
| GREENLEE | 0 | 20 | 0 | 0 | 0 | 0.0% |
| LA PAZ | 0 | 4,145 | 8 | 0 | 28 | 0.2% |
| MARICOPA | 35 | 262 | 1,633 | 192 | 6,005 | 52.3% |
| MOHAVE | 0 | 224 | 94 | 14 | 370 | 3.2% |
| NAVAJO | 2 | 2,082 | 55 | 16 | 297 | 2.6% |
| PIMA | 23 | 498 | 684 | 54 | 2,843 | 24.7% |
| PINAL | 5 | 498 | 200 | 35 | 738 | 6.4% |
| SANTA CRUZ | 0 | 18 | 5 | 3 | 26 | 0.2% |
| YAVAPAI | 0 | 278 | 81 | 19 | 378 | 3.3% |
| YUMA | 2 | 250 | 88 | 7 | 347 | 3.0% |
| STATEWIDE | 70 | 8,134 | 2,936 | 359 | 11,499 | 100.0% |
| % OF TOTAL | 0.6% | 70.8% | 25.5% | 3.1% | 100.0% | ■ |

**TABLE 28**
**NUMBER OF REPORTS ASSIGNED FOR INVESTIGATION BY TYPE OF MALTREATMENT BY COUNTY THAT RESULTED IN UNSUBSTANTIATION FOR PERIOD OF OCTOBER 1, 2014 THROUGH MARCH 31, 2015**

| COUNTY | EMOTIONAL ABUSE | NEGLECT | PHYSICAL ABUSE | SEXUAL ABUSE | TOTAL | % OF TOTAL |
|---|---|---|---|---|---|---|
| APACHE | 1 | 32 | 17 | 1 | 51 | 0.3% |
| COCHISE | 0 | 131 | 40 | 8 | 179 | 1.2% |
| COCONINO | 2 | 210 | 106 | 20 | 338 | 2.2% |
| GILA | 0 | 34 | 12 | 0 | 46 | 0.3% |
| GRAHAM | 1 | 72 | 23 | 2 | 98 | 0.7% |
| GREENLEE | 0 | 6 | 3 | 0 | 9 | 0.1% |
| LA PAZ | 0 | 39 | 3 | 1 | 43 | 0.3% |
| MARICOPA | 51 | 5,813 | 2,315 | 244 | 8,423 | 55.8% |
| MOHAVE | 4 | 402 | 141 | 15 | 562 | 3.7% |
| NAVAJO | 2 | 236 | 78 | 7 | 323 | 2.1% |
| PIMA | 22 | 2,316 | 823 | 76 | 3,237 | 21.4% |
| PINAL | 6 | 624 | 206 | 30 | 866 | 5.7% |
| SANTA CRUZ | 0 | 21 | 9 | 3 | 33 | 0.2% |
| YAVAPAI | 0 | 361 | 136 | 15 | 512 | 3.4% |
| YUMA | 3 | 278 | 93 | 13 | 387 | 2.6% |
| STATEWIDE | 92 | 10,575 | 4,005 | 435 | 15,107 | 100.0% |
| % OF TOTAL | 0.6% | 70.0% | 26.5% | 2.9% | 100.0% | ■ |

Page **35** of **69**

## SAFE HAVEN INFANTS

Communications from providers indicate that there were no newborn infants delivered to Safe Haven providers during the April 2015 – September 2015 reporting period. This compares to two infants being delivered to Safe Haven providers during the prior reporting period.

## CHILDREN ENTERING OUT-OF-HOME CARE

During the current reporting period, 6,819 children entered care, which represents a 14.9% increase in children entering care over the prior reporting period and a 5.5% increase over the same reporting period last year. As can be seen from Chart 18 below, the increasing trend of children entering out-of-home care continues. This increase in the number of children entering care is not unexpected as the number of reports of abuse and neglect has continued to increase (see Chart 1 for number of reports detail). It is important to note, however, that child welfare data is seasonal.  The trend in the data shows a higher number of reports and therefore a higher number children entering out-of-home care in reporting periods that cover April through September.  This seasonality can be attributed to higher call volume to the Hotline in April, Child Abuse Awareness month, and the close and start of the school year in May and August, respectively.

**CHART 18**
**TOTAL CHILDREN ENTERING OUT-OF-HOME CARE BY REPORTING PERIOD**



## CHILDREN ENTERING OUT-OF-HOME CARE – VOLUNTARY SERVICES

The number of children entering out-of-home placement through voluntary foster care agreements for the current reporting period was 154, which represents 2.3 percent of the children entering care this reporting period. Information on the county level distribution of voluntary placements into out-of-home care can be found in Table 29 for the current reporting period and in Table 30 for the prior reporting period.

Voluntary foster care may be provided when the parents or legal guardians of a child have requested such assistance and have signed a legally binding written agreement for the temporary placement of the child in foster care while risk factors are addressed to enable the child to live safely at home.  A.R.S. § 8-806 authorizes the Department to provide voluntary foster care placement for children for a period not to exceed 90 days and no more than twice within 24 consecutive months.

**TABLE 29**
**NUMBER OF CHILDREN ENTERING OUT-OF-HOME CARE BY COUNTY WHO ARE**
**VOLUNTARY PLACEMENTS FOR CHILDREN UNDER THE AGE OF EIGHTEEN FOR THE**
**PERIOD OF APRIL 1, 2015 THROUGH SEPTEMBER 30, 2015**

| COUNTY | NUMBER OF CHILDREN REMOVED | % OF TOTAL REMOVALS | NUMBER OF CHILDREN ENTERING OUT-OF-HOME CARE UNDER THE AGE OF EIGHTEEN WHO ARE VOLUNTARY PLACEMENTS | % OF CHILDREN ENTERING OUT-OF-HOME CARE WHO ARE VOLUNTARY PLACEMENTS |
|---|---|---|---|---|
| APACHE | 21 | 0.3% | 0 | 0.0% |
| COCHISE | 85 | 1.3% | 0 | 0.0% |
| COCONINO | 86 | 1.3% | 1 | 0.7% |
| GILA | 42 | 0.6% | 2 | 1.3% |
| GRAHAM | 21 | 0.3% | 0 | 0.0% |
| GREENLEE | 0 | 0.0% | 0 | 0.0% |
| LA PAZ | 7 | 0.1% | 0 | 0.0% |
| MARICOPA | 4,271 | 62.6% | 51 | 33.1% |
| MOHAVE | 234 | 3.4% | 13 | 8.4% |
| NAVAJO | 64 | 0.9% | 2 | 1.3% |
| PIMA | 1,218 | 17.9% | 67 | 43.4% |
| PINAL | 468 | 6.9% | 1 | 0.7% |
| SANTA CRUZ | 43 | 0.6% | 0 | 0.0% |
| YAVAPAI | 147 | 2.2% | 12 | 7.8% |
| YUMA | 112 | 1.6% | 5 | 3.3% |
| STATEWIDE | 6,819 | 100.0% | 154 | 2.3% |

**TABLE 30**
**NUMBER OF CHILDREN ENTERING OUT-OF-HOME CARE BY COUNTY WHO ARE**
**VOLUNTARY PLACEMENTS FOR CHILDREN UNDER THE AGE OF EIGHTEEN FOR THE**
**PERIOD OF OCTOBER 1, 2014 THROUGH MARCH 31, 2015**

| COUNTY | NUMBER OF CHILDREN REMOVED | % OF TOTAL REMOVALS | NUMBER OF CHILDREN ENTERING OUT-OF-HOME CARE UNDER THE AGE OF EIGHTEEN WHO ARE VOLUNTARY PLACEMENTS | % OF CHILDREN ENTERING OUT-OF-HOME CARE WHO ARE VOLUNTARY PLACEMENTS |
|---|---|---|---|---|
| APACHE | 12 | 0.2% | 0 | 0.0% |
| COCHISE | 50 | 0.8% | 0 | 0.0% |
| COCONINO | 66 | 1.1% | 7 | 5.3% |
| GILA | 38 | 0.6% | 2 | 1.5% |
| GRAHAM | 29 | 0.5% | 0 | 0.0% |
| GREENLEE | 0 | 0.0% | 0 | 0.0% |
| LA PAZ | 20 | 0.3% | 0 | 0.0% |
| MARICOPA | 3,682 | 62.1% | 50 | 38.2% |
| MOHAVE | 166 | 2.8% | 0 | 0.0% |
| NAVAJO | 52 | 0.9% | 1 | 0.8% |
| PIMA | 1,105 | 18.7% | 51 | 38.9% |
| PINAL | 441 | 7.4% | 3 | 2.3% |
| SANTA CRUZ | 14 | 0.2% | 0 | 0.0% |
| YAVAPAI | 152 | 2.6% | 11 | 8.4% |
| YUMA | 108 | 1.8% | 6 | 4.6% |
| STATEWIDE | 5,935 | 100.0% | 131 | 100.0% |

**Child Welfare Reporting Requirements**                    **April 1, 2015 - September 30, 2015**

<u>NUMBER OF CHILDREN ENTERING OUT-OF-HOME CARE</u>

The total number of children entering out-of-home care (of which voluntary placements are a subset) in the current reporting period was 6,819, which represents an increase of 14.9 percent and a 5.5 percent increase over the same reporting period last year.  Chart 19 displays the number of removed children, and then further differentiates new removals by providing the number with a prior removal in the past 12 months and the past 12 to 24 months.  Information on the county level distribution of children entering out-of-home care can be found in Table 31 for the current period and Table 32 for the prior period.

**TABLE 31**
**NUMBER OF CHILDREN ENTERING OUT-OF-HOME CARE BY COUNTY FOR THE PERIOD OF APRIL 1, 2015 THROUGH SEPTEMBER 30, 2015**

| COUNTY | NUMBER OF CHILDREN REMOVED | % OF TOTAL REMOVALS | NUMBER OF CHILDREN WITH A PRIOR REMOVAL IN THE LAST 12 MONTHS | % OF CHILDREN WITH A PRIOR REMOVAL IN THE LAST 12 MONTHS | NUMBER OF CHILDREN WITH A REMOVAL IN THE PRIOR 12 TO 24 MONTHS | % OF CHILDREN WITH A PRIOR REMOVAL IN THE PRIOR 12 TO 24 MONTHS |
|---|---|---|---|---|---|---|
| APACHE | 21 | 0.3% | 2 | 9.5% | 1 | 4.8% |
| COCHISE | 85 | 1.3% | 9 | 10.6% | 1 | 1.2% |
| COCONINO | 86 | 1.3% | 0 | 0.0% | 0 | 0.0% |
| GILA | 42 | 0.6% | 5 | 11.9% | 2 | 4.8% |
| GRAHAM | 21 | 0.3% | 0 | 0.0% | 0 | 0.0% |
| GREENLEE | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| LA PAZ | 7 | 0.1% | 0 | 0.0% | 0 | 0.0% |
| MARICOPA | 4,271 | 62.6% | 305 | 7.1% | 139 | 3.3% |
| MOHAVE | 234 | 3.4% | 17 | 7.3% | 3 | 1.3% |
| NAVAJO | 64 | 0.9% | 2 | 3.1% | 4 | 6.3% |
| PIMA | 1,218 | 17.9% | 125 | 10.3% | 51 | 4.2% |
| PINAL | 468 | 6.9% | 33 | 7.1% | 2 | 0.4% |
| SANTA CRUZ | 43 | 0.6% | 0 | 0.0% | 0 | 0.0% |
| YAVAPAI | 147 | 2.2% | 6 | 4.1% | 2 | 1.4% |
| YUMA | 112 | 1.6% | 11 | 9.8% | 3 | 2.7% |
| STATEWIDE | 6,819 | 100.0% | 515 | 7.6% | 208 | 3.1% |

**TABLE 32**
**NUMBER OF CHILDREN ENTERING OUT-OF-HOME CARE BY COUNTY FOR THE**
**PERIOD OF OCTOBER 1, 2014 THROUGH MARCH 31, 2015**

| COUNTY | NUMBER OF CHILDREN REMOVED | % OF TOTAL REMOVALS | NUMBER OF CHILDREN WITH A PRIOR REMOVAL IN THE LAST 12 MONTHS | % OF CHILDREN WITH A PRIOR REMOVAL IN THE LAST 12 MONTHS | NUMBER OF CHILDREN WITH A REMOVAL IN THE PRIOR 12 TO 24 MONTHS | % OF CHILDREN WITH A PRIOR REMOVAL IN THE PRIOR 12 TO 24 MONTHS |
|---|---|---|---|---|---|---|
| APACHE | 12 | 0.2% | 0 | 0.0% | 0 | 0.0% |
| COCHISE | 50 | 0.8% | 6 | 12.0% | 1 | 2.0% |
| COCONINO | 66 | 1.1% | 7 | 10.6% | 0 | 0.0% |
| GILA | 38 | 0.6% | 2 | 5.3% | 10 | 26.3% |
| GRAHAM | 29 | 0.5% | 4 | 13.8% | 3 | 10.3% |
| GREENLEE | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| LA PAZ | 20 | 0.3% | 1 | 5.0% | 0 | 0.0% |
| MARICOPA | 3,682 | 62.1% | 303 | 8.2% | 133 | 3.6% |
| MOHAVE | 166 | 2.8% | 25 | 15.1% | 6 | 3.6% |
| NAVAJO | 52 | 0.9% | 2 | 3.8% | 3 | 5.8% |
| PIMA | 1,105 | 18.7% | 120 | 10.9% | 28 | 2.5% |
| PINAL | 441 | 7.4% | 32 | 7.3% | 9 | 2.0% |
| SANTA CRUZ | 14 | 0.2% | 0 | 0.0% | 0 | 0.0% |
| YAVAPAI | 152 | 2.6% | 17 | 11.2% | 6 | 3.9% |
| YUMA | 108 | 1.8% | 12 | 11.1% | 6 | 5.6% |
| STATEWIDE | 5,935 | 100.0% | 531 | 8.9% | 205 | 3.5% |

**Child Welfare Reporting Requirements**                    **April 1, 2015 - September 30, 2015**

### CHART 19
### NUMBER OF CHILDREN ENTERING OUT-OF-HOME CARE BY REPORTING PERIOD



## CHILDREN IN OUT-OF-HOME CARE

Chart 20 below shows the number of children in out-of-home care on the last day of the current and past reporting periods.

On the last day of the current reporting period, 14,863 children, approximately 80 percent, of all children in out-of-home care were placed in family settings either with relatives, in foster homes or trial home visit with a parent.  Placement information for children in out-of-home care for the current and prior reporting periods can be found in Chart 27.  See Table 33 for the out-of-home population organized to show the number of children, grouped by age, in each placement type for the current reporting period.

For information on the age distribution of children in out-of-home care, see Chart 24, which displays this information for the current and prior reporting periods.  The ethnicity of children in out-of-home care for the current and prior reporting periods is displayed in Chart 25.

**CHART 20**
**NUMBER OF CHILDREN IN OUT-OF-HOME CARE ON THE LAST DAY OF THE REPORTING PERIOD BY REPORTING PERIOD**



**Child Welfare Reporting Requirements**                    **April 1, 2015 - September 30, 2015**

## CHART 21
## THE NUMBER OF CHILDREN IN OUT-OF-HOME CARE BY AGE



## CHART 22
## THE NUMBER OF CHILDREN IN OUT-OF-HOME CARE BY ETHNICITY



For 54.9 percent of the children in out-of-home care, family reunification remains the primary case plan goal. See Chart 23 for additional detail on the case plan goals of children in out-of-home care.

## CHART 23
## THE NUMBER OF CHILDREN IN OUT-OF-HOME CARE BY CASE PLAN GOAL



## CHART 24
## THE NUMBER OF CHILDREN IN OUT-OF-HOME CARE BY PLACEMENT TYPE[4]



---

[4]   In every reporting cycle DCS has children who, in the CHILDS database, do not have a placement identified when the data extract has run due to delays in CHILDS entry.  It has been the historical practice of the Department to proportionally allocate the unidentified children across the placement types, but they are now reflected in a standalone category.  The timeliness of CHILDS data entry is expected to increase as processes are standardized and workloads become more manageable.

**Child Welfare Reporting Requirements**            **April 1, 2015 - September 30, 2015**

**TABLE 33**
**THE NUMBER OF CHILDREN IN OUT-OF-HOME CARE BY PLACEMENT TYPE AND AGE**

| | RELATIVE | FAMILY FOSTER | GROUP HOME | RESIDENTIAL TREATMENT[5] | INDEPENDENT LIVING | RUNAWAY / ABSCONDED[6] | TRIAL HOME VISIT | NO IDENTIFIED PLACEMENT | TOTAL | % OF TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| UNDER 1 | 681 | 796 | 1 | 9 | 0 | 5 | 2 | 9 | 1,503 | 8.1% |
| 1 | 828 | 777 | 11 | 16 | 0 | 2 | 4 | 8 | 1,646 | 8.8% |
| 2 | 725 | 599 | 7 | 23 | 0 | 1 | 0 | 11 | 1,366 | 7.3% |
| 3 | 614 | 507 | 12 | 17 | 0 | 1 | 3 | 11 | 1,165 | 6.2% |
| 4 | 545 | 434 | 21 | 31 | 0 | 1 | 1 | 11 | 1,044 | 5.6% |
| 5 | 544 | 411 | 25 | 25 | 0 | 1 | 2 | 5 | 1,013 | 5.4% |
| 6 | 566 | 388 | 39 | 23 | 0 | 3 | 4 | 7 | 1,030 | 5.5% |
| 7 | 550 | 377 | 69 | 21 | 0 | 1 | 1 | 5 | 1,024 | 5.5% |
| 8 | 525 | 327 | 74 | 18 | 0 | 0 | 0 | 7 | 951 | 5.1% |
| 9 | 457 | 308 | 90 | 22 | 0 | 3 | 1 | 6 | 887 | 4.8% |
| 10 | 424 | 256 | 110 | 23 | 0 | 1 | 3 | 9 | 826 | 4.4% |
| 11 | 358 | 199 | 96 | 20 | 0 | 2 | 1 | 8 | 684 | 3.7% |
| 12 | 300 | 179 | 131 | 27 | 0 | 2 | 4 | 9 | 652 | 3.5% |
| 13 | 277 | 155 | 152 | 42 | 0 | 4 | 2 | 12 | 644 | 3.5% |
| 14 | 275 | 166 | 176 | 66 | 0 | 20 | 6 | 11 | 720 | 3.9% |
| 15 | 241 | 158 | 237 | 87 | 0 | 51 | 3 | 14 | 791 | 4.2% |
| 16 | 221 | 174 | 269 | 109 | 0 | 91 | 3 | 18 | 885 | 4.7% |
| 17 | 193 | 171 | 303 | 118 | 7 | 123 | 7 | 26 | 948 | 5.1% |
| 18 & OLDER | 38 | 69 | 96 | 108 | 520 | 24 | 3 | 20 | 878 | 4.7% |
| TOTAL | 8,362 | 6,451 | 1,919 | 805 | 527 | 336 | 50 | 207 | 18,657 | 100.0% |
| % OF TOTAL | 44.8% | 34.6% | 10.3% | 4.3% | 2.8% | 1.8% | 0.3% | 1.1% | 100.0% | |

---

[5]  This category includes shelter, detention, and hospital placement types.

[6]  This category includes children whose parents absconded with the child(ren) during this reporting period.

**Child Welfare Reporting Requirements**                     **April 1, 2015 - September 30, 2015**

During the reporting period 878 children remained in a shelter or receiving home for more than 21 consecutive days.  Chart 25 displays children by age grouping who remained in shelter more than 21 days for the current reporting period.

**CHART 25**
**NUMBER AND PERCENTAGE OF CHILDREN IN SHELTER OR RECEIVING HOMES FOR MORE THAN 21 CONSECUTIVE DAYS BY AGE OF CHILD[7]**



**CHART 26**
**THE NUMBER OF CHILDREN IN OUT-OF-HOME CARE BY LENGTH OF TIME IN CARE**



---

[7]   The chart displays children who spent more than 21 days in a shelter during the period. This number differs from the other out-of-home charts as they display children in out-of-home care on the last day of the reporting period.

**Child Welfare Reporting Requirements**               **April 1, 2015 - September 30, 2015**

Information on the number of placements in terms of the average, median, and range for children in out-of-home care on the last day of the reporting period is shown in Table 34.

**TABLE 34**
**PLACEMENT INFORMATION FOR CHILDREN IN**
**OUT-OF-HOME CARE ON SEPTEMBER 30, 2015**

|  | Placements |
|---|---|
| **Average** | 2.3 |
| **Median** | 2.0 |
| **Range Minimum** | 1 |
| **Range Maximum** | 59[8] |

Chart 27 displays the legal status of the children in out-of-home care for the current and prior reporting periods. As is shown by the graph, the vast majority of children in out-of-home care fall into one of three legal statuses – adjudicated dependent, legally free for adoption, and children in the Department's temporary custody.

**CHART 27**
**CHILDREN IN OUT-OF-HOME CARE BY LEGAL STATUS**

---

8  Some children are so impacted by the severity of the abuse they have suffered, that they become unable to form meaningful relationships or to respond to services. These children tend to go through multiple placements with numerous individuals and agencies.

Page **46** of **69**

At the end of the reporting period there were 18,657 children in out-of-home care who required visitation. Of these children, visitation was documented in the automated system for 15,746 children.

### CHART 28
### THE NUMBER AND PERCENTAGE OF CHILDREN WHO RECEIVED THE REQUIRED VISITATION



Department policy requires specialists to have face-to-face contact with all parents at least once a month, including any alleged parents and parents residing outside of the child's home where the case plan goal is family reunification. During the current reporting period, there were 3,096 parents who had a child with the case plan goal of reunification. Of those parents requiring visitation, 1,576 (50.9 percent) received the required visitation. This number does not reflect attempted visitation where contact with the parent(s) did not take place.

### CHART 29
### NUMBER OF CHILDREN RECEIVING AND NOT RECEIVING VISITATION BY REPORTING PERIOD



## FOSTER HOME LICENSING, CLOSURES, & VISITATION

As of September 30, 2015, there were 4,551[9] foster homes licensed for a total capacity of 9,114 spaces. Of the spaces, 2,431 are reported by contractors to be unavailable for placements. Reasons for this include, but are not limited to, licensing restrictions on age, bed holds for youth in treatment or hospitalization, foster parents' need for temporary reprieve from placements and corrective action plans. In addition, 975 spaces in available foster homes were unused spaces. This occurs when a match between the available spaces and children's needs was not possible.  Unused spaces may be, but are not limited to, the result of a denial by foster parents and/or contractors to the Department's request for placement due to the severity of child's needs, potential risk to other children in the home, the distance of a foster home from child's family and/or lack of unique services in the foster home's vicinity.

Licensed foster homes include family foster homes, professional family foster homes (HCTC homes), respite foster homes, receiving foster homes, and developmentally disabled homes with DCS children placed in them. Foster home licenses specify the age range, gender and maximum number of children that can be placed in a home. Foster parents, in consultation with the licensing worker, decide the type of physical, behavioral, and psychological needs of children they can effectively parent based upon their own skill level, experiences, and desires.

During the current reporting period, 774 new homes were licensed to provide foster care and 767 homes left the system. This compares to 821 new homes being licensed and 785 homes leaving the system during the prior reporting period. The following chart gives the reasons for foster home closures for the current reporting period.

**CHART 30**
**REASON FOR FOSTER HOME CLOSURE FOR THE PERIOD OF**
**APRIL 1, 2015 THROUGH SEPTEMBER 30, 2015**



N=767

---

[9] The number of homes cited in this report differs from the number cited by the Office of Licensing, Certification & Regulation (OLCR) due to the fact that the DCS utilizes both foster homes managed through HRSS contracts as well as homes that are licensed for developmental disabilities, licensed by the tribes, etc.

**Child Welfare Reporting Requirements**                    **April 1, 2015 - September 30, 2015**

Chart 31 displays the number of foster homes that received the required visitation in the current and prior reporting periods. The Department believes that more foster homes received the required visitation than is indicated in the chart below. The under-reporting of foster home visitation is attributable to the lack of automation being used in reporting the foster home visitation process.  The Department recognizes this as a problem and is working to correct this issue.

**CHART 31**
**THE NUMBER AND PERCENTAGE OF FOSTER HOMES WHO RECEIVED THE REQUIRED VISITATION\***



\*Required visitations to foster homes, for license monitoring purposes, are performed by licensing case managers and are part of the HRSS contract.

**Child Welfare Reporting Requirements**                    **April 1, 2015 - September 30, 2015**

## CHILDREN EXITING OUT-OF HOME CARE

Table 35 below shows the history of the number of children who left the custody of the Department.

**TABLE 35**
**CHILDREN EXITING OUT-OF-HOME CARE BY PERIOD**

| REPORTING PERIOD | NUMBER OF CHILDREN DISCHARGED | % CHANGE OVER PRIOR PERIOD |
|---|---|---|
| OCTOBER 2011 – MARCH 2012 | 3,826 | +7.1% |
| APRIL 2012 – SEPTEMBER 2012 | 3,923 | +2.5% |
| OCTOBER 2012 – MARCH 2013 | 4,668 | +19.0% |
| APRIL 2013 – SEPTEMBER 2013 | 4,805 | +2.9% |
| OCTOBER 2013 – MARCH 2014 | 4,786 | -0.4% |
| APRIL 2014 – SEPTEMBER 2014 | 5,042 | +5.3% |
| OCTOBER 2014 – MARCH 2015 | 5,063 | +0.4% |
| APRIL 2015 – SEPTEMBER 2015 | 5,555 | +10.2% |

**CHART 32**
**CHILDREN ENTERING AND EXITING OUT-OF-HOME CARE BY REPORTING PERIOD**



The following nine tables depict the children who exited out-of-home care by reason. The tables display the following information: reasons the child left custody, their age, their ethnicity, the number of placements each child had, and the length of time in out-of-home care.

**TABLE 36**
**TOTAL NUMBER OF CHILDREN EXITING DCS CUSTODY FOR THE END OF THE**
**REPORTING PERIOD ENDING ON SEPTEMBER 30, 2015**

| By Age | Number | Percentage |
|---|---|---|
| Under 1 | 293 | 5.3% |
| Ages 1 to 5 | 2,008 | 36.1% |
| Ages 6 to 8 | 966 | 17.4% |
| Ages 9 to 12 | 873 | 15.7% |
| Ages 13 to 17 | 992 | 17.9% |
| 18 and Over | 423 | 7.6% |
| **Total** | **5,555** | **100.0%** |

| Ethnicity | Number | Percentage |
|---|---|---|
| Caucasian | 2,112 | 38.0% |
| Hispanic | 1,851 | 33.3% |
| African American | 782 | 14.1% |
| American Indian | 446 | 8.0% |
| Asian | 77 | 1.4% |
| Other | 287 | 5.2% |
| **Total** | **5,555** | **100.0%** |

| By Number of Placements | Number | Percentage |
|---|---|---|
| One | 2,961 | 53.3% |
| Two | 1,308 | 23.6% |
| Three | 596 | 10.7% |
| Four | 285 | 5.1% |
| Five | 137 | 2.5% |
| More than Five | 268 | 4.8% |
| **Total** | **5,555** | **100.0%** |

| By Length of Time in Care | Number | Percentage |
|---|---|---|
| Less than 30 Days | 885 | 15.9% |
| 31 Days to 12 Months | 1,759 | 31.7% |
| 13 to 24 Months | 1,626 | 29.3% |
| More than 24 Months | 1,285 | 23.1% |
| **Total** | **5,555** | **100.0%** |

| | Average | Median |
|---|---|---|
| **By Age** | 8.4 | 7.4 |
| **By Number of Placements** | 2.1 | 1.0 |
| **By Months of Time in Care** | 16.2 | 13.7 |

**TABLE 37**
**NUMBER AND PERCENTAGE OF CHILDREN EXITING DCS CUSTODY**
**FOR REASON OF "REUNIFICATION WITH PARENTS OR PRIMARY CARETAKER" FOR**
**THE REPORTING PERIOD ENDING SEPTEMBER 30, 2015**

| By Age | Number | Percentage |
|---|---|---|
| Under 1 | 241 | 7.8% |
| Ages 1 to 5 | 1,078 | 34.8% |
| Ages 6 to 8 | 593 | 19.1% |
| Ages 9 to 12 | 541 | 17.4% |
| Ages 13 to 17 | 645 | 20.8% |
| 18 and Over | 4 | 0.1% |
| **Total** | **3,102** | **100.0%** |

| Ethnicity | Number | Percentage |
|---|---|---|
| Caucasian | 1,156 | 37.3% |
| Hispanic | 1,012 | 32.6% |
| African American | 468 | 15.1% |
| American Indian | 209 | 6.7% |
| Asian | 46 | 1.5% |
| Other | 211 | 6.8% |
| **Total** | **3,102** | **100.0%** |

| By Number of Placements | Number | Percentage |
|---|---|---|
| One | 1,833 | 59.1% |
| Two | 740 | 23.9% |
| Three | 289 | 9.3% |
| Four | 125 | 4.0% |
| Five | 57 | 1.8% |
| More than Five | 58 | 1.9% |
| **Total** | **3,102** | **100.0%** |

| By Length of Time in Care | Number | Percentage |
|---|---|---|
| Less than 30 Days | 791 | 25.5% |
| 31 Days to 12 Months | 1,409 | 45.4% |
| 13 to 24 Months | 700 | 22.6% |
| More than 24 Months | 202 | 6.5% |
| **Total** | **3,102** | **100.0%** |

| | Average | Median |
|---|---|---|
| **By Age** | 7.8 | 7.1 |
| **By Number of Placements** | 1.7 | 1.0 |
| **By Months of Time in Care** | 9.3 | 8.1 |

**TABLE 38**
**NUMBER AND PERCENTAGE OF CHILDREN EXITING DCS CUSTODY**
**FOR REASON OF "LIVING WITH OTHER RELATIVES" FOR THE REPORTING PERIOD**
**ENDING SEPTEMBER 30, 2015**

| By Age | Number | Percentage |
|---|---|---|
| Under 1 | 3 | 11.1% |
| Ages 1 to 5 | 6 | 22.2% |
| Ages 6 to 8 | 6 | 22.2% |
| Ages 9 to 12 | 6 | 22.2% |
| Ages 13 to 17 | 5 | 18.6% |
| 18 and Over | 1 | 3.7% |
| **Total** | **27** | **100.0%** |

| Ethnicity | Number | Percentage |
|---|---|---|
| Caucasian | 12 | 44.5% |
| Hispanic | 11 | 40.7% |
| African American | 2 | 7.4% |
| American Indian | 1 | 3.7% |
| Asian | 0 | 0.0% |
| Other | 1 | 3.7% |
| **Total** | **27** | **100.0%** |

| By Number of Placements | Number | Percentage |
|---|---|---|
| One | 24 | 88.9% |
| Two | 2 | 7.4% |
| Three | 0 | 0.0% |
| Four | 0 | 0.0% |
| Five | 0 | 0.0% |
| More than Five | 1 | 3.7% |
| **Total** | **27** | **100.0%** |

| By Length of Time in Care | Number | Percentage |
|---|---|---|
| Less than 30 Days | 19 | 70.4% |
| 31 Days to 12 Months | 4 | 14.8% |
| 13 to 24 Months | 3 | 11.1% |
| More than 24 Months | 1 | 3.7% |
| **Total** | **27** | **100.0%** |

| | Average | Median |
|---|---|---|
| **By Age** | 8.4 | 8.1 |
| **By Number of Placements** | 1.3 | 1.0 |
| **By Months of Time in Care** | 4.6 | 0.2 |

**Child Welfare Reporting Requirements**                    **April 1, 2015 - September 30, 2015**

**TABLE 39**
**NUMBER AND PERCENTAGE OF CHILDREN EXITING DCS**
**CUSTODY FOR REASON OF "ADOPTION" FOR THE REPORTING PERIOD**
**ENDING SEPTEMBER 30, 2015**

| By Age | Number | Percentage |
|---|---|---|
| Under 1 | 30 | 1.9% |
| Ages 1 to 5 | 848 | 53.9% |
| Ages 6 to 8 | 303 | 19.2% |
| Ages 9 to 12 | 245 | 15.5% |
| Ages 13 to 17 | 150 | 9.5% |
| 18 and Over | 0 | 0.0% |
| **Total** | **1,576** | **100.0%** |

| Ethnicity | Number | Percentage |
|---|---|---|
| Caucasian | 629 | 39.9% |
| Hispanic | 562 | 35.7% |
| African American | 200 | 12.7% |
| American Indian | 120 | 7.6% |
| Asian | 17 | 1.1% |
| Other | 48 | 3.0% |
| **Total** | **1,576** | **100.0%** |

| By Number of Placements | Number | Percentage |
|---|---|---|
| One | 740 | 46.9% |
| Two | 438 | 27.8% |
| Three | 201 | 12.8% |
| Four | 96 | 6.1% |
| Five | 47 | 3.0% |
| More than Five | 54 | 3.4% |
| **Total** | **1,576** | **100.0%** |

| By Length of Time in Care | Number | Percentage |
|---|---|---|
| Less than 30 Days | 1 | 0.1% |
| 31 Days to 12 Months | 104 | 6.6% |
| 13 to 24 Months | 677 | 43.0% |
| More than 24 Months | 794 | 50.3% |
| **Total** | **1,576** | **100.0%** |

| | Average | Median |
|---|---|---|
| **By Age** | 6.2 | 5.1 |
| **By Number of Placements** | 2.1 | 2.0 |
| **By Months of Time in Care** | 25.7 | 24.2 |

**TABLE 40**
**NUMBER AND PERCENTAGE OF CHILDREN EXITING DCS CUSTODY**
**FOR REASON OF "GUARDIANSHIP" FOR THE REPORTING PERIOD**
**ENDING SEPTEMBER 30, 2015**

| By Age | Number | Percentage |
|---|---|---|
| Under 1 | 10 | 2.9% |
| Ages 1 to 5 | 54 | 15.7% |
| Ages 6 to 8 | 51 | 14.9% |
| Ages 9 to 12 | 70 | 20.4% |
| Ages 13 to 17 | 158 | 46.1% |
| 18 and Over | 0 | 0.0% |
| **Total** | **343** | **100.0%** |

| Ethnicity | Number | Percentage |
|---|---|---|
| Caucasian | 119 | 34.7% |
| Hispanic | 112 | 32.7% |
| African American | 39 | 11.4% |
| American Indian | 57 | 16.6% |
| Asian | 8 | 2.3% |
| Other | 8 | 2.3% |
| **Total** | **343** | **100.0%** |

| By Number of Placements | Number | Percentage |
|---|---|---|
| One | 208 | 60.6% |
| Two | 59 | 17.2% |
| Three | 43 | 12.5% |
| Four | 23 | 6.7% |
| Five | 5 | 1.5% |
| More than Five | 5 | 1.5% |
| **Total** | **343** | **100.0%** |

| By Length of Time in Care | Number | Percentage |
|---|---|---|
| Less than 30 Days | 27 | 7.9% |
| 31 Days to 12 Months | 113 | 32.9% |
| 13 to 24 Months | 153 | 44.6% |
| More than 24 Months | 50 | 14.6% |
| **Total** | **343** | **100.0%** |

| | Average | Median |
|---|---|---|
| **By Age** | 11.1 | 11.9 |
| **By Number of Placements** | 1.8 | 1.0 |
| **By Months of Time in Care** | 15.2 | 14.7 |

Page **55** of **69**

**TABLE 41**
**NUMBER AND PERCENTAGE OF CHILDREN EXITING DCS CUSTODY**
**FOR REASONS OF "REACHING AGE OF MAJORITY" FOR THE REPORTING PERIOD**
**ENDING SEPTEMBER 30, 2015**

| By Age | Number | Percentage |
|---|---|---|
| Under 1 | 0 | 0.0% |
| Ages 1 to 5 | 0 | 0.0% |
| Ages 6 to 8 | 0 | 0.0% |
| Ages 9 to 12 | 0 | 0.0% |
| Ages 13 to 17 | 0 | 0.0% |
| 18 and Over | 406 | 100.0% |
| **Total** | **406** | **100.0%** |

| Ethnicity | Number | Percentage |
|---|---|---|
| Caucasian | 167 | 41.2% |
| Hispanic | 138 | 34.0% |
| African American | 62 | 15.3% |
| American Indian | 29 | 7.1% |
| Asian | 5 | 1.2% |
| Other | 5 | 1.2% |
| **Total** | **406** | **100.0%** |

| By Number of Placements | Number | Percentage |
|---|---|---|
| One | 94 | 23.2% |
| Two | 52 | 12.8% |
| Three | 56 | 13.8% |
| Four | 38 | 9.4% |
| Five | 27 | 6.7% |
| More than Five | 139 | 34.1% |
| **Total** | **406** | **100.0%** |

| By Length of Time in Care | Number | Percentage |
|---|---|---|
| Less than 30 Days | 9 | 2.2% |
| 31 Days to 12 Months | 95 | 23.4% |
| 13 to 24 Months | 78 | 19.2% |
| More than 24 Months | 224 | 55.2% |
| **Total** | **406** | **100.0%** |

| | Average | Median |
|---|---|---|
| **By Age** | 18.7 | 18.1 |
| **By Number of Placements** | 5.3 | 4.0 |
| **By Months of Time in Care** | 35.4 | 27.2 |

**TABLE 42**
**NUMBER AND PERCENTAGE OF CHILDREN EXITING DCS CUSTODY**
**FOR REASON OF "TRANSFER TO ANOTHER AGENCY" FOR THE REPORTING PERIOD**
**ENDING SEPTEMBER 30, 2015**

| By  Age | Number | Percentage |
|---|---|---|
| Under 1 | 6 | 9.7% |
| Ages 1 to 5 | 22 | 35.5% |
| Ages 6 to 8 | 13 | 21.0% |
| Ages 9 to 12 | 10 | 16.1% |
| Ages 13 to 17 | 10 | 16.1% |
| 18 and Over | 1 | 1.6% |
| **Total** | **62** | **100.0%** |

| Ethnicity | Number | Percentage |
|---|---|---|
| Caucasian | 14 | 22.6% |
| Hispanic | 7 | 11.3% |
| African American | 5 | 8.1% |
| American Indian | 28 | 45.1% |
| Asian | 0 | 0.0% |
| Other | 8 | 12.9% |
| **Total** | **62** | **100.0%** |

| By Number of Placements | Number | Percentage |
|---|---|---|
| One | 36 | 58.1% |
| Two | 15 | 24.2% |
| Three | 3 | 4.8% |
| Four | 2 | 3.2% |
| Five | 0 | 0.0% |
| More than Five | 6 | 9.7% |
| **Total** | **62** | **100.0%** |

| By Length of Time in Care | Number | Percentage |
|---|---|---|
| Less than 30 Days | 23 | 37.1% |
| 31 Days to 12 Months | 21 | 33.9% |
| 13 to 24 Months | 9 | 14.5% |
| More than 24 Months | 9 | 14.5% |
| **Total** | **62** | **100.0%** |

| | Average | Median |
|---|---|---|
| **By Age** | 11.1 | 11.9 |
| **By Number of Placements** | 1.8 | 1.0 |
| **By Months of Time in Care** | 15.2 | 14.7 |

**TABLE 43**
**NUMBER AND PERCENTAGE OF CHILDREN EXITING DCS CUSTODY**
**FOR REASON OF "RUNAWAY" FOR THE REPORTING PERIOD**
**ENDING SEPTEMBER 30, 2015**

| By  Age | Number | Percentage |
|---|---|---|
| Under 1 | 0 | 0.0% |
| Ages 1 to 5 | 0 | 0.0% |
| Ages 6 to 8 | 0 | 0.0% |
| Ages 9 to 12 | 1 | 3.0% |
| Ages 13 to 17 | 21 | 63.7% |
| 18 and Over | 11 | 33.3% |
| **Total** | **33** | **100.0%** |

| Ethnicity | Number | Percentage |
|---|---|---|
| Caucasian | 13 | 39.3% |
| Hispanic | 7 | 21.2% |
| African American | 5 | 15.2% |
| American Indian | 2 | 6.1% |
| Asian | 1 | 3.0% |
| Other | 5 | 15.2% |
| **Total** | **33** | **100.0%** |

| By Number of Placements | Number | Percentage |
|---|---|---|
| One | 22 | 66.7% |
| Two | 1 | 3.0% |
| Three | 3 | 9.1% |
| Four | 1 | 3.0% |
| Five | 1 | 3.0% |
| More than Five | 5 | 15.2% |
| **Total** | **33** | **100.0%** |

| By Length of Time in Care | Number | Percentage |
|---|---|---|
| Less than 30 Days | 15 | 45.5% |
| 31 Days to 12 Months | 8 | 24.2% |
| 13 to 24 Months | 6 | 18.2% |
| More than 24 Months | 4 | 12.1% |
| **Total** | **33** | **100.0%** |

| | Average | Median |
|---|---|---|
| **By Age** | 17.1 | 17.5 |
| **By Number of Placements** | 2.7 | 1.0 |
| **By Months of Time in Care** | 10.0 | 1.3 |

Page **58** of **69**

**TABLE 44**
**NUMBER AND PERCENTAGE OF CHILDREN EXITING DCS CUSTODY**
**FOR REASON OF "DEATH OF CHILD" FOR THE REPORTING PERIOD ENDING**
**SEPTEMBER 30, 2015**

| By Age | Number | Percentage |
|---|---|---|
| Under 1 | 3 | 50.0% |
| Ages 1 to 5 | 0 | 0.0% |
| Ages 6 to 8 | 0 | 0.0% |
| Ages 9 to 12 | 0 | 0.0% |
| Ages 13 to 17 | 3 | 50.0% |
| 18 and Over | 0 | 0.0% |
| **Total** | **6** | **100.0%** |

| Ethnicity | Number | Percentage |
|---|---|---|
| Caucasian | 2 | 33.3% |
| Hispanic | 2 | 33.3% |
| African American | 1 | 16.7% |
| American Indian | 0 | 0.0% |
| Asian | 0 | 0.0% |
| Other | 1 | 16.7% |
| **Total** | **6** | **100.0%** |

| By Number of Placements | Number | Percentage |
|---|---|---|
| One | 4 | 66.6% |
| Two | 1 | 16.7% |
| Three | 1 | 16.7% |
| Four | 0 | 0.0% |
| Five | 0 | 0.0% |
| More than Five | 0 | 0.0% |
| **Total** | **6** | **100.0%** |

| By Length of Time in Care | Number | Percentage |
|---|---|---|
| Less than 30 Days | 0 | 0.0% |
| 31 Days to 12 Months | 5 | 83.3% |
| 13 to 24 Months | 0 | 0.0% |
| More than 24 Months | 1 | 16.7% |
| **Total** | **6** | **100.0%** |

| | Average | Median |
|---|---|---|
| **By Age** | 8.2 | 7.6 |
| **By Number of Placements** | 1.5 | 1.0 |
| **By Months of Time in Care** | 12.4 | 4.6 |

**TABLE 45**
**CHILDREN EXITING CARE FOR REASON OF DEATH BY CAUSE OF DEATH,**
**PLACEMENT TYPE AT TIME OF DEATH, AND COUNTY**

| COUNTY | CAUSE OF DEATH | TYPE OF PLACEMENT AT TIME OF DEATH |
|---|---|---|
| Maricopa | Asthma and respiratory factors | DDD Foster Home |
| Maricopa | Unknown; child was born premature and substance exposed | Hospital – Hacienda Health Care (skilled nursing facility) |
| Maricopa | Pneumonia and respiratory failure | Non relative foster home |
| Pima | Suicide | Runaway |
| Pima | Kidney failure | Hospice |
| Pinal | Unable to determine | Relative foster home |

**TABLE 46**
**NUMBER OF CHILDREN IN AN OPEN CASE WHO DIED AS A RESULT OF ALLEGED**
**ABUSE AS CATEGORIZED BY THE CUSTODIAL RELATIONSHIP AND COUNTY FOR THE**
**PERIOD APRIL 1, 2015 THROUGH SEPTEMBER 30, 2015**

| COUNTY | BIOLOGICAL PARENT(S) | OTHER FAMILY MEMBER | ADOPTIVE PARENT(S) | FOSTER CARE PARENT(S) | OTHER OUT-OF-HOME CARE PROVIDER | TOTAL | % OF TOTAL |
|---|---|---|---|---|---|---|---|
| APACHE | 0 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| COCHISE | 0 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| COCONINO | 0 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| GILA | 0 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| GRAHAM | 0 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| GREENLEE | 0 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| LA PAZ | 0 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| MARICOPA | 3 | 0 | 0 | 2 | 0 | 5 | 62.5% |
| MOHAVE | 2 | 0 | 0 | 0 | 0 | 2 | 25.0% |
| NAVAJO | 0 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| PIMA | 0 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| PINAL | 1 | 0 | 0 | 0 | 0 | 1 | 12.5% |
| SANTA CRUZ | 0 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| YAVAPAI | 0 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| YUMA | 0 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| STATEWIDE | 6 | 0 | 0 | 2 | 0 | 8 | 100.0% |
| % OF TOTAL | 75.0% | 0.0% | 0.0% | 25.0% | 0.0% | 100.0% | |

The number of child maltreatment deaths presented in the Semi-Annual Report is not comparable to child maltreatment deaths reported on the website by the Arizona Department of Health Services (ADHS).

- DCS posts information in accordance with A.R.S. § 8-807 on child fatalities due to abuse or neglect by the child's parent, custodian or caregiver at: https://dcs.az.gov/news/child-fatalities-near-fatalities-information-releases.
- This information is posted when the information comes to DCS's attention and a final determination of the fatality due to abuse or neglect has been made by either a substantiated finding or specific criminal charges filed against a parent, guardian or caregiver for causing the fatality.
- The information that comes to DCS's attention and the determination of the fatality due to abuse or neglect may occur sometime after the actual incident for a number of reasons including a

**Child Welfare Reporting Requirements**                    **April 1, 2015 - September 30, 2015**

determination by a medical professional, a medical examiner, or a criminal child abuse arrest and charge of the perpetrator.

## CHILDREN WITH CASE PLAN GOALS OF ADOPTION

Of the 18,657 children in out-of-home care on September 30, 2015, there were 3,878 or 20.8% who had a case plan goal of adoption. Of those, 2,468 have been placed in an adoptive home and another 1,410 have not been placed. The age and ethnicity of the children with a case plan goal of adoption is displayed in Chart 33 and Chart 34.

**CHART 33**
**THE PLACEMENT AND NUMBER OF CHILDREN WITH A CASE PLAN GOAL OF ADOPTION BY AGE**



**Child Welfare Reporting Requirements**                    **April 1, 2015 - September 30, 2015**

**CHART 34**
**THE PLACEMENT AND NUMBER OF CHILDREN WITH A CASE**
**PLAN GOAL OF ADOPTION BY ETHNICITY**



Placed, N=2,468        ■ Not Placed, N=1,410

**TABLE 47**
**NUMBER OF CHILDREN WITH A PETITION FOR TERMINATION OF PARENTAL RIGHTS**
**BY COUNTY FOR THE PERIOD APRIL 1, 2015 THROUGH SEPTEMBER 30, 2015**

| COUNTY | TERMINATION OF RIGHTS GRANTED | TERMINATION OF RIGHTS DENIED | TERMINATION OF RIGHTS GRANTED IN PART/DENIED IN PART | TERMINATION OF RIGHTS WITHDRAWN | TOTAL | % OF TOTAL |
|---|---|---|---|---|---|---|
| APACHE | 5 | 0 | 0 | 0 | 5 | 0.2% |
| COCHISE | 50 | 0 | 0 | 0 | 50 | 2.2% |
| COCONINO | 20 | 0 | 0 | 0 | 20 | 0.9% |
| GILA | 38 | 1 | 0 | 0 | 39 | 1.7% |
| GRAHAM | 9 | 0 | 0 | 0 | 9 | 0.4% |
| GREENLEE | 8 | 0 | 0 | 0 | 8 | 0.4% |
| LA PAZ | 1 | 0 | 0 | 0 | 1 | <0.1% |
| MARICOPA | 965 | 1 | 0 | 4 | 970 | 43.2% |
| MOHAVE | 61 | 0 | 0 | 0 | 61 | 2.7% |
| NAVAJO | 31 | 0 | 0 | 0 | 31 | 1.4% |
| PIMA | 635 | 2 | 0 | 3 | 640 | 28.5% |
| PINAL | 269 | 3 | 0 | 0 | 272 | 12.1% |
| SANTA CRUZ | 9 | 0 | 0 | 1 | 10 | 0.5% |
| YAVAPAI | 47 | 0 | 0 | 0 | 47 | 2.1% |
| YUMA | 84 | 0 | 0 | 0 | 84 | 3.7% |
| STATEWIDE | 2,232 | 7 | 0 | 8 | 2,247 | 100.0% |
| % OF TOTAL | 99.3% | 0.3% | 0.0% | 0.4% | 100.0% | |

**Child Welfare Reporting Requirements**                    **April 1, 2015 - September 30, 2015**

The average length of time that a child with a case plan goal of "adoption" has spent in out-of-home care is 2 years and 10 days. Information on the number of placements in terms of the average, median, and range for children with a case plan goal of adoption is shown below in Table 48.

**TABLE 48**
**PLACEMENT INFORMATION FOR CHILDREN WITH A CASE PLAN GOAL OF ADOPTION**

|                   | Placements |
|-------------------|:----------:|
| **Average**       | 2.6        |
| **Median**        | 2.0        |
| **Range Minimum** | 1          |
| **Range Maximum** | 40         |

**CHART 35**
**THE PLACEMENT AND NUMBER OF CHILDREN WITH A CASE PLAN GOAL OF ADOPTION BY LEGAL STATUS**

*Partially free refers to a situation where only one of the parent's rights has been severed.

Page **63** of **69**

**CHART 36**
**THE NUMBER OF CHILDREN WITH A CASE PLAN GOAL OF ADOPTION BY LENGTH OF TIME FROM CHANGE OF CASE PLAN GOAL OF ADOPTION TO ADOPTIVE PLACEMENT**



**Placed, N=2,468**

\*\*Approximately 70 percent of children are adopted by relatives or their foster parents and are already in their prospective adoptive placement at the time the case plan goal changes to adoption.

**CHART 37**
**THE NUMBER OF CHILDREN WITH A CASE PLAN GOAL OF ADOPTION WHO WERE IN AN ADOPTIVE PLACEMENT BY THE MARITAL STATUS OF THE ADOPTIVE PARENT**



☐ April 2015 - September 2015, N=2,468    ◼ October 2014 - March 2015, N=2,221

**CHART 38**
**THE NUMBER OF CHILDREN WITH A CASE PLAN GOAL OF ADOPTION WHO WERE IN AN ADOPTIVE PLACEMENT BY THE RELATIONSHIP OF THE ADOPTIVE PARENT**



**DISRUPTIONS**

**TABLE 49**
**THE NUMBER OF CHILDREN WITH A CASE PLAN GOAL OF ADOPTION WHO WERE IN AN ADOPTIVE PLACEMENT AND DISRUPTED BY AGE AND ETHNICITY**

| By Age | Number | Percentage |
|---|---|---|
| Under 1 | 0 | 0.0% |
| Ages 1 – 5 | 0 | 0.0% |
| Ages 6 – 8 | 0 | 0.0% |
| Ages 9 – 12 | 0 | 0.0% |
| Ages 13 – 17 | 3 | 100.0% |
| 18 and Over | 0 | 0.0% |
| **Total** | **3** | **100.0%** |
|  |  |  |
| **Ethnicity** | **Number** | **Percentage** |
| Caucasian | 1 | 33.3% |
| Hispanic | 1 | 33.3% |
| African American | 1 | 33.3% |
| American Indian | 0 | 0.0% |
| Asian | 0 | 0.0% |
| Other | 0 | 0.0% |
| **Total** | **3** | **100.0%** |

**Child Welfare Reporting Requirements**                    **April 1, 2015 - September 30, 2015**

**CHART 39**
**THE NUMBER OF CHILDREN WITH A CASE PLAN GOAL OF ADOPTION WHO WERE IN AN ADOPTIVE PLACEMENT AND DISRUPTED BY THE MARITAL STATUS OF THE ADOPTIVE PARENT**



**CHART 40**
**THE NUMBER OF CHILDREN WITH A CASE PLAN GOAL OF ADOPTION WHO WERE IN AN ADOPTIVE PLACEMENT AND DISRUPTED BY THE RELATIONSHIP OF THE ADOPTIVE PARENT**



**Child Welfare Reporting Requirements**                    **April 1, 2015 - September 30, 2015**

**ADOPTIVE SERVICES**

## CHART 41
## THE NUMBER OF CHILDREN WITH A FINALIZED ADOPTION



There were 1,576 children with a finalized adoption during the reporting period. Chart 42 displays the number of children with a finalized adoption during the reporting period by the average length of time in out-of-home placement before adoptive placement.

## CHART 42
## THE NUMBER AND PERCENTAGE OF CHILDREN WITH A FINALIZED ADOPTION BY AVERAGE LENGTH OF TIME IN OUT-OF-HOME PLACEMENT BEFORE ADOPTIVE PLACEMENT



The chart below displays the number of children with a finalized adoption by average length of time in adoptive placement before the final order of adoption.

**CHART 43**
**THE NUMBER AND PERCENTAGE OF CHILDREN WITH A FINALIZED ADOPTION BY AVERAGE LENGTH OF TIME IN ADOPTIVE PLACEMENT BEFORE THE FINAL ORDER OF ADOPTION**



**CHART 44**
**THE NUMBER OF CHILDREN WITH A FINALIZED ADOPTION BY THE MARITAL STATUS OF THE ADOPTIVE PARENT**



**CHART 45**
**THE NUMBER OF CHILDREN WITH A FINALIZED ADOPTION BY THE RELATIONSHIP
OF THE ADOPTIVE PARENT TO THE CHILD**

