**Scharf-Norton Center for Constitutional Litigation at the GOLDWATER INSTITUTE**
Christina Sandefur (027983)
Aditya Dynar (031583)
500 E. Coronado Rd.
Phoenix, Arizona 85004
(602) 462-5000
litigation@goldwaterinstitute.org

**COOPER & KIRK, PLLC**
Michael W. Kirk (admitted *pro hac vice*)
Brian W. Barnes (admitted *pro hac vice*)
Harold S. Reeves (admitted *pro hac vice*)
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| A.D., C.C., L.G., and C.R., by CAROL COGHLAN CARTER, and DR. RONALD FEDERICI, their next friends; S.H. and J.H., a married couple; M.C. and K.C., a married couple; K.R. and P.R., a married couple; for themselves and on behalf of a class of similarly-situated individuals,<br>    Plaintiffs,<br><br>  vs.<br><br>KEVIN WASHBURN, in his official capacity as Assistant Secretary of Indian Affairs, BUREAU OF INDIAN AFFAIRS; SALLY JEWELL, in her official capacity as Secretary of the Interior, U.S. DEPARTMENT OF THE INTERIOR; GREGORY A. McKAY, in his official capacity as Director of ARIZONA DEPARTMENT OF CHILD SAFETY,<br>    Defendants. | No.  CV-15-1259-PHX-NVW<br><br><br>**PLAINTIFFS' COMBINED RESPONSE TO STATE AND FEDERAL DEFENDANTS' MOTIONS TO DISMISS** |

# INTRODUCTION AND SUMMARY[1]

Given this Court's April 4 order (Doc. 172) encouraging parties to incorporate by reference the relevant portions of their previous briefs, and in an effort to conserve the Court's time, Plaintiffs will combine herein their responses to State and Federal Defendants' motions to dismiss the First Amended Complaint ("AC"),[2] and, to the extent the Defendants reassert arguments raised in their previous motions, Plaintiffs incorporate their previous answers in Docs. 80, 88, 109, 115, 129, and 169.

The First Amended Complaint (Doc. 173) made two major changes: it added new Plaintiffs (K.R., P.R., L.G., C.R., and Dr. Ronald Federici), AC ¶¶ 14, 17, and a claim for damages for past constitutional violations. AC ¶¶ 147–150. The rest remains largely unchanged. The renewed dismissal motions focus primarily on the new Plaintiffs' standing, and add some extra arguments regarding abstention, failure to state a cause of action, etc. This Response begins by explaining why the new Plaintiffs have standing, and then addresses the Defendants' new arguments for dismissal.

## I. THE PLAINTIFFS HAVE STANDING

The Defendants' standing objections rest on their mistaken view that the injury L.G., C.R., C.C., K.C., and M.C. allege relates to their ultimate adoption, foster placements, or custody rights. *See, e.g.,* SM.7. This is incorrect. The injury they assert is *unequal treatment*. AC ¶ 121. "[T]he 'right invoked is that of equal treatment.'" *Heckler v. Mathews*, 465 U.S. 728, 740 (1984) (citation omitted). Once that is clearly understood, the rest of Defendants' standing arguments basically collapse.

---

[1] This Court's July 9, 2015, Order (Doc. 7) requires the parties to meet and confer before filing any motions to dismiss, and to accompany any motion to dismiss with a certification that a meet-and-confer occurred. Defendants did not meet and confer with Plaintiffs before filing their renewed motions to dismiss.

[2] Federal Defendant's Motion to Dismiss the First Amended Complaint (Doc. 178) is hereafter cited as "FM"; State Defendants' Motion to Dismiss the First Amended Complaint (Doc. 179) is cited as "SM." Plaintiffs' previously-filed Consolidated Response to Motions to Dismiss the initial complaint (Doc. 80) is referred to as "PR."

**A. C.R. Has Standing Because He is Currently Being Subjected to Race-Based Differential Treatment**

Defendants challenge C.R.'s standing on the grounds that ICWA "protect[s] C.R. rather than injure[s] him." FM.9. This is question-begging. Whether ICWA "protects" him is the point in dispute (which he has standing to raise) and therefore cannot be assumed as a premise for purposes of the standing analysis.

C.R. does not regard ICWA as a benefit. It deprives him of the "best interests of the child" standard that applies to children of all other races, *see* PR.27; of the individualized assessment to which he is entitled under due process, PR.26–27; of the jurisdictional protections afforded by due process, PR.25–26; of the protections afforded by federalism, PR.29–31; of freedom of association, PR.31–33; and, of course, of the equal protection of the laws, PR.20–25—and all on account of his racial ancestry. Yet the Federal Defendants call it "hubris" for him to complain about it! FM.9.[3] The state of Florida, in *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984), also said its racially discriminatory policies "benefitted" children. But the Court unanimously declared it unconstitutional to differentiate between children in custody cases on the basis of race. *Id.* Simply put, there is nothing hubristic about the idea that government should make decisions about children's welfare "on a racially nondiscriminatory basis." *Brown v. Board of Educ.*, 349 U.S. 294, 301 (1955).

---

[3] Federal Defendants, quoting *Santosky v. Kramer*, 455 U.S. 745 (1982), contend that the Court cannot "presume" that C.R.'s interests are adverse to those of his biological parents. FM.9. But what the *Santosky* Court said was, "*[a]t the factfinding [stage]*, the State cannot presume that a child and his parents are adversaries. … [T]he court *may* assume at the *dispositional* stage that the interests of the child and the natural parents *do* diverge." *Id.* at 760 (emphasis altered). C.R.'s case is beyond factfinding. The Department of Child Safety has already consented in state court to changing C.R.'s case plan to severance and adoption. AC ¶ 37. A termination-of-parental rights hearing is scheduled, but has not yet occurred. Since the termination hearing is "at the dispositional stage," the court may indeed assume that C.R.'s interests diverge from those of the birth parents. The termination hearing will be "an adversary contest between the State and the natural parents," *Santosky*, 455 U.S. at 761, and the Department of Child Safety, which agreed to that severance in *support* of C.R. in the state proceedings, is a defendant here *against* C.R.

1    Defendants also claim that C.R.'s injury is speculative.[4] FM.8–9, SM.9. But this is
2    an artifact of Defendants' misidentifying C.R.'s injury. C.R. has *already* been, and is *now*
3    being, injured, because the injury asserted is unequal treatment. *Mathews*, 465 U.S. at 739.
4    As the Ninth Circuit has explained, "equal treatment under law is a judicially cognizable
5    interest that satisfies the case or controversy requirement of Article III, even if it brings
6    no tangible benefit to the party asserting it." *Davis v. Guam*, 785 F.3d 1311, 1315 (9th Cir.
7    2015).

8    A party has standing to challenge a government's assertion that a set of rules applies
9    to him, where that assertion adversely affects the party's interests. In *Sabre, Inc. v.*
10   *Department of Transp.*, 429 F.3d 1113, 1117–19 (D.C. Cir. 2005), the court found that a
11   party was injured for Article III purposes when a federal agency asserted jurisdiction over
12   it, because that assertion was "definitive, not tentative," *id.* at 1117; the agency's past
13   actions demonstrated "a very high probability" that it would take actions adverse to the
14   party's interests, *id.*; and the assertion of authority meant the plaintiff could "realistically
15   expect" that the agency "might very well" prohibit the plaintiff from taking certain actions
16   in the future. *Id.* at 1118. In the same way, C.R. has standing to challenge ICWA because
17   ICWA's applicability is definitive and not tentative, its application is adverse to C.R.'s
18   interests—specifically, his right of "equal treatment," *Matthews*, 465 U.S. at 739—and as
19   a result of ICWA, C.R. "might very well" be denied adoption by K.R. and P.R. *Sabre,*
20   *Inc.*, 492 F.3d at 1118.

21   The error in the Defendants' argument that C.R.'s injury is speculative (or unripe, 
22   *see* SM.9–10) becomes clear when they claim that it is "speculative whether…the State
23   court will … conclud[e] that there is good cause to deviate from ICWA's placement
24   preferences." FM.9. Note that what is "speculative" here is *not* that ICWA applies to C.R.

---

[4] Federal Defendants are incorrect in saying that C.R. is "not yet the subject of any adoption proceeding and his parents' rights have not yet been terminated" and might never be. FM.8. In fact, the state court, with the consent of the Department of Children's Services, changed the case plan in his case to "severance." AC ¶ 37.

and subjects him to a separate and unequal legal regime. What is speculative is whether or not the State court will *deviate* from ICWA. Defendants do not dispute that ICWA *presumptively* applies, and *is now* being applied. AC ¶ 39. What is speculative is *not* that C.R. is injured, but whether a later "good cause" finding might render his injury *moot*. But a good cause finding could not render his injury moot, because it could not undo the harm he has already suffered, which is *unequal treatment*. That has already been done to him, is now being done to him, and cannot be undone. He seeks nominal damages for the past and present unequal treatment, AC ¶¶ 123–30, 147–50, so his case cannot be rendered moot. *Lokey v. Richardson*, 600 F.2d 1265, 1266 (9th Cir. 1979) (*per curiam*) (where change in plaintiff's status mooted request for injunction, case was not moot because he "could be entitled to nominal damages if he prevailed.").

Even if it could be, the possibility of mootness does not mean a person is not injured. Standing must be assessed based on the facts at the time the complaint was filed. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 598 n.4 (1992). *See also Glavin v. Clinton*, 19 F. Supp. 2d 543, 547 (E.D. Va. 1998), *aff'd* 525 U.S. 316 (1999) ("There is always the possibility that settlement or some external event will render a case moot, but that hardly renders the litigation nonjusticiable before that event occurs."). C.R. does not have "to negate the … speculative and hypothetical possibilit[y]" that a state court might someday deviate from ICWA in order to have standing. *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 78 (1978). To hold otherwise would be to "confuse[] mootness with standing." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). The fact that ICWA provides a narrow escape hatch does not disprove the fact that it applies, and is injuring C.R. right now.

**B. L.G. Has Standing Because She is Currently Being Injured by ICWA**

Defendants say L.G. lacks standing because ICWA does not directly apply to her. FM.3; SM.9. But L.G. is harmed by ICWA nevertheless, because her half-brother C.R. is subject to ICWA, AC ¶¶ 11–12, and as a result, the state laws that ordinarily would place her and C.R. together, AC ¶¶ 40–41, are overridden. AC ¶¶ 32–43. This harms L.G., who

4

loves him as her brother. Also, L.G.'s state-court child custody proceeding is consolidated with C.R.'s, AC ¶ 39, meaning that her adoption by K.R. and P.R. is now delayed to remain in sync with C.R.'s. AC ¶¶ 41–43. This injures L.G., and it is attributable to ICWA. AC ¶ 43.

The fact that ICWA does not *directly* apply to L.G., SM.9, is irrelevant. She is injured by ICWA nevertheless. "When a governmental prohibition or restriction imposed on one party causes specific harm to a third party, harm that a constitutional provision or statute was intended to prevent, the indirectness of the injury does not necessarily deprive the person harmed of standing to vindicate his rights." *Warth v. Seldin*, 422 U.S. 490, 505 (1975). *See also Jet Courier Servs., Inc. v. Federal Reserve Bank of Atlanta*, 713 F.2d 1221, 1225 (6th Cir.1983) ("[t]he fact that the plaintiffs will suffer indirect rather than direct injury … does not necessarily deprive them of standing").

What Federal Defendants call "conflicting" allegations in the Complaint (FM.5 n. 6), actually demonstrate why L.G. is injured for Article III purposes. Were it not for ICWA, K.R. and P.R. would be free to adopt both C.R. and L.G. upon a state court's termination of parental rights and determination of adoptability. But because ICWA applies to C.R., and state policy is to place well-bonded siblings together, L.G.'s fate is bound up with ICWA's mandates *vis-à-vis* C.R. AC ¶ 41. For example, the rights of L.G.'s and C.R.'s birth parents have not yet been terminated. AC ¶ 37. Because L.G. is *not* subject to ICWA, the court would ordinarily use the "clear and convincing evidence" standard in deciding whether to terminate parental rights. AC ¶ 98. But C.R. *is* subject to ICWA, so the more demanding "beyond a reasonable doubt" and "serious emotional or physical damage" standards apply when determining whether to terminate *his* birth parents' rights. AC ¶¶ 96–97. Also, the Gila River Indian Community is actively enforcing its ICWA powers with regard to C.R. right now, by seeking ICWA-compliant placements for him. AC ¶¶ 39, 42–43. L.G.'s case must await the ICWA-mandated determination of C.R.'s fate. AC ¶ 41. Thus she is injured both directly and indirectly by ICWA.

5

Either L.G. will be placed with C.R. in an ICWA-mandated proceeding, or she will be separated from him as a consequence of ICWA, or she will have to await a determination of "good cause" to deviate from ICWA in C.R.'s case, or she will be separated from him thanks to the different rules that apply to her and to C.R, or she will continue to languish in foster care. AC ¶¶ 42–43. Any of these outcomes affect her legally cognizable interests. There is "nothing 'improbable' about the proposition" that her interests will be detrimentally affected, *Laidlaw*, 528 U.S. at 184–85, and the cause of that effect is ICWA. L.G. therefore has standing.

This also answers the Defendants' claims that L.G.'s injuries are speculative. SM.9. There is nothing speculative about L.G.'s injury, because her injury is the fact that she is subject to different legal standards, not what the future consequences of those different standards might be. "[T]he right to equal treatment guaranteed by the Constitution is not co-extensive with any substantive rights to the benefits denied the party discriminated against." *Mathews*, 465 U.S. at 739.

Whatever C.R. or L.G.'s ultimate fate might be, it is undeniable that they are *now* being treated differently by the Defendants, and unless enjoined by this Court will continue to be, solely as a consequence of ICWA. Because C.R. is classified as Indian under that law, a set of rules apply to him that do not apply to L.G. (although they do indirectly injure her) or to children of other races. Since the injury L.G. alleges is *the difference in legal standards*, not the ultimate outcome when those standards are applied, she has standing. *Northeastern Fla. Chpt. of Associated Gen. Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993).

**C. A.D.'s Claims Are Not Moot Because She is Still Being Injured by ICWA**

State Defendants, but not the Federal Defendants, contend that A.D. lacks standing because the State Juvenile Court found good cause to deviate from ICWA in her case. SM.7. This is essentially a mootness argument (erroneously labeled as "ripeness.") *Id.* A.D.'s case, however, remains live, because the tribe has appealed. AC ¶ 23. Should the Arizona Court of Appeals or Supreme Court reverse that denial, the case would be ordered

1  transferred to tribal court. *Id.* Thus A.D. is still being injured by ICWA now, and her case

2  is not moot.

3  **D. Even if A.D.'s, S.H.'s, J.H.'s C.C.'s, K.C.'s and M.C.'s Claims for**
   **Prospective Relief Were Moot, Their Nominal Damages Claims for Past**
4  **Injuries Are Not**

5

6  In addition to seeking an injunction against future enforcement of ICWA, the

7  Amended Complaint also seeks nominal damages for past *de jure* racial discrimination.

8  AC ¶¶ 123–30, 147–50. Nominal damages are available in cases like this because it is

9  "importan[t] to organized society" that the right to equal treatment "be scrupulously

10  observed." *Carey v. Piphus*, 435 U.S. 247, 266 (1978). Even where a party's claim to

11  prospective injunctive relief against discriminatory action is rendered moot by acts that

12  occur after the complaint is filed, courts can proceed to determine the availability of

13  nominal damages for prior acts. *See, e.g., Lokey*, 600 F.2d at 1266.

14  Here, even if the Juvenile Court's decision to deviate from ICWA in A.D.'s case is

15  later affirmed on final appeal, she has *already* been injured. She was (a) subjected to

16  differential treatment based on race, which is itself "a type of personal injury … long

17  recognized as judicially cognizable," *Mathews*, 465 U.S. at 738; (b) forced to fend off the

18  Tribe's efforts to transfer jurisdiction—an effort that incurred delays and costs; and (c)

19  forced to undergo a lengthy, costly appellate proceeding solely because of ICWA. Plaintiff

20  A.D. seeks nominal damages for these past and present injuries. AC ¶¶ 148–50. "A live

21  claim for nominal damages will prevent dismissal for mootness." *Bernhardt v. County of*

22  *Los Angeles*, 279 F.3d 862, 872 (9th Cir. 2002). Thus State Defendants' argument must

23  fail.

24  The same holds for C.C., M.C., and K.C.[5] Although C.C. was cleared for adoption

25  with the Navajo Nation's consent after this case was filed, AC ¶ 30, that cannot moot

26  ───────────────

27  [5] And true, of course, of the other named Plaintiffs. Defendants reassert their challenge to
    their standing, and Plaintiffs hereby reassert their answers to those challenges, found at
28  PR.4–15. State Defendants cite *Smith v. Organization of Foster Families for Equality &*

claims for nominal damages arising from the delay, emotional and psychological harm, monetary and other injuries they suffered, AC ¶¶ 27–31, and from the injustice and indignity of being treated differently from other American citizens solely on account of race. Such injuries are "real, if intangible," because they are "inherent in the nature of the wrong." *Carey*, 435 U.S. at 260–61 (citation and quotation marks omitted). Were it not for C.C.'s race, the Navajo Nation's consent would not have been required in the first place, and the other injuries alleged at AC ¶¶ 26–31, would never have occurred. C.C., M.C., and K.C. seek nominal damages for these past injuries. AC ¶¶ 147–50. These causes of action are not moot. The Court can and should "vindicat[e] those constitutional rights, through the awarding of nominal, yet symbolic, damages." *Larez v. City of Los Angeles*, 946 F.2d 630, 640 (9th Cir. 1991).

### E. K.R. and P.R. Have Standing

As Defendants note, K.R. and P.R. are in essentially the same position as the other Plaintiffs who are foster parents and prospective adoptive parents. SM.9; FM.14. Thus both sets of Defendants rely on their earlier arguments regarding the standing of S.H., J.H., and other foster and prospective adoptive parents. SM.9; FM.14. Plaintiffs likewise incorporate by reference their answers to those arguments. *See* PR.6–7. But for ICWA, K.R. and P.R. would be allowed to adopt L.G. and C.R. under the same rules that govern foster and adoption proceedings involving children of other races. That race-based discrimination is unconstitutional.

---

*Reform*, 431 U.S. 816, 845–46 (1977), to contend that foster parents enjoy "the most limited constitutional 'liberty' interest." SM.7. But unlike the New York statute at issue in *Smith*, Arizona law protects "a person who has a significant relationship with the child," including a "foster parent." A.R.S. §§ 8-103(B)(3), 8-862(H)(1). *See Antonio M. v. ADES*, 214 P.3d 1010 (Ariz. App. 2009). And foster parents have as much right as any other person to equal treatment without discrimination on the basis of race.

8

## II. DR. FEDERICI AND MS. CARTER ARE PROPER NEXT FRIENDS

The Defendants reassert their objections to Ms. Carter's standing, and contend that Dr. Federici lacks standing for the same reasons as Carter. SM.6, 9, FM.14–15. Plaintiffs answered these arguments at PR.12–15.

As to Dr. Federici, the Federal Rules of Civil Procedure are broadly written to allow participation by next-friends. No "close" relationship between the child and next friend is required. *Coalition of Clergy, Lawyers, & Professors v. Bush*, 310 F.3d 1153 (9th Cir. 2002), refused to impose such a requirement, but explained that the closeness of a relationship is one factor in a "flexible" analysis used to determine "the probability" that the next friend "knows and is dedicated to the [party's] individual best interests." *Id.* at 1162. These "relative" and "subjective" determinations are "difficult of measurement," but are meant to "discern[] the 'intruder' or 'uninvited meddler' from the true 'next friend.'" *Id.*; *see also Bowen v. Rubin*, 213 F.Supp.2d 220, 226 (E.D.N.Y.2001) ("a close relationship or blood tie need not exist.).

Under these flexible standards, the First Circuit held in *Sam M. v. Carcieri*, 608 F.3d 77 (1st Cir. 2010), that a sociology professor who had never met the children or relatives, could appear as a next-friend plaintiff in a case involving the state's foster care system, because he was "familiar with the circumstances foster care children face while in the state's custody," had studied the children's situation and familiarized himself with the documents involved, and had concluded that pursuing the case was in the children's best interests. *Id.* at 93.

Applying the same test, the District Court in *Nichols v. Nichols*, 2011 WL 2470135 (D. Or. 2011), approved the participation of a next friend with no prior relationship with the minor, because his "experience, objectivity, and expertise in this role make him an exceptional candidate," *id.* at *4, particularly because there was reason to believe the Guardians ad Litem were incapable of discharging their duties. That is the case here. The state court-appointed guardians-ad-litem of the named children are unable or unwilling to

"advocate[]" for the children's cause here. Doc. 162 at 5. Director McKay and DCS are adverse to the children's interests in this case.

The foster/preadoptive parents are the logical alternative, but Defendants resisted this option, PR.13–14; Tr. Dec. 18, 2015 p. 100:2–9. An experienced and respected attorney like Carter, *see* PR.13, and an experienced, respected psychologist like Federici are a proper alternative. They are not "intruders" or "meddlers." There is no basis to think they are using the children as "pawns," as Federal Defendants claim.[6] *See* FM.15. Even if Carter and Federici have opinions about the effects of ICWA, this hardly disqualifies them as next friends. In *Child v. Beame*, 412 F. Supp. 593 (S.D.N.Y.1976), the court allowed the dean of a law school to participate as next friend of foster children, even though he had never met the children, *id*. at 597, and was unaware of their circumstances until recruited by the attorneys in the case. *Id*. at 599. The court found no impropriety, because "[w]hile [he] may well be interested in establishing a constitutional base for the children's claims," there was no reason to doubt his good faith or think he was not genuinely seeking the children's best interests. *Id*.

Carter and Federici are in good faith, *Beame,* 412 F.Supp. at 599, "truly dedicated to the children's best interests," *Sam M., 608 F.3d at 83, and are not "feared ideologue[s] that pursue[] an action for purely political or ideological reasons." *Id*. at 93.

## III. ICWA IS A RACE-BASED STATUTE

Plaintiffs briefed the question of whether or not ICWA is race-based and subject to strict scrutiny at PR.20–25, 40–42. In their new motions to dismiss, the Defendants add a few new arguments.

---

[6] This is an ironic insinuation, given that ICWA expressly refers to children as "tribal resources," 25 U.S.C. § 1901(2)–(3), and deprives them of an individualized adjudication of their fates. *See, e.g.,* Guidelines, 80 Fed. Reg. 10146, 10158, F.4(c)(3) ("[t]he good cause determination does not include an independent consideration of the best interest of the Indian child because the preferences reflect the best interests of an Indian child in light of the purposes of the Act."). It is ICWA that treats children as pawns instead of as individuals.

**A. L.G. is Being Injured Now as a Consequence of Her Race**

Federal Defendants claim that L.G. disproves the race-based nature of ICWA because there are children with Indian racial ancestry who are not subject to ICWA. FM.6. This is specious. ICWA's "explicit tie to race," *Rice v. Cayetano*, 528 U.S. 495, 516 (2000), cannot be overcome by the fact that some people of Indian descent are still excluded from its so-called "protections." *Rice* struck down a Hawaii law that entitled only Native Hawaiians to vote, and employed a blood quantum requirement among other factors, even though race was not the *sole* element required. In addition to blood quantum, the statute also required that a person prove she was descended from the "aboriginal peoples which exercised sovereignty and subsisted in the Hawaiian Islands in 1778 and which peoples thereafter continued to reside in Hawaii." *Id.* Thus some Native Hawaiians would not be included within the category created by the statute. The Court noted that the law "differentiates even among Polynesian people and is based simply on the date of an ancestor's residence in Hawaii," but concluded that this was "insufficient to prove the classification is nonracial in purpose and operation. *Simply because a class defined by ancestry does not include all members of the race does not suffice to make the classification race neutral*." *Id.* at 516–17 (emphasis added). Given the statute's "express racial purpose and … actual effects," *id.* at 517, the Court found that the statute's "explicit tie to race," *id.* at 516, was sufficient to doom it under the Fourteenth Amendment.

Similarly, the executive order at issue in *Korematsu v. United States*, 323 U.S. 214 (1944), applied only to persons with more than 1/16th Japanese ancestry. *See* Wendy Ng, *Japanese Internment During World War II: A History and Reference Guide* 37 (2001). Even persons with more than this amount of Japanese ancestry could leave detention centers if they enlisted in the military or obtained sponsorship. Benson Tong, *Asian American Children: A Historical Handbook and Guide* 95 (2004). Under the Defendants' logic, the fact that elements in addition to race were used in determining who was subject to the order—and that some persons with Japanese ancestry were exempt—would prove

1    that the order was not race-based. But the Supreme Court found that the order *was* race-

2    based nevertheless, and applied strict scrutiny. *Korematsu*, 323 U.S. at 216.

3         In other words, the fact that ICWA does not apply to every child with Indian

4    ancestry, or that factors in addition to race also play a role, hardly proves that ICWA is

5    race-neutral. *See* PR.24. ICWA's definition of "Indian child," and the BIA Guidelines,[7]

6    incorporate tribal definitions of membership. AC ¶ 59. Virtually all tribes employ blood

7    quantum or ethnic lineage requirements as prerequisites for membership. AC ¶¶ 60–62. It

8    follows syllogistically that ICWA, in combination with these other sources of law,

9    employs ancestry as a proxy for race.[8] *See* PR.20–25. Children subject to ICWA are

10   expressly denied the protections of the Multi-Ethnic Placement Act, 42 U.S.C. § 1996b,

11   which exemption would make no sense if ICWA did not establish a racial category. And

12   ICWA's jurisdiction transfer and adoption preference provisions apply *without regard* to

13   tribal affiliation, so that, for instance, an Indian child must be placed with an Indian family

14   of a different tribe over a non-Indian family. *See* PR.24.

15         The Federal Defendants' invocation of *Fisher v. District Court of Sixteenth Jud.*

16   *Dist. of Mont., in & for Rosebud Cnty.*, 424 U.S. 382 (1976) (*per curiam*), is off-point.

17   That case determined that a tribal court had jurisdiction over an adoption proceeding in

18   which all of the parties were members of the tribe and all resided on the reservation. *Id.* at

19   383. No party here disputes that tribes have ordinary jurisdiction over child custody and

20   other matters that involve tribal members and occur on, or involve people domiciled on,

21

---

22   [7] The Federal and State Defendants persist in denying that the 2015 BIA Guidelines, AC

23   ¶ 71, are mandatory. They are wrong. *See* PR.33–35, 39–40; Exhibit A, PR.64 (Memo from Dawn Williams, March 10, 2015).

24   [8] Moreover, ICWA is not tribe-specific, but in conjunction with tribal definitions of

25   membership, it relates to "Indians" as an ethnic category. For example, the Gila River Indian Community Constitution entitles "[a]ll children of members … [who] are of at least

26   one-fourth Indian blood" to membership. Gila River Indian Community Constitution, art. III § 1(b). Thus a child who has only 1 percent Gila River ancestry, and 24 percent Navajo

27   or Cherokee ancestry, would still qualify for membership in the Gila River Indian Community and consequently would be subject to ICWA. What counts is therefore not

28   tribal membership as a "consensual" matter, but Indian ethnicity.

1  reservation land. *See* PR.22 n. 9. What *is* at issue here is a statute that applies to people

2  with *no* "political" connection to a tribe, who are *not* domiciled on reservations, and are

3  *not* involved in conduct on reservations—yet who are defined as "Indian" on account of

4  their biological ancestry. *Id.* The statute also overrides traditional state powers, in defiance

5  of principles of federalism, *see* PR.29–31, and grants nationwide jurisdiction to tribes in

6  custody proceedings involving children of Indian ancestry, without regard for the

7  "traditional notions of fair play and substantial justice" necessary to satisfy due process.

8  *International Shoe v. Washington Office of Unemployment Comp. & Placement*, 326 U.S.

9  310, 316 (1945); PR.25–26. None of these issues were at issue in *Fisher,* which involved

10  nothing more undisputed—and nothing more irrelevant to this case—than "[t]he right of

11  the Northern Cheyenne Tribe to govern itself." 424 U.S. at 386.

## B. *Mancari* And Its Progeny Are Inapplicable Here

13  State Defendants repeat their contention that ICWA imposes a political, rather than

14  racial, category, relying on *Morton v. Mancari*, 417 U.S. 535 (1974). Plaintiffs answered

15  this argument at PR.20–25.

16  The State views *Mancari* as standing for the proposition that *all* legislation that

17  differentiates between people of Indian descent and people of non-Indian descent is

18  categorically exempt from the strict scrutiny that applies when the government treats

19  people differently on the basis of race. SM.15. This is certainly incorrect. The Ninth

20  Circuit has expressly rejected it. *Malabed v. North Slope Borough*, 335 F.3d 864, 868 n.

21  5 (9th Cir. 2003). Were *Mancari* that broad, the Supreme Court would not have said in

22  *Adoptive Couple v. Baby Girl*, 133 S. Ct. 2552, 2565 (2013), that using ICWA "to override

23  … the child's best interests … solely because an ancestor—even a remote one—was an

24  Indian" "would raise equal protection concerns." Nor would the Ninth Circuit have

25  expressly held that "an 'Indian tribe' may be … a 'racial group' in particular instances,"

26  and explicitly "reject[ed] the notion" that *Mancari* exempts "distinctions based on Indian

27  or tribal status" from analysis as "racial classifications subject to strict scrutiny."

28  *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1279 (9th Cir. 2004). Nor would *Mancari* itself

13

have emphasized that the case did *not* involve a law "directed towards a 'racial' group consisting of 'Indians.'" 417 U.S. at 553 n. 24. In all these cases and more, the courts have rejected the broad categorical interpretation of *Mancari* that the State Defendants offer.

## IV.   ICWA VIOLATES THE FIRST AMENDMENT FREEDOM OF ASSOCIATION

Federal Defendants contend that C.R. "demonstrates that Plaintiffs' First Amendment claim should be dismissed." FM.9 (emphasis removed), but their argument is incoherent. On one hand, they contend that "[m]embership in a tribe is a bilateral consensual relationship," *id.* at 10, and on the other, that C.R. "is an 'Indian child' because he was born to parents who chose to be and remain members of a federally recognized Indian tribe." *Id.* If an association is bilateral and consensual, it is not possible to be "born" into it.[9] Federal Defendants also believe that "blood descent is typically shorthand for the social, cultural, and communal ties a person has with a sovereign tribal entity." Doc. 68 at 23. But blood descent is not a bilateral consensual relationship.

For federal law to classify people as members of an association because of their biological ancestry—*and to impose a different set of laws on them as a result of that presumed association*—is an unconstitutional race-based presumption. PR.21, PR.32. A law that presumed children born to Republicans were members of the Republican Party, and decreed that they could only be adopted by Republicans, would hardly survive judicial review. PR.32.

Of course, eligibility for membership in a political party or other bilateral consensual relationship *cannot* be based on racial ancestry. *Cf. Terry v. Adams*, 345 U.S. 461, 472 (1953) (ruling "white primaries" illegal); *Runyon v. McCrary*, 427 U.S. 160, 168 (1976) (ruling racial qualifications for freedom of contract illegal); *Rice*, 528 U.S. at 516–17 (ruling election system which allowed only persons with certain racial ancestry to vote

---

[9] ICWA mandates that government take steps to enroll children in tribes when eligible, *even if the parents do not wish this*. PR.8. Thus, once again, ICWA prioritizes race over choice.

14

illegal). That is because such requirements are "'illegal, immoral, unconstitutional, inherently wrong, and destructive of democratic society.'" *Hi-Voltage Wire Works, Inc. v. City of San Jose*, 24 Cal. 4th 537, 548 (2000) (quoting Alexander Bickel, *The Morality of Consent* 133 (1975)).

In other words, even if tribal membership is merely a bilateral consensual relationship, to impose a racial qualification on eligibility for that relationship—or to mandate such a relationship for people of a certain genetic ancestry—is unconstitutional.

Of course, tribal membership is "a good deal more than 'private, voluntary'" association, *United States v. Mazurie*, 419 U.S. 544, 557 (1975), but even so, ICWA's racial "shorthand" is unconstitutional. Citizenship is usually a bilateral and consensual relationship, because it hinges on a person's choices. Thus, for instance, if two American citizens were to renounce their citizenship and become Canadians before having a child, the child would not be an American citizen on account of his biological ancestry. But "Indian child" status under ICWA *cannot* be defeated by the choices of parents, and the difference is solely biological. ICWA gives tribes "'an interest in the child which is distinct from but on a parity with the interest of the parents.'" *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 52 (1989) (quoting *In re Adoption of Halloway*, 732 P.2d 962, 969–70 (Utah 1986)). This means that even parents' conscious efforts to avoid having ICWA apply will be unsuccessful. *Id.* at 50 (invalidating efforts of parents to avoid ICWA's applicability by leaving reservation to give birth). And this rule applies because of the child's racial ancestry.

In *In re M.K.T.*, ___ P.3d ___, 2016 WL 236297 (Okla. Feb. 1, 2016), the child's father tried to relinquish his Cherokee tribal membership in an effort to block application of ICWA and "'help keep … [the child] where she's at'" and "'take the matter out of—out of the Tribe's hands.'" *Id.* at *2 ¶ 10. Nevertheless, the Cherokee tribe intervened and defeated the father's efforts to avert application of ICWA. *Id.* at *22 ¶ 92. So much for bilateral, consensual relationships.

15

ICWA also bars or obstructs foster and adoption placements—true consensual, bilateral relationships—solely on account of race. To cite just two examples, in *In re Adoption of T.A.W.*, 354 P.3d 46 (Wash. App. 2015), *rev. granted*, (No. 92127-0 (pending)), an Indian mother divorced the non-Indian birth father, and remarried. When her new husband sought to legally adopt her child, *id.* at 48–49 ¶¶ 6, 10, the non-Indian birth father invoked ICWA to stop what would otherwise have been a routine, bilateral, consensual adoption. In *In re Santos Y.*, 92 Cal.App.4th 1274 (2001), a child of Indian ancestry who had "no association with the Tribe other than genetics," *id.* at 1321, was put up for adoption, whereupon the tribe intervened to remove him from his foster family— the only family he had ever known: a true bilateral, consensual relationship—and to send him to a reservation in Minnesota.

Other factors of ICWA also show that it compels association. It requires people who have no contact at all with a tribe—except biological ancestry—to submit to tribal jurisdiction. It mandates efforts to "reunify" children with parents, even parents who have abused them. AC ¶ 79. It requires that children be placed with Indian families, based not on individual circumstances or needs (let alone choices), but based on a racial "shorthand." *But see Roberts v. United States Jaycees*, 468 U.S. 609, 617–18 (1984) (freedom of association especially protects family association, because the "choices to enter into and maintain certain intimate human relationships" are an essential "individual freedom … [and] central to our constitutional scheme.").

The racial nature of ICWA's associational mandates is made plain when Federal Defendants say C.R. "is already associated with that Tribe." FM.11. He is associated with it *because of his race.* AC ¶¶ 32–36. He is subject to the Tribe's offering of ICWA-compliant homes—whereas white or black or Asian or Hispanic kids are not—*because of his race*. AC ¶ 39. Federal law allows decisions about his custody and adoption to be denied or delayed *because of his race*. 42 U.S.C. § 1996b(3). He cannot be placed with a non-Indian foster or adoptive family without tribal permission, *because of their race*. Even

1   if his parents would prefer otherwise, ICWA mandates that he remain associated with the

2   tribe, *Holyfield*, 490 U.S. at 51—all *because of race*.

3          It is therefore misleading to suggest that ICWA's applicability depends on any

4   "bilateral consensual relationship." FM.10. It depends on race.

5   **V. ABSTENTION IS INAPPROPRIATE HERE**

6          State Defendants reiterate their abstention arguments, SM.5–6, but add little that is

7   not already answered in PR.17–20. Abstention is inapplicable. This is not a case where

8   Plaintiffs seek to "remove an open, active and ongoing State of Arizona juvenile

9   dependency proceeding" to federal court. *Dema v. Arizona*, 2008 WL 2437939, at *1 (D.

10  Ariz. 2008), or to place "decisions that are now in the hands of the state courts under the

11  direction of the federal district court." *31 Foster Children v. Bush*, 329 F.3d 1255, 1278

12  (11th Cir. 2003). This is not a case in which the "federal court would, in effect, assume an

13  oversight role over the entire state program." *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280,

14  1291–92 (10th Cir. 1999). Most important, this is not a case in which a Plaintiff is asking

15  a federal court to interfere with a "civil enforcement [in] state proceeding[] [that is] 'akin

16  to a criminal prosecution,'" which is when *Younger* abstention is proper. *Sprint*

17  *Commc'ns, Inc. v. Jacobs*, 134 S.Ct. 584, 592 (2013).

18         In *Doe v. Piper*, __ F. Supp. 3d __, 2016 WL 755619 (D. Minn. Feb. 25, 2016), the

19  court refused to abstain in a procedurally identical context. Parents sued to challenge the

20  Minnesota state statute analogous to ICWA on equal protection and due process grounds.

21  *Id.* at *1. The defendants argued for abstention because the parents were simultaneously

22  involved in a state court adoption proceeding. The District Court rejected application of

23  *Younger, id.* at *12, noting that after *Sprint,* abstention is only proper in three

24  "exceptional" circumstances, none of which were present there, and none of which is

25  present here: there are no pending state criminal proceedings, no pending state civil

26

27

28

17

proceedings akin to criminal proceedings, and no civil proceedings relating to enforcement of state court judgments.[10]

## VI. STATE DEFENDANTS ARE PROPER DEFENDANTS IN A CASE SEEKING INJUNCTIVE AND DECLARATORY RELIEF AGAINST FUTURE INJURY

State Defendants move to dismiss several counts in the AC with regard to them, on the grounds that these counts involve acts by the Federal Government, or because they assert violations of the First Amendment, the Fifth Amendment, or other constitutional clauses that apply only to the Federal Government. SM.10–13. It is of course black-letter law that the Bill of Rights applies not directly to the states, but via the Due Process and Equal Protection Clauses (as alleged in AC ¶¶ 123–30). But there is no meaningful distinction between the legal effect of these amendments and their applicability through the incorporation doctrine. As the Court observed in *McDonald v. Chicago*, 561 U.S. 742, 765 (2010) (plurality), the "incorporated Bill of Rights protections 'are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment.'" (citation omitted). There is thus no need to parse such distinctions here.

Moreover, to the extent that the State complies with the Guidelines and cooperates with tribes and the federal government, it is working in concert with the Federal Defendants to violate the Constitution. Full and fair consideration of the merits would be better served by hearing the evidence and arguments in full, and if Plaintiffs prevail, crafting an injunction that bars all Defendants from violating the Constitution. In any event, for purposes of a motion to dismiss, it is appropriate for Plaintiffs to name as defendants all parties likely to act unconstitutionally. *Ex parte Young*, 209 U.S. 123, 161

---

[10] For this reason, *Hirsh v. Justices of Supreme Ct. of State of Cal.*, 67 F.3d 708, 713 (9th Cir. 1995) (civil proceedings akin to criminal proceedings), and *Penzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 14 (1987) (enforcement of state court judgments), on which State Defendants rely, SM.6, are inapposite.

18

(1908); *Cornwell v. California Bd. of Barbering & Cosmetology*, 962 F. Supp. 1260, 1265–67 (S.D. Cal. 1997).

## CONCLUSION

For the reasons given above, and in Plaintiffs' other filings (Docs. 80, 88, 109, 115, 129, and 169) that are incorporated by reference, the motions to dismiss should be *denied*.

**RESPECTFULLY SUBMITTED** this 9th day of May, 2016 by:

/s/ Aditya Dynar
Christina Sandefur (027983)
Aditya Dynar (031583)
**Scharf-Norton Center for Constitutional Litigation at the GOLDWATER INSTITUTE**

Michael W. Kirk (admitted *pro hac vice*)
Brian W. Barnes (admitted *pro hac vice*)
Harold S. Reeves (admitted *pro hac vice*)
**COOPER & KIRK, PLLC**

*Attorneys for Plaintiffs*

1

**CERTIFICATE OF SERVICE**

2

Document Electronically Filed and Served by ECF this 9th day of May, 2016.

3
MARK BRNOVICH
ATTORNEY GENERAL

4
John S. Johnson
Dawn R. Williams

5
Gary N. Lento
Melanie G. McBride

6
Joshua R. Zimmerman
1275 West Washington Street

7
Phoenix, Arizona 85007
John.Johnson@azag.gov

8
Dawn.Williams@azag.gov
Gary.Lento@azag.gov

9
Melanie.McBride@azag.gov
Joshua.Zimmerman@azag.gov

10

11
Steven M. Miskinis
Ragu-Jara Gregg
JoAnn Kintz

12
Christine Ennis
U.S. Department of Justice

13
ENRD/ Indian Resources Section
P.O. Box 7611

14
Ben Franklin Station
Washington, D.C. 20044-7611

15
Steven.miskinis@usdoj.gov
ragu-jara.gregg@usdoj.gov

16
JoAnn.Kintz@usdoj.gov
christine.ennis@usdoj.gov

17

18
Courtesy Copy Mailed this 9th day of May, 2016 to:

19
Honorable Neil V. Wake
United States District Court

20
Sandra Day O'Connor U.S. Courthouse, Ste. 524
401 W. Washington St., SPC 52

21
Phoenix, AZ  85003-2154

22

23
/s/ Kris Schlott
Kris Schlott

24

25

26

27

28