Michael J. Hendershot (State Bar No. 022189)
Chief Deputy Solicitor
OFFICE OF THE OHIO ATTORNEY GENERAL MICHAEL DEWINE
30 E. Broad Street
17th Floor
Columbus, Ohio 43215
614-466-8980
614-466-5087 fax
michael.hendershot@ohioattorneygeneral.gov

*Attorney for State of Ohio*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| A.D., C.C., L.G., and C.R., by CAROL COGHLAN CARTER, and DR. RONALD FEDERICI, their next friend; S.H. and J.H., a married couple; M.C. and K.C., a married couple; K.R. and P.R., a married couple; for themselves and on behalf of a class of similarly-situated individuals,<br>                    Plaintiffs,<br><br>     vs.<br><br>KEVIN WASHBURN, in his official capacity as Assistant Secretary of Indian Affairs, BUREAU OF INDIAN AFFAIRS; SALLY JEWELL, in her official capacity as Secretary of Interior, U.S. DEPARTMENT OF THE INTERIOR; GREGORY A. McKAY, in his official capacity as Director of ARIZONA DEPARTMENT OF CHILD SAFETY,<br>                    Defendants. | No. CV-15-1259-PHX-NVW<br><br><br><br>**AMICUS MEMORANDUM OF STATE OF OHIO IN OPPOSITION TO MOTIONS TO DISMISS**<br><br>(Honorable Neil V. Wake) |

## INTRODUCTION AND STATEMENT OF AMICUS INTEREST

The State of Ohio, like every State, has always governed domestic relations within its borders, including legal relationships between parents and children. As the governments in charge of domestic relations, States have always struggled with difficult issues including when and how to place children in foster or pre-adoption care and when and how to approve an adoption in the best interests of the child.

As the United States Supreme Court and the Ninth Circuit have explained, "'[f]amily relations are a traditional area of state concern.'" *H.C. ex rel. Gordon v. Koppel*, 203 F.3d 610, 613 (9th Cir. 2000) (quoting *Moore v. Sims*, 442 U.S. 415, 435 (1979)); *Sosna v. Iowa*, 419 U.S. 393, 404 (1975) (describing domestic relations as "an area that has long been regarded as a virtually exclusive province of the States."). Thus, States have an interest, on federalism grounds alone, in protecting that area of state concern from unwarranted federal intrusion.

That state interest is magnified when, as here, the federal government seeks to order States to not only follow different rules, but to discard the States' usual commitment to considering the best interests of a child without regard to race or ethnicity. Ohio, like most States, generally follows these basic precepts: (1) the child's best interests, including safety, are paramount, (2) the rights of parents to raise their children should not be displaced without good cause, and (3) the State must not discriminate by the race or ethnicity of children, parents, or prospective parents.

But the federal government orders the States to do otherwise—to set aside a child's best interests and look to ethnicity—where children of Native American ancestry are involved. The Indian Child Welfare Act, 25 U.S.C. § 1901 *et seq.* ("ICWA"), orders a State to set aside its usual standards and processes, including the best-interests test, based ultimately on the presence of Native American ancestry in a child, no matter how minimal. That is wrong. It is wrong not just because it mandates race-based decisionmaking contrary to deep constitutional values, but also because it does so in a way that intrudes on the States' longstanding power over domestic relations. That type

of displacement of state authority is not authorized by the Indian Commerce Clause or anything else in the Constitution.  Worst of all, the ICWA does not merely take away States' power and allow federal actors to step in, as other laws do, but it commands state officers and agencies to be the agents of the federal race-based decisionmaking.

The State of Ohio submits this amicus to defend the States' power to protect children, to resist the federal government's unwarranted race-based mandate, and to urge the Court to deny the motions to dismiss and allow the case to proceed.

## ARGUMENT

The State of Ohio submits this amicus brief to addresses the federalism aspects of this case:  ICWA invades state authority, and it is not authorized by the U.S. Constitution.

**A.    The ICWA invades the States' authority in multiple ways.**

The ICWA improperly intrudes on State authority in multiple ways, as it both interferes with an area of State concern and commandeers state officers in the process.

*First*, no one doubts that domestic relations, which includes adoption and parental rights, is "an area that has long been regarded as a virtually exclusive province of the States."  *Sosna v. Iowa*, 419 U.S. 393, 404 (1975)*; see In re Burrus*, 136 U.S. 586, 593–94 (1890).

Indeed, the commitment of domestic relations to the States is so important that the Supreme Court has long recognized a "domestic relations exception" to diversity jurisdiction in federal courts.  That exception "divests the federal courts of power to issue divorce, alimony, and child custody decrees."  *Ankenbrandt v. Richards*, 504 U.S. 689, 703 (1992).  The exception is notable in that it goes even further than a commitment to state law rather than federal law.  Most traditionally state law issues, such as tort or contract, *may* still be heard in federal courts in diversity cases.  The domestic relations exception says that such issues are left to state courts *even when* they would otherwise be eligible for federal determination.  Domestic relations issues are left to state substantive law *and* to state courts. While the ICWA, by setting federal standards

to be applied in state courts, does not violate the domestic relations exception specifically, the principle it embodies is worse than the harm that the exception is meant to prevent. The domestic relations exception prevents federal courts from even hearing and applying *state law*, but if the exception were gone and that scenario occurred, at least state substantive law would still control. Under the ICWA, federal law controls.

*Second*, state officers must apply the ICWA. That result—i.e., that state actors must do the federal government's bidding—violates the anti-commandeering limitations in Article I of the Constitution, as confirmed by the Tenth Amendment. *Printz v. United States*, 521 U.S. 898 (1997); *New York v. United States*, 505 U.S. 144 (1992). In *Printz*, the Court invalidated a federal law that ordered state officers to conduct background checks on would-be handgun buyers. The Court justified and applied a bright-line principle: The "Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs." 521 U.S. at 925.

Here, the ICWA seeks to compel the States to implement its mandates. Notably, it does not merely order state courts, in hearing cases, to apply federal law. Instead, as in *Printz* and other anti-commandeering cases, the federal law orders state and local *executive* officers and employees to carry out its terms. For example, state agencies that oversee adoptions or foster care, such as children's services agencies, must seek to place those categorized as Indian children with Indian parents. Further, the federal government (in regulations) tells state executive officials to enroll Indian children in tribes. 80 Fed. Reg. at 10153, B.4(d)(iii). And if a child might be Indian, state officers may be told to trace records and prepare genealogy charts going back generations in a hunt for Indians. 80 Fed. Reg. at 10152, B.2(b)(1)(i).

The ICWA, by intruding upon state domestic relations law, and ordering state actors to follow federal mandates, violates limitations inherent in Congress's Article I powers (as construed against the Tenth Amendment's backdrop). And by impeding States from acting in the best interests of children—who are, of course, not political abstractions, but real flesh and blood people who need protection—the ICWA invades

not merely abstract "state interests," but harms the States' real-world efforts to help the most vulnerable among us.

**B.      The ICWA is not authorized by the Indian Commerce Clause or any other constitutional provision.**

Aside from its unconstitutional commandeering of the States, the ICWA is beyond the scope of federal power because the entire regime is not rooted in any express congressional power in the first place, whether the Indian Commerce Clause or anything else.

The Indian Commerce Clause empowers Congress to "regulate Commerce . . . with the Indian Tribes." U.S. Const., Art. I, § 8, cl. 3.  Notably, the Indian Commerce Clause is not a freestanding clause devoted to Indian Commerce, but is part of the broader Commerce Clause.  That clause refers to "Commerce" just once, with three branches regarding foreign, interstate, and Indian Commerce: "To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." *Id.* Whatever the definition of "Commerce" in the Commerce Clause, it has that meaning as applicable to each of the circumstances the Clause addresses.

The clause's text alone dooms the ICWA, as *adoption of children* is neither "commerce" nor an arrangement with Indian "Tribes."  However broad one's conception of "commerce," it does not involve termination of parental rights or approving adoption. And the ICWA, by applying to *individual* children who have not joined a tribe, does not involve Congress's power to regulate commercial relations with "the Indian Tribes." While the text and a dictionary are enough to end the matter, caselaw and original meaning confirm the result.

Justice Thomas explained all of this in his concurrence in *Adoptive Couple v. Baby Girl*, 133 S.Ct. 2552, 2565 (2013).  In that case, the Court held that certain ICWA provisions did not apply, as a statutory matter, to the facts at issue there.  Those facts involved a baby girl who was "classified as an Indian because she [was] 1.2% (3/256) Cherokee."  *Id.* at 2556 (majority op.).  Because of that ancestry, the South Carolina

Supreme Court had "held that certain provisions of [ICWA] required her to be taken, at the age of 27 months, from the only parents she had ever known and handed over to her biological father, who had attempted to relinquish his parental rights and who had no prior contact with the child." *Id.* But the Court rejected that conclusion, by interpreting the statute's own terms narrowly not to cover Baby Girl's situation. Thus, the Court did not reach any constitutional issues, although it noted that the rejected "interpretation would raise equal protection concerns." *Id.* at 2565.

Justice Thomas more fully explained that the Court's result was compelled by constitutional avoidance. In his view, the ICWA was not authorized by the Indian Commerce Clause. He reviewed the understanding of the term "commerce with Indian tribes" at the "time of the founding," which of course meant "trade with Indians." *Id.* at 2567 (citing Natelson, The Original Understanding of the Indian Commerce Clause, 85 Denver U.L.Rev. 201, 215-16 and n.97 (2007), and Report of Committee on Indian Affairs (Feb. 20, 1787), in 32 Journals of the Continental Congress 1774–1789, pp. 66, 68 (R. Hill ed. 1936)). Justice Thomas also carefully reviewed colonial regulations of Indian trade, the Articles of Confederation, and the drafting history of the clause at the Constitutional Convention. *Id.* at 2567-70. All of those materials pointed to one conclusion: The Constitution gave Congress the "power to regulate trade with the Indians," not a broader "power to regulate all Indian affairs." *Id.* at 2569.

In addition to exploring the Clause's overall meaning, Justice Thomas also noted the two discrete textual problems described above. First, the ICWA concerns "child custody proceedings," not "commerce." *Id.* at 2570. Second, the ICWA provisions "do not regulate Indian tribes as tribes," but regulate individual children without regard to tribal membership. *Id.* Consequently, Justice Thomas rightly concluded that "[b]ecause adoption proceedings like this one involve neither 'commerce' nor 'Indian tribes,' there is simply no constitutional basis for Congress' assertion of authority over such proceedings." *Id.* at 2571.

Any other reading leads to a massive expansion of federal power. If Congress could tell States to treat Indians differently based on their ethnicity alone without regard to tribal status, it could order state courts to use different legal rules in all criminal or civil cases involving Indians. *See id.* If Congress could treat child custody proceedings as "commerce," then it could regulate all interstate adoptions under the interstate Commerce Clause. But neither of those principles or outcomes is correct as a matter of law. Nor is either the right thing for the children involved. *Cf. Adoptive Couple*, 133 S. Ct. at 2564 (state Supreme Court's reading of ICWA mandate requirements "would, in turn, unnecessarily place vulnerable Indian children at a unique disadvantage in finding a permanent and loving home ….").

None of the federal government's arguments or authorities compel, or even allow, a contrary result. The federal government cites cases describing federal power over Indian "affairs" as "plenary." ECF No. 68 (Federal Defendants' Motion to Dismiss) at 29 (citing *United States v. Lara*, 541 U.S. 193, 200 (2004). But despite that generic language of "plenary" power, the actual powers at issue in every other case involve Indian *tribes* and tribal membership: The Court has never blessed a law that singled out all Indians based on ethnicity or blood alone, as the ICWA does. Instead, the Court has dealt with laws that involved tribes or reservations, not individuals alone. *See, e.g., Worcester v. Georgia*, 31 U.S. 519, 559 (1832) (describing "Indian nations" as "distinct, independent communities" in context of regulations of federal relations with "tribes"); *Morton v. Mancari,* 417 U.S. 535 (1974) (upholding federal employment preference for members of Indian *tribes* as against challenge that it was an impermissible racial classification; law turned on tribal membership and not mere ethnicity).

The Court's treatment of the ICWA in particular does not support the federal government's view. In one case, the Court addressed the ICWA in terms of its reach regarding "domicile" on a reservation, but did not address application to individuals. *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30 (1989). Further, *Mississippi Band* involved provisions granting jurisdiction to tribal courts, not mandates

to State agencies and courts. In a case involving the ICWA's application to a child based on ancestry, the Court held that the statute did not apply on those facts, and noted that such an application would raise constitutional concerns. *Adoptive Couple*, 133 S. Ct. at 2565. Thus, while the Court has used the phrase "plenary power," its application has always been as to tribes and reservations, not as to individuals with Native American ancestry.

Just as the federal government's elision from "Indian tribes" to "Indians" is unsupported by actual legal applications, so too is its over-reading of "commerce" to include child custody proceedings. It insists that the meaning of "commerce" changes in the Indian Commerce context from its meaning in the Interstate Commerce or Foreign Commerce contexts. ECF No. 68 at 29-30. The federal government cites *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 192 (1989), for the proposition that the "extensive case law that has developed under the Interstate Commerce Clause, moreover, is premised on a structural understanding of the unique role of the States in our constitutional system that is not readily imported to cases involving the Indian Commerce Clause." That is absolutely true, in terms of many substantive rules of interstate commerce that do not extend to Indian commerce, such as the pre-emption issue raised in *Cotton Petroleum*.

But the baseline *definition* of what constitutes "commerce" remains the same for all three prongs of the Commerce Clause, even if the resulting substantive law outcome that governs each type of commerce differs. After all, this is not just a matter of the same term "commerce" being used in parallel provisions near one another. The Commerce Clause uses the word "commerce" only once, before branching into three applications within the same sentence. The federal government cites no authority, and Ohio is aware of none, treating *the same word in the same place* to have shifting meanings as applied to different clauses in the same sentence. Defendants cite none in the Commerce Clause context, or in any context. Indeed, to the contrary, at the time of the Clause's adoption, an established "rule of construction [held] that the same word

normally had the same meaning when applied to different phrases in an instrument." *See* Natelson, The Original Understanding of the Indian Commerce Clause, 85 Denver U.L.Rev. 201, 215 and n.96 (citing cases for rule).

Because "Commerce" in the Commerce Clause means "Commerce" every time, any reading of "Commerce" to include child-custody proceedings for children within the States borders would radically expand federal power under the Commerce Clause and destroy the understanding that domestic relations are a State concern. *Sosna*, 419 U.S. at 404.

Instructive is the Court's decision in *United States v. Morrison,* 529 U.S. 598 (2000), in which the Court held that the Commerce Clause did not empower Congress to enact certain provisions of the Violence Against Women Act creating a federal civil remedy for certain gender-based violence. The Court explained that "[g]ender-motivated crimes of violence are not, in any sense of the phrase, economic activity." *Id.* at 613. The Court rejected the argument that the effects of gender-based violence "substantially affected" interstate commerce. And notably, the Court said that "Petitioners' reasoning, moreover, will not limit Congress to regulating violence but may, as we suggested in *Lopez*, be applied equally as well to family law and other areas of traditional state regulation since the aggregate effect of *marriage, divorce, and childrearing* on the national economy is undoubtedly significant." *Id.* at 615-16 (emphasis added). The Court thus rejected the notion that "effects" on commerce could justify a federal takeover of "childrearing"—and of course, if childrearing or adoption *themselves* were somehow found to constitute commerce, then Congress could take over those fields even without any showing of "effect." But the Court rejected such a course. Domestic relations are not commerce under the Commerce Clause, and Congress's power "To regulate Commerce with foreign nations, and among the several States, and with the Indian tribes" therefore does not extend to domestic relations under that clause.

In addition, the federal government's argument regarding the Tenth Amendment relies wholly upon its claim about the Indian Commerce Clause. Once the latter

collapses, so, too, does the former. The federal government argues only that the Tenth Amendment cannot be implicated when Congress acts pursuant to an enumerated power, ECF No. 68 at 31, so without the support of the Indian Commerce Clause as an enumerated power, its opposition to the Tenth Amendment argument disintegrates. *Cf.* Lash, The Lost Original Meaning of the Ninth Amendment, 83 Texas L. Rev. 331, 410 (Dec. 2004) (comparing Tenth Amendment's declaration of "principle of enumerated power" in limiting federal power to Ninth Amendment's role as rule of construction in reading enumerated powers narrowly).

Further, without support for the ICWA in the Indian Commerce Clause, no other constitutional authority supports the ICWA. As Justice Thomas noted, "no other enumerated power . . . could even arguably support Congress' intrusion into this area of traditional state authority." *Adoptive Couple*, 133 S.Ct. at 2566 (quoting Fletcher, The Supreme Court and Federal Indian Policy, 85 Neb. L.Rev. 121, 137 (2006) ("As a matter of federal constitutional law, the Indian Commerce Clause grants Congress the only explicit constitutional authority to deal with Indian tribes"; and citing Natelson, The Original Understanding of the Indian Commerce Clause, 85 Denver U.L.Rev. 201, 210 (2007) (explaining lack of other sources of authority supporting congressional power over Indians). Thus, Justice Thomas rightly concluded that "[t]he assertion of plenary authority must, therefore, stand or fall on Congress' power under the Indian Commerce Clause." *Id.* That means that it falls, not stands.

In sum, the Indian Commerce Clause does not support the ICWA's invasion of State authority over parental rights and adoption. It simply does not authorize federal dictates putting "certain vulnerable children" at a "great disadvantage solely because an ancestor—even a remote one—was an Indian." *Cf. Adoptive Couple*, 133 S. Ct. at 2565.

**C.     The ICWA applies to individual children, and the federal defendants cannot rely on federal power to address tribes as "political entities" to justify reaching individual children based on ancestry.**

Ohio is concerned with its State sovereignty and with federalism, especially where, as here, the well-being of children is at stake. Thus, Ohio does not fully address the other important issues at stake here, but addresses one aspect of the equal protection argument because it overlaps with the federal government's lack of authority under the Commerce Clause. The federal government seeks to shoehorn the ICWA under the Commerce Clause by describing it as protecting the interests of the "tribes," thus coming closer to the Clause's scope in concerning "Commerce . . . with the Indian Tribes." U.S. Const., Art. I, § 8, cl. 3; ECF No. 68 at 29-30. Similarly, in responding to the challenge that the ICWA discriminates by ethnicity, the federal government argues that ICWA is tied to "Affiliation with a Political Entity" through tribal membership, not ethnicity alone. ECF No. 68 at 20 ("The law expressly limits its application based on political affiliation with a tribe; it makes no mention of race or ancestry."). But, as explained above, the ICWA does govern individual children based on Native American ancestry; it goes beyond addressing tribes as political affiliations.

On its own terms, the ICWA expressly turns on whether the child's *parent* is a tribal member, and it does not always require the child to be a member. The federal government seeks to blur that line by first asserting that ICWA categorically "does *not* apply to proceedings involving children who may have Indian ancestry but are neither members of a tribe, nor eligible for membership and the child of a tribal member." ECF. No. 68 at 22. But it then footnotes a concession that its "does *not* apply" language is exceedingly qualified, and admits that the "definition of 'Indian child' encompasses some children who are not themselves yet enrolled in a tribe . . . ." *Id.* at 22 n.10. Arguing that the parent's tribal membership is a close proxy for the child's future interest in joining, the federal government quotes what it says is Congress's view that Indian children, "because of their minority, cannot make a reasoned decision about their

tribal and Indian identity." *Id.* In other words, such children have not chosen a political affiliation, so the law assumes that choice based on . . . ancestry. So the entire recasting of ethnicity as political affiliation reverts, in the end, to ethnicity.

Indeed, the federal government admits that equation, but says it is legitimate because "blood descent is typically shorthand for the social, cultural, and communal ties a person has with a sovereign entity." ECF No. 68 at 23. That "blood descent" as "shorthand" for communal ties *fails*, however, at least with regard to an infant or toddler who has no such communal ties but was fathered by a tribal member who had not seen the child, as in *Baby Girl*.

Moreover, the cases that the federal government cites all concerned statutes that actually involve a tribal status or directly involve relations with a tribe or reservation; not one involves the kind of ancestry-alone provision that ICWA does. *See* above at 7-8; *see* ECF No. 68 at 21 n.9 (citing cases); *see also* ECF no. 178 (Federal Defendants' Memorandum in Support of Motion to Dismiss First Amended Complaint). Further still, the reliance on ethnicity, and not tribal membership, is shown by the preferences that ICWA requires for placement with an adoptive family: The law requires preference for parents in the same tribe as the child, or, as a backup, for *any Indian prospective foster or adoptive parent to be preferred to non-Indians.* 25 U.S.C. 1915(a)(3), (b)(iii). Even if each tribe is a political affiliation, no such umbrella political affiliation exists for all Indians. Thus, that preference is one of ethnicity and "blood descent."

In sum, the ICWA indeed classifies individual children based on ethnic ancestry or "blood descent." It does not deal with "tribes" alone, and just as the ICWA's reach to individuals rather than tribes undercuts the claim of authority under the Indian Commerce Clause, so too does that mean that a reliance upon "tribes" as "political affiliations" does not insulate the ICWA from an equal-protection challenge.

## CONCLUSION

For the reasons above, Amicus State of Ohio urges the Court to deny the Motions to Dismiss, and to allow the case to proceed.

**RESPECTFULLY SUBMITTED** this 11th day of May, 2016 by:

/s/ Michael J. Hendershot
Michael J. Hendershot (State Bar No. 022189)
Chief Deputy Solicitor
OFFICE OF THE OHIO ATTORNEY GENERAL
MICHAEL DEWINE
30 E. Broad Street
17th Floor
Columbus, Ohio 43215
614-466-8980
614-466-5087 fax
michael.hendershot@ohioattorneygeneral.gov
*Attorney for Amicus State of Ohio*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 11th, 2016, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of an Electronic Filing to the following CM/ECF registrants:

MARK BRNOVICH
ARIZONA ATTORNEY GENERAL
John S. Johnson
Dawn R. Williams
Gary N. Lento
Melanie G. McBride
Joshua R. Zimmerman
1275 West Washington Street
Phoenix, AZ  85007
John.Johnson@azag.gov
Dawn.Williams@azag.gov
Gary.Lento@azag.gov
Melanie.McBride@azag.gov
Joshua.Zimmerman@azag.gov
*Attorneys for Gregory McKay, in his official capacity as Director of the Arizona Department of Child Safety*

Steven M. Miskinis
Ragu-Jara Gregg
JoAnn Kintz
Christine Ennis
U.S. DEPARTMENT OF JUSTICE
ENRD/Indian Resources Section
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044-7611
202-305-0262
Steven.miskinis@usdoj.gov
ragu-jara.gregg@usdoj.gov
JoAnn.Kintz@usdoj.gov
christine.ennis@usdoj.gov
*Attorneys for Federal Defendants*

Clint Bolic
Aditya Dynar
SCHARF-NORTON CENTER FOR
CONSTITUTIONAL LITIGATION AT THE
GOLDWATER INSTITUTE
500 East Coronado Road
Phoenix, AZ  85004
602-462-5000
litigation@goldwaterinstitute.org

1  Michael W. Kirk (*admitted pro hac vice*)
   Brian W. Barnes (*admitted pro hac vice*)
   Harold S. Reeves (*admitted pro hac vice*)
2  COOPER & KIRK, PLLC
   1523 New Hampshire Avenue, N.W.
3  Washington, D.C.  20036
   202-220-9600
4  202-220-9601 fax
   *Attorneys for Plaintiffs*
5
6    Courtesy Copy Mailed this 11th day of May, 2016 to:

7  Honorable Neil V. Wake
   United States District Court
8  Sandra Day O'Connor U.S. Courthouse, Ste. 524
   401 W. Washington St., SPC 52
9  Phoenix, AZ  85003-2154

10
   /s/ Michael J. Hendershot
11 Michael J. Hendershot (022189)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28