**Scharf-Norton Center for**
**Constitutional Litigation at the**
**GOLDWATER INSTITUTE**
Christina Sandefur (027983)
Aditya Dynar (031583)
500 E. Coronado Rd.
Phoenix, Arizona 85004
(602) 462-5000
litigation@goldwaterinstitute.org

*Attorneys for Plaintiffs*

**COOPER & KIRK, PLLC**
Michael W. Kirk (admitted *pro hac vice*)
Brian W. Barnes (admitted *pro hac vice*)
Harold S. Reeves (admitted *pro hac vice*)
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| A.D., C.C., L.G., and C.R., by CAROL COGHLAN CARTER, and DR. RONALD FEDERICI, their next friends; S.H. and J.H., a married couple; M.C. and K.C., a married couple; K.R. and P.R., a married couple; for themselves and on behalf of a class of similarly-situated individuals,<br>　　　　　Plaintiffs,<br><br>　　　vs.<br><br>KEVIN WASHBURN, in his official capacity as Assistant Secretary of Indian Affairs, BUREAU OF INDIAN AFFAIRS; SALLY JEWELL, in her official capacity as Secretary of the Interior, U.S. DEPARTMENT OF THE INTERIOR; GREGORY A. McKAY, in his official capacity as Director of ARIZONA DEPARTMENT OF CHILD SAFETY,<br>　　　　　Defendants,<br><br>GILA RIVER INDIAN COMMUNITY; and NAVAJO NATION,<br>　　　　　Intervenor Defendants. | No.  CV-15-1259-PHX-NVW<br><br><br>**PLAINTIFFS' RESPONSE TO NAVAJO NATION'S AMENDED MOTION TO DISMISS, AND GILA RIVER INDIAN COMMUNITY'S MOTION TO DISMISS** |

# Table of Contents

I.   INTRODUCTION…..................................................................................1

II.   PLAINTIFFS HAVE STANDING…...................................................3

    A.  Section 1912(d)...………...........................................................3

    B.  Section 1912(e)........................................................................5

    C.  Section 1912(f).........................................................................8

    D.  Section 1915(b).........................................................................9

III.   PLAINTIFFS ARE SUBJECT TO UNEQUAL TREATMENT.......................12

IV.   ICWA VIOLATES PLAINTIFFS' FREEDOM OF ASSOCIATION RIGHTS..................................................................................14

V.   INHERENT TRIBAL SOVEREIGNTY OR INHERENT TRIBAL JURISDICTION OVER MEMBER CHILDREN IS NOT AT ISSUE IN THIS CASE..................................................................................16

    A.  Imposing a *per se* "best interests" presumption on children of one race violates Due Process.......................................................16

    B.  Congress cannot give tribes personal adjudicative jurisdiction in the absence of minimum contacts..............................................18

VI.   EVEN IF VIEWED AS A "SOVEREIGN-TO-SOVEREIGN" ACT, ICWA IS UNCONSTITUTIONAL..............................................................21

    A.  Even under its "plenary" powers, Congress cannot disregard constitutional limits..................................................................21

    B.  Even if acting under its "sovereign-to-sovereign" powers, Congress cannot commandeer state authorities in violation of the Tenth Amendment..................................................................23

VII.   CONCLUSION..................................................................................24

Plaintiffs respond to Navajo Nation's Amended Motion to Dismiss ("NM"), Doc. 218, and Gila River Indian Community's Motion to Dismiss ("GM"), Doc. 217. Both motions should be denied.

# I. INTRODUCTION

The Motions to Dismiss filed by the Intervenor Defendants add little to the arguments already raised by the federal and state Defendants in their pending Motions (Doc. 178 & 179). To conserve the Court's time, therefore, Plaintiffs will respond only to those arguments raised for the first time in the Intervenors' motions, and, insofar as Intervenor's arguments duplicate those raised by Defendants, incorporate by reference their earlier responses to those arguments (Docs. 80, 187).

Plaintiffs, all American citizens, challenge six provisions of the Indian Child Welfare Act ("ICWA")—specifically, 25 U.S.C. §§ 1911(b), 1912(d), 1912(e), 1912(f), 1915(a), 1915(b)—and the corresponding Guidelines issued by the Bureau of Indian Affairs (BIA) in 2015 for the application of ICWA.[1] Doc. 173 ("Am. Compl."). All these provisions have concretely injured and are currently injuring Plaintiffs by depriving them of the protections and guarantees of the United States Constitution. To be precise, Plaintiffs allege:

(1) Count 1 – that the six ICWA provisions and corresponding Guidelines have violated, are violating, and unless enjoined by this Court will continue to violate the Plaintiffs' rights under the Equal Protection Component of the Due Process Clause of the Fifth Amendment;

(2) Count 2 – that those same provisions violate the Due Process Clause of the Fifth Amendment because they have deprived, are depriving, and unless enjoined by this Court will continue to deprive Plaintiffs of their right to an individualized determination of their specific best interests; and the jurisdiction-transfer provision, § 1911(b), and corresponding Guidelines, §§ C.1, C.2, C.3, violate the "minimum contacts" requirement for personal jurisdiction under the Due Process Clause;

(3) Count 3 – that the six ICWA provisions and corresponding Guidelines have violated, are violating, and unless enjoined by this Court will continue to violate the Plaintiffs' rights to due process of law and equal protection of law under the Fourteenth Amendment;

---

[1]   Specifically, 80 Fed. Reg. 10,146 (Feb. 25, 2015), §§ A.2, A.3, B.1, B.2, B.4, B.8, C.1, C.2, C.3, D.2, D.3, F.1, F.2, F.3, F.4.

(4)   Count 4 – that by imposing a national child-welfare legal regime, the Act exceeds Congress's power under the Indian Commerce Clause, and that by forcing state officials to enforce that federally-mandated regime, the Act commandeers state actors in violation of the Tenth Amendment;

(5)   Count 5 – that by seeking to compel child and adult Plaintiffs to associate with tribes and tribal communities and to subject them to tribal jurisdiction, the six ICWA provisions and corresponding Guidelines have violated, are violating, and unless enjoined by this Court will continue to violate the Plaintiffs' First Amendment right to Freedom of Association;

(6)   Count 6 – that the jurisdiction-transfer provisions of the Guidelines, §§ C.1, C.2, C.3, exceed the BIA's lawful authority and are therefore unlawful agency action under 5 U.S.C. § 706; and

(7)   Count 7 – that by subjecting the Plaintiffs to *de jure* discrimination on the basis of race, color, and/or national origin, the Defendants have in the past and are now violating Title VI of the Civil Rights Act, 42 U.S.C. §§ 2000d–2000d-7.

This Court granted the tribes permissive intervention, Doc. 216, on the express condition that the tribes "not … assert additional claims," *id.* at 8, and that the tribes not "expan[d] … issues" or impose "unwarranted burdens on existing parties." *Id.* at 9.

Intervenor Navajo Nation seeks dismissal of only Count 1 (Fifth Amendment Equal Protection), and the Fifth Amendment Substantive Due Process component of Count 2 of Plaintiffs' amended complaint. NM.2 (citing Amd. Compl. ¶ 116), NM.5 (citing Amd. Compl. ¶ 122). The Navajo motion also addresses the issue of Navajo membership requirements, NM.2–5, but because this is not an issue before the Court, and not relevant to any issue that is before the Court, this portion of the Navajo motion should be stricken for violating the express terms of this Court's order regarding intervention. Doc. 216 at 8, 9; *see also* 9/28/16 Oral Arg. Tr. (Doc. 227 ("TR")) at 31:25–32:1; 32:23. This case does not challenge how Navajo Nation defines tribal membership. It challenges the *federal* and *state* laws that treat "Indian children" differently based on their race, color, and/or national origin.

Intervenor Gila River's motion to dismiss[2] seeks dismissal only of Plaintiffs' challenge to the jurisdiction-transfer and active efforts provisions of ICWA and the BIA

_____

[2]      Because Gila River did not file an amended motion to dismiss, it references Plaintiffs' original complaint, Doc. 1 ("Compl."). Plaintiffs assume that Gila River seeks

Guidelines in Count 1, GM.4 (citing Compl. ¶¶ 89, 90), the "minimum contacts" component of Count 2, GM.4 (citing Compl. ¶ 98), Fifth Amendment Substantive Due Process component of Count 2, GM.4 (citing Compl. ¶ 99, 100), Fourteenth Amendment Substantive Due Process challenge to foster/preadoptive and adoptive placement preferences under state law, ICWA, and BIA Guidelines of Count 3, GM.4 (citing Compl. ¶ 108), Count 4, GM.4 (citing Compl. ¶ 110, 111), Count 5, GM.4 (citing Compl. ¶¶ 116–18), and Count 6,[3] GM.15–16.[4] Gila River has not moved to dismiss the remaining portions of the complaint.

## II. PLAINTIFFS HAVE STANDING.

Intervenor Gila River's motion contends that Plaintiffs lack standing to challenge 25 U.S.C. §§ 1912(d), (e), (f), 1915(b). GM.16–17. This is incorrect. Standing requires that a plaintiff state a concrete and particularized injury, fairly traceable to the actions of the defendant, which a favorable ruling can redress. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Plaintiffs easily meet this test. They have been injured in the past and continue to be injured today by the application of each of the challenged Sections.[5] The relief sought from this Court will remedy these injuries.

### A. Section 1912(d)

Defendants' enforcement of the active efforts requirement of Section 1912(d), has injured Plaintiffs and continues to injure them. That provision requires state officials to make "active efforts … to prevent the breakup of the Indian family," and to show "that these efforts have proved unsuccessful," before an Indian child may be placed in foster care, or parental rights may be terminated (often a necessary step to clear a child for

---

dismissal of only those portions of the original complaint that are retained in the amended complaint.

[3] Gila River seeks dismissal of Plaintiffs' Count 6. GM.15–16. Plaintiffs have already briefed this issue and for the sake of brevity will not repeat those arguments here. The 2015 Guidelines are final agency action and conflict with ICWA's jurisdiction-transfer provision, 25 U.S.C. § 1911(b).

[4] Gila River, unlike the Navajo motion, does not incorporate by reference any other filings.

[5] For past injuries, they claim Title VI damages; for continuing and future injuries to themselves and putative class members, they seek declaratory and injunctive relief.

adoption). The BIA Guidelines require active efforts "to *maintain and reunite* an Indian child with his or her family *or tribal community*." BIA Guidelines, § A.2 (emphasis added). In the course of enforcing this requirement, Defendants have subjected the Plaintiffs to *forced association* with the Intervenor tribes with which they had no prior association. Specifically, the child Plaintiffs had no social, cultural, or political affiliation with the Intervenor tribes, but, as a consequence of ICWA, were subjected to processes designed to impose such an affiliation upon them—solely because of their genetic ancestry. *See* Amd. Compl. ¶¶ 21, 32, 38, 139.

Furthermore, the active efforts provision has resulted in the safety and well-being of child Plaintiffs being jeopardized. As a direct consequence of the active efforts provision, State Defendant has taken active efforts to "reunite" child Plaintiffs not only with birth parents but also with complete strangers, and have done so despite the presence of "aggravated circumstances," such as "abandonment" and in-utero "chronic abuse" (due to birth mother's addiction to controlled substances). *See id.* ¶¶ 21, 26–27, 37, 79. Where a child is *not* classified as Indian child, State Defendant is *not* required to take efforts to maintain or reunite that child with parents if there are "aggravated circumstances." *See* 42 U.S.C. § 671(a)(15)(D). But where the child *is* classified as an "Indian child," ICWA's "active efforts" provision *does* require such efforts—and does not excuse them in the case of "aggravated circumstances." BIA Guidelines, § A.2; Amd. Compl. ¶ 79.

Children of other races do not have their cases delayed in order to satisfy any such reunification procedures*, see, e.g.*, 42 U.S.C. § 675(5)(E) (the "reasonable efforts" and the 15/22 rule)—indeed, it is illegal to deny or delay adoption of children on the basis of race. *See* 42 U.S.C. § 1996b. But termination-of-parental-rights motions for Indian children— and only Indian children—*are* delayed in order to satisfy ICWA's active efforts provision. *See* BIA Guidelines, § D.2. Likewise, the prohibition on delay or denial of adoption does not apply to children classified as Indian children under ICWA. 42 U.S.C. § 1996b(3). In short, children of other races are moved toward permanency and stability quicker than children classified as Indian.

Consequently, state and federal Defendants, by enforcing the challenged laws and regulations, have imposed legal disadvantages and inflicted concrete injuries on the child Plaintiffs by delaying their cases, undertaking "active efforts" to "reunite" them with birth parents in a way that would not apply to non-Indian children, and delaying or denying them permanency. Amd. Compl. ¶ 44–49. This process has also injured the adult Plaintiffs, by imposing on them greater burdens, delaying the procedure for adoption, and requiring them to experience the stress and difficulty of this separate, race-based system of law. *Id.*

All of this is a consequence of Defendants' implementation and enforcement of 25 U.S.C. § 1912(d). Such differential treatment is itself a constitutional injury sufficient to confer standing upon the plaintiffs. *Northeastern Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993); *see also* Doc. 187 at 1–8.

The adult Plaintiffs are the only family the child Plaintiffs have ever known. The parent and child Plaintiffs are in all respects families—except for the fact that these families have been denied legal recognition, solely as a consequence of ICWA. *Cf. Obergefell v. Hodges*, 135 S. Ct. 2584, 2590 (2015) ("Without the recognition, stability, and predictability marriage offers, children suffer the stigma of knowing their families are somehow lesser."). As a consequence of psychological and physical injuries to the child Plaintiffs, the injuries suffered by foster/preadoptive and adoptive parent Plaintiffs, who are "*de facto* and psychological parents," Amd. Compl. ¶ 40, of the child Plaintiffs, are "poignantly evident." *Lauver v. Cornelius*, 85 A.D.2d 866, 867 (N.Y. Sup. Ct. App. Div. 1981). Depriving these adult and child Plaintiffs of the recognition of their family status, solely as a consequence of their racial ancestry, is a constitutional injury sufficient to confer standing. *Cf. Obergefell*, 135 S.Ct. at 2605–06.

**B. Section 1912(e)**

ICWA imposes a higher evidentiary standard when the state seeks to place an at-risk Indian child in foster care than state law imposes in the case of children of other races. Amd. Compl. ¶ 94–95. A child classified as Indian under ICWA is subject to a "clear and

convincing" standard, while children of all other races are subject to more protective evidentiary standards. *Id.* As a consequence, unlike children of other races, Indian children must be—and the minor Plaintiffs in fact were—more obviously and extensively abused, abandoned, or neglected before they can be taken into DCS protective custody and placed in foster care. *Id.* ¶¶ 25, 32, 47.

For example, Baby Boy C.C. was not removed from the custody of his birth mother for a long period, and only *after* his birth mother was convicted of a felony. *Id*. ¶ 25. This delay resulted from DCS's compliance with ICWA's mandate that DCS prove "by clear and convincing evidence" "that the continued custody" of C.C. by his neglectful and abusive birth mother "is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(e).

Under Arizona law, had C.C. been classified a while child, the standard would have been "probable cause" and "reasonable grounds." A.R.S. §§ 8-821(A), 8-824(F); *see* Amd. Compl. ¶ 94. In other words, under Arizona law, had C.C. *not* been an "Indian child," he would have been taken into temporary protective custody as soon as allegations of child abuse and child neglect were corroborated through DCS's investigatory apparatus. *Id.* He would have been placed in temporary foster care in order "to protect [him] from suffering abuse or neglect." A.R.S. § 8-821(A)–(B).

But solely as a consequence of his Indian genetic ancestry, C.C. was forced to remain in conditions of neglect longer and to undergo "reunification" efforts with *complete strangers* during a prolonged period. Amd. Compl. ¶¶ 26–27. This was all because of Defendants' enforcement of the "active efforts" and "clear and convincing evidence" provisions of Sections 1912(d) and 1912(e). Under Arizona law, he would not have suffered the injuries that he did; those injuries were caused by the enforcement of ICWA's race-based double standard.

The same was true for L.G. and C.R. Their birth mother had a history of chronic abuse of dangerous drugs and controlled substances.[6] Amd. Compl. ¶ 32. C.R. was born substance-exposed. *Id.* Nonetheless, in order to meet the "serious emotional or physical damage to the child" standard of ICWA, DCS required both L.G. and C.R. to continue to visit their abusive and neglectful birth mother before they could be meaningfully protected and placed in an environment suited to their individual best interests. *Id.* ¶ 37. L.G. and C.R., as a result, suffered physical and emotional distress. *Id.* ¶¶ 43–49. Likewise, the adult Plaintiffs were forced, and are being forced, to experience delay in adoption proceedings and the stress and stigma of being subjected to a separate set of rules that treated them and the children they love differently solely on account of race, color, and/or national origin. *Id.* All of these consequences flowed and still flow directly from Defendants' implementation of ICWA; non-Indian children are not subject to the same legal regime, because a situation such as L.G. and C.R.'s would qualify as "aggravated circumstances" and would relieve DCS of any obligation to attempt reunification. *See id.* ¶ 79.

As this (and other matters in Plaintiffs' prior oppositions to motions to dismiss, Doc. Nos. 80 and 187) demonstrates, ICWA protects the individual rights of the child Plaintiffs to a *lesser degree* than ordinary state law protects non-Indian children—and does so solely as a consequence of their genetic ancestry. Such unequal treatment is a constitutional injury, *Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984), and there is no adequate forum for the children to seek resolution of that injury at this stage: the removal action and initial foster care placement occurs speedily—as occurred in the cases of child Plaintiffs.[7] The foster parents are not parties to the state court proceedings relating to the

---

[6]     The tribes counter that ICWA addresses the problem of Indian children being disproportionately removed from their birth parents' custody because of substance abuse. But if substance abuse is the problem, the "policy choice[]," GM.2, would be to address substance abuse problems of Indian parents and Indian families, not to create an ICWA penalty box for the children who are not at fault. Race-, color- or national-origin-based segregation and unequal treatment has been firmly rejected as an unconstitutional policy choice in the United States.

[7]     Intervenors' concern with "abusive child welfare practices," GM.2, that led to "unwarranted" "removal," 25 U.S.C. § 1901(4), is fully addressed at the state and federal level. The federal government abandoned its education policy that it admitted was "a

7

1   foster child at this stage and are unable to act to protect the rights of the foster children in

2   their care—as occurred in the Plaintiffs' cases. Amd. Compl. ¶¶ 29, 38. DCS merely

3   follows the federal standard dictated by ICWA—and did so in the cases of Plaintiffs.

4       This shows how Plaintiffs have been and continue to be injured. They have

5   experienced race-based differential treatment in the past, and the Amended Complaint

6   seeks Title VI damages for their past injuries—*a claim that neither the Gila River nor*

7   *Navajo Intervenors seeks to dismiss*. Also, in their own name and as named Plaintiffs of a

8   putative class, they seek declaratory and injunctive relief against future race-based

9   differential treatment due to future enforcement of §§ 1912(e) and (f).[8]

10   **C. Section 1912(f)**

11       Section 1912(f) unquestionably inflicted a concrete injury on Plaintiffs for which

12   they now seek Title VI damages. As a result of section 1912(f), the child Plaintiffs had to

13   overcome the "beyond a reasonable doubt" standard in order to obtain an order terminating

14   parental rights while *non*-Indian children had to satisfy only clear and convincing and

15   preponderance of the evidence standards to move forward in the adoption process. Amd.

16   Compl. ¶¶ 96, 98.

17       The difference between the standards "is not merely academic." *Gila River Indian*

18   *Community v. DCS*, 363 P.3d 148, 153 (Ariz. App. 2015). The "psychiatric evidence" that

19   child Plaintiffs needed to show "emotional or physical damage" under section 1912(f) is

20   precisely the type of evidence that is "rarely susceptible to proof beyond a reasonable

21   doubt." *Santosky v. Kramer*, 455 U.S. 745, 768–69 (1982). Indeed, the *Santosky* Court

22   expressly pointed out this flaw in section 1912(f) when it refused to adopt a reasonable-

23   

24   failure of major proportions." Cohen's Handbook of Federal Indian Law, § 22.03(1)(a) at
1397 (2012). In Arizona, DCS removals are closely regulated and scrutinized with various

25   levels of administrative checks in place under A.R.S. § 8-822.

26   [8]     By operation of ICWA, any removal of the child Plaintiffs "for the purpose of
*further* foster care, preadoptive, or adoptive placement" is also governed by "the
provisions of this chapter." 25 U.S.C. § 1916(b) (emphasis added). This means that if the

27   child Plaintiffs are removed from the custody of the adult Plaintiffs because of the
placement preferences provisions, *id.* §§ 1915(a), (b), they will again be subject to the

28   provisions of ICWA challenged here, and particularly, section 1912(e).

1   doubt standard for children of other races. *Id.* at 769. But under the ICWA standard, child

2   Plaintiffs had to marshal "medical and psychiatric testimony," proof of "lack of parental

3   motive, absence of affection between parent and child, and failure of parental foresight

4   and progress," "*to a level of absolute certainty*." *Id.* (emphasis added).

5       This harm suffered by child Plaintiffs is unquestionably redressable through an

6   award of damages under Title VI. The tribes are, moreover, not seeking dismissal of

7   Plaintiffs' Count 7. Their argument that Plaintiffs have no standing to challenge section

8   1912(f) because no plaintiff seeks termination of parental rights is therefore meritless.

9       **D. Section 1915(b)**

10      Gila River's standing argument rests on the presumption that Plaintiffs' challenge

11  to 25 U.S.C. §§ 1912(d), 1912(e), 1912(f), and 1915(b), is "not based on any live issues."

12  GM.16.[9] Not so. As an initial matter, Plaintiffs seek damages under Title VI for past

13  injuries that resulted from prior application of these four provisions. Gila River does not

14  seek dismissal of those claims.

15      Moreover, Plaintiffs are now being, and, unless this Court acts, will continue to be

16  harmed by application of the race-based preferences for foster and preadoptive placements

17  of Indian children imposed by Section 1915(b). Those preferences require state

18  Defendants to place an Indian child first with "a member of the Indian child's extended

19  family" (as defined "by the law or custom of the Indian child's tribe." 25 U.S.C.

20  § 1903(2)). Failing that, state Defendants must place that Indian child with "a foster home

21  licensed, approved, or specified by the Indian child's tribe." Failing that, the child must

22  next be placed with "*an Indian foster home* licensed or approved by an authorized non-

23  Indian licensing authority," and, failing that, with "an institution for children approved by

24  *an Indian tribe* or operated by an Indian organization which has a program suitable to

25  meet the Indian child's needs"—regardless of tribe. 25 U.S.C. § 1915(b) (emphases

26  added). No such preferences exist for children of other races.

27

28  _____

    [9]    Gila River spends one sentence on *Pullman* abstention. GM.17. Plaintiffs hereby
    incorporate by reference their previous briefing on this issue. Doc. 80 at 17–20.

1    For *non*-Indian children, the foster/preadoptive placement standard is primarily the

2    best interest of the child. Amd. Compl. ¶ 103. Arizona law applicable to *non*-Indian

3    children requires state Defendants to place a non-Indian child in the "least restrictive"

4    setting from an ordered list of *race-neutral* placement preferences. A.R.S. § 8-514(B);

5    *compare with* A.R.S. § 8-514(C) (mirroring ICWA placement preferences). The first

6    preference is with "a parent," the second, with "a grandparent." A.R.S. § 8-514(B). The

7    third preference is with "the child's extended family, *including a person who has a*

8    *significant relationship with the child*." *Id.* (emphasis added). "Extended family" is not

9    defined in Title 8 of A.R.S., but the term "relative" is defined as "a grandparent, great-

10   grandparent, brother or sister of whole or half blood, aunt, uncle or first cousin." *See*

11   A.R.S. § 8-501(A)(14). Because "relative" is defined but "extended family" is not,

12   Arizona courts have held that the term "extended family" in A.R.S. § 8-514(B) embodies

13   "a more expansive notion of family placement than the one defined by 'relative.'" *Jeff D.*

14   *v. DCS*, 367 P.3d 109, 115 (Ariz. App. 2016). This expansive notion of family placement

15   is, and should be, more than adequate to address the tribe's concern with placing an Indian

16   child with her extended family.

17       Gila River claims the "good cause" standard in Section 1915(b) is "ample

18   protection *in any situation where tribal membership or tribal jurisdiction is outweighed*

19   *by other circumstances*." GM.10 (emphasis added). This is false. Although "good cause"

20   is not defined in ICWA, one thing is clear: it is *not* sufficient to protect children in cases

21   where their individual interests outweigh the rest of ICWA's race-based mandates. Indeed,

22   the BIA, the tribes, and many state courts[10] hold that the "good cause" determination must

23   *not* include an individualized assessment of the best interests of the child in § 1915(b)

24   cases. Amd. Compl. ¶ 102 (quoting BIA Guidelines, § F.4); GM.9. In reality, the "good

25

---

26   [10]    *See, e.g.*, *In re C.H.*, 997 P.2d 776, 782 (Mont. 2000) ("while the best interests of
27   the child is an appropriate and significant factor in custody cases under state law, it is
     *improper*" in ICWA cases because "ICWA expresses the presumption that it is in an
28   Indian child's best interests to be placed in conformance with the preferences." (emphasis
     added)); *In re Interest of Zylena R.*, 284 Neb. 834, 852 (2012) (same).

1    cause" standard, like the rest of ICWA, prioritizes the racial ancestry of the child and the

2    foster/preadoptive parents over any individualized assessment of an "Indian child's"

3    needs.

4       ICWA's separate and unequal rules, particularly its race-based placement

5    preferences, harm both the child and adult Plaintiffs. They harm the child Plaintiffs by

6    sharply limiting their placement opportunities. *See In re Bridget R.*, 41 Cal. App. 4th 1483,

7    1508 (1996) ("As a result [of ICWA] … the number and variety of adoptive homes that

8    are potentially available to an Indian child are more limited than those available to non-

9    Indian children, and an Indian child who has been placed in an adoptive or potential

10    adoptive home has a greater risk … of being taken from that home and placed with

11    strangers."). They harm the adult Plaintiffs who, because they do not qualify as "Indian,"

12    receive no placement preferences under ICWA, and consequently must clear a higher

13    hurdle when seeking to provide foster care to an Indian child, to adopt an Indian child, or

14    to defend the interests of Indian children placed in their care. Amd. Compl. ¶ 44–46.

15       Navajo Nation argues that ICWA's placement preferences are "based on the

16    fundamental *assumption* that it is in the Indian child's best interest that its relationship to

17    the tribe be protected." NM.5 (emphasis added). But the question here is not *whether*

18    ICWA imposes that assumption, but whether that assumption is constitutional. Plaintiffs

19    argue that this assumption is an unconstitutional race-based preference that injures

20    Plaintiffs by depriving them of their constitutional rights, including the "individualized

21    determination" of their cases that "the Due Process Clause require[s]." *Cleveland Bd. of*

22    *Educ. v. LaFleur*, 414 U.S. 632, 645 (1974). Navajo Nation's argument is not a response

23    to this constitutional objection.

24       Plaintiffs have shown, here and in their prior pleadings, that they are injured by

25    Defendants as a consequence of Defendants' enforcement of the challenged provisions of

26    ICWA. They have therefore stated a concrete and particularized injury, fairly traceable to

27    Defendants' actions, which this Court can redress. The tribes' standing arguments must

28    be rejected.

### III. PLAINTIFFS ARE SUBJECT TO UNEQUAL TREATMENT.

Both the Navajo and Gila River motions argue that ICWA does not treat Plaintiffs differently on the basis of race, but on the basis of tribal membership, which they claim is a political distinction. NM.2, GM.7–10. Plaintiffs have already responded extensively to this argument and refer the Court to Plaintiffs' earlier-filed briefs.

Plaintiffs observe, however, that the Navajo Nation's lengthy explanation of the process of obtaining tribal membership is irrelevant because ICWA is not triggered by tribal membership, but by *eligibility* for membership. 25 U.S.C. § 1903(4). The fact that a racially-eligible child's application for membership would also have to obtain approval through the procedures detailed in the Navajo Nation's brief is beside the point.

That Navajo Nation (like other tribes) imposes requirements *in addition* to biological requirements in no way means that ICWA's differential treatment of Indian children is not a racial classification. As explained in Plaintiffs' Opposition to Motion to Dismiss (Doc. No. 187 at 11–12), a race-based classification is not made any *less* race-based by the fact that criteria in *addition* to race define the class. In *Rice v. Cayetano,* 528 U.S. 495, 516 (2000), the Supreme Court found that the Hawaii statute allowing only Native Hawaiians to vote in an election created a racial, not a political, classification, even though factors in addition to race were considered when defining the class: "Simply because a class defined by ancestry does not include all members of the race does not suffice to make the classification race neutral," the Court declared. *Id.* at 516–17. Likewise, the fact that a person must not only have the required quantum of Navajo blood, but must also satisfy other requirements does not make that classification race-neutral.

Plaintiffs reiterate: tribal membership is entirely a matter of tribal law, and Plaintiffs do not dispute it, or challenge any provision of the Navajo code.[11] But there is a

---

[11]   Still, it is revealing that the Navajo brief details the intensely *racial* nature of the membership criteria. The "Screening Committee," it says, "is required to base its recommendation for citizenship on an individual's degree of Navajo blood," NM.3, and "a showing of one-fourth degree of Navajo blood is required." NM.4. Political, social, or cultural affiliation plays no role whatsoever in the determination; tribal membership depends exclusively on biological criteria.

distinction between *tribal membership*, on one hand, and *"Indian child" status* under ICWA, on the other. *In re Abbigail A.*, 375 P.3d 879, 885 (Cal. 2016). The latter "is a conclusion of federal and state law based on the tribe's determination," *id.*, and accordingly must meet the constitutional standards of due process and equal protection. Whatever the tribe's views regarding the proper relationship of a child to her genetic ancestry, the state and federal Defendants are not free to give legal effect to racial distinctions. "The Constitution cannot control such prejudices but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984).

It is simply not true, as Gila River contends, GM.8–9, that laws that treat Indians as a class differently from other ethnic groups are immune from scrutiny as racial classifications. *Malabed v. North Slope Borough*, 335 F.3d 864, 868 n.5 (9th Cir. 2003); *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1279 (9th Cir. 2004). As explained in Plaintiffs' previous briefs (Doc. 187 at 13–14; Doc. 80 at 20–25), *Morton v. Mancari*, 417 U.S. 535 (1974), involved adults who chose to become, or remain, members of recognized tribes. The Court made a point of *not* deciding whether a law "directed towards a 'racial' group consisting of 'Indians'" would be subject to strict scrutiny. *Id.* at 553 n.24. And the Ninth Circuit has expressly "reject[ed] the notion that distinctions based on Indian or tribal status can never be racial classifications subject to strict scrutiny." *Kahawaiolaa*, 386 F.3d at 1279. ICWA does not apply to adult members of tribes. It applies to children who, for genetic reasons alone, are eligible for tribal membership—without regard to political, social, or cultural affiliation. In other words, it "singles out identifiable classes of persons … solely because of their ancestry or ethnic characteristics … [and] use[s] ancestry as a racial definition and for a racial purpose." *Rice*, 528 U.S. at 515 (citation and quotation marks omitted).

The rule that "a statutory scheme" framed "solely on the basis of racial classifications violates the Equal Protection and Due Process Clauses of the Fourteenth

Amendment" is not new. *Loving v. Virginia*, 388 U.S. 1, 2 (1967).[12] For Plaintiffs, however, their race, color or national origin is the determinative factor in the Defendants' placement determinations, in the application of "active efforts" rather than "reasonable efforts," in the application of the various delays in finalizing adoption or foster placement, and in the various other provisions of ICWA and the Guidelines challenged in the Amended Complaint. There is no question that both the child Plaintiffs (through their next friends) and the adult Plaintiffs have standing to challenge the constitutionality of such discrimination. *Cf. Charlie H. v. Whitman*, 83 F. Supp. 2d 476, 495 (D.N.J. 2000). Intervenors have come forth with no justification, much less one that shows Plaintiffs' claim is implausible on its face, for dismissing this case.

**IV. ICWA VIOLATES PLAINTIFFS' FREEDOM OF ASSOCIATION RIGHTS.**

Gila River's arguments seeking dismissal of Plaintiffs' Count 5 are meritless. GM.14–15. Indian tribes, as Gila River admits, "are governmental entities, analogous to state and local governments." GM.15. As explained previously by Plaintiffs (Doc. No. 187 at 14–17), ICWA forces Plaintiffs to associate with those government entities—and does so solely on the basis of their race. Only Indian children are forced to associate with a governmental entity that is analogous to state and local governments. California's government cannot force children born in California, who move to other states, to associate with the California government. A child whose parents were born in Las Vegas, but who has never himself been to Las Vegas, is not automatically subject to the jurisdiction of the Superior Court there in consequence of his racial ancestry.[13]

---

[12] Gila River argues that ICWA does not involve racial classification because ICWA "excludes children who are racially "Indian," but who are not members of, and are not eligible for membership … in, a federally recognized Indian tribe." GM.8. That question was asked and has been answered. *See* Doc. 187 at 10–14.

[13] On the contrary—that would plainly violate the "minimum contacts" requirement. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 294 (1980) (the Due Process Clause "does not contemplate that a state may make binding a judgment *in personam* against an individual or corporate defendant with which the state has no contacts, ties, or relations." (citation omitted)).

Gila River also acknowledges that the standard for evaluating a First Amendment freedom of association claim is whether the mandatory association "serve[s] a compelling state interest that cannot be achieved through means *significantly less restrictive* of associational freedoms." GM.15 (quoting *Knox v. SEIU*, 132 S. Ct. 2277, 2289 (2012)). Gila River has identified no compelling state interest sufficient to justify ICWA's challenged elements that exist for the purpose of compelling a child's association with a tribe. Nor has Gila River shown that a less restrictive means that is readily available under the best-interests standard (letting children and their parents to choose whether to associate with tribes and tribal culture) would fail to achieve or address Gila River's concerns. ICWA's applicability is not triggered by any *existing* political, social, or cultural affiliation with a tribe; instead, it aims to force the *creation* of such an affiliation *where none existed before*.

Gila River counters that Indian children brought up in non-Indian homes will face an identity crisis when they grow up and feel that they have been deprived of a connection to Native American culture. GM.9. That is not a dispute this Court must resolve for purposes of this motion. That is a *merits* argument as to whether ICWA serves a sufficiently compelling government interest, and should therefore be raised in a motion for summary judgment. It suffices for now to note the binding Supreme Court precedent that holds that while "[t]here is a risk that a child living with a stepparent of a different race may be subject to a variety of pressures and stresses not present if the child were living with parents of the same racial or ethnic origin," state and federal officials may not draw racial or ethnic lines for that reason; nor may they "'avoid a constitutional duty by bowing to the hypothetical effects of private racial prejudice that they assume to be both widely and deeply held.'" *Palmore*, 466 U.S. at 433 (quoting *Palmer v. Thompson*, 403 U.S. 217, 260–61 (1971) (White, J., dissenting)).

Adult Plaintiffs' freedom-of-association rights are also violated by ICWA. As a consequence of ICWA, they must accommodate all visits with proposed placements. This was especially evident in the situation faced by M.C. and K.C. who had to repeatedly

15

drive, for four years, sometimes over 100 miles, to visit with supposed ICWA-compliant placements proposed for C.C. Amd. Compl. ¶ 27. C.C. was significantly distressed after each such visit, which in turn caused psychological and emotional harm to M.C. and K.C., his then-*de facto* parents. *Id.* Each such visit reminded them that their family was not legally recognized as permanent because C.C. is deemed an Indian child but M.C. and K.C. have no Indian ancestry. *Id.*

## V. INHERENT TRIBAL SOVEREIGNTY OR INHERENT TRIBAL JURISDICTION OVER MEMBER CHILDREN IS NOT AT ISSUE IN THIS CASE.

Both tribes emphasize the importance of tribal government sovereignty. That is simply not at issue here. Plaintiffs did not sue the tribes, and do not seek any relief against the tribes. They do not challenge the tribes' right to determine the conditions of tribal citizenship, or to adjudicate on-reservation child custody disputes. Also, Plaintiffs in no way seek to minimize the abuses suffered by Native Americans at the hands of state and federal governments throughout American history. None of that is at issue here. What *are* at issue here are federal and state laws and regulations that "put certain vulnerable children at a great disadvantage solely because an ancestor—even a remote one—was an Indian." *Adoptive Couple*, 133 S. Ct. at 2565. What is at issue is whether the challenged federal and state laws and regulations violate the Constitution.

### A. Imposing a *per se* "best interests" presumption on children of one race violates Due Process.

Both Gila River and Navajo Nation argue that ICWA reflects Congress's determination that it is inherently in the best interests of children with Indian genetic ancestry to be placed with foster or adoptive families of Indian genetic ancestry—and therefore, that ICWA does not violate Due Process. NM.5–6, GM.9. True, a mere "disagreement with Congress" on a matter of public policy does not give rise to a constitutional violation, *id.*, but for Congress to decree across the board what is in the best interests of a class of children on the basis of their genetic makeup most certainly does. Congress has no authority to decree that children of one race should attend one school,

16

and children of another race attend a different school. *Bolling v. Sharpe*, 347 U.S. 497 (1954). Likewise, it cannot constitutionally decree that it is necessarily in a child's best interests—because of his race—to be placed in accordance with preconceived—that is, pre-judged, or *prejudiced*—race-based preferences.

Navajo Nation asserts that "the relationship between a child and the Nation is considered sacred in Navajo thinking," and that knowledge of a person's ancestry is important to that person's well-being. NM.5–6. That is not disputed. But it simply does not prove that ICWA does not violate due process. For the federal government to impose a separate and substandard set of rules on children because of their race is unconstitutional even where doing so is alleged to be in accord with sincerely-held beliefs about the best interests of the child. *Johnson v. California*, 543 U.S. 499, 505 (2005) ("We have insisted on strict scrutiny in every context, even for so-called 'benign' racial classifications.").

In *Palmore, supra,* the Supreme Court expressly and unanimously rejected the proposition that cross-racial adoption could be barred on such grounds. There, the Florida state court granted custody to the father on the grounds that the child would be harmed by living with his mother and her boyfriend of a different race. 466 U.S. at 433–34. The Court acknowledged that this was not an unrealistic concern, but concluded that even goals that are "'[d]esirable … and important … cannot be accomplished by laws or ordinances which deny rights created or protected by the Federal Constitution.'" *Id.* (quoting *Buchanan v. Warley*, 245 U.S. 60, 81 (1917)).

Preserving ancestral ties might be important, but it cannot justify a deprivation of due process or equal protection. Congress may not impose a one-size-fits-all "presumption" that Indian children, solely because of their ethnic heritage, must be placed with Indian families.[14] To do so deprives those children of their due process rights to an

---

[14]   The "separate" ICWA standards applied to Indian children "are inherently unequal" to Arizona law applied to all other children in Arizona state courts. *Brown v. Board of Educ.*, 347 U.S. 483, 495 (1954). To reiterate, Sections 1915(a) and (b) of ICWA require placement with "*an* Indian foster home" or "*other* Indian families," *regardless of tribe*, meaning that a Navajo child must be placed with a Ute, Hopi, or Comanche family rather than a white, black, Hispanic, or Asian family—regardless of the substantial

1    individualized determination of their cases and their right to equal treatment before the

2    law.

3    **B. Congress cannot give tribes personal adjudicative jurisdiction in the**
4    **absence of minimum contacts.**

5        This case is not about inherent tribal sovereignty. GM.10–13. Gila River conflates

6    jurisdiction over member children with the tribe's *adjudicative* jurisdiction. Adjudicative

7    jurisdiction requires *personal* jurisdiction, which, in turn, requires that the party have such

8    "minimum contacts" with the forum that the forum may issue a binding judgment

9    consistent with due process of law. *International Shoe Co. v. Washington*, 326 U.S. 310,

10   324 (1945). Tribal courts may not be bound by the Bill of Rights, *United States v. Bryant*,

11   136 S. Ct. 1954, 1962 (2016), but *Congress is*, and *Congress* cannot disregard the

12   "minimum contacts" / "purposeful availment" requirement, or impose a different set of

13   jurisdictional rules for children identified by genetic ancestry. In short, the fact that tribes

14   are "domestic dependent nations" does not necessarily mean that Congress can give tribes

15   power to exercise *adjudicative* jurisdiction in the absence of minimum contacts. Suffice

16   to say that genetic ancestry does not satisfy "fair play and substantial justice." *Int'l Shoe*,

17   326 U.S. at 324.

18       Gila River argues that its purported power to adjudicate child welfare proceedings

19   involving children who are not domiciled on reservation, and who lack any political,

20   social, or cultural affiliation with a tribe, but are simply eligible for membership because

21   of the DNA in their cells, is a facet of inherent tribal sovereignty. GM.10. It further argues

22   that "because Congress's power to legislate for the protection and benefit of Indians

23   operates *in personam* and is not limited to any land base or reservation," *id.* at 11,

24   Congress can give the tribes race-based personal jurisdiction. This is incorrect, and the

25   cases Gila River cites simply do not support the broad proposition that constitutional

26

27   ───────────────

28   differences or even traditional enmity between these Native cultures. ICWA does not
     depend on culture; it depends on race.

18

limitations on the exercise of *in personam* jurisdiction are inapplicable to American citizens of Indian ancestry.

On the contrary, the minimum contacts requirement *does* apply to tribal courts. *Wilson v. Marchington,* 127 F.3d 805, 810–11 (9th Cir. 1997); *Water Wheel Camp Recreational Area, Inc. v. LaRance,* 642 F.3d 802, 820 (9th Cir. 2011). *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30 (1989) proves the point. Had ICWA granted tribes authority over all children who are biologically eligible for membership in a tribe, regardless of domicile, the *Holyfield* Court would not have spent 11 pages discussing the definition of "domicile"—it would instead have declared in one sentence that the children were subject to ICWA because of their race. That was not what the Court did. To the contrary, the Court found that "the sole issue"—the dispositive question—was whether the children were domiciled on-reservation. *Id.* at 42. Its affirmative conclusion on that question was the *sole* basis supporting tribal jurisdiction. Gila River's effort to interpret *Holyfield* as standing for the proposition that tribes may exercise jurisdiction over children of Indian ancestry without regard to domicile therefore flies in the face of the Court's decision.

*United States v. Wheeler,* 435 U.S. 313 (1978), on which Gila River relies, GM.10–11, involved a tribal court conviction of an adult tribal member for a crime that occurred *on reservation*. *Id.* at 314. The Court found that the defendant could be tried again under federal law because the tribal conviction was under a separate sovereign. *Id.* at 329–30. Nothing about that precedent is applicable to this case. This case involves a class of *children* who are *not* domiciled on reservation, and who are subject to ICWA "solely because an ancestor—even a remote one—was an Indian." *Adoptive Couple*, 133 S. Ct. at 2565. Neither *Wheeler* nor any other case has held that tribes may exercise personal jurisdiction, in the absence of minimum contacts, over *off*-reservation minors, and who are members or eligible for membership solely because of their biological ancestry.[15]

---

[15]   As this Court noted in oral argument on the intervention motion, Gila River's position would mean that tribes could prescribe the tort rules governing car accidents

1      Moreover, this case is not about whether Congress has "power over Indian

2 children." GM.11. The question is whether, in exercising that power, Congress may

3 exceed the limits of the Constitution. The Supreme Court has made clear that respect for

4 tribal sovereignty requires balancing the "interests of the Tribes and the Federal

5 Government … and those of the State." *Nevada v. Hicks*, 533 U.S. 353, 362 (2001). The

6 state and federal interests are "derive[d] from the basic principle that the Fifth and

7 Fourteenth Amendments" to the Constitution "protect *persons*, not *groups*." *Adarand*

8 *Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995) (emphasis in original; citation

9 omitted). The proper balancing of interests, therefore, requires that "a *group*

10 classification" give way "to ensure that the *personal* right to equal protection of the laws

11 has not been infringed." *Id.* (emphasis in original).

12      For Congress to subject citizens of the United States who have no political, social,

13 or cultural connection to a tribe—but are connected to that tribe solely because of their

14 chromosomes—"to a sovereignty outside the basic structure" of our Constitution, would

15 be "a serious step," and one the Supreme Court has never authorized in the off-reservation

16 context. *United States v. Lara*, 541 U.S. 193, 212 (2004) (Kennedy, J., concurring in the

17 judgment).

18      Gila River seeks to create the impression that there is no difference between on-

19 and off-reservation tribal court jurisdiction. GM.11–12. But ICWA *itself* recognizes that

20 distinction, in the different language of sections 1911(a) and 1911(b). Section 1911(a)—

21 which is not at issue in this case—recognizes that tribes have exclusive jurisdiction over

22 *on*-reservation child custody proceedings. Section 1911(b), by contrast, imposes a

23 different rule for *off*-reservation child custody matters. Those are for state courts to decide

24 unless a tribe obtains jurisdiction transfer. As for the constitutional issues here, tribal

25 adjudication of *on*-reservation child custody proceedings easily satisfies the jurisdictional

26 minimum of due process, which is why Plaintiffs do not challenge Section 1911(a). But

27

28 involving tribal members—or even the children of tribal members—driving on highways
beyond the reservation, certainly an absurd result. TR.18:1–18:9.

1    *off*-reservation child custody proceedings—like out-of-state proceedings in cases

2    involving non-Indian children—must satisfy due process, including the minimum contacts

3    rule. *See In re J.D.M.C.*, 739 N.W.2d 796, 811–13 (S.D. 2007) (rejecting tribe's effort to

4    exercise ICWA power due to lack of minimum contacts).

5         Gila River's argument that minimum contacts analysis is inapplicable because

6    people who seek adoption of children are plaintiffs, while minimum contacts analysis

7    applies to defendants, GM.13, is sophistry. First, the minimum contacts requirement *does*

8    apply to plaintiffs—it's just that a plaintiff satisfies that requirement by filing a lawsuit.

9    *Threlkeld v. Tucker*, 496 F.2d 1101, 1103 (9th Cir. 1974). Second, in jurisdiction-transfer

10   situations at issue in this case, a prospective adoptive parent is a plaintiff *in a state court*

11   *action* (and thereby subjects herself to the personal jurisdiction of *that state* court—not

12   tribal court), but ICWA's transfer provision then sends the case to tribal court, to which

13   *no* party has voluntarily subjected herself, and with which the parties may have *no*

14   contacts, let alone the minimum contacts required by due process. *That* is what violates

15   due process.

16   **VI. EVEN IF VIEWED AS A "SOVEREIGN-TO-SOVEREIGN" ACT, ICWA IS UNCONSTITUTIONAL.**

17

18        **A. Even under its "plenary" powers, Congress cannot disregard constitutional limits.**

19        Gila River argues that Congress adopted ICWA as part of its "sovereign-to-

20   sovereign dealings" akin to its treaty powers, GM.6, and that this entitled Congress to

21   establish the separate system of rules that ICWA imposes for child protection and child

22   custody proceedings involving Indian children. That argument is unavailing, because "the

23   power of Congress in Indian affairs, although 'plenary,' is not absolute." *Bugenig v.*

24   *Hoopa Valley Tribe*, 266 F.3d 1201, 1219 (9th Cir. 2001). It must remain within

25   constitutional boundaries.

26        *Reid v. Covert,* 354 U.S. 1, 17 (1957), is instructive. *Reid* involved a statute that—

27   like ICWA—imposed separate jurisdictional rules and a special judicial system for a

28   particular class of American citizens; specifically, civilian dependents of servicemen

21

stationed in Great Britain and Japan. *Id.* at 3–5. The civilians in that case were women convicted in military courts of murdering their husbands. *Id.* at 3–4. They argued that they could not constitutionally be tried by military authorities, and the Supreme Court agreed. It held that "no agreement with a foreign nation can confer power on the Congress, or on any other branch of Government, which is free from the restraints of the Constitution," *id.* at 16, including those restraints that apply in the courtroom. Congress's *plenary* power over the military and agreements with foreign governments did not permit Congress to "set[] up a rival system of … courts to compete with civilian courts for jurisdiction over civilians who might have some contact or relationship with the armed forces." *Id.* at 30. Given that "[t]he United States is entirely a creature of the Constitution," Congress could not "strip[] away" the "shield which the Bill of Rights and other parts of the Constitution provide … just because [the citizen] happens to be in another land." *Id.* at 5–6.

In the same way, Congress has no power to create a separate legal system which strips away that shield, ignores the requirements of due process, disregards the minimum contacts requirement, overrides state law, vetoes application of the "best interests of the child" standard, and "place[s] vulnerable Indian children at a unique disadvantage in finding a permanent and loving home … solely because an ancestor—even a remote one— was an Indian." *Adoptive Couple*, 133 S. Ct. at 2564–65—not even as part of sovereign-to-sovereign dealings.

**B. Even if acting under its "sovereign-to-sovereign" powers, Congress cannot commandeer state authorities in violation of the Tenth Amendment.**

Gila River's arguments regarding Count 4, GM.6–7, 13–14, largely repeat arguments already answered both in the Plaintiffs' prior briefs, Doc. 80 at 29–31, and in the Ohio Attorney General's amicus brief, Doc. 191. In short, the challenged ICWA provisions and BIA Guidelines commandeer Arizona officers and compel them to implement rules that impose separate, unequal treatment on children deemed Indian.

Gila River's argument is essentially that the anti-commandeering principle of the Tenth Amendment is inapplicable when Congress acts on the basis of "sovereign-to-sovereign dealings," as through its treaty power. GM.6. This is incorrect. The Supreme Court has made clear that Congress cannot circumvent the Constitution. *Covert,* 354 U.S. at 16–17. Nor can Congress use its treaty powers to override a state's constitutionally protected authority. Thus in *Bond v. United States*, 134 S. Ct. 2077 (2014), the Court refused to construe the chemical weapons treaty in such a manner as to regulate domestic disputes. To do otherwise, warned Justice Thomas, "would destroy the basic constitutional distinction between domestic and foreign powers." *Id.* at 2103 (Thomas, J., concurring). Likewise, in *Medellin v. Texas,* 552 U.S. 491, 528–29 (2008), the Court found that even when acting pursuant to an international obligation, the President could not issue an order preempting state law.

The challenged provisions of ICWA and the Guidelines override state law regarding domestic relations, and "dragoon" state officials into implementing a nationwide child welfare regime, *Printz v. United States*, 521 U.S. 898, 927–28 (1997), despite the fact that child welfare is a subject reserved to state, not federal, authority. *See, e.g.*, *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004) ("[t]he whole subject of the domestic relations of … parent and child, belongs to the laws of the States and not to the laws of the United States." (citation and quotation marks omitted)). In fact, ICWA is *only* applied by state officials and in state courts—it does not apply to tribal courts. BIA Guidelines § A.3(e). ICWA—at least, with regard to the named Plaintiffs and the putative class—has nothing to do with foreign or "external affairs." It regulates the "domestic or

internal affairs" reserved to the states. *Cf. United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 315–16, 319 (1936).

This case does not involve children who are politically, culturally, or socially affiliated with a tribe or who live on a reservation. It involves children who are utterly indistinguishable from the black, white, Hispanic, or Asian kids who live in Phoenix, Tucson, or Mesa. They have no political, social, or cultural connection to a tribe. They may have never visited a reservation. They may not even know that they are eligible for tribal membership. Yet ICWA requires state officials to treat them differently solely on account of their genetic ancestry. ICWA requires DCS and state courts to delay their foster and adoption proceedings, to place them in accordance with race-based preferences, to engage in "active efforts," to transfer cases to tribal jurisdiction, to set aside the evidentiary standards that apply to these children's black, white, Hispanic, or Asian playmates, and take other steps to "administer[] federal law." *Printz,* 521 U.S. at 929.

Of course, whether ICWA violates the Constitution's limits on Congressional power to regulate internal affairs is a matter to be decided upon trial or summary judgment, not a motion to dismiss. It is enough here that Plaintiffs have put forth a plausible argument for relief—one that "raise[s] [their] right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)—and that the tribes' motions to dismiss should be denied.

**VII. CONCLUSION**

The Gila River and Navajo motions to dismiss do not show how Fed. R. Civ. P. 12(b)(1) and 12(b)(6) standards are met. The motions should be *denied*.

**RESPECTFULLY SUBMITTED** this 31st day of October, 2016 by:


/s/ Aditya Dynar
Christina Sandefur (027983)
Aditya Dynar (031583)
**Scharf-Norton Center for Constitutional Litigation
at the GOLDWATER INSTITUTE**

24

Michael W. Kirk (admitted *pro hac vice*)
Brian W. Barnes (admitted *pro hac vice*)
Harold S. Reeves (admitted *pro hac vice*)
**COOPER & KIRK, PLLC**

*Attorneys for Plaintiffs*

### CERTIFICATE OF SERVICE

Document Electronically Filed and Served by ECF this 31st day of October, 2016.

MARK BRNOVICH
ATTORNEY GENERAL
John S. Johnson
Dawn R. Williams
Gary N. Lento
Melanie G. McBride
Joshua R. Zimmerman
Wendy Jacobsen Harrison
1275 West Washington Street
Phoenix, Arizona 85007
John.Johnson@azag.gov
Dawn.Williams@azag.gov
Gary.Lento@azag.gov
Melanie.McBride@azag.gov
Joshua.Zimmerman@azag.gov
Wendy.Harrison@azag.gov
*Attorneys for Defendant Gregory McKay*

Steven M. Miskinis
JoAnn Kintz
Christine Ennis
Ragu-Jara Gregg
U.S. Department of Justice
ENRD/ Indian Resources Section
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044-7611
Steven.miskinis@usdoj.gov
JoAnn.Kintz@usdoj.gov
Christine.Ennis@usdoj.gov
ragu-jara.gregg@usdoj.gov
*Attorneys for Federal Defendants*

Ethel Branch, Attorney General
THE NAVAJO NATION
Katherine Belzowski
NAVAJO NATION DEPT. OF JUSTICE
P.O. Box 2010
Window Rock, Navajo Nation (AZ) 86515
*Attorneys for Intervenor Navajo Nation*

Linus Everling
Thomas L. Murphy
GILA RIVER INDIAN COMMUNITY
525 W. Gu u Ki
P.O. Box 97
Sacaton, AZ 85147
Linus.everling@gric.nsn.us
Thomas.murphy@gric.nsn.us
*Attorneys for Intervenor Gila River Indian Community*

Donald R. Pongrace
Merrill C. Godfrey
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Ave., NW
Washington, DC 20036-1564
dpongrace@akingump.com
mgodfrey@akingump.com
*Counsel for Intervenor Gila River Indian Community*

Courtesy Copy Mailed this 31st day of October, 2016 to:

Honorable Neil V. Wake
United States District Court
Sandra Day O'Connor U.S. Courthouse, Ste. 524
401 W. Washington St., SPC 52
Phoenix, AZ 85003-2154


/s/ Kris Schlott
Kris Schlott